# US COURT OF APPEAL FEDERAL CIRCUIT

## APPEAL DOCKET NO.: 2024-1756

## APPELLANT: MOHAMMAD A. MAZED

## OPENING APPEAL BRIEF

RECEIVED
2024 JUL 15 AM 8:50
US COURT OF APPEALS
FEDERAL CIRCUIT

# TABLE OF CONTENT


| SECTION | PAGE |
|---|---|
| **I.** ISSUE TO BE REVIEWED IN THIS APPEAL | **4** |
| **II.** APPLEANT'S TECHNICAL ARGUMENTS | **4** |
| **III.** APPLEANT'S LEGAL ARGUMENTS | **21** |
| **IV.** DEPENDENT CLAIM 87 | **31** |
| **V.** CONCLUSION | **32** |
| CERTIFICATE OF WORD COUNT | **33** |
| **EXHIBIT 1**: FILED REPLY BRIEF @ PTAB {**Appx 389 – 517**} | **34** |
| **EXHIBIT 2**: FILED OPENING BRIEF @ PTAB {**Appx 279-362**} | **158** |
| **EXHIBIT 3**: FILED TEXT SPECIFICATION {**Appx 443 – 517**} | **238** |

**Citied Cases**

Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1376 (Fed. Cir. 2004) ..........................................................27

DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326–27 (Fed.Cir.2009) ..........................................................25

DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006) ..........................................................25

Eisai Co. v. Dr. Reddy's Labs, Ltd, 533 F.3d1353 (Fed. Cir. 2008)..........................................................21, 26

W. L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir. 1983).
.......................................................... 23

In re Bergel, 292 F.2d 955, 956-57 (C.C.P.A. 1961) ..........................23

In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988) ............27, 31

In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) ..................15, 28, 30

In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) ..........................................................21

## I. ISSUE TO BE REVIEWED IN THIS APPEAL

Review of PTAB's errors in obviousness rejection under 35 U.S.C. § 103, in view of (i) factual discrepancy/dispute and (ii) a reasoned legal explanation, showing why Appellant's claimed invention would have been obvious to a PHOSITA at that time of the claimed invention.

## II. APPLEANT'S TECHNICAL ARGUMENTS

### [A] Issue On Claim Terms Including Scaffold & Naturally Expressed Biomolecules

Claim terms such as (i) Engineered, (ii) Biocompatible and (iii) Bioactive were generally known to a PHOSITA at the time of the claimed invention. Thus, Appellant was not required in defining such terms in the specification. However, it should be noted that USPTO **selectively and conveniently** construed only one term – "Engineered", but not other claim terms.

As to **intrinsic meaning of Scaffold,** following specification text paragraphs 189-194 {Bates Number: Appx 482-483} outlines such meaning.

"**[000189]** An implanted biodegradable and biocompatible (artificial) lymph node can be fabricated/constructed (e.g., a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure or a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer or a scaffold of silk fibroin) or a metallic glass material and then antibiotics can be added by soaking the scaffold in an antibiotic solution. Furthermore, the metallic glass material can be

fabricated/constructed to have nanoscaled porosity and/or nanoscaled surface pattern for cell adhesion and/or inflammation.

**[000190]** The implanted biodegradable and biocompatible (artificial) lymph node can be integrated with a mechanically actuating membrane (which changes its shape in microscale level) to reduce unwanted cell growth near the implanted biodegradable and biocompatible (artificial) lymph node.

**[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution.

**[000192]** The above scaffold can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000193]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000194]** The above scaffold can contain one or more molecules (e.g., recruiting molecules and/or co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells to recruit, attract and activate nearby immature dendritic cells at the site of the implanted biodegradable and biocompatible (artificial) lymph node."

**Naturally Expressed Biomolecules** would require either presence or absence of various biological factors (**for example, as shown in Figure 1, Bates No. Appx 189 that "CD40 is upregulated on activated DCs,"**) and such biological factors can vary from one person to another person and even in a course of time. But, to construct a consistent engineered dendritic cell in a lab, it is not possible to rely on occasionally expressed naturally biomolecules. Thus, to construct an engineered dendritic cell in a lab, synthetic molecules are to be added consistently in the claimed invention.

For example, according to Bates No. Appx 189, CD40 is upregulated on activated DCs. Thus, there is no presence of CD40 without any upregulation.



| |
|---|
| Fig. 1. Schematic showing CD40 and CD40L/CD154 expression on DCs and lymphocytes. (Left). Model of CD40-CD40L/CD154 interactions between T cells and DCs. **CD40 is upregulated on activated DCs,** and CD154 is expressed on activated T cells. Engagement of CD40 on DCs induces positive signaling that leads to expression of CDS0/86 and the production of lL-12 that skews towards Thl differentiation in CD4+ Tcells. ln addition to IL-12, CD154 signaling in Tcells induces IFN--y production. (Right) Model of CD40-CD40L/CD154 crosstalk interactions between T cells, B cells and DCs. CD40 and CD154 are both reciprocally expressed on activated DCs and lymphocytes, and may engage in multi-directional crosstalk between cell types. CD40 signaling on DCs induces secretion of IL-12 which promotes Th 1 differentiation, IL-10 which induces Icegs, or other cytokines that induce Th 17 differentiation. CD40 signaling in DCs also induces BAFF and APRIL production, which along with effector T cell-derived IL-2 and IL-4 ! 128],induce B cell class switching and secretion of lgG and lgA antibodies. |

**[B] Factual Discrepancy/Dispute of Prior Art With Respect to Claim Elements of Independent Claim 85**

**{Bates Number: Appx 204-205}**

**Independent Claim 85**

An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,[;]

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami,

> wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**<u>Preamble</u>**: An engineered dendritic cell comprising:

**Prior Art**: Prior art, in combination does not teach an engineered dendritic cell with all added synthetic biocomponents.

**Appellant's Technical Argument**: Engineered dendritic cell requires consistent addition of synthetic molecules, but cannot rely on occasional naturally expressed biomolecules based on either presence or absence of various biological factors and such biological factors can vary from one person to another person and even in a course of time. Thus, prior art in combination does not teach an engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents, as in claimed invention).

**Preamble is limited to an engineered dendritic cell.**

**Claim Element 1:**

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**Prior Art**: Prior art allegedly discloses CD40/CD40L is a programming molecule per Ma.

**Appellant's Technical Argument**: This is a disputed fact, based on the following two (2) publications CD40 and CD40L are not programming molecules.

**{Bates Number: Appx 417}**

Publication 1: Bullock, T.N.J. CD40 stimulation as a molecular adjuvant for cancer vaccines and other immunotherapies. Cell Mol Immunol 19, 14–22 (2022). https://doi.org/10.1038/s41423-021-00734-4

Publication 2 Targeting CD40L: a Promising Therapeutic Approach "CD40L is a member of the tumor necrosis factor (TNF) family of cell surface interaction molecules. https://journals.asm.org/doi/10.1128/CDLI.11.4.635-641.2004

**Claim element 1 has disputed fact, because CD40 and CD40L are not programming molecules in an engineered dendritic cell.**

**Claim Element 2:**

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**Prior Art:** Prior art discloses MHC molecule.

**Appellant's Technical Argument:** MHC molecule is naturally expressed. Engineered dendritic cell requires consistent addition of synthetic molecules, but cannot rely on occasional naturally expressed biomolecules based on either presence or absence of various biological factors and such biological factors can vary from one person to another person and even time to time. Thus, prior art in combination does not teach an engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents, as in claimed invention).

**Claim element 2 has disputed fact, because there is distinction between occasional naturally expressed biomolecules (based on either presence or absence of various biological factors) and synthetically added biomolecules in an engineered dendritic cell.**

**Claim Element 3:**

**(c)** an identifying protein on a cancer cell;

**Prior Art**: Prior art discloses Tumor Antigen Peptide bound directly onto RNA origami nanostructure (Chang 2020).

**Appellant's Technical Argument:** An identifying protein (which can be generally found on a cancer cell) is to be synthetically added with an engineered dendritic cell, but not directly bound on a RNA origami nanostructure, as taught by (Chang 2020).

Chang (2020) favors benefits due to directly binding of a protein onto a RNA origami nanostructure for immuno-therapy. USPTO does not explain **when RNA nanostructure robot itself is immunosimulatory, then why a PHOSITA would be motivated to make an identifying protein (which can be generally found on a cancer cell) to be synthetically added with an engineered dendritic cell.** Thus, Chang (2020) as a whole discourages a PHOSITA to make an identifying protein (which can be generally found on a cancer cell) to be synthetically added with an engineered dendritic cell.

**Prior art teaches away unlikely, reasonably, from being combined to produce claim element 3 in an engineered dendritic cell, as prior art is sacrificing the benefits provided in incorporating a tumor antigen peptide directly binding onto a RNA origami nanostructure** for immuno-therapy and this is a clear discouragement from binding an identifying protein (which can be generally found on a cancer cell) onto engineered dendritic cell, as in the claimed invention.

**<u>Claim Element 4</u>:**

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami,

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

**Prior Art**: Prior art discloses a RNA nanostructure origami, not a Scaffold.

**Appellant's Technical Argument**: **As to intrinsic meaning of scaffold, following specification text paragraphs 189-194** gives the contour of such meaning.

**{Bates Number: Appx 483}**

Paragraph of 191 of the specification outlines what a scaffold is.

"[000191] Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution."

Claim element 4 requires a scaffold of a biocompatible polymer. Furthermore, the meaning of biocompatible polymer would be known to a PHOSITA as generally as (i) **polylactic-co-glycolic acid** or (ii) **polyLactic Acid**, at the time of the claimed invention. A PHOSITA will not consider DNA/RNA as a biocompatible polymer for a scaffold (specification text paragraph 191 "whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution",) as it

has not been used in medical device and/or drug delivery industry, at the time of the invention. For example, a 2019 review paper on biocompatible polymer and its abstract is included in its **entirety** below:

**https://pubmed.ncbi.nlm.nih.gov/31604409/Biocompatible Polymers and their Potential Biomedical Applications: A Review: Arif et. al**

**Current Pharmaceutical Design, Volume 25, Issue 34, 2019**

**DOI: 10.2174/1381612825999191011105148**

> **"Abstract**
>
> **Background:** Biocompatible polymers are gaining great interest in the field of biomedical applications. The term biocompatibility refers to the suitability of a polymer to body and body fluids exposure. Biocompatible polymers are both synthetic (man-made) and natural and aid in the close vicinity of a living system or work in intimacy with living cells. These are used to gauge, treat, boost, or substitute any tissue, organ or function of the body. A biocompatible polymer improves body functions without altering its normal functioning and triggering allergies or other side effects. It encompasses advances in tissue culture, tissue scaffolds, implantation, artificial grafts, wound fabrication, controlled drug delivery, bone filler material, etc.
>
> **Objectives:** This review provides an insight into the remarkable contribution made by some well-known biopolymers such as polylactic-co-glycolic acid, poly(ε-caprolactone) (PCL), polyLactic Acid, poly(3-hydroxybutyrate-co-3-hydroxyvalerate) (PHBV), Chitosan and Cellulose in the therapeutic measure for many biomedical applications.
>
> **Methods:** Various techniques and methods have made biopolymers more significant in the biomedical fields such as augmentation (replaced petroleum based

> polymers), film processing, injection modeling, blow molding techniques, controlled / implantable drug delivery devices, biological grafting, nano technology, tissue engineering etc.
>
> **Results:** The fore mentioned techniques and other advanced techniques have resulted in improved biocompatibility, nontoxicity, renewability, mild processing conditions, health condition, reduced immunological reactions and minimized side effects that would occur if synthetic polymers are used in a host cell.
>
> **Conclusion:** Biopolymers have brought effective and attainable targets in pharmaceutics and therapeutics. There are huge numbers of biopolymers reported in the literature that has been used effectively and extensively.
>
> **Keywords:** Biopolymers; biocompatibility; drug delivery; nano technology; scaffolds; tissue engineering."

**Additionally, such a scaffold (made) of a biocompatible polymer and then the scaffold at least includes an origami of DNA/RNA/XNA.**

USPTO equated a scaffold of a biocompatible polymer is a DNA/RNA origami nanostructure. To contrast this with the intrinsic meaning of the specification text paragraph 191, a PHOSITA would differ from USPTO

> **[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution.

Following the intrinsic meaning of a scaffold in the specification text paragraphs 189-194 and knowledge of a PHOSITA at the time of the claimed invention, PTAB errored in equating a scaffold made of a biocompatible polymer (that at least includes an origami of

DNA/RNA/XNA) as just a nanostructure origami of DNA/RNA itself – thus improperly supplying two (2) distinct claim limitations with a single prior art.

**Claim element 4 (in particular a Scaffold) in an engineered dendritic cell is a missing element.**

Furthermore, USPTO selectively and conveniently construed only one term – "Engineered", but not other claim terms such as "Biocompatible" and "Bioactive". USPTO engaged in hindsight biased reconstruction to engineer obviousness rejection under 35 U.S.C. § 103 with disregard of facts and law.

> "Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

**Claim Element 5:**

(e) wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**Prior Art**: Prior art supposedly discloses dendritic cell is #16 and is externally interacting with another cell #17 through a RNA origami scaffold #1.

**Appellant's Technical Argument**:

**{Bates Number: Appx 299-300}**

"Chang (2020) Portion of Fig. 20"

**[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.




For example, items #16 and #17 were never identified in Chang (2020)'s Figure 20 in the entire specification, but USPTO fills it anyway by guessing.

Additionally, in view of Chang (2020)'s Figure 15 {Bates Number: Appx 411},



FIG. 15

Chang (2020) favors directly externally coupling a RNA origami nanostructure with a cell for immuno-therapy.

Thus, prior art **discourages any internal coupling** of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an engineered dendritic cell (which

is a lab-made dendritic cell with all added synthetic biocomponents, as in the claimed invention),

**Prior art teaches away from being combined, unlikely, reasonably, to produce the claim element 5 in an engineered dendritic cell.**

**[B] Summary Of Technical Arguments**

In summary, prior art, in combination does not teach Appellant's claimed invention in view of at least the following:

**(i)** USPTO is equating (with hindsight bias) naturally occasionally expressed naturally biomolecules with synthetically added consistent biomolecules in construction of an engineered dendritic cell. USPTO's argument is essentially that an engineered robotic hand invention is obvious under 35 U.S.C. § 103, when a naturally expressed biological hand already exists;

**(ii)** In view of issue of occasional naturally expressed biomolecules based on either presence or absence of various biological factors versus synthetically added biomolecules, Thaiss et al., prior art is moot;

**(iii)** Factual dispute as to claim element 1, ((a) a first bioactive molecule; wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule), whether CD40/CD40L is a programming molecule- a disputed fact;

**(iv)** Teaching away as to claim element 3 ((c) an identifying protein on a cancer cell;), as Chang (2020) and as a whole, discourages an identifying protein (which can be generally found on a cancer cell) to be synthetically added with an engineered dendritic cell, as Chang (2020) favors for directly binding such a protein onto a RNA origami nanostructure;

**(v)** Missing element in claim element 4 ((d) a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell). Following the intrinsic

meaning of a scaffold, PTAB errored in equating a scaffold of a biocompatible polymer (that at least includes a nanostructure origami) as just a nanostructure origami, when a PHOSTIA would not count DNA/RNA as a biocompatible polymer at the time of the claimed invention;

**(vi)** Using one single prior art for two (2) distinct claim limitations - Scaffold and Origami nanostructure; and

**(vii)** Teaching away as to claim element 5 ((e) wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.), even in view of Chang (2020)'s Figure 15, prior art discourages internal coupling of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents in the claimed invention), as Chang (2020) favors for directly externally coupling a RNA origami nanostructure with a cell for immuno-therapy.

## II. APPLEANT'S LEGAL ARGUMENTS

### [A] All Words Must Be Considered – Including Even "Minor Differences"

When determining eligibility, PTAB must consider the claims as a whole without discounting or disregarding any claim element and without regard to its novelty or conventionality. The entire claim should be considered properly to ensure that even "Minor differences" in claim terms accurately reflect the desired breadth and scope over alleged prior art. "All words in a claim must be considered in judging the patentability of that claim against the prior art." In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) requires the "consideration" of every claim feature in an obviousness determination. Unlike engineering, biology is an unpredictable technological field. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable". To render claim unpatentable, PTAB must do more than merely "consider" each and every feature for Claim. See In re Royka, 490 F.2d 981, 180 USPQ 580 (CCPA 1974) (emphasis added) (to establish Prima Facie case of obviousness of Appellant's claimed invention, all claim features must be taught or suggested by alleged prior art). A proper obviousness determination requires that Examiner make "a searching comparison of the claimed invention – including all its limitations with the teaching of the prior art." See In re Wada and Murphy, Appeal 2007-3733, citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since Supreme Court has

long held that obviousness is a question of law based on underlying factual inquiries, including … ascertaining the differences between Appellant's claimed invention and the alleged prior art. See Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added). For example, the fact that a certain result or characteristic may occur or be present in alleged prior art is NOT sufficient to establish the inherency of that result or characteristic. In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993).

**PTAB decision on page 8-9.** "FF 6. Examiner found that Chang 2011 does not disclose cell are APC or dendritic cells that "comprises (a) a first bioactive molecule such as a co-stimulatory molecule, (b) a second bioactive molecule that activate[s] T cells, and (c) a synthetic protein found on a cancer cell" (Ans. 12; see also Final Act 4), yet PTAB Decision on page 13, Examiner, therefore, found that "DC would have been an obvious choice among a limited genus of APC to engineer" (Ans. 13, See FF 11-12, 14)". PTAB never explained why DC would have been an obvious choice and this is conclusory. The real trouble with **"if A / Y then B / Z" is when it comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A / Y then B / Z" this is conclusory.**

The state of the art at the time of the invention may have pointed researchers in a different direction including just activating T-Cell or a nanostructure than the direction followed by Appellant. A contrary to the accepted wisdom (of just activating T-Cell or a nanostructure) in the art represents strong evidence of unobviousness. In re Hedges, 783

F.2d 1038, 1041 (Fed. Cir. 1986); W. L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir. 1983).

**[B] A PHOSITA's Motivation To Combine Prior Art**

**PTAB Decision on page 10. "FF 9.** Chang 2020 disclosed "a RNA nanostructure robot, wherein RNA nanostructure is immuno-simulatory" (Chang 2020 ¶ 38). USPTO does not explain when RNA nanostructure robot **itself is immunosimulatory**, then why a PHOSITA would be motivated to make the combination of prior art (even including without limitation of the context of the prior art) to arrive at Appellant's claims' actual limitations of an engineered dendritic cells. In re Fulton, 391 F.3d 1195, 1201 (Fed. Cir. 2004). In re Gurley, 27 F.3d 551 (Fed. Cir. 1994). Additionally even in view of Chang (2020)'s Figure 15, and as a whole, prior art discourages internal coupling of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an engineered dendritic cell. Furthermore, the combination of prior art is not obvious, when there is a missing element in the combination and the combination discourages and teaches away from Appellant's claimed invention. Furthermore, the combination of prior art is not obvious "unless the art also contains something to suggest the desirability of the proposed combination" to construct an engineered dendritic cell (which is a lab-made dendritic cell with all claim elements in the claimed invention). In re Bergel, 292 F.2d 955, 956-57 (C.C.P.A. 1961).

**[C] A PHOSITA's Reasonable Expectation of Success, In Absence of Motivation To Combine Prior Art, In View Of Missing Element & Teaching Away By Prior Art**

Reasonable expectation of success is a distinct and a separate requirement from the motivation to combine. As there is no motivation to combine in view of teaching away and missing elements, then there is no reasonable expectation of success.

Prior art discloses Tumor Antigen Peptide bound onto RNA origami nanostructure **directly** (Chang 2020).

Furthermore, "Chang (2020) Portion of Fig. 20"




For example, items #16 and #17 were never identified in Chang (2020)'s Figure 20 and in its entire specification, but USPTO fills it anyway by guessing.

Additionally, in view of Chang (2020)'s Figure 15, prior art does not teach internal coupling of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an engineered dendritic cell (which is a lab-made dendritic cell with all claim elements in the claimed invention). Developments flowing from prior art are unlikely, reasonably to produce Appellant's engineered dendritic cell (which is a lab-made dendritic cell with all

added synthetic biocomponents in the claimed invention), further in view of factual discrepancy/dispute what are #16 and #17. Thus, prior art teaches away from being combined, unlikely, reasonably, to produce the claimed invention of an engineered dendritic cell. DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326–27 (Fed.Cir.2009). Furthermore, in Mintz *v.* Dietz & Watson, Inc., 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("The mere recitation of the words **`common sense'** without any support adds nothing to the obviousness equation."); Arendi S.A.R.L. *v.* Apple Inc., 832 F.3d 1355, 1362 (Fed. Cir. 2016) ("[R]eferences to `common sense'—whether to supply a motivation to combine or a missing limitation—cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references specified."). Common sense is typically invoked to provide a known motivation to combine references. DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).

**[D] Obvious To Try**

"Obvious to Try" test has three (3) prongs:

(1) A recognized problem,

(2) A finite number of identified and predictable solutions and

(3) A reasonable expectation of success.

Furthermore, contrary to USPTO's belief, unlike engineering, biology is an unpredictable technological field; result based on one cell does not produce the similar result on another cell. Thus, there was no finite number of identified and predictable solutions at the time of

claimed invention in an unpredictable art. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable".

**[E] One Prior Art For Two (2) Distinct Claim Limitations**

Use of one prior art of against two (2) distinct limitations: scaffold and origami. Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994).

**[F] Impermissible Hindsight Bias/Reconstruction**

Claim element in Appellant's claimed invention clearly defines "X" and prior art describes a distinct concept of "Y" and there is a high degree of separation between claim element "X" and prior art's distinct concept of "Y". But USPTO misreads claim element "X" into alleged prior art's distinct concept of "Y", using Hindsight Bias and engaged in impermissible Hindsight reconstruction just to design rejection under 35 U.S.C. § 103.

**PAGE 5 OF EXAMINER'S ANSWER**

**"Chang (2020) Fig. 15"**




**"Chang (2020) Portion Of Fig. 20"**



> **[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

For example, items #16 and #17 were never identified in Chang (2020)'s Figure 20 in its entire specification, but USPTO fills it anyway by guessing.

> "the dendritic cell is #16 and is interacting with a tumor cell #17 through a RNA origami scaffold #1 coupled to a peptide antigen based on Figure 15 (see below) of Chang (2020) which explicitly labels each as such."

Furthermore, Thaiss prior art (Thaiss et al., Chemokines: a new dendritic cell signal for T cell activation, Frontiers in Immunology) is moot, in view of added synthetic biocomponents with an engineered dendritic cell.

Graham v. John Deere Co., 383 U.S. 1, 36 (1966) ("[Objective inquiries] may also serve to guard against slipping into use of hindsight, and to resist the temptation to read into the prior art the teachings of the invention in issue.") (internal quotations and citations omitted); In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention."); Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1376 (Fed. Cir. 2004) ("[T]he suggestion to combine references must not be derived by hindsight from knowledge of the invention itself.").

USPTO used impermissible Hindsight Bias to bridge the gap of the missing elements (as described before).

> "Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

See Otsuka Pharmaceutical Co. Ltd v. Sandoz Inc., 678F. 3d 1280 (Fed. Cir. 2012), cert denied, 133 S. Ct. 940 (Jan. 14. 2013) In re Brimonide Patent Litigation, 643 F.3d (Fed. Cir. 2011), cert denied (March 26, 2012).

**[G] Summary Of Legal Arguments**

In summary, prior art, in combination does not teach Appellant's claimed invention in view of at least the following:

**(i)** USPTO is equating (with hindsight bias) naturally occasionally expressed naturally biomolecules with synthetically added consistent biomolecules in construction of an engineered dendritic cell. USPTO's argument is essentially that an engineered robotic hand invention is obvious under 35 U.S.C. § 103, when a naturally expressed biological hand already exists;

**(ii)** There is no motivation to combine prior art, due to disputed fact, missing element and teaching away;

**(iii)** Reasonable expectation of success is a distinct requirement. There is no reasonable expectation of success, as there is no motivation to combine; and

**(iv)** For example, items #16 and #17 were never identified in Chang (2020)'s Figure 20 in its entire specification, but USPTO fills it anyway by guessing.




Furthermore, USPTO selectively and conveniently construed only one term – "Engineered", but not other claim terms such as "Biocompatible" and "Bioactive".

Furthermore, USPTO disregarded intrinsic meaning of Scaffold. Specification text paragraphs 189-194 {Bates Number: Appx 482-483} outlines such meaning of a Scaffold.

USPTO engaged in **wholesale** hindsight biased reconstruction to engineer obviousness rejection under 35 U.S.C. § 103 with disregard of facts and law.

> "Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

**Prima Facie Case of Obviousness**

A Prima Facie case of obviousness is established, when three (3) strict basic criteria have been met.

- First, there must be some Suggestion or Motivation, either in alleged prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify alleged prior art being relied upon to reject Appellant's claimed invention.
- Second, there must be an "Anticipated Success" or "Expectation of Success".
- Third, alleged prior art must Teach or Suggest All Requirements of Appellant's claimed invention.

USPTO failed to prove Appellant's claimed invention is **Prima Facie obvious.**

## IV. DEPENDENT CLAIM 87

Furthermore, when independent claim 85 is not Prima Facie obvious under 35 U.S.C § 103, then its dependent claim 87 is also not Prima Facie obvious under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

## V. CONCLUSION

PTAB's errors in obviousness rejection under 35 U.S.C. § 103 should be reversed in view of at least the following facts and law:

**(i)** USPTO is equating (with hindsight bias) naturally occasionally expressed naturally biomolecules with synthetically added consistent biomolecules in construction of an engineered dendritic cell. **USPTO's argument is essentially that an engineered robotic hand invention is obvious under 35 U.S.C. § 103, when a naturally expressed biological hand already exists**;

**(ii)** There is no motivation to combine prior art due to the disputed fact, missing element and teaching away;

**(iii)** Reasonable expectation of success is a distinct requirement. There is no reasonable expectation of success, as there is no motivation to combine; and

**(iv)** USPTO used **wholesale** hindsight biased reconstruction just to engineer/fit an obviousness rejection under 35 U.S.C. § 103 with disregard of facts and law. Hindsight reconstructions of obviousness are impermissible.

Respectfully Submitted,

Dated: July 4, 2024

/Mohammad A. Mazed/

**Mohammad A. Mazed**

## CERTIFICATE OF WORD COUNT

Appellant's Opening Brief was produced using the 14-font size in the Times New Roman style.

It has approximately **5010** words, **excluding** embedded images and exhibits. For the Word Count, Appellant relied on the Word Count Function of the Tool Menu of the Microsoft Word ("MS Word") program.

Respectfully Submitted,

Dated: July 4, 2024

/Mohammad A. Mazed/

**Mohammad A. Mazed**

# Exhibit 1

## {Bates No. Appx 389 – 517}

## Filed Reply Appeal Brief @ PTAB

**US PATENT & TRADEMARK OFFICE**

**BOARD OF PATENT APPEAL AND INTERFERENCES (BPAI)**

| | |
|---|---|
| **Inventor(s): Mazed** | |
| **Serial No.: 16/602,403** | **Examiner: Arthur Leonard** |
| **Filed: September 28, 2019** | **Group Art Unit: 1631** |
| **MOLECULAR SYSTEM FOR CANCER BIOLOGY** | |

Mail Stop: Appeal Brief (Patents)

Commissioner For Patents

USPTO P.O. Box 1450, Alexandria, VA 22313-1450

Fax (571) 273-8300

**PLEASE DO NOT BREAK ENTIRE BRIEF AND ITS EXHIBITS INTO PARTS FOR FEDERAL CIRCUIT & SUPREME COURT**

CC. IP Blogs, Reuters, NY Times

**Certificate of Mailing**

I hereby certify that this correspondence and any document referenced herein are being deposited with the USPTO via **USPS Express Mail EJ 314 209 640 & Attached Post Card**

Mo Mazed
(Printed Name of Person Sending Correspondence)

/Mo Mazed/
(Signature)

# TABLE OF CONTENT


| SECTION | PAGE |
|---|---|
| I. TECHNICAL ANALYSIS | 4 |
| II. LEGAL ANALYSIS | 44 |
| III. FLAWED ANALYSIS OF INHERENCY, COMMON SENSE & REASONABLE EXPECTATION OF SUCCESS | 49 |
| IV. CONCLUSION | 54 |
| EXHIBIT A [FILED TEXT SPECIFICATION] | 55 |

**Citied Key Cases**

Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016) ....................................................................44, 52

Atlas Powder Co. v. IRECO Inc., 190 F.3d 1342 (Fed. Cir. 1999) ...........50

Crocs, Inc. v. U.S. Int'l Trade Comm'n, 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010)......................................................47, 53, 54

Eisai Co. v. Dr. Reddy's Labs, Ltd, 533 F.3d1353 (Fed. Cir. 2008)..........................................................47, 53, 54

Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018) ..................................................46, 51, 54

In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993). ................47, 52, 54

In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970)...........................................................41, 44, 54

Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994)..................................................................35

Par Pharmaceutical Inc. v. TWI Pharmaceutical Inc., 773 F.3d 1186 (Fed. Cir. 2014) ...................................................50, 54

Univ. of Strathclyde v. Clear-Vu Lighting LLC, No. 2020-2243, 2021 U.S. App. LEXIS 32872, *1 (Fed. Cir. Nov. 4, 2021)..............................54

Pursuant to 37 C.F.R. 41.37 Appellant/Inventor, Mohammad A. Mazed files this **Reply Appeal Brief** with the required forwarding fee check of **$944** via **USPS Express Mail EJ314209640**, after Examiner's Answer on **October 4, 2023**.

## I. TECHNICAL ANALYSIS [AGAINST EXAMINER'S REJECTION UNDER 35 U.S.C § 103 OBVIOUSNESS]

Upon issued/granted 48 US patents to Applicant/inventor, Applicant/inventor is aware of limitations of patenting under § 101.

**Independent Claim 85** relates to an **ENGINEERED CONSTRUCTION OF A DENDRITIC CELL** – NOT what naturally found/occurring/expressed in a natural dendritic cell. Such engineered construction may be suitable to be implanted or delivered through a patch or injected. Thus, teaching of **Thaiss et al.** Frontier Immuno, 2011, 2:1-9 is **Moot,** as it teaches about naturally occurring molecules expressed in a dendritic cell.

**Paragraph 251 of Specification Text is instructive.**

> **[000251] When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.**

**Following Text Paragraphs of Specification are instructive in the Context of an Engineered Construction of a Dendritic Cell for Entered Independent claim 85 (See also Exhibit A)**

[Text Paragraphs] 235-254: Ex Vivo Engineered/Edited Dendritic Cells

[Text Paragraphs] 255-261: Ex Vivo Engineered/Edited Dendritic Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System

[Text Paragraphs] 262-291: Ex Vivo Engineered/Edited Dendritic Cells, Utilizing Modulating CRISPR-Cas9 System

**Ex Vivo Engineered/Edited Dendritic Cells**

**[000235]** Instead of an implanted biodegradable and biocompatible (artificial) lymph node, the activation of the dendritic cells by one or more molecules (e.g., co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells and/or sensing proteins to detect a particular type of cancer cells can be realized in ex vivo

**[000236]** The engineered dendritic cell (about 7 microns in diameter) can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000237]** The engineered dendritic cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility

Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000238]** The engineered dendritic cell can include or bind/couple (e.g., chemically bind/couple) with the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure for enhanced interaction with the T-cells and/or natural killer cells.

**[000239]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[000240]** To overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be attached with a red blood cell/white blood cell.

**[000241]** Alternatively, to overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be encapsulated in a lipid bilayer.

**[000242]** Furthermore, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based

nanostructure/XNA origami based nanostructure can include or couple (e.g., chemically couple) with RNAi based logic circuit for precise/enhanced interaction of the engineered dendritic cells with the T-cells and/or natural killer cells.

**[000243]** RNAi based logic circuit can be capable of deciphering (computation by RNAi-based logic circuit) the cellular transcriptome, which calculates levels of targeted biomarkers and determines whether cells are either healthy or cancerous by evaluating internal cell state through mRNA expression patterns specifically via an overexpression of Gata3, NPYIR and TFFI (as these are generally present in cancer cells).

**[000244]** The engineered dendritic cell can include one or more (e.g., a first/second/third/fourth) nanoshells.

**[000245]** At least a first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000246]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000247]** A third nanoshell can encapsulate a messenger RNA

(mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000248]** The first nanoshell or the second nanoshell or the third nanoshell can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000249]** The first nanoshell or the second nanoshell or the third nanoshell can be a carbon nanodot.

**[000250]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000251] When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.**

**[000252] When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.**

[000253] Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

[000254] Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural

lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**<u>Ex Vivo Engineered/Edited Dendritic Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System</u>**

**[000255] These dendritic cells can include the** CRISPR-Cas9 system or the light activated CRISPR-Cas9 system. Thus, these are engineered/edited dendritic cells.

**[000256]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for inactivation of immature dendritic cells and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for enhanced interaction of the dendritic cell with the T-cell and/or natural killer cell.

**[000257]** Autophagy is a process of maintaining cell homeostasis by removing cellular waste and damaged cellular

organelles. Autophagy of the dendritic cell can activate the T-cell's anticancer activity. Furthermore, autophagy related Atg5-deficient dendritic cell has significantly elevated receptor CD36 on its surface, which increased the phagocytosis of apoptotic cancer cell, but restricted the activation of the T-cell. Thus, controlling receptor CD36 on the surface of the dendritic cell by the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can activate the T-cell's anticancer activity.

**[000258]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000259]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000260]** The nanoshell can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000261]** The nanoshell (encapsulating/caging the CRISPR-

Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**Ex Vivo Engineered/Edited Dendritic Cells, Utilizing Modulating CRISPR-Cas9 System**

**[000262]** These dendritic cells can include the modulated CRISPR-Cas9 system. Thus, these are engineered/edited dendritic cells.

**[000263]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against a particular type of cancer cells.

**[000264]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000265]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000266]** The nanoshell can include one or more deoxyribonucleic acid/XNA sequences to encode one or more

therapeutic proteins.

**[000267]** Autophagy is a process of maintaining cell homeostasis by removing cellular waste and damaged cellular organelles. Autophagy of the dendritic cell can activate the T-cell's anticancer activity. Furthermore, autophagy related Atg5-deficient dendritic cell has significantly elevated receptor CD36 on its surface, which increased the phagocytosis of apoptotic cancer cell, but restricted the activation of the T-cell. Thus, controlling receptor CD36 on the surface of the dendritic cell by the modulating CRISPR-Cas9 system can activate the T-cell's anticancer activity.

**[000268]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells

**[000269]** When injected into human body, these engineered/edited dendritic cells may then travel to nearby natural lymph nodes, where these can train other types of immune cells (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000270]** The engineered dendritic cell can contain the nanoshell, wherein one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells are encapsulated within the nanoshell.

**[000271]** Furthermore, the engineered dendritic cell can contain the nanoshell, wherein one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells are encapsulated within the nanoshell.

**[000272]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000273]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000274]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural

lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000275]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000276]** Additionally, an engineered T-cells/natural killer cells can include or bind/couple (e.g., chemically bind/couple) with deoxyribonucleic acid origami nanostructure/ribonucleic acid origami nanostructure/XNA origami nanostructure for enhanced interaction with the engineered/edited dendritic cells.

**[000277]** Additionally, the engineered T-cells/natural killer cells can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000278]** In general, but not limited to, an engineered dendritic cell (ex vivo) includes:

(a) a first molecule,

wherein the first molecule is selected from the group consisting of the following: a co-stimulating molecule, a mobility enhancing molecule and a programming molecule,

(b) an identifying protein on the surface of a particular type of cancer cells,

or

a sensing protein to detect a particular type of cancer cells and

(c) a nanostructure,

wherein the nanostructure includes a deoxyribonucleic acid origami based nanostructure or a ribonucleic acid origami based nanostructure or a XNA origami based nanostructure for interaction with the T-cells and/or the natural killer cells against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases, wherein the nanostructure is encapsulated in a lipid bilayer, or the nanostructure is attached with a red blood cell, or a white blood cell.

**[000279]** The engineered dendritic cell in above, further includes a second molecule to initiate response of the T-cells and/or the natural killer cells.

**[000280]** The engineered dendritic cell in above, further includes an activating protein to detect a molecular event within a particular type of cancer cells.

**[000281]** The engineered dendritic cell in above, further exchanges or transfers the sensing protein to the T-cells and/or the natural killer cells.

**[000282]** The engineered dendritic cell in above, further includes or binds/couples (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000283]** The engineered dendritic cell in above, further includes or binds/couples (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000284]** The engineered dendritic cell in above, further includes a nanoshell, wherein the nanoshell encapsulates deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000285]** The engineered dendritic cell in above, further exchanges or transfers the nanoshell to the T-cells and/or the natural killer cells, wherein the nanoshell releases deoxyribonucleic acid sequence and/or XNA sequence to

encode a therapeutic protein against a particular type of cancer cells within the T-cells and/or the natural killer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000286]** The engineered dendritic cell in above, wherein the nanostructure further includes RNAi based logic circuit.

**[000287]** The engineered dendritic cell in above, wherein the nanostructure is functionalized by a pattern of ligands to induce or activate dendritic cell to initiate response of the T-cells and/or the natural killer cells.

**[000288]** The engineered dendritic cell in above, further includes a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system removes a first defective gene for inactivation of a dendritic cell, and adds/inserts/replaces a second gene, wherein the added/inserted/replaced second gene expresses, or releases a third molecule to increase interaction with the T-cells and/or the natural killer cells. The added/inserted/replaced second gene includes one or more synthetic or artificial genetic bases.

**[000289]** The Cas9 can be replaced by Cas9-HFI or Cas12a. CRISPR-Cas9 system can be replaced by a transposon-encoded CRISPR-Cas system.

**[000290]** The engineered dendritic cell in above, further couples with or includes one or more modified exosomes.

**[000291]** The engineered dendritic cell in above, is an engineered and modulated dendritic cell, wherein the engineered dendritic cell further includes a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system includes Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus, wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes beneficial gene against a particular type of cancer cells.

## ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87

An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami,

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**Dependent Claim 87**

The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell

***Note!** A **first** scaffold in the independent claim 85 **was** proper, when the dependent claim 93 had a second scaffold. Since the dependent claim 93 of a second scaffold was not examined, **the word first in independent claim 85** can be deleted in later amendment.

**PREAMBLE OF INDEPENDENT CLAIM 85:**

**An engineered dendritic cell comprising:**

**PAGE 5 OF EXAMINER'S ANSWER**

**"Chang [2020] Fig. 15"** **"Chang [2020] Portion Of Fig. 20"**







The Examiner has **interpreted** that the **dendritic cell is #16** and is interacting with a **tumor cell #17** through a RNA origami scaffold #1 coupled to a peptide antigen based on Figure 15 (see below) of Chang (2020) which explicitly labels each as such."

**APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 5 FROM PARAGRAPHS 83 & 347 OF CHANG [2020]**

**SHORT DESCRIPTION OF FIG. 20 OF CHANG [2020]**

[0083] FIG. 20. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

**DETAILED DESCRIPTION OF FIG. 20 OF CHANG [2020]**

**[0347]** As shown in FIG. **20**, in some embodiments the RNA nanostructure polymeric robot **1** comprises a first nano-robot ($NR_1$) **8**, a second nano-robot ($NR_2$) **9**, a linker (L) **3**, a moiety ($R_3$) **2** and n is 1 or more, and the moiety $R_3$ is in contact with $NR_1$. In some embodiments, the moiety $R_3$ is an antigen peptide. A second optionally heterogeneous series of moiety $R_4$ (**4**, **5**, **6**, **7**) comprise a nucleolin-binding or other cancer tumor marker aptamers **5** wherein m is 2 or more, an aptamer-target bound lock **6**, optionally a cargo molecule **7**, and optionally a checkpoint antagonist **4**. In some embodiments, the linker (L) **3** comprises of a double-stranded oligonucleotide helix. In some embodiments, the antigen peptides are tumor antigen peptides. In some embodiments, the tumor antigen peptides are TTP. In some embodiments, the cargo molecule **7** is a therapeutic agent. In some embodiments, the cargo molecule **7** is an antibody. The antibody can be an anti-PD-1 antibody. The antibody can further comprise a linkage to a polylysine chain. In some embodiments, the checkpoint antagonist is an anti-PD-1 aptamer. In some embodiments, the checkpoint antagonist is an anti-PD-1 antibody. In some embodiments, the first nano-robot ($NR_1$) **8** is an immune-adjuvant RNA robot exhibiting immune-stimulatory properties. In some embodiments, the aptamer-target bound lock **6** is an INF-γ aptamer

bound to INF-γ. In some embodiments, the second nano-robot ($NR_2$) **9** is configured to be in a cylindrical conformation which is operably openable via the aptamer-target bound lock **6**. The RNA nanostructure polymeric robot **1** induces activation of T cells **11** at antigen-presenting cells **9** by contacting the first nano-robot ($NR_1$) **8** comprising a moiety $R_3$ wherein the moiety is an antigen peptide **2**, with a T cell **11**. In some embodiments, the second nano-robot ($NR_2$) **9** interacts with the tumor environment **13**. In some embodiments, the aptamer-target bound lock **6** is opened when the target is a compound, biomarkers, or protein present in high regional concentration in the tumor environment **13**. The aptamer-target bound lock **6** competitively binds with the free target in the tumor environment **13**, resulting in the unlocking of the second nano-robot ($NR_2$) **9**. The opening of the second nano-robot ($NR_2$) **9** exposes the optional cargo molecule **7**, and the optional checkpoint antagonist **4**, to the tumor environment. When the cargo molecule **7** is a therapeutic agent and/or the checkpoint antagonist **4** is present, the therapeutic agent and/or checkpoint antagonist effect tumor necrosis in the tumor environment **13**.

**[0348]** As shown in FIG. **21**, in certain embodiments the scaffold is an unfolded rectangular RNA origami structure **20** having fasteners **50** extending from the edges that is joined, aptamer-containing targeting strands and a therapeutic agent-RNA conjugate capture strand. In certain embodiments, the RNA origami structure **20** also has aptamer-containing targeting strands **30** attached thereto.

[0349] As shown in FIG. **22** in certain embodiments the aptamer-containing targeting strand **30** containing an aptamer portion **31** and an attaching RNA strand portion **32**.

[0350] As shown in FIG. **23** in certain embodiments the fastener **50** has two arms **51** and **52**, and having a quencher moiety **54** attached to one arm **52** of the Y-structure and a fluorophore moiety **55** attached to the second arm **51** of the Y-structure by means of a linker **53**.

[0351] As shown in FIG. **24** in certain embodiments the therapeutic agent-RNA conjugate capture strand **15** has a ssRNA attachment strand **10** and a therapeutic agent payload **11**. As shown in FIG. **25** in certain embodiments the therapeutic agent payload **11** is operably linked to an imaging agent **12**. As shown in FIG. **26** in certain embodiments the ssRNA attachment strand **10** is linked to a therapeutic agent payload **11** by means of a linker **14**. As shown in FIG. **27** in certain embodiments therapeutic agent-RNA conjugate capture strand having a ssRNA attachment strand that is linked to a therapeutic agent payload by means of a linker, where the therapeutic agent payload is operably linked to an imaging agent **12**.

[0352] As shown in FIGS. **28-31**, in certain embodiments the unfolded rectangular RNA origami structure has one to four therapeutic agent-RNA conjugates operably linked to the origami structure. The therapeutic agent-RNA conjugates can be attached to either the "top" or the "bottom" (or both) of the origami structure, such that when the origami structure is rolled into a tube, the therapeutic agent-RNA conjugates can be designed to be either on the inside or outside of the tube.

[0353] FIG. **32** depicts an exploded view of the RNA origami structure **20**, detailing the hybridization of a single stranded RNA scaffold strand **60** and staple strands **70**, and the interaction of the two staple strands.

**FIG. 15 illustrates a natural Dendritic Cell, NOT an Engineered Dendritic Cell and NOT interacting with a Tumor Cell; rather a natural Dendritic Cell is interacting with a NK cell or a T-Cell. A NK cell or a T-cell is NOT a Tumor cell.**

**Furthermore, who is he (Examiner) to erroneously define/interpret about 16 and 17, when neither short description (in paragraph 83) nor detailed description (in paragraph 347) regarding FIG. 20 describes ANYTHING about 16 and 17?**

**FIG. 20** is about a nano double-robot and it is NOT what **Examiner** (willful) fraudulently interpreted a material fact with intent to deceive a Pro Se Applicant as **Applicant's claimed invention of an Engineered (as opposed to naturally occurring) Dendritic Cell.**

Too long, the Axis of Evil-Popa, Leonard and Babic has been discriminating the cancer biology patenting landscape with very low allowance rate with their relentless willful misrepresentation (fraud) and unlawful tactics of a material fact under Title 18, U.S.C., §§ 241 & 242 against certain applicants.

See https://www.fbi.gov/investigate/civil-rights/federal-civil-rights-statutes and https://www.justice.gov/crt/deprivation-rights-under-color-law).

**<u>CLAIM ELEMENT 1 OF INDEPENDENT CLAIM 85:</u>**

An engineered dendritic cell comprising: **(a) a first bioactive molecule**;

> wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and **a programming molecule,**

**<u>PAGE 5 OF EXAMINER'S ANSWER</u>**

**"Ma [2009] Page 269, 2nd Para**

> While the role of CD40 signaling and expression on DCs has not been directly connected to the induction or maintenance of $T_{regs}$, the levels of CD40 expression on DCs may influence CD40–CD154 interactions between DCs and T cells and thus lymphocyte programming by DCs. In this regard, it is relevant to consider how CD40 and/or CD154 signaling of DCs affects regulation of B and T lymphocytes. Thus, we next discuss the differential expression of CD40 and CD154 on DCs and lymphocytes and how crosstalk between these molecules may affect DC–lymphocyte interactions.

**APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 5**

Where does Ma teach that CD 40 is a programming molecule? Following two "2" publications dispute Examiner's interpretation of CD 40 as programming molecule – **rather CD 40 is a molecular adjuvant and CD40L is a member of the tumor necrosis factor (TNF) family**

**Publication 1**:

Bullock, T.N.J. CD40 stimulation as a molecular adjuvant for cancer vaccines and other immunotherapies. Cell Mol Immunol 19, 14–22 (2022). https://doi.org/10.1038/s41423-021-00734-4

"Publication 1 Title: **CD40 stimulation as a molecular adjuvant for cancer vaccines** and other immunotherapies"

**Publication 2**:

https://journals.asm.org/doi/10.1128/CDLI.11.4.635-641.2004

Publication 2 Title: Targeting CD40L: a Promising Therapeutic Approach

"CD40L is a member of the tumor necrosis factor (TNF) family of cell surface interaction molecules

**<u>CLAIM ELEMENT 2 OF INDEPENDENT CLAIM 85:</u>**

An engineered dendritic cell comprising: **(b) a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;**

**<u>PAGE 7 OF EXAMINER'S ANSWER</u>**

**[0006]** CD8 T cells and natural killer (NK) cells are traditionally known as the major players in tumor immunity. The engagement of MHC class I on an antigen presenting cell (APC) with the T cell receptor (TCR) activates CD8 T cells.

**<u>APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 7</u>**

Examiner's Rejection under 35 U.S.C § 103 Obviousness is not supported by (i) Prima Facie case and (ii) Federal Circuit's case laws – rather it is a mere "a priori" conclusion **using naturally occurring molecules/cells against engineered construction of a dendritic cell in this claim element of Independent Claim 85.**

**Paragraph 251 of Specification Text is instructive.**

> **[000251] When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.**

**CLAIM ELEMENT 3 OF INDEPENDENT CLAIM 85:**

An engineered dendritic cell comprising: **(c) an identifying protein on a cancer cell**; and

**PAGE 8 OF EXAMINER'S ANSWER**

**Chang [2020]**

**40**. A RNA nanostructure robot having the sequence of $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$, wherein:

$NR_1$ represents a first nano-robot comprising a single stranded RNA (ssRNA) of about 1500 to 10,000 bases in length that self-assembles into a first scaffold:

$NR_2$ represents a second nano-robot comprising a ssRNA of about 1500 to 10,000 bases in length that self-assembles into a second scaffold:

L is a linker which operably links $NR_1$ to $NR_2$:

wherein $R_3$ and $R_4$ are independently selected from a pair of fastener strands, an aptamer, a cargo molecule, a capture strand, a targeting strand, or H:

n is an integer from 1 to 20:

m is an integer from 0 to 20,

wherein $NR_1$ or $NR_2$ further comprises a complex comprising an RNA nanostructure and at least one therapeutic agent operably linked to the RNA nanostructure, and wherein the therapeutic agent is a peptide that comprises a positively-charged moiety which comprises from about 10 positively-charged amino acids.

**41**. The RNA nanostructure robot of claim **40**, wherein the positively-charged moiety is a peptide comprising 10 lysine residues.

**42**. The RNA nanostructure robot of claim **40**, wherein the therapeutic agent is a protein selected from tumor targeting peptide (TTP), a human cancer peptide, or calreticulin protein.

**43**. The RNA nanostructure robot of claim **42**, wherein the protein is calreticulin protein to engage interactions between tumor cells and macrophages or dendritic cells for enhanced antigen presentation and stimulation of antigen-specific T cells.

## APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 8

**How does Chang (2020) teach an engineered dendritic cell comprising an identifying protein (on a cancer cell), when Chang (2020) has a therapeutic agent directly on a RNA Origami? But a therapeutic agent directly on a RNA Origami (Chang 2020) teaches away from the Appellant's claim element 3.**

Teaching way cannot provide any motivation (to a PHOSITA) to combine the teachings of the alleged prior art. Examiner misconstrued and failed to provide this evidence. Thus, it is a missing element.

Claim element 3 in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element "X" and alleged prior art's distinct concept of "Y". But, Examiner willfully misreads/misinterpret claim element "X" into alleged prior art's distinct concept of "Y".

Furthermore, the real trouble with "if A / Y then B / Z" is when it comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A / Y then B / Z" the obviousness rejection is a **mere conclusion, against the context of an engineered construction of a dendritic cell.**

**CLAIM ELEMENT 4 OF INDEPENDENT CLAIM 85:**

An engineered dendritic cell comprising: **(d)** a [first] scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

> wherein the [first] scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

**PAGE 7 OF EXAMINER'S ANSWER**

**Chang [2011]**

What is claimed is:

1. A method of promoting interactions between a first cell type and a second cell type comprising contacting the first cell type and the second cell type with a composition comprising a first ligand that is capable of binding to a receptor of the first cell type, and a second ligand that is capable of binding to a receptor of the second cell type, wherein the first and second ligands are bound to a nucleic acid nanostructure, under conditions suitable to promote interactions between the first and the second cell types.

13. The method of claim 2, wherein the first aptamer is capable of binding to a TCR and the second aptamer is capable of binding to a major histocompatibility complex (MHC) on an antigen presenting cell (APC).




FIGURE 13

[0067] As used herein, "nucleic acid" means DNA, RNA, peptide nucleic acids ("PNA"), and locked nucleic acids ("LNA"), nucleic acid-like structures, as well as combinations thereof and analogues thereof, unless specifically indicated. Nucleic acid analogues include known analogues of natural nucleotides which have similar or improved binding properties. The term also encompasses nucleic-acid-like structures with synthetic backbones. DNA backbone ana-

**APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 7**

**Dependent claim 93 is instructive to extract the claim meaning of scaffold.** Examiner has to find a **scaffold** of a biocompatible polymer first, when that **scaffold** of a biocompatible polymer **at least includes** a deoxyribonucleic acid (DNA) based origami, a ribonucleic acid (RNA) based origami or a XNA based origami.

It is also improper to rely on the same structure in alleged prior art as being responsive to two distinct/different limitations/sub-claim elements.

For example, when a claim states a biological computational processor, **wherein** the biological computational processor comprises a RNA logic gate. Examiner has to find first a prior art of (i) a biological computational processor and also (ii) a prior art of a RNA logic gate, but NOT just RNA logic gate. **Examiner cannot use just a prior art of a RNA logic gate against two different limitations/sub-claim elements.** See Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994).

Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element "X" and alleged prior art's distinct concept of "Y". But, Examiner willfully misreads/misinterpret claim element "X" into alleged prior art's distinct concept of "Y", using Hindsight Bias

Furthermore, the **intrinsic meaning of Scaffold** from the following paragraphs of the Specification is presented below:

**<u>In Vivo Implanted, Biodegradable & Biocompatible (Artificial) Lymph Node</u>**

**[000189]** An implanted biodegradable and biocompatible (artificial) lymph node can be fabricated/constructed (e.g., a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure or **a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer** or **a scaffold of silk fibroin)** or **a metallic glass material** and then antibiotics can be added by soaking the scaffold in an antibiotic solution. Furthermore, the metallic glass material can be fabricated/constructed to have nanoscaled porosity and/or nanoscaled surface pattern for cell adhesion and/or inflammation.

**[000190]** The implanted biodegradable and biocompatible (artificial) lymph node can be integrated with a mechanically actuating membrane (which changes its shape in microscale level) to reduce unwanted cell growth near the implanted biodegradable and biocompatible (artificial) lymph node.

**[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution.

**[000192]** The above scaffold can contain the Ly49 protein

and/or a patient-specific Major Histocompatibility Complex protein.

**[000193]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000194]** The above scaffold can contain one or more molecules (e.g., recruiting molecules and/or co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells to recruit, attract and activate nearby immature dendritic cells at the site of the implanted biodegradable and biocompatible (artificial) lymph node.

**CLAIM ELEMENT 5 OF CLAIM 85:**

**wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled**

**PAGE 10 OF EXAMINER'S ANSWER**

**"Chang [2020] Fig. 15"**




**"Chang [2020] Portion Of Fig. 20"**




The Examiner has **interpreted** that the **dendritic cell is #16** and is **interacting with another cell #17** through a RNA origami scaffold #1."

**APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 10**

> [0083] FIG. 20. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

[0347] As shown in FIG. **20**, in some embodiments the RNA nanostructure polymeric robot **1** comprises a first nano-robot ($NR_1$) **8**, a second nano-robot ($NR_2$) **9**, a linker (L) **3**, a moiety ($R_3$) **2** and n is 1 or more, and the moiety $R_3$ is in contact with $NR_1$. In some embodiments, the moiety $R_3$ is an antigen peptide. A second optionally heterogeneous series of moiety $R_4$ (**4**, **5**, **6**, **7**) comprise a nucleolin-binding or other cancer tumor marker aptamers **5** wherein m is 2 or more, an aptamer-target bound lock **6**, optionally a cargo molecule **7**, and optionally a checkpoint antagonist **4**. In some embodiments, the linker (L) **3** comprises of a double-stranded oligonucleotide helix. In some embodiments, the antigen peptides are tumor antigen peptides. In some embodiments, the tumor antigen peptides are TTP. In some embodiments, the cargo molecule **7** is a therapeutic agent. In some embodiments, the cargo molecule **7** is an antibody. The antibody can be an anti-PD-1 antibody. The antibody can further comprise a linkage to a polylysine chain. In some embodiments, the checkpoint antagonist is an anti-PD-1 aptamer. In some embodiments, the checkpoint antagonist is an anti-PD-1 antibody. In some embodiments, the first nano-robot ($NR_1$) **8** is an immune-adjuvant RNA robot exhibiting immune-stimulatory properties. In some embodiments, the aptamer-target bound lock **6** is an INF-γ aptamer

bound to INF-γ. In some embodiments, the second nano-robot ($NR_2$) **9** is configured to be in a cylindrical conformation which is operably openable via the aptamer-target bound lock **6**. The RNA nanostructure polymeric robot **1** induces activation of T cells **11** at antigen-presenting cells **9** by contacting the first nano-robot ($NR_1$) **8** comprising a moiety $R_3$ wherein the moiety is an antigen peptide **2**, with a T cell **11**. In some embodiments, the second nano-robot ($NR_2$) **9** interacts with the tumor environment **13**. In some embodiments, the aptamer-target bound lock **6** is opened when the target is a compound, biomarkers, or protein present in high regional concentration in the tumor environment **13**. The aptamer-target bound lock **6** competitively binds with the free target in the tumor environment **13**, resulting in the unlocking of the second nano-robot ($NR_2$) **9**. The opening of the second nano-robot ($NR_2$) **9** exposes the optional cargo molecule **7**, and the optional checkpoint antagonist **4**, to the tumor environment. When the cargo molecule **7** is a therapeutic agent and/or the checkpoint antagonist **4** is present, the therapeutic agent and/or checkpoint antagonist effect tumor necrosis in the tumor environment **13**.

**"All words in a claim must be considered in judging the patentability of that claim against the prior art." In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) requires the "consideration" of every claim feature in an obviousness determination.**

**Where/how does Chang teach "wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the [first] scaffold are coupled"? FIG. 15 illustrates a natural Dendritic Cell, NOT an Engineered Dendritic Cell and NOT interacting with a Tumor Cell; rather a natural Dendritic Cell is interacting with a NK cell or a T-Cell. A NK cell or a T-cell is NOT a Tumor cell.**

**Furthermore, who is he (Examiner) to erroneously define/interpret about 16 and 17, when neither short description (in paragraph 83) nor detailed description (in paragraph 347) regarding FIG. 20 describes ANYTHING about 16 and 17?**

**FIG. 20** is about a nano double-robot and it is NOT what **Examiner** (willful) fraudulently interpreted a material fact with intent to deceive a Pro Se Applicant as **Applicant's claimed invention of an Engineered (as opposed to naturally occurring) Dendritic Cell.**

Too long, the Axis of Evil-Popa, Leonard and Babic has been discriminating the cancer biology patenting landscape with very low allowance rate with their relentless willful misrepresentation (fraud) and unlawful tactics of a material fact under Title 18, U.S.C., §§ 241 & 242 against certain applicants.

See https://www.fbi.gov/investigate/civil-rights/federal-civil-rights-statutes and https://www.justice.gov/crt/deprivation-rights-under-color-law).

**Dependent Claim 87**

The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell

*Note! A **first** scaffold in the independent claim 85 was proper, when the dependent claim 93 had a second scaffold. Since the dependent claim 93 of a second scaffold was not examined, **the word first in independent claim 85** can be deleted in later amendment.

**PAGE 10 OF EXAMINER'S ANSWER**

**"Chang [2020] Paragraph [0171]**

[0171] Certain embodiments of the invention provide an RNA nanostructure having immuno-stimulatory properties. As used herein, an immune-stimulatory RNA nanostructure stimulates the immune system by, for example, inducing activation or increasing activity of any components of the immune system, or by reducing inhibition of the immune system. In certain embodiments, the RNA nanostructure is an agonist of a pattern recognition receptor. As used herein, the terms "pattern recognition receptor" or "PRR" refer to proteins expressed by cells of the innate immune system, such as dendritic cells, macrophages, monocytes, neutrophils and epithelial cells, to identify two classes of molecules: pathogen-associated molecular patterns (PAMPs), which are associated with microbial pathogens, and damage-associated molecular patterns (DAMPs), which are associated with components of host's cells that are released during cell damage or death. PRRs also mediate the initiation of antigen-specific adaptive immune response and release of inflammatory cytokines. In certain embodiments, the PRR is a toll-like receptor (TLR) (e.g., TLR3 or TLR7).

**APPLEANT'S EXPLANATION TO ABOVE EXAMINER'S ANSWER ON PAGE 10**

> Where/how does Chang teach "the engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell?

When independent claim 85 is not Prima Facie obvious under 35 U.S.C § 103, then its respective dependent claim 87 is not Prima Facie obvious either under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

## II. LEGAL ANALYSIS [AGAINST EXAMINER'S REJECTION UNDER 35 U.S.C § 103 OBVIOUSNESS]

**Prima Facie Case of Obviousness**

A Prima Facie case of obviousness is established, when three (3) strict basic criteria have been met.

- First, there must be some Suggestion or Motivation, either in alleged prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify alleged prior art being relied upon to reject Appellant's claimed invention.
- Second, there must be an "Anticipated Success" or "Expectation of Success".
- Third, alleged prior art must Teach or Suggest All Requirements of Appellant's claimed invention.

"All words in a claim must be considered in judging the patentability of that claim against the prior art." In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) requires the "consideration" of every claim feature in an obviousness determination.

When determining eligibility, USPTO must also consider the claim as a whole without discounting or disregarding any claim element and without regard to its novelty or conventionality. The entire claim should be considered properly to ensure that even "Minor" differences in claim terms accurately reflect the desired breadth and scope over alleged prior art.

In Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016). Federal Circuit held that the PTAB conclusion that it would have been "**common sense**" for an ordinary artisan to supply the limitation missing from alleged prior art was not supported by substantial evidence.

Furthermore, unlike engineering, biology is an unpredictable technological field; result based on one molecule/cell does not produce the similar result on another molecule/cell. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable".

First, **common sense** is typically invoked to provide a known motivation to combine references, but NOT to supply a missing claim limitation. See DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).

To render claim unpatentable, Examiner must do more than merely "consider" each and every feature for Claim. See In re Royka, 490 F.2d 981, 180 USPQ 580 (CCPA 1974) (emphasis added) (to establish Prima Facie case of obviousness of Appellant's claimed invention, all claim features must be taught or suggested by alleged prior art). A proper obviousness determination requires that Examiner make "a searching comparison of the claimed invention – including all its limitations with the teaching of the prior art." See In re Wada and Murphy, Appeal 2007-3733, citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including … ascertaining the differences between Appellant's claimed invention and the alleged prior art. See Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added).

Federal Circuit has repeatedly warned that **use of inherency** in the context of obviousness must be carefully limited because "that which may be inherent is not necessarily known and that which is unknown cannot be

obvious." See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V. (2017). To support inherency, Examiner must establish a clear factual record that demonstrates what is disclosed in alleged prior art that would prove that the inherent-undisclosed claim element was necessarily present. See Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018).

In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994) "When a piece of prior art 'suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant' the piece of prior art is said to 'teach away' from the claimed invention." See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994)).

Saying "the prior art shows A to accomplish Y, therefore B to accomplish Z would have been obvious" is a **mere conclusion**, and not the type of rigorous explanation that the KSR Guidelines (KSR Int'l Co. v. TeleflexInc., 550 U.S. 398, 82 USPQ2d 1385 (2007)) mandate.

Furthermore, the real trouble with "if A / Y then B / Z" is when it comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A / Y then B / Z" the obviousness rejection is a mere conclusion, against the context of an engineered construction of a dendritic cell.

**For example, the fact that a certain result or characteristic may occur or be present in alleged prior art is NOT sufficient to establish the inherency of that result or characteristic. In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993).**

Even if each and every element of independent claim 85 found in alleged prior art, without a motivation ("teaching-suggestion-motivation"

(TSM)) to combine the teachings of the alleged prior art, there is still no reasonable expectation of success.

But teaching way and/or missing claim elements cannot provide any motivation (to a PHOSITA) to combine the teachings of the alleged prior art in an unpredictable technological field and without motivation, there is no "reasonable expectation of success". In an unpredictable technological field, there are many parameters that might be varied and when alleged prior art provides no guidance as to which parameter(s) might be most likely to successfully create Appellant's solution and therefore nonobvious.

Furthermore, what Nature and Level of Certainty is required to establish a "Reasonable Expectation of Success"? Crocs, Inc. v. U.S. Int'l Trade Comm'n, 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010). In re Omeprazole Patent Litigation, 536 F.3d 1361, 87 USPQ2d 1865 (Fed. Cir. 2008).

**The Federal Circuit's discussion in Crocs serves as a reminder to USPTO merely pointing to the presence of even all claim elements in the prior art is not a complete statement of a rejection for obviousness.**

In accordance with MPEP § 2143, subsection I.A.(3), a proper rejection based on the rationale that the claimed invention is a combination of prior art elements also includes a finding that results flowing from the combination would have been predictable to a person of ordinary skill in the art.

**Examiner does not explain how a person of ordinary skill in the art arrives from naturally occurring molecules/cells against Applicant's engineered construction of a dendritic cell in Independent Claim 85 in an unpredictable biological art? For example, how is it predictable from a natural horse based transportation to artificial automobile engine based transportation?**

Examiner's Rejection under 35 U.S.C § 103 Obviousness is not supported by (i) Prima Facie case and (ii) Federal Circuit's case laws – rather it is a mere "a priori" convenient conclusion **using naturally occurring molecules/cells against Applicant's engineered construction of a dendritic cell in Independent Claim 85 in an unpredictable biological art.**

When independent claim 85 is not Prima Facie obvious under 35 U.S.C § 103, then its respective dependent claim 87 is also not Prima Facie obvious either under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

## III. FLAWED ANALYSIS OF INHERENCY, COMMON SENSE & REASONABLE EXPECTATION OF SUCCESS

**Following Text Paragraphs of Specification are instructive in the Context of an Engineered Construction of a Dendritic Cell for Entered Independent claim 85 (See also Exhibit A)**

[Text Paragraphs]: 235-254: Ex Vivo Engineered/Edited Dendritic Cells

[Text Paragraphs]: 255-261: Ex Vivo Engineered/Edited Dendritic Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System

[Text Paragraphs] 262-291: Ex Vivo Engineered/Edited Dendritic Cells, Utilizing Modulating CRISPR-Cas9 System

→ **Independent Claim 85** relates to an **ENGINEERED CONSTRUCTION** of a dendritic cell – NOT what naturally found/occurring/expressed in a natural dendritic cell. Such engineered construction **may be** suitable to be implanted or delivered through a patch or injected. Thus teaching of **Thaiss et al.** Frontier Immuno, 2011, 2:1-9 is **Moot**, as it teaches about naturally occurring molecules expressed in a dendritic cell

**Paragraph 251 From Specification Text is instructive**

> **[000251] When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.**

**In summary, Appellant's claim elements (a), (b), (c), (d) and its required coupling of independent claim 85 and its dependent claim 87 do not necessarily or inherently possessed in Chang.**

**Where/how does Chang (using naturally occurring molecules/cells) teach engineered construction of a dendritic cell in Independent Claim 85?**

Furthermore, the real trouble with "if A / Y then B / Z" is when it comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A / Y then B / Z" the obviousness rejection is a **mere conclusion, against the context of an engineered construction of a dendritic cell.**

The Federal Circuit has repeatedly stated what it said in Par Pharmaceutical Inc. v. TWI Pharmaceutical Inc., 773 F.3d 1186 (Fed. Cir. 2014): that the concept of inherency "must be carefully circumscribed" in the obviousness context, and that a party must "meet a high standard in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis" showing that "the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art" (emphasis added). In view of the court's warnings that "[i]nherency ... may not be established by probabilities or possibilities," and "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient."5 The Federal Circuit in Atlas Powder Co. v. IRECO Inc., 190 F.3d 1342 (Fed. Cir. 1999), clearly laid out the policy rationale for these requirements: "The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer."

Prior art products do not necessarily or inherently possess the characteristics of **Applicant's claimed invention of an engineered construction of an artificial dendritic cell** with added engineered molecules and/or engineered biological components. **Such an engineered construction of an artificial dendritic cell can be delivered via injection or a patch.**

**Paragraph 251 From Specification Text is instructive**

> **[000251] When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.**

<u>[INHERENCY]</u>

Furthermore, to support **inherency (of Chang on Page 23 of Examiner's Answer)**, Examiner must establish a clear factual record that demonstrates what is disclosed in alleged prior art that would prove that the inherent-undisclosed claim element was necessarily present. See <u>Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc.,</u> 17-1719 (Fed. Cir. July 13, 2018).

The fact that a certain result or characteristic may occur or be present in alleged prior art is **NOT SUFFICIENT** to establish the inherency of that result or characteristic. <u>In re Rijckaert</u>, 9 F.3d 1531, 1534, (Fed. Cir. 1993).

When determining eligibility, USPTO must also consider the <u>claim as a whole</u> without discounting or disregarding any claim element and without regard to its novelty or conventionality. The entire claim should be

considered properly to ensure that even "Minor" differences in claim terms accurately reflect the desired breadth and scope over alleged prior art.

**[COMMON SENSE]**

In Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016). Federal Circuit held that the PTAB conclusion that it would have been "**common sense**" for an ordinary artisan to supply the limitation missing from alleged prior art was not supported by substantial evidence. Furthermore, unlike engineering, biology is an unpredictable technological field; result based on one molecule/cell does not produce the similar result on another molecule/cell. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable". First, **common sense** is typically invoked to provide a known motivation to combine references, but NOT to supply a missing claim limitation. See DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).

**[REASONABLE EXPECTATION OF SUCCESS]**

But teaching way and/or missing claim elements cannot provide any motivation (to a PHOSITA) to combine the teachings of the alleged prior art in an unpredictable technological field and without motivation, there is no "reasonable expectation of success" from a naturally occurring dendritic cell to Applicant's engineered construction of an engineered dendritic cell.

In an unpredictable technological field, there are many parameters that might be varied and when alleged prior art provides no guidance as to which parameter(s) might be most likely to successfully create Appellant's solution and therefore nonobvious from a naturally occurring dendritic cell to Applicant's engineered construction of an engineered dendritic cell.

Examiner never explains how. The Federal Circuit's discussion in **Crocs serves as a reminder to USPTO** merely pointing to the presence of even all claim elements in the prior art is not a complete statement of a rejection for obviousness. In accordance with **MPEP § 2143**, subsection I.A.(3), a proper rejection based on the rationale that the claimed invention is a combination of prior art elements also includes a finding that results flowing from the combination would have been predictable to a person of ordinary skill in the art. **Examiner does not even explain how a person of ordinary skill in the art arrives from naturally occurring molecules/cells against Applicant's engineered construction of a dendritic cell in Independent Claim 85 in an unpredictable biological art?** This is analogues for example, how is it predictable from a natural horse based transportation to artificial automobile engine? **Examiner's Rejection under 35 U.S.C § 103 Obviousness is not supported by (i) Prima Facie case and (ii) Federal Circuit's case laws** – rather it is a mere "a priori" convenient conclusion using naturally occurring molecules/cells against Applicant's engineered construction of a dendritic cell in Independent Claim 85 in an unpredictable biological art.

## IV. CONCLUSION

**If cancer biology is obvious, why does one out of six deaths occur due to cancer globally?** Source: https://www.who.int/news-room/fact-sheets/detail/cancer. Examiner's Rejection under 35 U.S.C § 103 Obviousness is not supported by (i) Prima Facie case and (ii) Federal Circuit's case laws – rather it is a mere "a priori" conclusion **using naturally occurring molecules/cells against Applicant's engineered construction of a dendritic cell in Independent Claim 85 in an unpredictable biological art.** There is no reasonable expectation of success

from a natural paradigm to Applicant's engineered construction of an dendritic cell. Examiner has not provided such.

Therefore, it is respectfully requested that BPIA (subsequently Federal Circuit) (i) carefully apply consistent patent laws without giving Examiner's usual home court advantages, (ii) make an example of Examiner's misapplication of patent laws and (iii) reverse Examiner's Rejection under 35 U.S.C § 103 Obviousness, in view of specification (intrinsic evidence) and further in view of: **(i)** In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970), (ii) Eisai Co. v. Dr. Reddy's Labs, Ltd, 533 F.3d1353 (Fed. Cir. 2008), **(iii)** In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993), **(iv)** Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018), **(v)** Par Pharmaceutical Inc. v. TWI Pharmaceutical Inc., 773 F.3d 1186 (Fed. Cir. 2014), **(vi)** Crocs, Inc. v. U.S. Int'l Trade Comm'n, 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010), **(vii)** Univ. of Strathclyde v. Clear-Vu Lighting LLC, No. 2020-2243, 2021 U.S. App. LEXIS 32872, *1 (Fed. Cir. Nov. 4, 2021).

## EXHIBIT A: [FILED TEXT SPECIFICATION]

# MOLECULAR SYSTEM FOR CANCER BIOLOGY

Mohammad A. Mazed

## CROSS REFERENCE OF RELATED APPLICATIONS

**[0001]** The present application is

- a continuation-in-part (CIP) of **(a)** U.S. Non-Provisional Patent Application with Serial No. **16/501,943** entitled, MOLECULAR SYSTEM FOR CANCER BIOLOGY, filed on **July 5, 2019**,
- wherein **(a)** is a continuation-in-part (CIP) of **(b)** U.S. Non-Provisional Patent Application with Serial No. **16/350,897** entitled, CRISPR-Cas9 BASED ENGINEERED/EDITED OR MODULATED STEM CELLS FOR INFLAMMATION OR PAIN, filed on **January 29, 2019**,
- wherein **(b)** is a continuation-in-part (CIP) of **(c)** U.S. Non-Provisional Patent Application with Serial No. **16/350,313** entitled, CRISPR-Cas9 BASED MOLECULAR SYSTEM FOR INFLAMMATION OR PAIN, filed on **October 30, 2018**,
- wherein **(c)** is a continuation-in-part (CIP) of **(d)** U.S. Non-Provisional Patent Application with Serial No. **15/998,386** entitled, CRISPR-Cas9 BASED MOLECULAR SYSTEM FOR INFLAMMATION OR PAIN, filed on **August 14, 2018**,

- wherein **(d)** is a continuation-in-part (CIP) of **(e)** U.S. Non-Provisional Patent Application with Serial No. **15/932,920** entitled, CRISPR-Cas9 BASED MOLECULAR SYSTEM FOR INFLAMMATION OR PAIN, filed on **May 21, 2018,**
- wherein **(e)** claims priority benefit to **(f)** U.S. Provisional Patent Application with Serial No. **62/603,139** entitled, "FORMULATIONS FOR INFLAMMATION/PAIN", filed on **May 19, 2017.**

**[0002]** The entire contents of all (i) U.S. Non-Provisional Patent Applications, (ii) U.S. Provisional Patent Applications, as listed in the previous paragraph and (iii) the filed (Patent) Application Data Sheet (ADS) are hereby incorporated by reference, as if they are reproduced herein in their entirety.

## BRIEF DESCRIPTION OF THE FIGURES

**[0003]** **FIG. 1** illustrates a progression model of Alzheimer's disease.

**[0004]** **FIG. 2** illustrates a progression model of Parkinson's disease.

**[0005]** **FIG. 3** illustrates a T-cell, wherein the T-cell includes (a) a sensing protein and/or an activating protein (on its surface) to detect a particular type of cancer cells and (b) a nanoshell encapsulating deoxyribonucleic acid (DNA) sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells and/or one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells. XNA contains genetic bases – adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic/artificial genetic bases (e.g., α and ß). The nanoshell can also include RNAi based logic circuit.

[0006] However, this configuration of a T-cell may be applicable to any diseased cells, instead of only cancer cells.

## BRIEF DESCRIPTION OF THE TABLES

[0007] Table 1 describes a pharmaceutical formulation for inflammation/pain.

[0008] Table 2 describes a pharmaceutical formulation for inflammation/pain.

## DETAILED DESCRIPTION

**Nanoshell**

[0009] By way of an example and not by way of any limitation, a nanoshell (of about 5 nanometers to 500 nanometers in diameter) can be any one of the following: a boron nitride nanotube, a carbon nanotube, a Cornell-dot, a cubisome, a dendrimer (including a plant based dendrimer), a deoxyribonucleic acid origami based nanostructure, an exosome, fullerene $C_{60}$ (e.g., malonic acid derivative of $C_{60}$), a gold nanoparticle (coated for biocompatibility), a grapefruit-derived nanovector (GNV), a hollow magnetic cage molecule (e.g., $Co_{12}C_6$, $Mn_{12}C_6$ and $Mn_{24}C_{18}$), a metal-organic framework (MOF), a modified exosome, an iron nanoparticle, a lipidoid, a liposome, mesoporous silica, a micelle, a nanocrystal, a niosome, polysebacic acid (PSA), polysilsesquioxane (PSQ), a porous (photonic) crystal, a quantum dot, a quantum dot capped with glutathione, a ribonucleic acid (RNA) origami based nanostructure, a self-assembling peptide/protein, a silk-fibroin nanoparticle, a solid-lipid nanoparticle, a spherical nucleic acid (SNA), synthasome, a tubular/tetrahedral structure fabricated/constructed utilizing deoxyribonucleic acid/ribonucleic acid/XNA origami based nanostructure, a virus (e.g., tobacco mosaic virus), zein (plant) protein, a

XNA origami based nanostructure, a worm-shaped nanoparticle and a zeolite-L-nanocrystal.

**[00010]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[00011]** Silk fibroin is biodegradable and biocompatible.

**[00012]** Additionally, a nanoshell can be made of synthetic lipids including disulfide bonds in the fatty chain. Furthermore, when the nanoshell (of synthetic lipids including disulfide bonds in the fatty chain) enters a cell, the environment within the cell breaks open the disulfide bond to disassemble the nanoshell and the contents of the nanoshell can be quickly and efficiently released into the cell.

**[00013]** Furthermore, a nanoshell can be a nanobot or a nanomotor in some biological applications.

**Macroshell**

**[00014]** By way of an example and not by way of any limitation, a macroshell (of about 1 micron to 50 microns in diameter) can be an approximately spherically shaped structure (e.g., with composition of polycaprolactone polymer/hydrogel).

**Bioavailability, Sustained (Controlled) Delivery & Disintegration**

**[00015]** To increase bioavailability of any bioactive compound (of the Table 1 and Table 2), microemulsion/nanoemulsion or microsuspension/nanosuspension of the bioactive compound can be utilized.

**[00016]** To prevent any dissolution/disintegration in the gastric (acidic) environment of any bioactive compound (of the Table 1 and Table 2), the macroshell or the nanoshell itself can be enteric coated by a polymer barrier.

**[00017]** To increase bioavailability and/or sustained (controlled) delivery of the entire pharmaceutical formulation (of the Table 1 and Table 2), microencapsulation of the entire pharmaceutical formulation (of the Table 1 and Table 2) or nanoencapsulation of any bioactive compound (of the Table 1 and Table 2) in a nanoshell can be utilized.

**[00018]** The macroshell or the nanoshell can include an immune shielding surface (as it is discussed in later paragraphs).

**Immune Shielding Surface Of A Nanoshell**

**[00019]** A polymer membrane (e.g., polyethylene glycol polymer) can be utilized, as an immune shielding surface on a nanoshell.

**[00020]** Alternatively, a red blood (natural/synthetic/three-dimensionally bio-inkjet printed red blood) cell membrane can be utilized, as an immune shielding surface on the nanoshell.

**[00021]** Alternatively, a combination of a polymer membrane and a red blood cell membrane can be utilized, as an immune shielding surface on the nanoshell.

**[00022]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a red blood cell (about 8 microns in diameter) to act as an immune shielding surface on the nanoshell. A red blood cell is about 8 microns in diameter.

**[00023]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a white blood cell (about 5 microns to 17 microns in diameter) to act as an immune shielding surface on the nanoshell.

**Immune Shielding Surface Of A Macroshell**

**[00024]** A polymer membrane (e.g., polyethylene glycol polymer) can be utilized, as an immune shielding surface on the macroshell.

**[00025]** Alternatively, a red blood (natural/synthetic/three-dimensionally bio-inkjet printed red blood) cell membrane can be utilized, as an immune shielding surface on the macroshell.

**[00026]** Alternatively, a combination of a polymer membrane and a red blood cell membrane can be utilized, as an immune shielding surface on the macroshell.

**[00027]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a red blood cell to act as an immune shielding surface on the macroshell.

**[00028]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a white blood cell to act as an immune shielding surface on the macroshell.

**[00029]** Details of an immune shielding surface have been disclosed in U.S. Non-Provisional Patent Application No. **13/135,832** entitled "CHEMICAL COMPOSITION AND ITS DELIVERY FOR LOWERING THE RISKS OF ALZHEIMER'S, CARDIOVASCULAR AND TYPE-2 DIABETES DISEASES", filed on July 15, 2011.

**[00030] Table 1 Pharmaceutical Formulation**

| **Botanical** | **WT % +/- 20%** |
|---|---|
| *Boswellia serrata* Extract | 20% |
| **Chemical** | **WT % +/- 20%** |
| Astaxanthin | 2.5% |
| Capsaicin | 5% |
| CBD (Or CBD Pro-Drug) | 40% |
| Chondroitin Sulfate | 5% |
| Glucosamine Hydrochloride Or Glucosamine Sulfate | 5% |
| Hyaluronic Acid | 5% |
| Lidocaine Hydrochloride | 2.5% |
| Methylsufonlymethane (MSM) | 5% |
| Menthol | 5% |
| S-Adenosyl Methionine (SAM) | 5% |

| | |
|---|---|
| **Total** | **100%** |

**[00031] Table 2 Pharmaceutical Formulation**

| **Botanical** | **WT % +/- 20%** |
|---|---|
| *Boswellia serrata* Extract | 20% |
| **Chemical** | **WT % +/- 20%** |
| Capsaicin | 5% |
| CBD (Or CBD Pro-Drug) | 42.5% |
| Chondroitin Sulfate | 5% |
| Glucosamine Hydrochloride Or Glucosamine Sulfate | 5% |
| Hyaluronic Acid | 5% |
| Lidocaine Hydrochloride | 2.5% |
| Methylsufonlymethane (MSM) | 5% |
| Menthol | 5% |
| S-Adenosyl Methionine (SAM) | 5% |
| **Total** | **100%** |

**[00032]** Cannabidiol (CBD)'s molecular structure is described below.




**[00033]** CBD or CBD pro-drug can be replaced by Perrottetinene (PET) and its molecular structure is described below.




**[00034]** Any bioactive compound of the Table 1 and Table 2 loaded with silk fibroin-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of

the Table 1 and Table 2 loaded with silk fibroin-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain (e.g., via a tablet/patch/injection).

**[00035]** Any bioactive compound of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP)-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP)-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain (e.g., via a tablet/patch/injection).

**[00036]** Any bioactive compound of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from a stem cell (e.g., a pluripotent stem cell/three-dimensional (3-D) bio-inkjet printed stem cell)-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from a stem cell-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain or tissue regeneration (e.g., via a tablet/patch/injection).

**[00037]** Any bioactive compound of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from an engineered/edited stem cell or a modulated stem cell-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table

2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from an engineered/edited stem cell or a modulated stem cell-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain or tissue regeneration (e.g., via a tablet/patch/injection).

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[00038]** Cas9 is an RNA-directed deoxyribonucleic acid-binding protein, guided by a single guide RNA. By inactivating its nuclease activity, coupling the protein to other effector domains and choosing an appropriate guide sequence, it can direct activities in a specific part of a genome.

**[00039]** CRY2 and CIB1 are plant proteins. In response to light, CRY2 undergoes a conformational change that allows it to interact with CIB1. In a light activated CRISPR-Cas9 system, CRY2 is fused to the transactivation domain (either p65 or VP64) and C1B1 is fused to dCas9-the deactivated Cas9 nuclease from CRISPR. The light activated CRISPR-Cas9 system can enable precise spatial and/or temporal control by light (e.g., blue light) and can direct activities in a specific part of a genome.

**[00040]** Generally, a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system can remove a first defective gene and add/insert/replace a second gene, which may be beneficial against a particular type of diseased cells.

**Modulating CRISPR-Cas9 System**

**[00041]** A modulating CRISPR-Cas9 system includes Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus (AAV).

**[00042]** The modulating CRISPR-Cas9 does not remove or add/insert/replace any gene. Rather it can activate an expression of one or more genes beneficial against a particular type of diseased cells.

**[00043]** Various gene editing methods has been disclosed in "OPTICAL BIOMODULE FOR DETECTION OF DISEASES", filed on October 29, 2012, wherein U.S. Non-Provisional Patent Application No. **13/663,376** resulted in an issuance of a U.S. Patent No. **9,557,271** on January 31, 2017.

**Engineered/Edited Stem Cell**

**[00044]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can deliver the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system into a stem cell by an external stimulus (e.g., heat/light/pH/receptor binding).

**[00045]** Alternatively, the above nanoshell can be decorated with one or more targeting ligands to recognize/match/bind with specific biological receptors on a stem cell to deliver the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system into a stem cell.

**[00046]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of diseased cells

**[00047]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein

to detect a molecular event that occurs within a particular type of diseased cells.

**Modulated Stem Cell**

**[00048]** The modulating CRISPR-Cas9 system (inserted) into a stem cell activates an expression of one or more genes beneficial against a particular diseased cells-thus enabling a modulated stem cell.

**[00049]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of diseased cells.

**[00050]** The modulated stem cell can include with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of diseased cells

**Encapsulation Of Engineered/Edited Stem Cell Or Modulated Stem Cell**

**[00051]** The engineered/edited or the modulated stem cell can be encapsulated/caged in a macroshell.

**[00052]** The macroshell can include an immune shielding surface (details of an immune shielding surface were discussed in previous paragraphs).

**Application To Treatment Of Inflammation Without An Engineered/Edited Or Modulated Stem Cell**

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[00053]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., a defective/mutated gene) responsible for inflammation and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) to reduce inflammation (e.g., tumor necrosis factor-alpha (TNF-alpha) inhibitor) or pain.

**[00054]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[00055]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells.

**[00056]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or

modified ligand(s)) exosomes beneficial against inflammation.

**Modulating CRISPR-Cas9 System**

**[00057]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against inflammation.

**[00058]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[00059]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells.

**[00060]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation.

**Application To Treatment Of Inflammation Without An Engineered/Edited Or Modulated Stem Cell**

**[00061]** Deoxyribonucleic acids can be coupled with a metal (e.g., gold) nanorod. Upon infrared light activation, deoxyribonucleic acids can be decoupled from the metal nanorod due to heating. Upon Deoxyribonucleic acids-receptors coupling, stem cells can migrate to a site of inflammation or

pain for tissue regeneration.

**Application To Treatment Of Inflammation With An Engineered/Edited Or Modulated Stem Cell**

**Engineered/Edited Stem Cell**

**[00062]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a stem cell to remove a first gene responsible for inflammation or pain and then add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) that expresses/releases a molecule to reduce inflammation or pain (and/or enhance regeneration of tissues)-thus enabling an engineered/edited stem cell.

**[00063]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. An engineered or edited stem cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a stem cell.

**[00064]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells. Furthermore, the nanoshell includes an immune shielding

surface.

**[00065]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation. Furthermore, the nanoshell can include an immune shielding surface.

**Modulated Stem Cell**

**[00066]** The modulating CRISPR-Cas9 system inserted into a stem cell. The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against inflammation-thus enabling a modulated stem cell.

**[00067]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells

**[00068]** The modulated stem cell can include with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation.

**Application To Treatment Of Alzheimer's Disease Without An Engineered/Edited Or Modulated Stem Cell**

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[00069]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., defective/mutated ApoE4 gene) responsible for Alzheimer's disease and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) to reduce accumulation of amyloid beta protein and/or tau protein. (**FIG. 1**).

**[00070]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[00071]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of neurons.

**[00072]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease.

**[00073]** The nanoshell can include or bind/couple (e.g., chemically couple) with an antibody or surface modification with a functional ligand (e.g., lactoferrin/transferrin) and/or a carrier molecule (e.g., glutathione/glucose) to cross the blood-brain barrier (BBB).

**Modulating CRISPR-Cas9 System**

**[00074]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against Alzheimer's disease.

**[00075]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[00076]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of Alzheimer's disease within a particular type of neurons.

**[00077]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease.

**[00078]** This approach can be applicable to other neurodegenerative diseases (e.g., Parkinson's disease (**FIG. 2**)/dementia with Lewy bodies).

**Application To Treatment Of Alzheimer's Disease With Engineered/Edited Or Modulated Stem Cell**

**Engineered/Edited Stem Cell**

**[00079]** A stems cell such as mesenchymal stem cell can cross the blood-brain barrier. The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a mesenchymal stem cell to remove a first gene responsible for Alzheimer's disease and then add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) that expresses/releases a molecule (e.g., an antibody/hormone/protein) for reduction in accumulation of amyloid beta protein and/or tau protein. (**FIG.** 1)-thus enabling an engineered/edited mesenchymal stem cell.

**[00080]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. An engineered or edited mesenchymal stem cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a stem cell.

**[00081]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of Alzheimer's disease within a particular type of neurons. Furthermore, the nanoshell includes an immune shielding surface.

**[00082]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease. Furthermore, the nanoshell can include an immune shielding surface.

**Modulated Stem Cell**

**[00083]** The modulating CRISPR-Cas9 system inserted into a mesenchymal stem can activate an expression of one or more genes beneficial against Alzheimer's disease-thus enabling a modulated mesenchymal stem cell.

**[00084]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of Alzheimer's disease within a particular type of neurons.

**[00085]** The modulated stem cell can include one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease. The modulated stem cell can transfer healthy mitochondria to damaged neurons for neuroregeneration.

**Application To Treatment Of Brain Cancer Without An Engineered/Edited Or Modulated Stem Cell**

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[00086]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., a defective/mutated gene) responsible for brain cancer and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for apoptosis of a brain cancer cell and/or reduction of brain cancer growth (e.g., blocking an enzyme to inhibit self-regenerating capabilities glioma stem cell (GSC)).

**[00087]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[00088]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[00089]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi

molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of brain cancer cells.

**[00090]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[00091]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[00092]** The nanoshell can include or bind/couple (e.g., chemically couple) with an antibody or surface modification with a functional ligand (e.g., lactoferrin/transferrin) and/or a carrier molecule (e.g., glutathione/glucose) to cross the blood-brain barrier (BBB).

**[00093]** Combining the above approach with photodynamic therapy (PDT) delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Modulating CRISPR-Cas9 System**

**[00094]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against brain cancer.

**[00095]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[00096]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[00097]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against brain cancer.

**[00098]** Combining the above approach with photodynamic therapy (PDT) delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Application To Treatment Of Brain Cancer With An Engineered/Edited Or Modulated Stem Cell**

**Engineered/Edited Stem Cell**

**[00099]** A stems cell such as mesenchymal stem cell can cross the blood-brain barrier. The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a mesenchymal stem cell to remove a first gene responsible for a first gene (e.g., a defective/mutated gene) responsible for brain cancer and then add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) that expresses/releases a molecule (e.g., an antibody/hormone/protein) for

apoptosis of a brain cancer cell and/or reduction of brain cancer growth (e.g., blocking an enzyme to inhibit self-regenerating capabilities glioma stem cell (GSC)).

**[000100]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. An engineered or edited mesenchymal stem cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a stem cell.

**[000101]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[000102]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of brain cancer cells.

**[000103]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000104]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g.,

chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000105]** Combining the above approach with photodynamic therapy (PDT) delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Modulated Stem Cell**

**[000106]** The modulating CRISPR-Cas9 system inserted into a mesenchymal stem can activate an expression of one or more genes beneficial against brain cancer-thus enabling a modulated mesenchymal stem cell.

**[000107]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[000108]** The modulated stem cell can include one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of brain cancer cells.

**[000109]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000110]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g.,

Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000111]** Combining the above approach with photodynamic therapy (PDT) delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Application To Treatment Of Cancer Without An Engineered/Edited Or Modulated Stem Cell CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000112]** Calcium is generally increased in a cancer cell. Calcium stimulates the secretion of exosomes due to calcium-binding protein called Munc13-4. Furthermore, Munc13-4 protein levels are often elevated in breast, pancreatic and lung cancers. Munc13-4 protein couples (e.g., chemically couples) with Rab11 protein to develop multivesicular bodies for fusing with the plasma membrane and releasing exosomes.

**[000113]** Exosomes released from cancer cells carry MT1-MMP enzyme, which can degrade in the extracellular matrix around cancer cells, by dispersing a secondary metastatic cancer cells.

**[000114]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., a defective/mutated gene responsible for Munc13-4 protein) responsible for cancer and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more

synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for reduce cancer growth (e.g., a gene for turning on gulonolactone oxidase production or activation of p53 gene responsible for apoptosis of a particular type of cancer cells.

**[000115]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000116]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000117]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosome beneficial against a particular type of cancer cells.

**[000118]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000119]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g.,

chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000120]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000121]** The nanoshell can include or couple (e.g., chemically couple) with a separate nanosystem.

**[000122]** The separate nanosystem can be coated with lipid oleate and DOTAP to enhance its interaction and penetration into a particular type of cancer cells.

**[000123]** The separate nanosystem can include a tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal (e.g., gold) rod (which is about 35 nanometers long and about 10 nanometers in radius).

**[000124]** The tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal rod can be coupled/chemically coupled with a heat shock protein and/or TRAIL protein.

**[000125]** Furthermore, the tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal rod can include or couple (e.g., chemically couple) with a biocompatible metal (e.g., gold) nanoparticle, a nanoshell X and a nanoshell Y by strands of a biological material (e.g., apatmers/deoxyribonucleic acids/ribonucleic acids/XNAs).

**[000126]** The biocompatible metal nanoparticle, the nanoshell X and the nanoshell Y includes an immune shielding surface.

**[000127]** About fifteen (15) X/Y nanoshells can be coupled.

**[000128]** The strands of the biological material can include or couple (e.g., chemically couple) with one or more molecules beneficial against a particular type of cancer cells (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or a photosensitizer molecule(s).

**[000129]** For example, a cannabis flavonoid is any of these molecules: Cannflavin A, Cannflavin B, Cannflavin C, Chrysoeriol, Cosmosiin and Flavocannabiside – but not limited to these examples.

**[000130]** The chemical structure of Cannflavin A is illustrated below:



**[000131]** The chemical structure of Cannflavin B is illustrated below:




[000132] It should be noted that Cannflavin B causes apoptosis and enhances the effectiveness of common chemo-and radiation therapies.

[000133] The nanoshell X can include or couple (e.g., chemically couple) with a near-infrared fluorescent polymer to visualize its accumulation at the target location of a particular type of cancer cells.

[000134] The nanoshell Y can be an upconverting nanoshell which converts a (continuous wave/pulsed) laser light of near-infrared wavelength into a (continuous wave/pulsed) laser light of visible wavelength.

[000135] The separate nanosystem can include one or more liposomes. Each liposome can encapsulate bioactive molecules/drugs and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

[000136] The separate nanosystem can further include or couple (e.g., chemically couple) with cerium fluoride nanoparticles and/or hafnium oxide.

**[000137]** Cerium fluoride nanoparticles can release reactive oxygen species upon activated/stimulated by X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000138]** Hafnium oxide can generate electrons when exposed to X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000139]** Chimeric antigen receptor (CAR) is produced by splicing together the gene for an antibody that recognizes a tumor antigen and the gene for a receptor that sits on the surface of the T-cells.

**[000140]** CAR natural killer (NK) cells may be safer without many side effects, faster to produce and cheaper. CAR natural killer cells can be less vulnerable to cancer cells' tricks for avoiding attacks, as natural killer cells generally rely on other receptors to recognize a particular type of cancer cells and they may detect a particular type of cancer cells, even when a particular type of cancer cells modifies the antigens.

**[000141]** There may be multiple doses of CAR natural killer cells, as opposed to a single dose of the T-cells.

**Engineered T-cell/ Natural Killer Cell/CAR T-cell/CAR Natural Killer Cell**

**[000142]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system or the modulating CRISPR-Cas9 system (encapsulated/caged in the nanoshell) can be utilized to CRISPR-Cas9 mediated modification of a T-cell/CAR T-cell/CAR natural killer cell.

**[000143]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000144]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein. The Ly49 protein can bind with a Major Histocompatibility Complex (MHC) molecule to distinguish between a healthy cell and a particular type of cancer cells.

**[000145]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000146]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000147]** The T-cell/CAR T-cell/CAR natural killer cell can include one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000148]** The T-cell/CAR T-cell/CAR natural killer cell can include one or more XNA sequences, wherein the one XNA sequence at least consists of one or more synthetic/artificial genetic bases (e.g., α and ß) to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000149]** The T-cell/CAR T-cell/CAR natural killer cell can include one or

more (e.g., a first/second/third/fourth) nanoshells.

**[000150]** At least a first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000151]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000152]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000153]** The first/second/third nanoshell can be made of synthetic lipids comprising disulfide bonds in the fatty chain.

**[000154]** When the first/second/third nanoshell enters a cancer cell, the environment within the cancer cell breaks open the disulfide bond to disassemble the first/second/third nanoshell, subsequently the contents with specific purposes of the first/second/third nanoshell are quickly and efficiently released into the cell.

**[000155]** The first/second/third nanoshell can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with a binding site for a molecule.

**[000156]** The first/second/third nanoshell can be a carbon nanodot.

**[000157]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000158]** The carbon nanodot can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with a binding site for a molecule.

**[000159]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000160]** Alternatively, the T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells and a nanoshell encapsulating one or more deoxyribonucleic acid sequences and/or one or more XNA sequences and/or one or more with one or more molecules/RNAi molecules/modified (e.g., an

overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000161]** The nanoshell can be decorated with one or more targeting ligands to recognize/match/bind with specific biological receptors on a particular type of cancer cells.

**[000162]** The nanoshell can also include RNAi based logic circuit for computation regarding receptor based binding on a particular type of cancer cells.

**[000163]** The T-cell with above configuration is illustrated in **FIG. 3.**

**Augmented & Engineered T-cell/ Natural Killer Cell/CAR T-cell/CAR Natural Killer Cell**

**[000164]** Furthermore the T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with deoxyribonucleic acid origami based nanostructure/ribonucleic acid (RNA) origami based nanostructure/XNA origami based nanostructure for recognition of a particular type of cancer cells.

**[000165]** The nanoshell (as described in previous paragraphs) can be coupled with a separate nanosystem.

**[000166]** The above separate nanosystem can be coated with lipid oleate and DOTAP to enhance its interaction and penetration into a particular type of cancer cells.

**[000167]** The separate nanosystem can include a tube shaped nanoscaled deoxyribonucleic acid cargo/carbon nanodot/nanoscaled metal (e.g., gold)

rod (which is about 35 nanometers long and about 10 nanometers in radius).

**[000168]** The carbon nanodot is a fluorescent nanoparticle made of sucrose and citric acid and it is less toxic.

**[000169]** The tube shaped nanoscaled deoxyribonucleic acid cargo/carbon nanodot/nanoscaled metal rod can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin (HSA)), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000170]** The tube shaped nanoscaled deoxyribonucleic acid cargo/carbon nanodot/nanoscaled metal rod can be coupled/chemically coupled with a heat shock protein and/or TRAIL protein.

**[000171]** Furthermore, the tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal rod can include or couple (e.g., chemically couple) with a biocompatible metal (e.g., gold) nanoparticle, a nanoshell X and a nanoshell Y by strands of a biological material (e.g., apatmers/deoxyribonucleic acids/ribonucleic acids/XNAs).

**[000172]** The biocompatible metal nanoparticle, the nanoshell X and the nanoshell Y includes an immune shielding surface.

**[000173]** About fifteen (15) X/Y nanoshells can be coupled.

**[000174]** The strands of the biological material can include or couple (e.g., chemically couple) with one or more molecules beneficial against a particular type of cancer cells (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or a

photosensitizer molecule(s).

**[000175]** The nanoshell X can include or couple (e.g., chemically couple) with a near-infrared fluorescent polymer to visualize its accumulation at the target location of a particular type of cancer cells.

**[000176]** The nanoshell Y can be an upconverting nanoshell which converts a (continuous wave/pulsed) laser light of near-infrared wavelength into a (continuous wave/pulsed) laser light of visible wavelength.

**[000177]** The separate nanosystem can include one or more liposomes. Each liposome can encapsulate bioactive molecules/drugs and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000178]** The separate nanosystem can further include or couple (e.g., chemically couple) with cerium fluoride nanoparticles and/or hafnium oxide.

**[000179]** Cerium fluoride nanoparticles can release reactive oxygen species upon activated/stimulated by X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000180]** Hafnium oxide can generate electrons when exposed to X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000181]** The nanoshell can include or bind/couple (e.g., chemically

bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000182]** Combining the above approach with photodynamic therapy (PDT) via an optical fiber(s) can enhance therapeutic outcome against a particular type of cancer cells.

**Nanostructure Assisted Preferential Binding**

**[000183]** A biologic pro-drug can be a non-toxic immune-stimulating drug (e.g., a non-toxic interleukin-2, when it binds only on beta and gamma units of a lymphocyte's surface).

**[000184]** Such preferential binding only on beta and gamma units of a lymphocyte's surface can be enabled by a combination of (a) polyethylene glycol (PEG) molecules and/or (b) a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure.

**Modulating CRISPR-Cas9 System**

**[000185]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against a particular type of cancer cells.

**[000186]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000187]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a

sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000188]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**In Vivo Implanted, Biodegradable & Biocompatible (Artificial) Lymph Node**

**[000189]** An implanted biodegradable and biocompatible (artificial) lymph node can be fabricated/constructed (e.g., a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure or a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer or a scaffold of silk fibroin) or a metallic glass material and then antibiotics can be added by soaking the scaffold in an antibiotic solution. Furthermore, the metallic glass material can be fabricated/constructed to have nanoscaled porosity and/or nanoscaled surface pattern for cell adhesion and/or inflammation.

**[000190]** The implanted biodegradable and biocompatible (artificial) lymph node can be integrated with a mechanically actuating membrane (which changes its shape in microscale level) to reduce unwanted cell growth near the implanted biodegradable and biocompatible (artificial) lymph node.

**[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution).

**[000192]** The above scaffold can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000193]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000194]** The above scaffold can contain one or more molecules (e.g., recruiting molecules and/or co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells to recruit, attract and activate nearby immature dendritic cells at the site of the implanted biodegradable and biocompatible (artificial) lymph node.

**[000195]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[000196]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be functionalized by modifying the oligonucleotide structures.

**[000197]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami

based nanostructure can include RNAi based logic circuit regarding receptor computation on a particular type of cancer cells.

**[000198]** The inside and out side of the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be functionalized by a precise spatial pattern of ligands to induce/activate dendritic cells in order to initiate response of the T-cells and/or natural killer cells.

**[000199]** To overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be attached with a red blood cell/white blood cell.

**[000200]** Alternatively, to overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be encapsulated in a lipid bilayer.

**[000201]** The engineered dendritic cell exchanges or transfers the sensing protein to the T-cell, and/or the natural killer cell.

**[000202]** The engineered dendritic cell can include one or more (e.g., a first/second/third/fourth) nanoshells.

**[000203]** A first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000204]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or

an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000205]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000206]** For example, a cannabis flavonoid is any of these molecules: Cannflavin A, Cannflavin B, Cannflavin C, Chrysoeriol, Cosmosiin and Flavocannabiside – but not limited to these examples.

**[000207]** The first nanoshell or the second nanoshell or the third nanoshell can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000208]** The first nanoshell or the second nanoshell or the third nanoshell can be a carbon nanodot.

**[000209]** The engineered dendritic cell can exchange or transfer the first/second/third nanoshell to the T-cell and/or the natural killer cell.

**[000210]** At least a first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000211]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or

an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000212]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000213]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000214]** These immature dendritic cells can include the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system.

**[000215]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for inactivation of immature dendritic cells and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine)

and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for enhanced interaction of dendritic cells with the T-cells and/or natural killer cells.

**[000216]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000217]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000218]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNA(s) and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

Modulating CRISPR-Cas9 System

**[000219]** These immature dendritic cells can include the modulating CRISPR-Cas9 system.

**[000220]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against a particular type of cancer cells.

**[000221]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000222]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000223]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000224]** These activated dendritic cells can then travel to nearby natural lymph nodes, where these can train other types of immune cells (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000225]** In general, but not limited to, an engineered dendritic cell (in vivo), wherein the engineered dendritic cell is residing in a biocompatible/biodegradable lymph node, wherein the lymph node is coated with a lattice of microgels or dipped in an antibiotic solution, wherein the engineered dendritic cell includes:

(a) a first molecule,

wherein the first molecule is selected from the group consisting of the following: a co-stimulating molecule, a mobility enhancing molecule and a programming molecule,

(b) an identifying protein on the surface of a particular type of cancer cells,

or

a sensing protein to detect a particular type of cancer cells,

(c) a nanostructure or a scaffold of biocompatible polymers or a scaffold of silk-fibroin,

wherein the nanostructure includes a deoxyribonucleic acid origami based nanostructure or a ribonucleic acid origami based nanostructure or a XNA origami based nanostructure for interaction with the T-cells and/or the natural killer cells against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases, wherein the nanostructure is functionalized by a pattern of ligands to induce or activate dendritic cell to initiate response of the T-cells and/or the natural killer cells, wherein the nanostructure is encapsulated in a lipid bilayer or the nanostructure is attached with a red blood cell or a white blood cell.

**[000226]** The engineered dendritic cell in above, can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000227]** The engineered dendritic cell in above, can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further

chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000228]** The engineered dendritic cell in above, further exchanges or transfers the sensing protein to the T-cells and/or the natural killer cells.

**[000229]** The engineered dendritic cell in above, further includes a nanoshell, wherein the nanoshell encapsulates deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000230]** The engineered dendritic cell in above, further exchanges or transfers the nanoshell with to the T-cells and/or the natural killer cells, wherein the nanoshell releases deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells within the T-cells and/or the natural killer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000231]** The engineered dendritic cell in above, wherein the nanostructure includes RNAi based logic circuit.

**[000232]** The engineered dendritic cell in above, further includes a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system removes a first defective gene for inactivation of a dendritic cell and adds/inserts/replaces a second gene, wherein the added/inserted/replaced

second gene expresses, or releases a third molecule to increase interaction with the T-cells and/or the natural killer cells. The added/inserted/replaced second gene includes one or more synthetic or artificial genetic bases.

**[000233]** The Cas9 can be replaced by Cas9-HFI or Cas12a. CRISPR-Cas9 system can be replaced by a transposon-encoded CRISPR-Cas system.

**[000234]** The engineered dendritic cell in above, includes a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system consists of Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus (AAV), wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes beneficial gene against a particular type of cancer cells.

Ex Vivo Engineered/Edited Dendritic Cells

**[000235]** Instead of an implanted biodegradable and biocompatible (artificial) lymph node, the activation of the dendritic cells by one or more molecules (e.g., co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells and/or sensing proteins to detect a particular type of cancer cells can be realized in ex vivo

**[000236]** The engineered dendritic cell (about 7 microns in diameter) can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000237]** The engineered dendritic cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major

Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000238]** The engineered dendritic cell can include or bind/couple (e.g., chemically bind/couple) with the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure for enhanced interaction with the T-cells and/or natural killer cells.

**[000239]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[000240]** To overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be attached with a red blood cell/white blood cell.

**[000241]** Alternatively, to overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be encapsulated in a lipid bilayer.

**[000242]** Furthermore, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can include or couple (e.g., chemically couple) with RNAi based logic circuit for precise/enhanced interaction of the engineered dendritic cells with the T-cells and/or natural killer cells.

**[000243]** RNAi based logic circuit can be capable of deciphering

(computation by RNAi-based logic circuit) the cellular transcriptome, which calculates levels of targeted biomarkers and determines whether cells are either healthy or cancerous by evaluating internal cell state through mRNA expression patterns specifically via an overexpression of Gata3, NPYIR and TFFI (as these are generally present in cancer cells).

**[000244]** The engineered dendritic cell can include one or more (e.g., a first/second/third/fourth) nanoshells.

**[000245]** At least a first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000246]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000247]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000248]** The first nanoshell or the second nanoshell or the third nanoshell can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000249]** The first nanoshell or the second nanoshell or the third nanoshell

can be a carbon nanodot.

**[000250]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000251]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000252]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000253]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more

deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000254]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

Ex Vivo Engineered/Edited Dendritic Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System

**[000255]** These dendritic cells can include the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system. Thus, these are engineered/edited dendritic cells.

**[000256]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for inactivation of immature dendritic cells and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for enhanced interaction of the dendritic cell with the T-cell and/or natural killer cell.

**[000257]** Autophagy is a process of maintaining cell homeostasis by

removing cellular waste and damaged cellular organelles. Autophagy of the dendritic cell can activate the T-cell's anticancer activity. Furthermore, autophagy related Atg5-deficient dendritic cell has significantly elevated receptor CD36 on its surface, which increased the phagocytosis of apoptotic cancer cell, but restricted the activation of the T-cell. Thus, controlling receptor CD36 on the surface of the dendritic cell by the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can activate the T-cell's anticancer activity.

**[000258]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000259]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000260]** The nanoshell can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000261]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer

cells.

Ex Vivo Engineered/Edited Dendritic Cells, Utilizing Modulating CRISPR-Cas9 System

**[000262]** These dendritic cells can include the modulated CRISPR-Cas9 system. Thus, these are engineered/edited dendritic cells.

**[000263]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against a particular type of cancer cells.

**[000264]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000265]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000266]** The nanoshell can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000267]** Autophagy is a process of maintaining cell homeostasis by removing cellular waste and damaged cellular organelles. Autophagy of the dendritic cell can activate the T-cell's anticancer activity. Furthermore, autophagy related Atg5-deficient dendritic cell has significantly elevated receptor CD36 on its surface, which increased the phagocytosis of apoptotic cancer cell, but restricted the activation of the T-cell. Thus, controlling receptor CD36 on the surface of the dendritic cell by the modulating

CRISPR-Cas9 system can activate the T-cell's anticancer activity.

**[000268]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells

**[000269]** When injected into human body, these engineered/edited dendritic cells may then travel to nearby natural lymph nodes, where these can train other types of immune cells (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000270]** The engineered dendritic cell can contain the nanoshell, wherein one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells are encapsulated within the nanoshell.

**[000271]** Furthermore, the engineered dendritic cell can contain the nanoshell, wherein one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells are encapsulated within the nanoshell.

**[000272]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize

and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000273]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000274]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000275]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000276]** Additionally, an engineered T-cells/natural killer cells can include or bind/couple (e.g., chemically bind/couple) with deoxyribonucleic acid origami nanostructure/ribonucleic acid origami nanostructure/XNA origami

nanostructure for enhanced interaction with the engineered/edited dendritic cells.

**[000277]** Additionally, the engineered T-cells/natural killer cells can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000278]** In general, but not limited to, an engineered dendritic cell (ex vivo) includes:

(a) a first molecule,

wherein the first molecule is selected from the group consisting of the following: a co-stimulating molecule, a mobility enhancing molecule and a programming molecule,

(b) an identifying protein on the surface of a particular type of cancer cells,

or

a sensing protein to detect a particular type of cancer cells and

(c) a nanostructure,

wherein the nanostructure includes a deoxyribonucleic acid origami based nanostructure or a ribonucleic acid origami based nanostructure or a XNA origami based nanostructure for interaction with the T-cells and/or the natural killer cells against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases, wherein the nanostructure is encapsulated in a lipid bilayer, or the nanostructure is attached with a red blood cell, or a white blood cell.

**[000279]** The engineered dendritic cell in above, further includes a second molecule to initiate response of the T-cells and/or the natural killer cells.

**[000280]** The engineered dendritic cell in above, further includes an activating protein to detect a molecular event within a particular type of cancer cells.

**[000281]** The engineered dendritic cell in above, further exchanges or transfers the sensing protein to the T-cells and/or the natural killer cells.

**[000282]** The engineered dendritic cell in above, further includes or binds/couples (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000283]** The engineered dendritic cell in above, further includes or binds/couples (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000284]** The engineered dendritic cell in above, further includes a nanoshell, wherein the nanoshell encapsulates deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000285]** The engineered dendritic cell in above, further exchanges or transfers the nanoshell to the T-cells and/or the natural killer cells, wherein the nanoshell releases deoxyribonucleic acid sequence and/or XNA

sequence to encode a therapeutic protein against a particular type of cancer cells within the T-cells and/or the natural killer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000286]** The engineered dendritic cell in above, wherein the nanostructure further includes RNAi based logic circuit.

**[000287]** The engineered dendritic cell in above, wherein the nanostructure is functionalized by a pattern of ligands to induce or activate dendritic cell to initiate response of the T-cells and/or the natural killer cells.

**[000288]** The engineered dendritic cell in above, further includes a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system removes a first defective gene for inactivation of a dendritic cell, and adds/inserts/replaces a second gene, wherein the added/inserted/replaced second gene expresses, or releases a third molecule to increase interaction with the T-cells and/or the natural killer cells. The added/inserted/replaced second gene includes one or more synthetic or artificial genetic bases.

**[000289]** The Cas9 can be replaced by Cas9-HFI or Cas12a. CRISPR-Cas9 system can be replaced by a transposon-encoded CRISPR-Cas system.

**[000290]** The engineered dendritic cell in above, further couples with or includes one or more modified exosomes.

**[000291]** The engineered dendritic cell in above, is an engineered and modulated dendritic cell, wherein the engineered dendritic cell further includes a modulating CRISPR-Cas9 system, wherein the modulating

CRISPR-Cas9 system includes Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus, wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes beneficial gene against a particular type of cancer cells.

Application To Editing B Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System Or Modulating CRISPR-Cas9 System To Create Specific Antibody

**[000292]** The CRISPR-Cas9 system/light activated CRISPR-Cas9 system or modulating CRISPR-Cas9 system can be utilized to modify B cells (a class of white blood cells) with genes that create specific antibodies that produce antibodies to protect from diseases and/or inflammation.

**[000293]** Furthermore, genes can include natural genetic bases such as adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and/or one or more synthetic/artificial genetic bases (e.g., α and ß).

**[000294]** Furthermore, the CRISPR-Cas9 system/light activated CRISPR-Cas9 system or modulating CRISPR-Cas9 system can be encapsulated in the nanoshell.

**[000295]** Additionally, the nanoshell can include synthetically created a small chain(s) of amino acids or a polypeptide for triggering B cells to create specific antibodies.

**[000296]** As an example, but not limited to, a synthetic polypeptide for a specific beta amyloid protein (Alzheimer's disease) can be a formula Vab-Rn-X-P-Y-Rn-Vab, wherein the synthetic polypeptide is engineered and chemically conjugated, wherein each variable antigen-binding (Vab) domain

includes a binding site for an antigen and all or a portion of the Vab domains are from camelid single-domain heavy chain antibodies lacking light-chains, wherein each Rn independently includes a camelid hinge region from a single domain heavy chain antibody lacking light chains, wherein X is a human immunoglobulin CH2 domain, wherein P is $-(CH_2\text{-}CH_2\text{-}O)_n$-, wherein n = 4, wherein Y is a succinimidyl moiety, wherein Y further includes -S-$(CH_2)_3$-C($NH_2Cl$)NH-, wherein the synthetic polypeptide binds or couples to a segment of a beta amyloid protein, wherein the beta amyloid protein has an amino acid sequence (Sequence ID No: 52): MDAEFRHDSG YEVHHQKLVF FAEDVGSNKG AIIGLMVGGV VIATVIVITL VMLKKKQYTS IHHGVVEVGK LDCMFPSGN, wherein the synthetic polypeptide has a molecular weight between 25 kDa and 90 kDa.

**[000297]** Similarly, a synthetic polypeptide for a specific tau protein (Alzheimer's disease) can be realized.

Application To Treatment Of HIV With An Engineered/Edited Or Modulated Stem Cell

**[000298]** In order for HIV, the virus causing AIDS, to enter cells it usually must fuse with a receptor called CCR5 that sits on the surface of T-helper immune cells.

**[000299]** The delta-32 mutation in the gene encoding the CCR5 protein results in a defective/mutated receptor site that can block the entry of the virus causing AIDS.

**[000300]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a stem cell to remove a first

gene (or first genes) that promote the development of mutation of the receptor called CCR5 and/or additionally, the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a stem cell to add/insert/replace a second gene (or genes) that promote the development of mutation of the receptor called CCR5.

**[000301]** Thus, a mutation strategy of the receptor called CCR5 can block the entry of the virus causing AIDS.

Application To Genetic Medicine, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System

**[000302]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include a drug printed by a three-dimensional printer/bio-ink printer.

**[000303]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for a disease and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein), beneficial against a particular type of diseased cells.

**[000304]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion

sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000305]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of diseased cells.

**[000306]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of diseased cells

Application To Genetic Medicine, Utilizing Modulating CRISPR-Cas9 System

**[000307]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial genes against a particular type of diseased cells.

**[000308]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000309]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event

within a particular type of diseased cells.

**[000310]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of diseased cells

Application To Transplantable Organ With Stem Cell, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System Or Modulating CRISPR-Cas9 System

**[000311]** A human induced pluripotent stem cells can be injected into the animal's embryo and placed into womb of the female animal (e.g., a pig/sheep) to grow a human organ – resulting in birth of an adult animal (e.g., a pig/sheep) with the human organ after nine (9) months.

**[000312]** Furthermore, the human induced pluripotent stem cells can be engineered/edited utilizing the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system or the modulating CRISPR-Cas9 system.

**[000313]** Then, the human organ can be transplanted to a patient, upon slaughtering the adult animal with the human organ.

Application To Stem Cell Derived Beta Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System Or Modulating CRISPR-Cas9 System

**[000314]** Immature pancreatic cells (beta cells) can be derived from human

embryonic stem cells. Such immature pancreatic cells (beta cells) can be edited utilizing CRISPR-Cas9 system or light activated CRISPR-Cas9 system, encapsulated in the nanoshell.

**[000315]** Alternatively, such immature pancreatic cells (beta cells) can be modulated utilizing modulating CRISPR-Cas9 system, encapsulated in the nanoshell.

**[000316]** The edited/modulated immature pancreatic cells (beta cells) can be encapsulated to protect from the human body's immune system. The encapsulated edited/modulated immature pancreatic cells (beta cells) can be implanted under the skin of the human body to manage insulin production for either Type -1 diabetes or Type- 2 diabetes

Replacement By Cas9-HFI Or Cas12a

**[000317]** In all previous paragraphs, high-fidelity Cas9-HFI or a suitable molecule (e.g., Cas12a) can be utilized instead of Cas9 for reduced off-targets.

Replacement By Transposon-Encoded CRISPR-Cas System (With Jumping Genes)

**[000318]** A first concern with is that editing with CRISPR-Cas9 system can alter deoxyribonucleic acid in places it is not supposed to be there and these off-target may trigger cancers. A second concern is that a cell can insert a random deoxyribonucleic acid when it is making repairs with CRISPR-Cas9 system and these could silence needed genes. A third concern is that it is harder to insert the right new genes with CRISPR-Cas9 system. A transposon-encoded CRISPR-Cas system (with jumping genes) can be

utilized instead of CRISPR-Cas9 system to reduce the above mentioned first, second and third concerns.

## PREFERRED EMBODIMENTS & SCOPE OF THE INVENTION

**[000319]** As used in the above disclosed specifications, the above disclosed specifications "/" has been used to indicate an "or".

**[000320]** As used in the above disclosed specifications and in the claims, the singular forms "a", "an", and "the" include also the plural forms, unless the context clearly dictates otherwise.

**[000321]** As used in the above disclosed specifications, the term "includes" means "comprises". Also the term "including" means "comprising".

**[000322]** As used in the above disclosed specifications, the term "couples" or "coupled" does not exclude the presence of an intermediate element(s) between the coupled items.

**[000323]** As used in the above disclosed specifications, any weight % in the above disclosed specifications is by way of an approximation only and not by way of any limitation.

**[000324]** Any dimension in the above disclosed specifications is by way of an approximation only and not by way of any limitation.

**[000325]** As used in the above disclosed specifications, unless otherwise specified in the relevant paragraph(s), a nanoscaled dimension shall generally mean a dimension from about 1 nm to about 1000 nm.

**[000326]** Any example in the above disclosed specifications is by way of an example only and not by way of any limitation. Having described and illustrated the principles of the disclosed technology with reference to the illustrated embodiments, it will be recognized that the illustrated embodiments can be modified in any arrangement and detail with departing from such principles. The technologies from any example can be combined in any arrangement with the technologies described in any one or more of the other examples. Alternatives specifically addressed in this application are merely exemplary and do not constitute all possible examples. Claimed invention is disclosed as one of several possibilities or as useful separately or in various combinations. See Novozymes A/S v. DuPont Nutrition Biosciences APS, 723 F3d 1336,1347.

**[000327]** The best mode requirement "requires an inventor(s) to disclose the best mode contemplated by him/her, as of the time he/she executes the application, of carrying out the invention." "...[T]he existence of a best mode is a purely subjective matter depending upon what the inventor(s) actually believed at the time the application was filed." See Bayer AG v. Schein Pharmaceuticals, Inc. The best mode requirement still exists under the America Invents Act (AIA). At the time of the invention, the inventor(s) described preferred best mode embodiments of the present invention. The sole purpose of the best mode requirement is to restrain the inventor(s) from applying for a patent, while at the same time concealing from the public preferred embodiments of their inventions, which they have in fact conceived. The best mode inquiry focuses on the inventor(s)' state of mind at the time he/she filed the patent application, raising a subjective factual question. The specificity of disclosure required to comply with the best

mode requirement must be determined by the knowledge of facts within the possession of the inventor(s) at the time of filing the patent application. See Glaxo, Inc. v. Novopharm Ltd., 52 F.3d 1043, 1050 (Fed. Cir. 1995). The above disclosed specifications are the preferred best mode embodiments of the present invention. However, they are not intended to be limited only to the preferred best mode embodiments of the present invention.

**[000328]** Embodiment by definition is a manner in which an invention can be made or used or practiced or expressed. "A tangible form or representation of the invention" is an embodiment.

**[000329]** Numerous variations and/or modifications are possible within the scope of the present invention. Accordingly, the disclosed preferred best mode embodiments are to be construed as illustrative only. Those who are skilled in the art can make various variations and/or modifications without departing from the scope and spirit of this invention. It should be apparent that features of one embodiment can be combined with one or more features of another embodiment to form a plurality of embodiments. The inventor(s) of the present invention is not required to describe each and every conceivable and possible future embodiment in the preferred best mode embodiments of the present invention. See SRI Int'l v. Matsushita Elec. Corp. of America, 775F.2d 1107, 1121, 227 U.S.P.Q. (BNA) 577, 585 (Fed. Cir. 1985) (enbanc).

**[000330]** The scope and spirit of this invention shall be defined by the claims and the equivalents of the claims only. The exclusive use of all variations and/or modifications within the scope of the claims is reserved. The general presumption is that claim terms should be interpreted using their

plain and ordinary meaning without improperly importing a limitation from the specification into the claims. See Continental Circuits LLC v. Intel Corp. (Appeal Number 2018-1076, Fed. Cir. February 8, 2019) and Oxford Immunotec Ltd. v. Qiagen, Inc. et al., Action No. 15-cv-13124-NMG. Unless a claim term is specifically defined in the preferred best mode embodiments, then a claim term has an ordinary meaning, as understood by a person with an ordinary skill in the art, at the time of the present invention. Plain claim language will not be narrowed, unless the inventor(s) of the present invention clearly and explicitly disclaims broader claim scope. See Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd., Case Nos. 17-1798; -1799; -1800 (Fed. Cir. Apr. 16, 2018) (Stoll, J). As noted long ago: "Specifications teach. Claims claim". See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001). The rights of claims (and rights of the equivalents of the claims) under the Doctrine of Equivalents-meeting the "Triple Identity Test" (a) performing substantially the same function, (b) in substantially the same way and (c) yielding substantially the same result. See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009)) of the present invention are not narrowed or limited by the selective imports of the specifications (of the preferred embodiments of the present invention) into the claims.

**[000331]** While "absolute precision is unattainable" in patented claims, the definiteness requirement "mandates clarity." See Nautilus, Inc. v. Biosig Instruments, Inc., 527 U.S., 134 S. Ct. 2120, 2129, 110 USPQ2d 1688, 1693 (2014). Definiteness of claim language must be analyzed NOT in a vacuum, but in light of:

(a) The content of the particular application disclosure,

(b) The teachings of any prior art and

(c) The claim interpretation that would be given by one possessing the ordinary level of skill in the pertinent art at the time the invention was made. (Id.).

See Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1 USPQ2d 1081 (Fed. Cir. 1986)

**[000332]** There are number of ways the written description requirement is satisfied. Applicant(s) does not need to describe every claim element exactly, because there is no such requirement (MPEP §2163). Rather to satisfy the written description requirement, all that is required is "reasonable clarity" (MPEP §2163.02). An adequate description may be made in any way through express, implicit or even inherent disclosures in the application, including word, structures, figures, diagrams and/or equations (MPEP §§ 2163(I), 2163.02). The set of claims in this invention generally covers a set of sufficient number of embodiments to conform to written description and enablement doctrine. See Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1355 (Fed. Cir. 2010), Regents of the University of California v. Eli Lilly & Co., 119 F.3d 1559 (Fed. Cir. 1997) & Amgen Inc. v. Chugai Pharmaceutical Co. 927 F.2d 1200 (Fed. Cir. 1991).

**[000333]** Furthermore, Amgen Inc. v. Chugai Pharmaceutical Co. exemplifies Federal Circuit's strict enablement requirements. Additionally, the set of claims in this invention is intended to inform the scope of this invention with "reasonable certainty". See Interval Licensing, LLC v. AOL Inc. (Fed. Cir. Sept. 10, 2014). A key aspect of the enablement requirement is that it only requires that others will not have to perform "undue

experimentation" to reproduce it. Enablement is not precluded by the necessity of some experimentation, "[t]he key word is 'undue', not experimentation." Enablement is generally considered to be the most important factor for determining the scope of claim protection allowed. However, enablement does not require that an inventor disclose every possible embodiment of his invention. The scope of enablement must be commensurate with the scope of the claims. The scope of the claims must be less than or equal to the scope of enablement. See Promega v. Life Technologies Fed. Cir., Dec. 2014, Magsil v. Hitachi Global Storage Fed. Cir. Aug. 2012.

**[000334]** The term "means" was not used nor intended nor implied in the disclosed preferred best mode embodiments of the present invention. Thus, the inventor(s) has not limited the scope of the claims as mean plus function.

**[000335]** An apparatus claim with functional language is not an impermissible "hybrid" claim; instead, it is simply an apparatus claim including functional limitations. Additionally, "apparatus claims are not necessarily indefinite for using functional language . . . [f]unctional language may also be employed to limit the claims without using the means-plus-function format." See National Presto Industries, Inc. v. The West Bend Co., 76 F. 3d 1185 (Fed. Cir. 1996), R.A.C.C. Indus. v. Stun-Tech, Inc., 178 F.3d 1309 (Fed. Cir. 1998) (unpublished), Microprocessor Enhancement Corp. v. Texas Instruments Inc. & Williamson v. Citrix Online, LLC, 792 F.3d 1339 (2015).

# Exhibit 2

## {Bates No. Appx 279-362}

## Filed Opening Appeal Brief @ PTAB

**US PATENT & TRADEMARK OFFICE**

**BEFORE BOARD OF PATENT APPEAL AND INTERFERENCES (BPAI)**

| | | |
|---|---|---|
| **Inventor(s):** | **Mazed** | |
| **Serial No.:** | **16/602,403** | **Examiner: Arthur Leonard** |
| **Filed:** | **September 28, 2019** | **Group Art Unit: 1631** |
| **MOLECULAR SYSTEM FOR CANCER BIOLOGY** | | |

**Mail Stop: Appeal Brief (Patents)**

Commissioner For Patents

USPTO

P.O. Box 1450

Alexandria, VA 22313-1450

Fax (571) 273-8300

**PLEASE DO NOT BREAK ENTIRE BRIEF AND ITS EXHIBITS INTO PARTS FOR LATER FILING IN FEDERAL CIRCUIT OF APPEAL**

CC. IP Blogs, Reuters, NY Times

## TABLE OF CONTENT


| SECTION | PAGE |
|---|---|
| **I.** REAL PARTY OF INTEREST | **5** |
| **II.** RELATED APPEAL, INTERFERENCES OR JUDICIAL PROCEEDINGS/TRIALS | **5** |
| **III.** STATEMENT OF FACTS | **5** |
| **IV.** STATUS OF CLAIMS | **5** |
| **V.** GROUNDS FOR FINAL REJECTION FOR ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87 | **6** |
| **VI.** ISSUES TO BE REVIEWED IN APPEAL FOR ENTERED INDEPENDENT CLAIM 85 & & ITS DEPENDENT CLAIM 87 | **6** |
| **VII. SUPPORT FOR ENTERED INDEPENDENT CLAIMS 85 & ITS DEPENDENT CLAIM 87** | **6** |
| CASE LAWS REGARDING PREFERRED BEST MODE SPECIFICATION | **10** |
| **VIII. APPLEANT'S ARGUMENTS IN THIS APPEAL** | **14** |
| **(A)** ENTERED INDEPENDENT CLAIM 85 & & ITS DEPENDENT CLAIM 87.... **PAGE 14** | |
| **(B)** PAGES 4-6 OF FINAL OFFICE ACTION ON ENTERED INDEPENDENT CLAIM 85 & & ITS DEPENDENT CLAIM 87... **PAGE 16** | |
| **(C)** TECHNICAL-LEGAL ARGUMENT AGAINST § 103 OBVIOUSNESS DETERMINATION ON ENTERED INDEPENDENT CLAIM 85 & & ITS DEPENDENT CLAIM 87 .... **PAGE 26** | |

| | |
|---|---|
| **(D)** FURTHER LEGAL ARGUMENT AGAINST § 103 OBVIOUSNESS DETERMINATION ON ENTERED INDEPENDENT CLAIM 85 & & ITS DEPENDENT CLAIM 87 …. **PAGE 44** | |
| **IX.** CONCLUSION | **71** |
| CERTIFICATE OF WORD COUNT | **73** |
| **CLAIM APPENDIX** | **74** |

**Citied Key Cases**

Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016) ....................................................................36, 49, 66, 72

Bayer Schering Pharm. AG v. Barr Labs., Inc., 575 F.3d 1341, 1350 (Fed. Cir)...................................................................59, 63

Crocs, Inc. v. U.S. Int'l Trade Comm'n, 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010)...........................................................39, 59, 72

Eisai Co. v. Dr. Reddy's Labs, Ltd, 533 F.3d1353 (Fed. Cir. 2008)......................................................36, 41, 62, 69, 72

Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018)...............................................................

In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970)............................................................36, 45, 50, 72

Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994)...............................................................28, 32, 71

Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001) .............................................................................11

Univ. of Strathclyde v. Clear-Vu Lighting LLC, No. 2020-2243, 2021 U.S. App. LEXIS 32872, *1 (Fed. Cir. Nov. 4, 2021)...........................40, 72

Pursuant to 37 C.F.R. 41.37 Appellant/Inventor, Mohammad A. Mazed files this Opening Brief, based on the following timeline.

(a) Before Final Office Action, there was NO claim amendment.

(b) Examiner's Final Office Action was on May 3, 2023.

(c) Pursuant to 37 C.F.R. 41.31 Notice of Appeal was filed on July 15, 2023.

(d) Thus, filing of this Opening Brief is timely.

## I. REAL PARTY OF INTEREST

The real party in interest is Appellant/Inventor, Mohammad A. Mazed.

## II. RELATED APPEAL, INTERFERENCES OR JUDICIAL PROCEEDINGS

Appellant is unaware of any related appeals, interferences or judicial proceedings/trial at the time of filing of this Opening Brief.

## III. STATEMENT OF FACTS

Examiner ignored Appellant's arguments after Final Office Action. Claims were NOT entered after First Office Action.

## IV. STATUS OF CLAIMS

Claims were NOT entered after First Office Action.

Only independent claim **85** and its dependent claim **87** were examined; other remaining claims were NOT examined.

## V. GROUNDS FOR FINAL REJECTION FOR ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87

Independent claim 85 and its dependent claim 87 were rejected on the ground of obvious under 35 U.S.C § 103 in view of (i) Chang et al. (US 2011/0275702, filed 10/02/2009), (ii) Chang et al., (US 2020/0385734, filed 1/10/2019, with priority to 62/615,806, filed 1/10/2018) and (iii) Ma. et al. (Semin Immunol, 2009, 21:265-272).

## VI. ISSUES TO BE REVIEWED IN APPEAL FOR ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87

Obviousness rejection under 35 U.S.C § 103 for independent claim 85 and its dependent claim 87 are to be reviewed.

## VII. SUPPORT FOR ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87

Paragraphs from 224 to 234 of the Text Specification (as listed below) generally describe the independent claim 85 and its dependent claim 87.

> "**[000224]** These activated dendritic cells can then travel to nearby natural lymph nodes, where these can train other types of immune cells (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.
>
> **[000225]** In general, but not limited to, an engineered dendritic cell (in vivo), wherein the engineered dendritic cell is residing in a biocompatible/biodegradable lymph node, wherein the lymph node is coated with a lattice of

microgels or dipped in an antibiotic solution, wherein the engineered dendritic cell includes:

**(a)** a first molecule,

wherein the first molecule is selected from the group consisting of the following: a co-stimulating molecule, a mobility enhancing molecule and a programming molecule,

**(b)** an identifying protein on the surface of a particular type of cancer cells,

or

a sensing protein to detect a particular type of cancer cells,

**(c)** a nanostructure or a scaffold of biocompatible polymers or a scaffold of silk-fibroin,

wherein the nanostructure includes a deoxyribonucleic acid origami based nanostructure or a ribonucleic acid origami based nanostructure or a XNA origami based nanostructure for interaction with the T-cells and/or the natural killer cells against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases, wherein the nanostructure is functionalized by a pattern of ligands to induce or activate dendritic cell to initiate response of the T-cells and/or the natural killer cells, wherein the nanostructure is encapsulated in a lipid bilayer or the

nanostructure is attached with a red blood cell or a white blood cell.

**[000226]** The engineered dendritic cell in above, can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000227]** The engineered dendritic cell in above, can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000228]** The engineered dendritic cell in above, further exchanges or transfers the sensing protein to the T-cells and/or the natural killer cells.

**[000229]** The engineered dendritic cell in above, further includes a nanoshell, wherein the nanoshell encapsulates deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000230]** The engineered dendritic cell in above, further exchanges or transfers the nanoshell with to the T-cells and/or the natural killer cells, wherein the nanoshell releases deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a

particular type of cancer cells within the T-cells and/or the natural killer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000231]** The engineered dendritic cell in above, wherein the nanostructure includes RNAi based logic circuit.

**[000232]** The engineered dendritic cell in above, further includes a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system removes a first defective gene for inactivation of a dendritic cell and adds/inserts/replaces a second gene, wherein the added/inserted/replaced second gene expresses, or releases a third molecule to increase interaction with the T-cells and/or the natural killer cells. The added/inserted/replaced second gene includes one or more synthetic or artificial genetic bases.

**[000233]** The Cas9 can be replaced by Cas9-HFI or Cas12a. CRISPR-Cas9 system can be replaced by a transposon-encoded CRISPR-Cas system.

**[000234]** The engineered dendritic cell in above, includes a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system consists of Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus (AAV), wherein the modulating CRISPR-Cas9 system activates an expression of one or

more genes beneficial gene against a particular type of cancer cells."

**Case Laws Regarding Preferred Best Mode Specification**

Numerous variations and/or modifications are possible within the scope of the present invention. Accordingly, the disclosed preferred best mode embodiments are to be construed as illustrative only. Those who are skilled in the art can make various variations and/or modifications without departing from the scope and spirit of this invention. It should be apparent that features of one embodiment can be combined with one or more features of another embodiment to form a plurality of embodiments. The inventor(s) of the present invention is not required to describe each and every conceivable and possible future embodiment in the preferred best mode embodiments of the present invention. See SRI Int'l v. Matsushita Elec. Corp. of America, 775F.2d 1107, 1121, 227 U.S.P.Q. (BNA) 577, 585 (Fed. Cir. 1985) (enbanc). The scope and spirit of this invention shall be defined by the claims and the equivalents of the claims only. The exclusive use of all variations and/or modifications within the scope of the claims is reserved. The general presumption is that claim terms should be interpreted using their plain and ordinary meaning. See Oxford Immunotec Ltd. v. Qiagen, Inc. et al., Action No. 15-cv-13124-NMG. Unless a claim term is specifically defined in the preferred best mode embodiments, then a claim term has an ordinary meaning, as understood by a person with an ordinary skill in the art, at the time of the present invention. Plain claim language will not be narrowed, unless the inventor(s) of the present invention clearly and explicitly disclaims broader claim scope. See Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd., Case Nos. 17-1798; -1799; -1800 (Fed. Cir. Apr.

16, 2018) (Stoll, J). As noted long ago: "Specifications teach. Claims claim". See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001).

The rights of claims (and rights of the equivalents of the claims) under the Doctrine of Equivalents-meeting the "Triple Identity Test" (a) performing substantially the same function, (b) in substantially the same way and (c) yielding substantially the same result. See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009)) of the present invention are not narrowed or limited by the selective imports of the specifications (of the preferred embodiments of the present invention) into the claims.

There are number of ways the written description requirement is satisfied. Applicant(s) does not need to describe every claim element exactly, because there is no such requirement (MPEP §2163). Rather to satisfy the written description requirement, all that is required is "reasonable clarity" (MPEP §2163.02). An adequate description may be made in anyway through express, implicit or even inherent disclosures in the application, including word, structures, figures, diagrams and/or equations (MPEP §§ 2163(I), 2163.02). The set of claims in this invention generally covers a set of sufficient number of embodiments to conform to written description and enablement doctrine. See Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1355 (Fed. Cir. 2010), Regents of the University of California v. Eli Lilly & Co., 119 F.3d 1559 (Fed. Cir. 1997) & Amgen Inc. v. Chugai Pharmaceutical Co. 927 F.2d 1200 (Fed. Cir. 1991).

Drawings under 37 C.F.R. § 1.83(a): In particular, as outlined in MPEP 608.02 Drawing [R-07.2015], the statutory requirement for showing the claimed invention only requires that the "applicant shall furnish a drawing where necessary for the understanding of the subject matter to be

patented..." (See 35 U.S.C. § 113, See also 37 CFR § 1.81(a), which states "[t]he applicant for a patent is required to furnish a drawing of the invention where necessary for the understanding of the subject matter sought to be patented...").

Furthermore, Amgen Inc. v. Chugai Pharmaceutical Co. exemplifies Federal Circuit's strict enablement requirements. Additionally, the set of claims in this invention is intended to inform the scope of this invention with "reasonable certainty". See Interval Licensing, LLC v. AOL Inc. (Fed. Cir. Sept. 10, 2014). A key aspect of the enablement requirement is that it only requires that others will not have to perform "undue experimentation" to reproduce it. Enablement is not precluded by the necessity of some experimentation, "[t]he key word is 'undue', not experimentation." Enablement is generally considered to be the most important factor for determining the scope of claim protection allowed. The scope of enablement must be commensurate with the scope of the claims. However, enablement does not require that an inventor disclose every possible embodiment of his invention. The scope of enablement must be commensurate with the scope of the claims. The scope of the claims must be less than or equal to the scope of enablement. See Promega v. Life Technologies Fed. Cir., Dec. 2014, Magsil v. Hitachi Global Storage Fed. Cir. Aug. 2012.

The term "means" was not used nor intended nor implied in the disclosed preferred best mode embodiments of the present invention. Thus, the inventor(s) has not limited the scope of the claims as mean plus function. The standard is "whether the words of the claim are understood by person of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." See Williamson v. Citrix Online, LLC, 792 F.3d 1339 (2015).

An apparatus claim with functional language is not an impermissible "hybrid" claim; instead, it is simply an apparatus claim including functional limitations. Additionally, "apparatus claims are not necessarily indefinite for using functional language . . . [f]unctional language may also be employed to limit the claims without using the means-plus-function format." See National Presto Industries, Inc. v. The West Bend Co., 76 F. 3d 1185 (Fed. Cir. 1996), R.A.C.C. Indus. v. Stun-Tech, Inc., 178 F.3d 1309 (Fed. Cir. 1998) (unpublished), Microprocessor Enhancement Corp. v. Texas Instruments Inc. & Williamson v. Citrix Online, LLC, 792 F.3d 1339 (2015).

## VIII. APPLEANT'S ARGUMENTS IN THIS APPEAL

## (A) ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87

**Independent Claim 85.**

An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**Dependent Claim 87.**

The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell.

**Note!* **A first** scaffold in the independent claim 85 was proper, when the dependent claim 93 had a second scaffold. Since the dependent claim 93 of a second scaffold was not examined, **the word first in independent claim 85** can be deleted in later amendment.

**(B) PAGES 4-6 OF FINAL OFFICE ACTION ON ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87**

"In regard to claim 85, Chang (2011) teaches engineered antigen presenting cells (APCs) comprising

A nanostructure comprising a polymer of nucleic acid based origami nanostructure for interaction with a T cell. Specifically, Chang (2011) teaches the origami nanostructure binds the MHC receptor on the APC, and the TCR on the T cells ([0046], see claim 13 of Chang (2011).

In regard to the nature of the origami nanostructure, Chang (2011) the origami comprises DNA scaffolds and RNA aptamers ([0066, 0109, 0150], Example 1, Fig. 1, 2, 5, 13). Thus, Chang (2011) teaches an XNA based origami comprising A, C, G, U and T. Furthermore, Chang (US2011) teaches synthetic or artificial bases to protect the origami from nucleases and other enzymatic activities ([0056, 0067]).

However, Chang (2011) is silent to dendritic cells as the APC, and that dendritic cells comprise (a) a first bioactive molecule such as a co-stimulatory molecule, (b) a second bioactive molecule to activate T cells, and (c) a synthetic protein found on a cancer cell.

Nevertheless, in regard to claim 85, Chang (US2020), which is the same inventor as Chang (US2011) teaches

engineered dendritic cells. Specifically, Chang (2020) teaches that dendritic cells comprise

a first bioactive molecule such as programing molecules like CD40/CD40L.

Although Chang (2020) does not explicitly teach that CD40/CD40L are programming molecules on DCs that couple them to activated T cells and B cells, the prior art review of Ma et al (2009) evidences that this is the case (p. 269, and see Fig. 1 of Ma).

a second bioactive molecule to activate a T cell such as MHC molecules.

an identifying protein on a cancer cell **such as a synthetic tumor antigen peptide bound to the RNA aptamer based origami nanostructure ([0041, 0290], see claim 40 of Chang (2020).**

[0041] In some aspects, one or more of the $R_3$ and/or $R_4$ moieties is a protein. In some aspects, the protein is selected from: tumor targeting peptide (TTP), a human cancer peptide, or calreticulin protein. In some aspects, the protein is calreticulin protein to RNA-origami to engage interactions between tumor cells and macrophages or dendritic cells for enhanced antigen presentation and stimulation of antigen-specific T cells. In some aspects, the protein is Human cancer peptide NY-ESO-1 or Muc1. In some aspects, the TTP is CTKD-K10 having the sequence:

(SEQ ID NO: 3)

CTKDNNLLGRFELSGGGSKKKKKKKKKK.

[0290] In some embodiments, one or more of $R_3$ and/or $R_4$ is a peptide that comprises a positively-charged moiety which comprises from about 10 positively-charged amino acids. The the positively-charged moiety is a peptide comprising 10 lysine residues.

40. A RNA nanostructure robot having the sequence of $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$, wherein:

$NR_1$ represents a first nano-robot comprising a single stranded RNA (ssRNA) of about 1500 to 10,000 bases in length that self-assembles into a first scaffold:

$NR_2$ represents a second nano-robot comprising a ssRNA of about 1500 to 10,000 bases in length that self-assembles into a second scaffold:

L is a linker which operably links $NR_1$ to $NR_2$:

wherein $R_3$ and $R_4$ are independently selected from a pair of fastener strands, an aptamer, a cargo molecule, a capture strand, a targeting strand, or H:

n is an integer from 1 to 20:

m is an integer from 0 to 20,

wherein $NR_1$ or $NR_2$ further comprises a complex comprising an RNA nanostructure and at least one therapeutic agent operably linked to the RNA nanostructure, and

wherein the therapeutic agent is a peptide that comprises a positively-charged moiety which comprises from about 10 positively-charged amino acids.

Accordingly, **it would have been obvious to prepare** the engineered APC comprising the origami nanostructure for interacting with a T cell as taught by Chang (2011), and choose a dendritic cell as the APC comprising an origami nanostructure for binding a synthetic peptide tumor antigen as taught by Chang (2020) with a reasonable expectation of success.

One of ordinary skill **would have been motivated to do so** for several reasons.

First, the artisan following the guidance of Chang (2011) for engineering APCs would have naturally turned to analogous art by the same inventor out of **common sense.**

In regard to the types of APCs as per the **preamble of claim 85, dendritic cells are the most common** for activating T cells and, as stated supra, have the programing factors (as per Claim 85 (a)), and bioactive molecules (as per Claim 85 (b)) for doing so.

Thus, **DCs would have been an obvious choice among a limited genus of APCs to engineer.**

In regard to the motivation for combining a DC comprising a nanostructure for binding a synthetic tumor peptide as per Claim 85 (c), Chang (2020) generally

demonstrates that this was an effective means for activating cells in a tumor antigen specific manner (see Example 3).

Furthermore, since both Chang (2011) and Chang (2020) are directed to immunotherapy for cancers, using a peptide would have immediately enabled the engineered dendritic cells of Chang to target tumors with already establish tumor antigens such as NY-ESO-1.

Finally, in regard to the first bioactive molecule (i.e., CD40/CD40L on DCs), the second bioactive molecule (i.e., MHC cell surface receptors on DC binding T cells), the identifying protein (i.e., the synthetic tumor antigen specific peptide), and the origami nanostructures being coupled, **Chang (2020) teaches engineered dendritic cells are capable of coupling with other cells via the origami nanostructures (see <u>Fig. 20, excerpt adjacent</u>), thus there was a reasonable expectation of success that such coupling would have occurred in the engineered dendritic cells of Chang."**



**[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

[0347] As shown in FIG. **20**, in some embodiments the RNA nanostructure polymeric robot **1** comprises a first nano-robot ($NR_1$) **8**, a second nano-robot ($NR_2$) **9**, a linker (L) **3**, a moiety ($R_3$) **2** and n is 1 or more, and the moiety $R_3$ is in contact with $NR_1$. In some embodiments, the moiety $R_3$ is an antigen peptide. A second optionally heterogeneous series of moiety $R_4$ (**4**, **5**, **6**, **7**) comprise a nucleolin-binding or other cancer tumor marker aptamers **5** wherein m is 2 or more, an aptamer-target bound lock **6**, optionally a cargo molecule **7**, and optionally a checkpoint antagonist **4**. In some embodiments, the linker (L) **3** comprises of a double-stranded oligonucleotide helix. In some embodiments, the antigen peptides are tumor antigen peptides. In some embodiments, the tumor antigen peptides are TTP. In some embodiments, the cargo molecule **7** is a therapeutic agent. In some embodiments, the cargo molecule **7** is an antibody. The antibody can be an anti-PD-1 antibody. The antibody can further comprise a linkage to a polylysine chain. In some embodiments, the checkpoint antagonist is an anti-PD-1 aptamer. In some embodiments, the checkpoint antagonist is an anti-PD-1 antibody. In some embodiments, the first nano-robot ($NR_1$) **8** is an immune-adjuvant RNA robot exhibiting immune-stimulatory properties. In some embodiments, the aptamer-target bound lock **6** is an INF-γ aptamer

bound to INF-γ. In some embodiments, the second nano-robot ($NR_2$) **9** is configured to be in a cylindrical conformation which is operably openable via the aptamer-target bound lock **6**. The RNA nanostructure polymeric robot **1** induces activation of T cells **11** at antigen-presenting cells **9** by contacting the first nano-robot ($NR_1$) **8** comprising a moiety $R_3$ wherein the moiety is an antigen peptide **2**, with a T cell **11**. In some embodiments, the second nano-robot ($NR_2$) **9** interacts with the tumor environment **13**. In some embodiments, the aptamer-target bound lock **6** is opened when the target is a compound, biomarkers, or protein present in high regional concentration in the tumor environment **13**. The aptamer-target bound lock **6** competitively binds with the free target in the tumor environment **13**, resulting in the unlocking of the second nano-robot ($NR_2$) **9**. The opening of the second nano-robot ($NR_2$) **9** exposes the optional cargo molecule **7**, and the optional checkpoint antagonist **4**, to the tumor environment. When the cargo molecule **7** is a therapeutic agent and/or the checkpoint antagonist **4** is present, the therapeutic agent and/or checkpoint antagonist effect tumor necrosis in the tumor environment **13**.

**In regard to claim 87,** Chang (US2020) teaches dendritic cells comprise pattern recognition receptors "PRRs" [0171], which detect **"DAMPs" that are molecular events within cancer cells.**

Hence, the claimed invention as a whole was **prima facie** obvious in the absence of evidence to the contrary.

> **[0171]** Certain embodiments of the invention provide an RNA nanostructure having immuno-stimulatory properties. As used herein, an immune-stimulatory RNA nanostructure stimulates the immune system by, for example, inducing activation or increasing activity of any components of the immune system, or by reducing inhibition of the immune system. In certain embodiments, the RNA nanostructure is an agonist of a pattern recognition receptor. As used herein, the terms "pattern recognition receptor" or "PRR" refer to proteins expressed by cells of the innate immune system, such as dendritic cells, macrophages, monocytes, neutrophils and epithelial cells, to identify two classes of molecules: pathogen-associated molecular patterns (PAMPs), which are associated with microbial pathogens, and damage-associated molecular patterns (DAMPs), which are associated with components of host's cells that are released during cell damage or death. PRRs also mediate the initiation of antigen-specific adaptive immune response and release of inflammatory cytokines. In certain embodiments, the PRR is a toll-like receptor (TLR) (e.g., TLR3 or TLR7).

**(C) TECHNICAL-LEGAL ARGUMENT AGAINST § 103 OBVIOUSNESS DETERMINATION ON ENTERED INDEPENDENT CLAIM 85 & ITS DEPENDENT CLAIM 87:**

| CLAIM 85 | DESCRIPTION | PRIOR ART | ARGUMENT |
|---|---|---|---|
| **PREAMBLE** | An engineered dendritic cell comprising | **NONE** | **Preamble is limiting.** |
| **CLAIM ELEMENT 1 OF CLAIM 85** | **(a)** a first bioactive molecule;<br>wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule, | **ALLEGED** CD40/CD40L is a Programming Molecule Per Ma | **Disputed See Publications 1 & 2** |
| **CLAIM ELEMENT 2 OF CLAIM 85** | **(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell; | **ALLEGED MHC Molecule** | |

| | | | |
|---|---|---|---|
| **CLAIM ELEMENT 3 OF CLAIM 85** | **(c)** an identifying protein on a cancer cell; and | **ALLEGED** Tumor Antigen Peptide **<u>bound to RNA Origami</u>** (Chang 2020) | **MISSING ELEMENT (1)**<br><br>**TEACHING AWAY & MISCONSTRUED BY EXAMINER** |
| **CLAIM ELEMENT 4 OF CLAIM 85**<br><br>➡ | **(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,<br><br>wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases, | | **MISSING ELEMENT (2) & MISCONSTRUED BY EXAMINER**<br><br>Scaffold of a biocompatible that interacts with T-cell and/or NK cell. Said scaffold includes an origami of DNA/RNA/XNA.<br><br>**Alleged Prior art is being used for "2" distinct claim elements – scaffold and DNA/RNA/XNA origami.**<br><br>**See also claim 93.** <u>Lantech, Inc. v. Keip Machine Co</u> |

| | | | |
|---|---|---|---|
| | | | |
| **CLAIM ELEMENT 5 OF CLAIM 85** | (e) wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled. | **NONE** | **MISSING ELEMENT (3) & MISCONSTRUED BY EXAMINER** |

*

| | | | |
|---|---|---|---|
| **DEPENDENT CLAIM 87** | The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell. | **NONE** | **MISSING ELEMENT (4) & MISCONSTRUED BY EXAMINER** |

**In Re: Claim Element 2**

CD40/CD40L is a Programming Molecule per Ma (**claim element 2**) is disputed based on two (2) publications listed below:

**Publication 1**:

Bullock, T.N.J. CD40 stimulation as a molecular adjuvant for cancer vaccines and other immunotherapies. Cell Mol Immunol 19, 14–22 (2022). https://doi.org/10.1038/s41423-021-00734-4

"**Publication 1 Title**: CD40 stimulation as **a molecular adjuvant** for cancer vaccines and other immunotherapies"

**Publication 2**:

https://journals.asm.org/doi/10.1128/CDLI.11.4.635-641.2004

**Publication 2 Title**: Targeting CD40L: a Promising Therapeutic Approach

"**CD40L is a member of the tumor necrosis factor (TNF) family** of cell surface interaction molecules"

**<u>In Re: Claim Element 3</u>**

(c) an identifying protein on a cancer cell (**claim element 3**)

**Analysis of claim element 3: Appellant's claim element 3 requires an engineered dendritic cell comprising an identifying protein (on a cancer cell).**

How does Chang (2020) teach an engineered dendritic cell comprising an identifying protein (on a cancer cell) when Chang (2020) has an identifying protein directly on a RNA Origami? **But an identifying protein directly on a RNA Origami (Chang 2020) teaches away from the Appellant's claim element 3**. Teaching way cannot provide any motivation (to a PHOSITA) to combine the teachings of the alleged prior art. Examiner misconstrued and failed to provide this evidence. Thus, it is a missing element).

Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element "X" and alleged prior art's distinct concept of "Y". But, Examiner misreads/misinterpret claim element "X" into alleged prior art's distinct concept of "Y".

**In Re: Claim Element 4**

(d) a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell, **wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami**, or a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases, (**claim element 4**)

**Analysis of claim element 4**: Appellant's claim element 4 requires a first scaffold of a biocompatible polymer, **wherein** the first scaffold at least includes an origami nanostructure of a DNA or a RNA or a XNA. Examiner misconstrued and failed to provide this evidence. Thus, it is a missing element. It is also improper to rely on the same structure in alleged prior art as being responsive to two different claim elements.

For example, a claim stating a biological computational processor, **wherein** the biological computational processor comprises a RNA logic gate. Examiner has to find first a prior art of (i) biological computational processor and also (ii) a prior art of a RNA logic gate, but NOT just RNA logic gate. Dependent claim 93 is instructive to extract the claim meaning. Examiner cannot use just a prior art of a RNA logic gate against two different claim elements. See Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994)

Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element "X" and alleged prior art's distinct concept of "Y". But, Examiner misreads/misinterpret claim element "X" into alleged prior art's distinct concept of "Y".

**<u>In Re: Claim Element 5</u>**

**(e)** wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled (**claim element 5**).

Examiner writes in his Final Office Action – "Chang (2020) teaches engineered dendritic cells are capable of coupling with other cells via the origami nanostructures (see Fig. 20, excerpt adjacent), thus there was a reasonable expectation of success that such coupling would have occurred in the engineered dendritic cells of Chang."

**[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

**Analysis of claim element 5: Fig. 20 does not teach at all what that Examiner claimed.** Examiner misreads/misinterprets/misleads claim element into alleged prior art's distinct concept.

**DEPENDENT CLAIM 87:** The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell

Evidence Provided by Examiner In regard to claim 87, Chang (US2020) teaches dendritic cells comprise pattern recognition receptors "PRRs" [0171], which detect **"DAMPs" that are molecular events within cancer cells.**

> [0171] Certain embodiments of the invention provide an RNA nanostructure having immuno-stimulatory properties. As used herein, an immune-stimulatory RNA nanostructure stimulates the immune system by, for example, inducing activation or increasing activity of any components of the immune system, or by reducing inhibition of the immune system. In certain embodiments, the RNA nanostructure is an agonist of a pattern recognition receptor. As used herein, the terms "pattern recognition receptor" or "PRR" refer to proteins expressed by cells of the innate immune system, such as dendritic cells, macrophages, monocytes, neutrophils and epithelial cells, to identify two classes of molecules: pathogen-associated molecular patterns (PAMPs), which are associated with microbial pathogens, and damage-associated molecular patterns (DAMPs), which are associated with components of host's cells that are released during cell damage or death. PRRs also mediate the initiation of antigen-specific adaptive immune response and release of inflammatory cytokines. In certain embodiments, the PRR is a toll-like receptor (TLR) (e.g., TLR3 or TLR7).

An agonist means a substance which initiates a physiological response when combined with a receptor. Meaning RNA nanostructure acts like an

agonist of a pattern recognition receptor or PRR-PRR refer to protein expressed by cells of the innate immune system such as dendritic cells (DC) …. to identify two classes of molecules PAMPS or damage associated with molecular patterns …. **DAMPS, which are associated with component's host's cells that are released during cell damage or death.**

**Analysis of Dependent Claim 87:** Where does this alleged prior art identify the dependent claim 87 (The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell)?

➡ Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element "X" and alleged prior art's distinct concept of "Y". But, Examiner misreads/misinterpret claim element "X" into alleged prior art's distinct concept of "Y".

When determining eligibility, USPTO must consider the claims as a whole without discounting or disregarding any claim element and without regard to its novelty or conventionality. The entire claim should be considered properly to ensure that **even "Minor" differences** in claim terms accurately reflect the desired breadth and scope over alleged prior art. **"All words in a claim must be considered in judging the patentability of that claim against the prior art."** In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) requires the "consideration" of every claim feature in an obviousness determination.

In Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016). Federal Circuit held that the PTAB conclusion that it would have been "**common sense**" for an ordinary artisan to supply the limitation missing from alleged prior art was not supported by substantial evidence.

Furthermore, unlike engineering, biology is an unpredictable technological field; result based on one molecule/cell does not produce the similar result on another molecule/cell. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for **unpredictable arts, "potential solutions are less likely to be genuinely predictable"**.

First, **common sense** is typically invoked to provide a known motivation to combine references, but NOT to supply a missing claim limitation. See DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).

To render claim unpatentable, Examiner must do **more than** merely "consider" each and every feature for Claim. See In re Royka, 490 F.2d 981, 180 USPQ 580 (CCPA 1974) (emphasis added) (to establish Prima Facie case of obviousness of Appellant's claimed invention, all claim features

must be taught or suggested by alleged prior art). A proper obviousness determination requires that Examiner make "a searching comparison of the claimed invention – including all its limitations with the teaching of the prior art." See In re Wada and Murphy, Appeal 2007-3733, citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including ... ascertaining the differences between Appellant's claimed invention and the alleged prior art. See Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added).

Federal Circuit has repeatedly warned that **use of inherency** in the context of obviousness must be carefully limited because "that which may be inherent is not necessarily known and that which is unknown cannot be obvious." See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V. (2017). To support inherency, Examiner must establish a clear factual record that demonstrates what is disclosed in alleged prior art that would prove that the inherent-undisclosed claim element was necessarily present. See Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018).

In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994) "When a piece of prior art 'suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant' the piece of prior art is said to 'teach away' from the claimed invention." See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994)).

Saying "the prior art shows A to accomplish Y, therefore B to accomplish Z would have been obvious" is a mere conclusion, and not the

type of rigorous explanation that the **KSR Guidelines** (KSR Int'l Co. v. TeleflexInc., 550 U.S. 398, 82 USPQ2d 1385 (2007)) mandate. The real trouble with "if A / Y then B / Z" is when it comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A / Y then B / Z" the obviousness rejection is a mere conclusion

For example, the fact that a certain result or characteristic may occur or be present in alleged prior art is NOT sufficient to establish the inherency of that result or characteristic. In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993).

Even if each and every element of independent claim 85 found in alleged prior art, without a motivation ("teaching-suggestion-motivation" (TSM)) to combine the teachings of the alleged prior art, there is still no reasonable expectation of success.

**But teaching way and/or missing claim elements cannot provide any motivation (to a PHOSITA) to combine the teachings of the alleged prior art in an unpredictable technological field and without motivation, there is no "reasonable expectation of success".** In an unpredictable technological field, there are many parameters that might be varied and when alleged prior art provides no guidance as to which parameter(s) might be most likely to successfully create Appellant's solution and therefore nonobvious.

Furthermore, what Nature and Level of Certainty is required to establish a "**Reasonable Expectation of Success**"? See Regents of the University of California et al. v. The Broad Institute Inc. et al; CAFC No 2017-1907. Crocs, Inc. v. U.S. Int'l Trade Comm'n, 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010). In re Omeprazole Patent Litigation, 536 F.3d 1361, 87 USPQ2d 1865 (Fed. Cir. 2008).

**The Federal Circuit's discussion in Crocs serves as a reminder to USPTO** merely pointing to the presence of even all claim elements in the prior art is not a complete statement of a rejection for obviousness. In accordance with **MPEP § 2143**, subsection I.A.(3), a proper rejection based on the rationale that the claimed invention is a combination of prior art elements also includes a finding that results flowing from the combination would have been predictable to a person of ordinary skill in the art.

**In re NuVasive (Fed. Cir. 2016)**

Still, in KSR Int'l Co. v. Teleflex Inc., *550* U.S. 398 (2007), the Supreme Court that it "can be important to identify a reason that would have prompted [PHOSITA] to combine the elements in the way the claimed new invention does." Extending that decision, the Federal Circuit ruled that PTO **must** (1) "articulate a reason why a PHOSITA would combine the prior art references (at the time of the invention)"; (2) have an adequate evidentiary basis for that finding; and (3) provide a "satisfactory explanation" for the motivation finding that includes an express and "rational" connection with the evidence presented. Thus, Examiner's "arguments amount to nothing more than conclusory statements" and thus should not be credited.

**Motivation Evidence For § 103 Obviousness @ PTAB**

Two PTAB decisions recently designated as informative show that failure to provide detailed evidence of motivation to combine references for an obviousness challenge, can sink a IPR Petition before or after institution of trial. In Johns Manville Corp. v. Knauf Insulation, Inc. (IPR2018-00827, Paper 9) PTAB denied institution of an IPR for lack of reasons to substitute compositions in one reference with those of another. In Hulu, LLC v. Sound

View Innovations, LLC (IPR2018-00582, Paper 34) detailed consideration of the facts may ultimately demonstrate a lack of motivation to combine. "Reasonable expectation of success" in combining the teachings of two prior art references require substantial evidence. See Univ. of Strathclyde v. Clear-Vu Lighting LLC , No. 2020-2243, 2021 U.S. App. LEXIS 32872, *1 (Fed. Cir. Nov. 4, 2021). Furthermore, as there missing claim elements in alleged prior art then the invention should not be obvious even under KSR (KSR Int'l Co. v. TeleflexInc., 550 U.S. 398, 82 USPQ2d 1385 (2007)) due to lack of predictability in the art and/or a lack of a reasonable expectation of success.

Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element X and alleged prior art's distinct concept of "Y. But, Examiner misreads claim element X into alleged prior art's distinct concept of "Y.

Examiner used **impermissible Hindsight Bias** to bridge the gap of the missing elements (as described before).

→ **"Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."**

See Otsuka Pharmaceutical Co. Ltd v. Sandoz Inc., 678F. 3d 1280 (Fed. Cir. 2012), cert denied, 133 S. Ct. 940 (Jan. 14. 2013) In re Brimonide Patent Litigation, 643 F.3d (Fed. Cir. 2011), cert denied (March 26, 2012).

**Obvious To Try**

As embodied in the MPEP § 2143, the "Obvious to Try" test has three prongs:

(1) a Recognized Problem,

(2) a Finite Number of identified and Predictable Solutions and

(3) a Reasonable Expectation of Success.

Kubin established two platforms (1) numerous possible solutions and no guidance as to which one might work and (2) experimentation in a promising field.

In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable".

**EXAMINER'S ASSERTION OF PRIMA FACIE § 103 OBVIOUSNESS ON INDEPENDENT CLAIM 85 AND ITS DEPENDENT CLAIM 87 ARE SOLEY BASED ON MISREPRESENTATION & MISCONSTRUCTION OF CLAIM ELEMENTS**

**Prima Facie** case is defined generally as:

"Evidence good and sufficient on its face; such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted is sufficient to sustain a judgment in favor of the issue which it supports, but which may be contradicted by other evidence ...." Blacks Law Dictionary, 1189-90 (6th ed., West 1990). See In re Glaug, 283 F.3d 1335, 1338 (Fed. Cir. 2002); cf. In re Piasecki, 745 F.2d 1468, 1471-72 (Fed. Cir. 1984).

A Prima Facie case of obviousness is established, when **three (3)** strict basic criteria have been met.

**First,** there must be some Suggestion or Motivation, either in alleged prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify alleged prior art being relied upon to reject Appellant's claimed invention.

**Second,** there must be an "Anticipated Success" or "Expectation of Success".

**Third**, alleged prior art must Teach or Suggest All Requirements of Appellant's claimed invention.

Federal Circuit has repeatedly warned that use of inherency in the context of obviousness must be carefully limited because "that which may be inherent is not necessarily known and that which is unknown cannot be obvious." See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V. (2017). To support inherency, Examiner must establish a clear factual record that demonstrates what is disclosed in alleged prior art that would prove that the inherent-undisclosed claim element was necessarily present. See Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018). In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994) "When a piece of prior art 'suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant' the piece of prior art is said to 'teach away' from the claimed invention." See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994)).

Speculation is NOT evidence. Teaching way and/or missing claim elements cannot provide any motivation (to a PHOSITA) to combine the teachings of the alleged prior art in an unpredictable technological field and

without motivation, there is no "reasonable expectation of success" and without "reasonable expectation of success".

Examiner's assertion of Prima Facie § 103 Obviousness of independent claim 85 and its dependent claim 87 are solely based on misrepresentation and misconstruction of Appellant's claim elements onto alleged prior art.

**(D) FURTHER LEGAL ARGUMENT AGAINST § 103 OBVIOUSNESS DETERMINATION ON ENTERED INDEPENDENT CLAIM 85 AND ITS DEPENDENT CLAIM 87**

**In a Broader Context**

https://www.thefreedictionary.com/reasonable

"Governed by or being in accordance with reason or sound thinking: a reasonable solution to the problem."

**"Broadest Reasonable" Interpretation v. "Broadest Possible" Interpretation**

The patent examiners are stretching patent claims like a plastic wrap, within reasonable limits, to see whether the claims overlap with the prior art. If a pending patent claim overlaps with the prior art it must be narrowed so that it does not so overlap. Notwithstanding, it is also important to note that the broadest reasonable interpretation does not mean the broadest possible interpretation.

1. How Specific or Atomized must the Instructions of alleged prior art be in order to support a Conclusion of Obviousness?
2. What Nature and Level of Certainty is required to establish a "Reasonable Expectation of Success"?

See Regents of the University of California et al. v. The Broad Institute Inc. et al; CAFC No 2017-1907

Alleged prior art reference must be considered in its **entirety**, i.e., as a whole, including portions that would lead away from the claimed invention. See W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540, 1550 (Fed. Cir. 1983).

→ **"All words in a claim must be considered in judging the patentability of that claim against the prior art."** In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970).

**[Phillips v. AWH Corporation]**

The entire claim should be considered properly to ensure that even "**Minor**" differences in claim terms accurately reflect the desired breadth and scope over alleged prior art. See Phillips v. AWH Corporation, No. 03-1269 (Fed. Cir. July 12, 2005).

**The general presumption is that claim terms should be interpreted using their plain and ordinary meaning.** See Oxford Immunotec Ltd. v. Qiagen, Inc. et al., Action No. 15-cv-13124-NMG. Unless a claim term is specifically defined in the preferred best mode embodiments, then a claim term has an ordinary meaning, as understood by a person with an ordinary skill in the art, at the time of the present invention. Plain claim language will not be narrowed, unless the inventor(s) of the present invention clearly and explicitly disclaims broader claim scope. See Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd., Case Nos. 17-1798; -1799; -1800 (Fed. Cir. Apr. 16, 2018).

Lastly, Appellant also directs attention to MPEP § 2143, the instructions of which buttress a conclusion that obviousness requires at least a suggestion of **all features** of a claim, since Supreme Court in KSR. stated that "there must be some articulated reasoning with some rational

underpinning to support the legal conclusion of obviousness." See KSR Int'l v. Teleflex Inc., 127 S. Ct. 1727, 1741 (2007) (quoting In re Kahn, 441 F.3d 977, 988 (Fed. Cir. 2006).

In sum, it remains well-settled law that obviousness requires at least a suggestion of all of the features in a claim. See In re Wada and Murphy, citing CFMT, Inc. v. Yieldup Intern. Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003) and In re Royka, 490 F.2d 981, 985 (CCPA 1974)).

Specifically, if something is missing in alleged prior art then the invention should not be obvious even under KSR due to lack of predictability in the art and/or a lack of a reasonable expectation of success. Because it would NOT merely be a reorganization of known components and would as a matter of fact have to interject at least something non-obvious. Moreover, there is nothing in Supreme Court's KSR decision that authorizes or even suggests that an obvious rejection is appropriate when all claim elements are NOT "found" in alleged prior art.

Similarly, Federal Circuit discussed the requirement that "PTAB must articulate a reason why a PHOSITA would combine the prior art references" and "identified some insufficient articulations of motivations to combine" in BPAI's recent decisions: conclusory statements, mere rejection of contrary arguments, and reliance solely on common knowledge, further in view of **NuVasive and Van Os.**

**[Prima Facie Case Of Obviousness]**

A Prima Facie case of obviousness is established, when three (3) strict basic criteria have been met. First, there must be some Suggestion or Motivation, either in alleged prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify alleged prior art being relied upon to reject Appellant's claimed invention. Second, there

must be an "Anticipated Success" or "Expectation of Success". Third, alleged prior art must Teach or Suggest All Requirements of Appellant's claimed invention.

Federal Circuit has repeatedly warned that use of inherency in the context of obviousness must be carefully limited because "that which may be inherent is not necessarily known and that which is unknown cannot be obvious." See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V. (2017). To support inherency, Examiner must establish a clear factual record that demonstrates what is disclosed in alleged prior art that would prove that the inherent-undisclosed claim element was necessarily present. See Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018).

In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994) "When a piece of prior art 'suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant' the piece of prior art is said to 'teach away' from the claimed invention." See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994)).

In a Broader Context Examiner needs to answer,

1. How Specific or Atomized must the Instructions of alleged prior art be in order to support a Conclusion of Obviousness?
2. What Nature and Level of Certainty is required to establish a "Reasonable Expectation of Success"?

See Regents of the University of California et al. v. The Broad Institute Inc. et al; CAFC No 2017-1907

Alleged prior art reference must be considered in its entirety, i.e., as a whole, including portions that would lead away from the claimed invention.

See W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540, 1550 (Fed. Cir. 1983).

Additionally, a reference may teach away from a use when that use would render the result inoperable. See McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1354 (Fed. Cir. 2001). This has resulted in a situation in which Examiner has erroneously failed to take into account the teachings of alleged prior art **as a Whole**, including portions that, as we have herein found, teach away from Appellant's claimed invention. See Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1568 (Fed. Cir. 1987) (error to not consider prior patent in its entirety, i.e., as a whole, including portions that would lead away from the invention).

Furthermore, In re Fulton and factor that holding into Appellant's argument, whether a reference teaches away from a claimed invention is a question of fact. See In re Harris, 409 F.3d 1339, 1341 (Fed. Cir. 2005).

"A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be led in a direction divergent from the path that was taken by the applicant." In re Haruna, 249 F.3d 1327, 1335 (Fed. Cir. 2001) (quoting Tec Air, Inc. v. Denso Mfg. Mich., Inc., 192 F.3d 1353, 1360 (Fed. Cir. 1999)).

**[How Does Combination Work?]**

In Personal Web Techs., LLC v. Apple, Inc. 848 F.3d 987 (Fed. Cir. 2017), Federal Circuit found that the PTAB's analysis was lacking with respect to both alleged prior art's disclosure of the claim elements and the rationale underlying the combination of references. On the latter point, Federal Circuit went into greater substantive detail than in NuVasive and Van Os, holding that it is simply not enough "that a skilled artisan, once presented with the two references, would have understood that they could be

combined." The court further criticized the PTAB's failure to explain "how the combination of the two references was supposed to work."

In re NuVasive, Inc Federal Circuit discussed the requirement that "the PTAB must articulate a reason why a PHOSITA would combine the prior art references" and "identified some insufficient articulations of motivations to combine" in the PTAB's recent decisions: conclusory statements, mere rejection of contrary arguments, and reliance solely on common knowledge.

**[Common Sense]**

In Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016). Federal Circuit held that the PTAB conclusion that it would have been **"common sense"** for an ordinary artisan to supply the limitation missing from alleged prior art was not supported by substantial evidence.

It is well established that when alleged prior art discloses multiple distinct embodiments, combining teachings from those distinct embodiments requires an obviousness analysis, including a demonstration of why one of ordinary skill would be motivated to combine those disparate teachings. See Cutsforth Inc. v. Motivepower Inc., No. 2015-1316 (Fed. Cir. Jan. 22, 2016). In Cutsforth Inc. v. Motivepower Inc. the Court states that "explain why a person of ordinary skill in the art would modify prior art references to create the claimed invention"; and In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000) and In re Rouffet, 149 F.3d 1350 (Fed. Cir. 1998).

**[On Missing Element]**

**"All words in a claim must be considered in judging the patentability of that claim against the prior art."** In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970). First, common sense is typically invoked to provide a known motivation to combine references, but

NOT to supply a missing claim limitation. See DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).

To render Claim unpatentable, Examiner must do more than merely "consider" each and every feature for Claim. See In re Royka, 490 F.2d 981, 180 USPQ 580 (CCPA 1974) (emphasis added) (to establish Prima Facie case of obviousness of Appellant's claimed invention, all claim features must be taught or suggested by alleged prior art). A proper obviousness determination requires that Examiner make "a searching comparison of the claimed invention – including all its limitations with the teaching of the prior art." See In re Wada and Murphy, Appeal 2007-3733, citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including … ascertaining the differences between Appellant's claimed invention and the alleged prior art. See Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added).

Appellant submits that this is why Section 904 of MPEP instructs Examiner to conduct an art search that covers "the invention as described and claimed." (emphasis added).

Lastly, Appellant also directs attention to MPEP § 2143, the instructions of which buttress a conclusion that obviousness requires at least a suggestion of all features of a claim, since Supreme Court in KSR. stated that "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." See KSR Int'l v. Teleflex Inc., 127 S. Ct. 1727, 1741 (2007) (quoting In re Kahn, 441 F.3d 977, 988 (Fed. Cir. 2006).

In sum, it remains well-settled law that obviousness requires at least a suggestion of all of the features in a claim. See In re Wada and Murphy, citing CFMT, Inc. v. Yieldup Intern. Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003) and In re Royka, 490 F.2d 981, 985 (CCPA 1974)).

**[Impermissible Hindsight Bias]**

Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describe a distinct concept of "Y" and there is a high degree of separation between claim element X and alleged prior art's distinct concept of "Y".

But, Examiner misreads claim element "X" into alleged prior art's distinct concept of "Y".

Examiner used impermissible Hindsight Bias to bridge the gap of the missing elements (as described before).

→ **"Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."**

The combination of alleged prior art is improper, because Examiner heavily relies on information gleaned solely from Appellant's specification. MPEP § 2142 states that "impermissible Hindsight **must be avoided** and the legal conclusion must be reached on the basis of the facts gleaned from the prior art" (emphasis added).

"Any judgment on obviousness is in a sense necessarily a reconstruction based on hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill in the art at the time the claimed invention was made and does not include

knowledge gleaned only from Appellant's disclosure, such a reconstruction is proper'"

In view of the foregoing, there is NO Evidence of Flexible TSM that Examiner avoided (a) knowledge and (b) residual memory gleaned from Appellant's claimed invention. Rather evidence based analysis on the contrary regarding Examiner used Hindsight Bias.

**Part I**: Would one of ordinary skills in the art have selected asserted alleged prior art as the best candidate(s) or most promising starting point(s) for further development efforts?

**Part II**: Would alleged prior art have supplied one of ordinary skills in the art with a reason or motivation to modify alleged prior art to make Appellant's claimed invention with an expectation of success? Not simply obvious to try. See Otsuka Pharmaceutical Co. Ltd v. Sandoz Inc., 678F. 3d 1280 (Fed. Cir. 2012), cert denied, 133 S. Ct. 940 (Jan. 14. 2013) In re Brimonide Patent Litigation, 643 F.3d (Fed. Cir. 2011), cert denied (March 26, 2012).

"Patent examination is necessarily conducted by Hindsight with complete knowledge of Applicant's invention and courts have recognized the subjective aspects of determining whether an inventor would reasonably be motivated to go to the field in which the examiner found the reference, in order to solve the problem confronting the inventor." In re Oetiker, 977 F.2d 1443, 1447 (Fed. Cir. 1992). As such, the fact finder must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." KSR, 550 U.S. at 421(citing the warning in Graham, 383 U.S. at 36, against the "temptation to read into the prior art the teachings of the invention in issue").

In this case, Examiner has not articulated a reasonable basis with rational underpinnings as to **How** and **Why** alleged prior art could be combined to render Appellant's claimed invention Prima Facie case of obviousness.

It is improper to base a conclusion of obviousness upon facts gleaned only through Impermissible Hindsight. See W.L. Gore and Assocs. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983).

In determining the differences between alleged prior art and Appellant's claimed invention, the critical question under 35 U.S.C. § 103 is NOT whether the differences themselves would have been obvious, but whether Appellant's claimed invention **as a Whole** would have been obvious. See Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530 (Fed. Cir. 1983). W.L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1548 (Fed.Cir.1983), cert. denied, 469 U.S. 851 (1984). Obviousness can not be established using Hindsight Bias or in view of the teachings or suggestions of the inventor. Id. at 1551, 1553.

"To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction-an illogical and inappropriate process by which to determine patentability." See Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1570 (Fed. Cir. 1996) (citing W.L. Gore & Assoc. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983)).

"The invention must be viewed **NOT** after the blueprint has been drawn by the inventor, but as it would have been perceived in the state of the art that existed at the time the invention was made." Id. (citing Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1138 (Fed. Cir. 1985)).

By using knowledge gleaned from Appellant's claimed invention, Examiner improperly relied on impermissible Hindsight Bias to conveniently chain together alleged prior art to make a case for obviousness. Reconstructing Appellant's claimed invention only with the benefit of Hindsight Bias is insufficient to establish a Prima Facie case of Obviousness.

It has not been shown that a person of ordinary skill would reasonably be expected to seek the teachings of reference A and apply it to reference B, without the benefit of Hindsight.

The determination of the content of alleged prior art under Graham must be done with a view of alleged prior art at the time of invention to avoid impermissible hindsight. "It is difficult but necessary that the decision maker forget what he or she has been taught ... about the claimed invention and cast the mind back to the time the invention was made (often as here many years), to occupy the mind of one skilled in the art...." See W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983).

Moreover, one of skill in the art is not compelled to blindly follow the teaching of one reference of alleged prior art over other reference of alleged prior art, without the exercise of independent judgment. See Lear Siegler, Inc. v. Aeroquip Corp., 733 F.2d 881, 889 (Fed. Cir. 1984).

Furthermore, modifying reference is indicative of Hindsight Reconstruction and ex-post facto reasoning. "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of argument reliant upon ex post reasoning." "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements" and "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." See KSR v. Teleflex Inc., 550

U.S. 398, 418 (2007) (quoting In re Kahn' 441 F.3d 977, 988 (Fed. Cir. 2006)).

Examiner's catch-all phrase "it would have been obvious" .......

In short, Examiner's Obviousness rejection lack clear evidence as to **How** and **Why** alleged prior art would be combined, beyond a simple reasoning that effectively amounts to an assertion that one of skill in the art would try to make the combination to enable "Anticipated Success" or "Expectation of Success" for Appellant's claimed invention.

Obviousness rejections can not be sustained by mere conclusions. There must be some articulated reasoning to support conclusion. In re Gitt Air Technologies, Inc., 630 F.3d 1336(Fed. Cir. 2011)_There must still be some evidence or suggestion in alleged prior art of such configuration. See Amkor Technology, Inc. v. U.S. Int'l Trade Commission, 692 F.3d 1250 (Fed. Cir. 2012).

There must be a reasonable Expectation of Success in using to enable Appellant's claimed invention. See Alcon Research, Ltd. v. Apotex, Inc., 687 F.3d 1362 (Fed. Cir. 2012).

**[Prima Facie Case Of Obviousness]**

"Only God creates new things. Man must work with old elements." How would have been Prima Facie obvious to one having ordinary skill in the art at the time of the invention? Examiner does not provide any analysis of Prima Facie case of obviousness here. Prima Facie case is defined generally as:

> "Evidence good and sufficient on its face; such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted is sufficient

to sustain a judgment in favor of the issue which it supports, but which may be contradicted by other evidence ...." Blacks Law Dictionary, 1189-90 (6th ed., West 1990). See In re Glaug, 283 F.3d 1335, 1338 (Fed. Cir. 2002); cf. In re Piasecki, 745 F.2d 1468, 1471-72 (Fed. Cir. 1984).

A Prima Facie case of obviousness is established, when three (3) strict basic criteria have been met. First, there must be some Suggestion or Motivation, either in alleged prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify alleged prior art being relied upon to reject Appellant's claimed invention. Second, there must be an "Anticipated Success" or "Expectation of Success". Third, alleged prior art must Teach or Suggest All Requirements of Appellant's claimed invention.

Generally, an examiner examines claims first, then only by hindsight (d/reconstruction), picks alleged prior art, using Appellant's invention as a template. This is unacceptable to pick closest alleged prior art in hindsight for claiming a Prima Facie case of obviousness. See Purdue Pharma v. Dopomed.

The initial burden of establishing a Prima Facie case of obviousness to deny patentability of Appellant's claimed invention is always upon Examiner considering Appellant's claimed invention and alleged prior art **As a Whole**. In re Oetiker, 977 F.2d 1443, 1445 (Fed. Cir. 1992), also In re Piasecki, 745 F.2d 1468, 1472 (Fed. Cir. 1984).

The Prima Facie case of obviousness must include articulated reasoning with some rational underpinning. Unsupported assertions are not adequate, using Appellant's claimed invention, as a template through

hindsight biased d/reconstruction of Appellant's claimed invention. See Ex Parte Crawford et al, Appeal 20062429, decided on May 30, 2007.

A casual statement by Examiner that "it would have been Prima Facie obvious" is within the motivation of ordinary skill in the art is NOT sufficient by itself to establish Prima Facie obviousness. As further explained in MPEP §§ 2141 and 2143, Examiner must provide a reasoned explanation as to **Why** Appellant's claimed invention would have been obvious to one of ordinary skill in the art at the time of the invention, when there are missing elements in alleged prior art? This requirement for explanation remains even in intangible realities such as common sense and ordinary ingenuity.

Furthermore, a statement that modifications of alleged prior art to meet Appellant's claimed invention would have been well within the ordinary skill of the art at the time Appellant's claimed invention was made because alleged prior art relied upon teach even all aspects of Appellant's claimed invention were individually known in the art is NOT sufficient to establish a Prima Facie case of obviousness.

Without an Objective Reason to Combine the teachings of alleged prior art to enable "Anticipated Success" or "Expectation of Success" at the time of invention. See Ex parte Levengood, 28 USPQ2d 1300 (Bd. Pat. App. & Inter. 1993).

Thus, "obviousness requires a Suggestion of **All** limitations in a Claim." See CFMT, Inc. v. Yieldup Intern. Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003) (citing In re Royka, 490 F.2d 981, 985 (CCPA 1974)).

''[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'' See

KSR, 550 U.S. at 418, 82 USPQ2d at 1396 (quoting In re Kahn, 441 F.3d 977, 988, 78 USPQ2d 1329, 1336 (Fed. Cir. 2006)). See Crocs Inc. v. International Trade Commission 598 F.3d 1294(Fed. Cir. 2010). In re Omeprazole 536 F.3d 1361 (Fed. Cir. 2008), Sundance Inc. v. DeMonte Fabricating Ltd. 550 F.3d 1356 (Fed. Cir. 2008), Ecolab Inc. v. FMC Corp. 569 F.3d 1335 (Fed Cir. 2009), Wyers v. Master Lock Co. No. 2009-1412 F.3d-(Fed. Cir. July 22, 2010), DePuy Spine Inc. v. Medtronic Sofamor Danek Inc. 567 F.3d 1314 (Fed. Cir. 2009), Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 92 USPQ2d 1849 (Fed. Cir. 2009) and Ex parte Seemed No. 2009-1696 (BPAI 2009).

"Furthermore, obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. See KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007).

Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined alleged prior art in the normal course of research and development to yield Appellant's claimed invention into Anticipated Success at the time of Appellant's invention. Id. at 421 (describing that a person of ordinary skill possesses "ordinary creativity, [and is] not an automaton"), See Bayer Schering Pharm. AG v. Barr Labs., Inc., 575 F.3d 1341, 1350 (Fed. Cir. 2009) ("The statutory criterion is whether the invention would have been obvious to persons of ordinary skill at the time of the invention, NOT whether it is sufficiently simple to appear obvious to Judges (Examiners) after the discovery is finally made . . . .)."

Federal Circuit has repeatedly warned that use of inherency in the context of obviousness must be carefully limited because "that which may

be inherent is not necessarily known and that which is unknown cannot be obvious." See Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V. (2017).

**[Phillips v. AWH Corporation]**

The entire claim should be considered properly to ensure that even "Minor" differences in claim terms accurately reflect the desired breadth and scope over alleged prior art. See Phillips v. AWH Corporation, No. 03-1269 (Fed. Cir. July 12, 2005).

**The general presumption is that claim terms should be interpreted using their plain and ordinary meaning.** See Oxford Immunotec Ltd. v. Qiagen, Inc. et al., Action No. 15-cv-13124-NMG. Unless a claim term is specifically defined in the preferred best mode embodiments, then a claim term has an ordinary meaning, as understood by a person with an ordinary skill in the art, at the time of the present invention. Plain claim language will not be narrowed, unless the inventor(s) of the present invention clearly and explicitly disclaims broader claim scope. See Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd., Case Nos. 17-1798; -1799; -1800 (Fed. Cir. Apr. 16, 2018).

**[Limitations On Inherency In Alleged Prior Art]**

In order to combat the subjective nature of inherency rejections, Federal Circuit has set forth several important limitations. For example, the fact that a certain result or characteristic may occur or be present in alleged prior art is NOT sufficient to establish the inherency of that result or characteristic. In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993). Furthermore, "[a]n invitation to investigate is not an inherent disclosure" where a prior art reference "discloses no more than a broad genus of

potential applications of its discoveries." See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1367 (Fed. Cir. 2004).

Another important limitation is that the inherent teaching of alleged prior art reference is a question of fact, both in the context of inherent anticipation and inherent obviousness.

What this means is that who relies upon inherence must provide the basis in fact or technical reasoning that reasonably supports the determination that allegedly inherent characteristic necessarily flows from what has been specifically disclosed within alleged prior art. See Par Pharmaceutical Inc. v. Twi Pharmaceuticals, Inc.. 14-1391 (Fed. Cir. Dec. 3, 2014). In re Giannelli, 2014 WL 104029 (Fed. Cir. Jan. 13, 2014) likely, everyone personally agrees that claim is likely unpatentable (then there has got to be alleged prior art out there).

However, the evidence of record must demonstrate the Legal Standard – Examiner's own whimsical views are NO substitute for Evidence and Legal Analysis.

Obviousness requires that a person of ordinary skill in the art have reasonably expected success in achieving the known goal. The expectation-of-success analysis must match the desire goal and not switch to a different goal that may be less challenging, but also a less worthwhile pursuit. Id. at 1346 referring to KSR at 550 U.S. at 421 (asking if there is a "design need or market pressure to solve" a problem and if that same problem is one having "identified, predictable solutions") (emphasis added). See Institut Pasteur & Univ. Pierre Et Marie Curie v. Focarino 738 F.3d 1337 (Fed. Cir. 2013)

**[Obvious To Try]**

As embodied in the MPEP §2143, the "Obvious to Try" test has three prongs: (1) a Recognized Problem, (2) a Finite Number of identified and Predictable Solutions and (3) a Reasonable Expectation of Success.

Kubin established two platforms (1) numerous possible solutions and no guidance as to which one might work and (2) experimentation in a promising field. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable".

The relevant categories are (1) situations in which one would have "to vary all parameters … where the prior art gave either no indication of which parameters were critical …" and (2) situations in which the rejections identify a promising field of experimentation where alleged prior art gives no guidance as to arriving at Appellant's claimed invention.

"When a field is 'unreduced by direction of the prior art,' and when prior art gives 'no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful,' an invention is not obvious to try." See Bayer Schering Pharm. AG v. Barr Labs., Inc., 575 F.3d 1341, 1347 [91 USPQ2d 1569] (Fed. Cir. 2009).

**[Degree To Which Results Are Predictable]**

Another factor is whether Appellant's claimed invention is predictable by simply pausing to consider whether a person of ordinary skill in the art would have had a "reasonable expectation of success" in combining alleged prior art, **further in view of Missing Elements.** In a technological field, there are many parameters that might be varied and when alleged prior art provides no guidance as to which parameter(s) might be most likely to successfully create Appellant's solution and therefore nonobvious.

**[Inherency Does Not Speak For Itself In Alleged Prior Art]**

"A party must ... meet a high standard in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art." See Par Pharmaceutical Inc. v. Twi Pharmaceuticals, Inc., 14-1391 (Fed. Cir. Dec. 3, 2014).

**[Obviousness Cannot Be Predicated On What Is Unknown In Alleged Prior Art]**

To support inherency, Examiner must establish a clear factual record that demonstrates what is disclosed in alleged prior art that would prove that the inherent-undisclosed claim element was necessarily present. See Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018).

A particular case may not be inherently obvious depending on what was expected by a person of ordinary skill. The court pointed out "'the mere fact that a certain thing may result from a given set of circumstances is not sufficient' to render the results inherent." See Millennium Pharmaceuticals, 2017 WL 3013204, at *6 (citations omitted by author). The court also held that it is never appropriate to consider "what the inventor intended when the experiment was performed,"

Thus, hindsight reasoning should never be applied and, obviousness is "measured objectively in light of the prior art, as viewed by a person of ordinary skill in the invention in that industry at the time of invention.

Incidentally, more recently, in Honeywell International Inc. v. Mexichem, Federal Circuit reaffirmed the foregoing principle on focusing on what a person of ordinary skill would have expected. See Honeywell

International Inc. v. Mexichem Appeal No. 2016-1996, 2017-WL3254943 (Fed. Cir. Aug. 1, 2017) at *5. Inherency in the context of obviousness must be carefully circumscribed because "[t]hat which may be inherent is not necessarily known" and that which is unknown cannot be obvious. [Id. at *4]. Examiner needs to show that one of ordinary skill would have had a motivation to combine the references with a reasonable expectation of success. Id. at *5.

**["Why" Is Important In Obviousness Analysis In Alleged Prior Art]**

**Why** it would have been routine optimization to arrive at Appellant's claimed invention. Examiner provided No rational or explanation. See In re Stepan Company.

**[Motivated To Do v. Able To Do]**

To avoid Impermissible Hindsight, an obvious to combine analysis should focus on what a person of ordinary skill would have been **Motivated to Do, NOT on what a person of ordinary skill would have been Able to Do**. "A reference teaches away when it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." See Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed Cir. 20006).

**"Opinions about obviousness are to a certain extent a function of time." Albert Einstein, a patent examiner.**

A proper obviousness rejection is based on a "fact-intensive comparison of the claimed process with the prior art rather than the mechanical application of one or another per se rule."

> "Where a skilled artisan merely pursues "known options" from "a finite number of identified, predictable solutions," the resulting invention is obvious under Section 103. KSR, 550

U.S. at 421. Where, however, a defendant urges an obviousness finding by "merely throw[ing] metaphorical darts at a board" in hopes of arriving at a successful result, but "the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful," courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

**Moreover, there is nothing in Supreme Court's KSR decision that authorizes or even suggests that an obvious rejection is appropriate when all claim elements are NOT "found" in alleged prior art.**

In Personal Web Techs., LLC v. Apple, Inc. 848 F.3d 987 (Fed. Cir. 2017), Federal Circuit found that BPAI's analysis was lacking both alleged prior art's (a) disclosure of claim elements (with respect to claimed invention) and (b) rationale of underlying the combination of references (with respect to claimed invention).

On the latter point, Federal Circuit went into greater substantive detail than in NuVasive and Van Os, holding that it is simply NOT enough "that a skilled artisan, once presented with the two references, would have understood that they could be combined."

Court states that "explain Why a person of ordinary skill in the art would modify prior art references to create the claimed invention"; and In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000) and In re Rouffet, 149 F.3d 1350 (Fed. Cir. 1998).

Federal Circuit further criticized BPAI's failure to explain "how the combination of the two references was supposed to work." In re NuVasive,

Inc., Federal Circuit discussed the requirement that "PTAB must articulate a reason why a PHOSITA would combine the prior art references" and "identified some insufficient articulations of motivations to combine" in BPAI's recent decisions: conclusory statements, mere rejection of contrary arguments, and reliance solely on common knowledge.

In Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016), Federal Circuit held that BPAI's conclusion that it would have been "common sense" for an ordinary artisan to supply the limitation missing from alleged prior art was not supported by substantial evidence.

It is well established that when alleged prior art discloses multiple distinct embodiments, combining teachings from those distinct embodiments (of software simulations), which further requires an obviousness analysis, including a demonstration of why one of ordinary skill would be motivated to combine those disparate teachings. See Cutsforth Inc. v. Motivepower Inc., No. 2015-1316 (Fed. Cir. Jan. 22, 2016). In Cutsforth Inc. v. Motivepower Inc.

As Rolls-Royce, PLC v. United Technologies Corp., 603 F.3d 1325, 1339 (Fed. Cir. 2010), Federal Circuit emphasized that "[t]he important question is whether the invention is . . . an "anticipated success."".

Examiner did not provide any analysis in Final Office Action that Appellant's claim invention is an "anticipated success"

**A.** Examiner's Rejection under 35 U.S.C § 103 obviousness is Conclusory, Unsupported and without Rigorous Analysis of all Claim Elements and Limitation, per Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966),

**B.** Examiner Failed to Consider the Totality of the Evidence, Presented by All Claims, but Falsely Used "**Common Sense**" Clause,

**C**. Examiner Failed to Undertake a Full Graham Analysis,

**D**. Failure to Consider the Claimed Invention as a Whole,

**E**. Examiner Ignored All Claim Limitations and Claim Elements,

**F**. Examiner Failed to Show a Finite Number of Predictable Solutions with Anticipated Success,

**G**. Examiner Failed to Show a Reasonable Motivation to Combine/Modify the Reference(s),

- The Prior Art or Appropriate Evidence Must Provide a Basis for the Modification; **Why** a PHOSITA be Motivated to Select the Alleged Prior Art?; **Why** a PHOSITA be Motivated to Combine the Alleged Prior Art?; Conclusion of Obviousness Cannot Derive from Appellant's Specification,
- Examiner Relied Upon Recognition of Problem Rather than Recognition of Solution,
- No Reasonable Expectation of Anticipated Success,
- Evidence Showing a Lack of Expectation of Success

**H**. Examiner Inappropriately Imagined "Obvious to Try".

Claim element in Appellant's claimed invention clearly defines "X" and alleged prior art describes a distinct concept of "Y" and there is a high degree of separation between claim element X and alleged prior art's distinct concept of "Y". Examiner repeatedly misreads/misleds claim element "X" into alleged prior art's distinct concept of "Y" **to manufacture § 103 obviousness rejection.**

**For example Fig. 20 of Chang (2020) does not teach at all what Examiner claimed:**

> [0083] FIG. 20. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

Moreover, there is nothing in Supreme Court's KSR decision that authorizes or even suggests that an obvious rejection is appropriate when all claim elements are NOT "found" in alleged prior art. Specifically, if something is missing in alleged prior art then the invention should not be obvious even under KSR due to lack of predictability and/or a lack of a reasonable expectation of success.

Specifically, in view of teaching away and/or missing claim elements and/or misconstrued claim elements in alleged prior art, the invention is not obvious, even under KSR due to lack of predictability and/or a lack of a reasonable expectation of success, **further in view of an unpredictable technological field like biology***. See Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008).

Independent claim 85 is not **Prima Facie obvious** under 35 U.S.C § 103 in view of teaching away and missing claim elements and further in view of MPEP § 2143.03; In re Haruna, 249 F.3d 1327, 1335 (Fed. Cir. 2001); Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966); Par Pharmaceutical Inc. v. Twi Pharmaceuticals, Inc.14-1391 (Fed. Cir. Dec. 3, 2014), Rolls-Royce, PLC v. United Technologies Corp., 603 F.3d 1325, 1339 (Fed. Cir. 2010), In re Kotzab, 217 F.3d 1365, 1371 (Fed. Cir. 2000); and In re Rouffet, 149 F.3d 1350, 1359 (Fed. Cir. 1998).

When independent claim 85 is not **Prima Facie** obvious under 35 U.S.C § 103, then its respective dependent claim 87 is also not **Prima Facie** obvious either under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

* **An Example that Biology is an Unpredictable Technological Field is described below:**

https://www.newsweek.com/immortal-creature-grows-new-body-using-aging-hydractinia-1810124

https://www.cell.com/cell-reports/fulltext/S2211-1247(23)00698-8?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS2211124723006988%3Fshowall%3Dtrue

Most studies on senescence are related to chronic inflammation, cancer and age-related diseases in humans. But Hydractinia symbiolongicarpus needs senescence-related genes in order to regenerate new stem cells/organs. This is an exact opposite effect in humans.

## IX. CONCLUSION

Examiner

**(i)** Misconstrued/misread/misled claim elements, claim as a whole, for example, **Fig. 20 of Chang (2020) does not teach at all** what Examiner claimed:

> **[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

**(ii)** Relied on common sense without substantial evidence,

**(iii)** Used the same structure in alleged prior art as being responsive to two different claim elements, See Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994),

**(iv)** Engaged in impermissible Hindsight to manufacture § 103 obviousness rejection,

**(v)** Misconstrued/misread/misled a reasonable expectation of success, which was NOT supported by substantial evidence in view of missing claim elements, misconstrued claim elements and teaching way. Moreover, there is nothing in Supreme Court's KSR decision that authorizes or even suggests




that an obvious rejection is appropriate when all claim elements are NOT "found" in alleged prior art. Specifically, if something is missing in alleged prior art then the invention should not be Prima Facie obvious under 35 U.S.C § 103, even under KSR due to lack of predictability and/or a lack of a reasonable expectation of success – as shown below.

Specifically, in view of teaching away and/or missing claim elements and/or misconstrued claim elements, claimed invention is **not Prima Facie obvious**, even under KSR due to a lack of (i) predictability and/or (ii) reasonable expectation of success, further in view of an unpredictable technological field like biology*. See Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008).

Furthermore, when independent claims are not **Prima Facie obvious** under 35 U.S.C § 103, then its respective dependent claim 87 is also not obvious under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

**In view of technical and legal arguments presented herein with, BPAI should reverse § 103 obviousness rejection of independent claim 85 and its dependent claim 87.**

See In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970); Arendi S.A.R.L. v. Apple Inc No. 15-2073 (Fed. Cir. 2016); Crocs, Inc. v. U.S. Int'l Trade Comm'n, 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010); Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 17-1719 (Fed. Cir. July 13, 2018); and Univ. of Strathclyde v. Clear-Vu Lighting LLC, No. 2020-2243, 2021 U.S. App. LEXIS 32872, *1 (Fed. Cir. Nov. 4, 2021).

## CERTIFICATE OF WORD COUNT

Appellant's Opening Brief was produced using the 14-font size in the Times New Roman style.

It has approximately **12,900** words, excluding embedded images. For the Word Count, Appellant relied on the Word Count Function of the Tool Menu of the Microsoft Word ("MS Word") program.

Respectfully Submitted,

Dated: July 1, 2023

/Mohammad A. Mazed/

**Mohammad A. Mazed**

**CLAIM APPENDIX**

**ENTERED BY EXAMINER, BEFORE FINAL OFFICE ACTION**

**IN CLAIMS**

**CLAIMS 1-45 ARE DULY CANCELLED**

**CLAIMS 46-93 ARE TO BE EXAMINED.**

**NOTE! ONLY CLAIM 85 AND 87 WERE EXAMINED**

**46.** An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first nanostructure for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first nanostructure comprises

a deoxyribonucleic acid (DNA) based origami,

or

a ribonucleic acid (RNA) based origami,

or

a XNA based origami

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first nanostructure is encapsulated in a lipid bilayer,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first nanostructure are coupled.

**47.** The identifying protein in claim 46, is replaced by a sensing protein to detect the cancer cell.

**48.** The first nanostructure in claim 46, is replaced by a second nanostructure, wherein the second nanostructure is attached with a red blood cell, or a white blood cell.

**49.** The engineered dendritic cell in claim 46, further comprising a first protein to detect a molecular event within the cancer cell.

**50**. The engineered dendritic cell in claim 46, further comprising a Ly49 protein.

**51**. The engineered dendritic cell in claim 46, further comprising a patient specific Major Histocompatibility Complex (Patient-MHC) protein.

**52.** The engineered dendritic cell in claim 46, further comprising a synthetic Major Histocompatibility Complex (Synthetic-MHC) molecule, wherein the synthetic Major Histocompatibility Complex (Synthetic-MHC) molecule is coupled with a peptide of the cancer cell.

**53.** The engineered dendritic cell in claim 46, further comprising a first nanoshell, or a second nanoshell, or a third nanoshell,

wherein the first nanoshell encapsulates a deoxyribonucleic acid (DNA) based sequence to encode a second protein against the cancer cell,

wherein the second nanoshell encapsulates a XNA based sequence to encode a third protein against the cancer cell,

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U),
wherein XNA further comprises one or more synthetic or artificial genetic bases,
wherein the third nanoshell comprises a messenger RNA (mRNA) based sequence to encode (i) a fourth protein against the cancer cell, or (ii) Cas9.

**54.** The first nanoshell, or the second nanoshell, or the third nanoshell in claim 53, further comprising disulfide bonds.

**55.** The first nanoshell, or the second nanoshell, or the third nanoshell in claim 53, further comprising a molecular complex, wherein the molecular complex comprises a long-chain fatty acid.

**56.** The molecular complex in claim 55, is encapsulated in a human serum albumin (HSA).

**57.** The first nanoshell, or the second nanoshell, or the third nanoshell in claim 53, is a carbon nanodot.

**58.** The third nanoshell in claim 53, comprising a single-guide RNA (sgRNA).

**59.** The engineered dendritic cell in claim 46, further comprising a liposome, wherein the liposome comprises a magnetic nanoparticle, wherein the magnetic nanoparticle is heated by a magnetic field.

**60.** The engineered dendritic cell in claim 46, further comprising an RNAi based logic circuit.

**61**. The first nanostructure in claim 46, is functionalized by a first pattern of ligands that is designed for coupling with the T-cell, and/or the natural killer cell.

**62**. The second nanostructure in claim 48, is functionalized by a second pattern of ligands that is designed for coupling with the T-cell, and/or the natural killer cell.

**63.** The engineered dendritic cell in claim 46, further comprising a CRISPR-Cas9 system, or a light activated CRISPR-Cas9 system,
wherein the CRISPR-Cas9 system, or the light activated CRISPR-Cas9 system
(i) removes a first gene in the engineered dendritic cell, wherein the first gene is a defective gene,
or
(ii) adds/inserts/replaces a second gene in the engineered dendritic cell,
wherein the second gene expresses a third bioactive molecule, wherein the third bioactive molecule that is designed for coupling with the T-cell, and/or the natural killer cell.

**64.** The second gene in claim 63, comprising one or more synthetic or artificial genetic bases.

**65.** The Cas9 in claim 63, is replaced by a (i) a Cas9-HFI, or (ii) a Cas12a.

**66.** The CRISPR-Cas9 system, or the light activated CRISPR-Cas9 system in claim 63, is replaced by a transposon-encoded CRISPR-Cas system.

**67.** The engineered dendritic cell in claim 46, further comprising a

modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system comprises (i) Cas9, (ii) a short single guide RNA, (iii) a transcriptional activator, and (iv) an adeno-associated virus (AAV), wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes against the cancer cell.

**68.** The engineered dendritic cell in claim 46, further comprising an engineered exosome.

**69.** The engineered dendritic cell in claim 46, is residing in a biocompatible, or a biodegradable lymph node.

**70.** The biocompatible, or the biodegradable lymph node in claim 69, is coated with a lattice of microgels.

**71.** The biocompatible, or the biodegradable lymph node in claim 69, is dipped in an antibiotic solution.

**72.** The biocompatible, or the biodegradable lymph node in claim 69, comprising a metallic glass material.

**73.** The biocompatible, or the biodegradable lymph node in claim 69, comprising a mechanically actuating membrane.

**74.** An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first nanostructure for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first nanostructure comprises

a deoxyribonucleic acid (DNA) based origami,

or

a ribonucleic acid (RNA) based origami,

or

a XNA based origami

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first nanostructure is encapsulated in a lipid bilayer,

wherein the first nanostructure further comprises an RNAi based logic circuit,

wherein the first nanostructure is encapsulated in a lipid bilayer,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first nanostructure are coupled.

**75.** The identifying protein in claim 74, is replaced by a sensing protein to detect the cancer cell.

**76.** The first nanostructure in claim 74, is replaced by a second nanostructure, wherein the second nanostructure is attached with a red blood cell, or a white blood cell.

**77.** The engineered dendritic cell in claim 74, further comprising a protein to detect a molecular event within the cancer cell.

**78.** The first nanostructure in claim 74, is functionalized by a first pattern of ligands that is designed for coupling with the T-cell, and/or the natural killer cell.

**79.** The second nanostructure in claim 76, is functionalized by a second pattern of ligands that is designed for coupling with the T-cell, and/or the natural killer cell.

**80.** The engineered dendritic cell in claim 74, further comprising a CRISPR-Cas9 system, or a light activated CRISPR-Cas9 system,

wherein the CRISPR-Cas9 system, or the light activated CRISPR-Cas9 system

(i) removes a first gene in the engineered dendritic cell, wherein the first gene is a defective gene,

or

(ii) adds/inserts/replaces a second gene in the engineered dendritic cell, wherein the second gene expresses a third bioactive molecule, wherein the third bioactive molecule that is designed for coupling with the T-cell, and/or the natural killer cell.

**81.** The second gene in claim 80, comprising one or more synthetic or artificial genetic bases.

**82.** The Cas9 in claim 80, is replaced by a (i) a Cas9-HFI, or (ii) a Cas12a.

**83.** The CRISPR-Cas9 system, or the light activated CRISPR-Cas9 system in claim 80, is replaced by a transposon-encoded CRISPR-Cas system.

**84.** The engineered dendritic cell in claim 74, further comprising a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system comprises (i) Cas9, (ii) a short single guide RNA, (iii) a transcriptional activator, and (iv) an adeno-associated virus (AAV), wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes against the cancer cell.

**85.** An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises

a deoxyribonucleic acid (DNA) based origami,

or

a ribonucleic acid (RNA) based origami,

or

a XNA based origami

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,
wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**86.** The identifying protein in claim 85, is replaced by a sensing protein to detect the cancer cell.

➡ **87.** The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell.

**88.** The engineered dendritic cell in claim 85, further comprising a CRISPR-Cas9 system, or a light activated CRISPR-Cas9 system,
wherein the CRISPR-Cas9 system, or the light activated CRISPR-Cas9 system
(i) removes a first gene in the engineered dendritic cell, wherein the first gene is a defective gene,
or
(ii) adds/inserts/replaces a second gene in the engineered dendritic cell, wherein the second gene expresses a third bioactive molecule, wherein the third bioactive molecule that is designed for coupling with the T-cell, and/or the natural killer cell.

**89.** The second gene in claim 88, comprising one or more synthetic or artificial genetic bases.

**90.** The Cas9 in claim 88, is replaced by a (i) a Cas9-HFI, or (ii) a Cas12a.

**91.** The CRISPR-Cas9 system, or the light activated CRISPR-Cas9 system in claim 88, is replaced by a transposon-encoded CRISPR-Cas system.

**92.** The engineered dendritic cell in claim 85, further comprising a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system comprises (i) Cas9, (ii) a short single guide RNA, (iii) a transcriptional activator, and (iv) an adeno-associated virus (AAV), wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes against the cancer cell.

**93.** The first scaffold in claim 84, is replaced by a second scaffold of a silk-fibroin.

# Exhibit 3

## {Bates No. Appx 443 – 517}

## Filed Text Specification @ USPTO

**MOLECULAR SYSTEM FOR CANCER BIOLOGY**

Mohammad A. Mazed

## CROSS REFERENCE OF RELATED APPLICATIONS

**[000336]** The present application is

- a continuation-in-part (CIP) of **(a)** U.S. Non-Provisional Patent Application with Serial No. **16/501,943** entitled, MOLECULAR SYSTEM FOR CANCER BIOLOGY, filed on **July 5, 2019**,
- wherein **(a)** is a continuation-in-part (CIP) of **(b)** U.S. Non-Provisional Patent Application with Serial No. **16/350,897** entitled, CRISPR-Cas9 BASED ENGINEERED/EDITED OR MODULATED STEM CELLS FOR INFLAMMATION OR PAIN, filed on **January 29, 2019**,
- wherein **(b)** is a continuation-in-part (CIP) of **(c)** U.S. Non-Provisional Patent Application with Serial No. **16/350,313** entitled, CRISPR-Cas9 BASED MOLECULAR SYSTEM FOR INFLAMMATION OR PAIN, filed on **October 30, 2018**,
- wherein **(c)** is a continuation-in-part (CIP) of **(d)** U.S. Non-Provisional Patent Application with Serial No. **15/998,386**

entitled, CRISPR-Cas9 BASED MOLECULAR SYSTEM FOR INFLAMMATION OR PAIN, filed on **August 14, 2018,**

- wherein **(d)** is a continuation-in-part (CIP) of **(e)** U.S. Non-Provisional Patent Application with Serial No. **15/932,920** entitled, CRISPR-Cas9 BASED MOLECULAR SYSTEM FOR INFLAMMATION OR PAIN, filed on **May 21, 2018,**
- wherein **(e)** claims priority benefit to **(f)** U.S. Provisional Patent Application with Serial No. **62/603,139** entitled, "FORMULATIONS FOR INFLAMMATION/PAIN", filed on **May 19, 2017.**

**[000337]** The entire contents of all (i) U.S. Non-Provisional Patent Applications, (ii) U.S. Provisional Patent Applications, as listed in the previous paragraph and (iii) the filed (Patent) Application Data Sheet (ADS) are hereby incorporated by reference, as if they are reproduced herein in their entirety.

## BRIEF DESCRIPTION OF THE FIGURES

**[000338] FIG. 1** illustrates a progression model of Alzheimer's disease.

**[000339] FIG. 2** illustrates a progression model of Parkinson's disease.

**[000340] FIG. 3** illustrates a T-cell, wherein the T-cell includes (a) a sensing protein and/or an activating protein (on its surface) to detect a particular type of cancer cells and (b) a nanoshell encapsulating deoxyribonucleic acid (DNA) sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells and/or one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells. XNA contains genetic bases – adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic/artificial genetic bases (e.g., α and ß). The nanoshell can also include RNAi based logic circuit.

**[000341]** However, this configuration of a T-cell may be applicable to any diseased cells, instead of only cancer cells.

## BRIEF DESCRIPTION OF THE TABLES

**[000342]** Table 1 describes a pharmaceutical formulation for inflammation/pain.

**[000343]** Table 2 describes a pharmaceutical formulation for inflammation/pain.

## DETAILED DESCRIPTION

**Nanoshell**

**[000344]** By way of an example and not by way of any limitation, a nanoshell (of about 5 nanometers to 500 nanometers in diameter) can be any one of the following: a boron nitride nanotube, a carbon nanotube, a Cornell-dot, a cubisome, a dendrimer (including a plant based dendrimer), a deoxyribonucleic acid origami based nanostructure, an exosome, fullerene $C_{60}$ (e.g., malonic acid derivative of $C_{60}$), a gold nanoparticle (coated for biocompatibility), a grapefruit-derived nanovector (GNV), a hollow magnetic cage molecule (e.g., $Co_{12}C_6$, $Mn_{12}C_6$ and $Mn_{24}C_{18}$), a metal-organic framework (MOF), a modified exosome, an iron nanoparticle, a lipidoid, a liposome, mesoporous silica, a micelle, a nanocrystal, a niosome, polysebacic acid (PSA), polysilsesquioxane (PSQ), a porous (photonic) crystal, a quantum dot, a quantum dot capped with glutathione, a ribonucleic acid (RNA) origami based nanostructure, a self-assembling peptide/protein, a silk-fibroin nanoparticle, a solid-lipid nanoparticle, a spherical nucleic acid (SNA), synthasome, a tubular/tetrahedral structure fabricated/constructed utilizing deoxyribonucleic acid/ribonucleic acid/XNA origami based nanostructure, a virus (e.g., tobacco mosaic virus), zein (plant) protein, a

XNA origami based nanostructure, a worm-shaped nanoparticle and a zeolite-L-nanocrystal.

**[000345]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[000346]** Silk fibroin is biodegradable and biocompatible.

**[000347]** Additionally, a nanoshell can be made of synthetic lipids including disulfide bonds in the fatty chain. Furthermore, when the nanoshell (of synthetic lipids including disulfide bonds in the fatty chain) enters a cell, the environment within the cell breaks open the disulfide bond to disassemble the nanoshell and the contents of the nanoshell can be quickly and efficiently released into the cell.

**[000348]** Furthermore, a nanoshell can be a nanobot or a nanomotor in some biological applications.

**Macroshell**

**[000349]** By way of an example and not by way of any limitation, a macroshell (of about 1 micron to 50 microns in diameter) can be an approximately spherically shaped structure (e.g., with composition of polycaprolactone polymer/hydrogel).

**Bioavailability, Sustained (Controlled) Delivery & Disintegration**

**[000350]** To increase bioavailability of any bioactive compound (of the Table 1 and Table 2), microemulsion/nanoemulsion or microsuspension/nanosuspension of the bioactive compound can be utilized.

**[000351]** To prevent any dissolution/disintegration in the gastric (acidic) environment of any bioactive compound (of the Table 1 and Table 2), the macroshell or the nanoshell itself can be enteric coated by a polymer barrier.

**[000352]** To increase bioavailability and/or sustained (controlled) delivery of the entire pharmaceutical formulation (of the Table 1 and Table 2), microencapsulation of the entire pharmaceutical formulation (of the Table 1 and Table 2) or nanoencapsulation of any bioactive compound (of the Table 1 and Table 2) in a nanoshell can be utilized.

**[000353]** The macroshell or the nanoshell can include an immune shielding surface (as it is discussed in later paragraphs).

**Immune Shielding Surface Of A Nanoshell**

**[000354]** A polymer membrane (e.g., polyethylene glycol polymer) can be utilized, as an immune shielding surface on a nanoshell.

**[000355]** Alternatively, a red blood (natural/synthetic/three-dimensionally bio-inkjet printed red blood) cell membrane can be utilized, as an immune shielding surface on the nanoshell.

**[000356]** Alternatively, a combination of a polymer membrane and a red blood cell membrane can be utilized, as an immune shielding surface on the nanoshell.

**[000357]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a red blood cell (about 8 microns in diameter) to act as an immune shielding surface on the nanoshell. A red blood cell is about 8 microns in diameter.

**[000358]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a white blood cell (about 5 microns to 17 microns in diameter) to act as an immune shielding surface on the nanoshell.

**Immune Shielding Surface Of A Macroshell**

**[000359]** A polymer membrane (e.g., polyethylene glycol polymer) can be utilized, as an immune shielding surface on the macroshell.

**[000360]** Alternatively, a red blood (natural/synthetic/three-dimensionally bio-inkjet printed red blood) cell membrane can be utilized, as an immune shielding surface on the macroshell.

**[000361]** Alternatively, a combination of a polymer membrane and a red blood cell membrane can be utilized, as an immune shielding surface on the macroshell.

**[000362]** Alternatively, the nanoshell can bind/couple (e.g., chemically

bind/couple) or attach with a red blood cell to act as an immune shielding surface on the macroshell.

**[000363]** Alternatively, the nanoshell can bind/couple (e.g., chemically bind/couple) or attach with a white blood cell to act as an immune shielding surface on the macroshell.

**[000364]** Details of an immune shielding surface have been disclosed in U.S. Non-Provisional Patent Application No. **13/135,832** entitled "CHEMICAL COMPOSITION AND ITS DELIVERY FOR LOWERING THE RISKS OF ALZHEIMER'S, CARDIOVASCULAR AND TYPE-2 DIABETES DISEASES", filed on July 15, 2011.

**[000365] Table 1 Pharmaceutical Formulation**

| **Botanical** | **WT % +/- 20%** |
|---|---|
| *Boswellia serrata* Extract | 20% |
| **Chemical** | **WT % +/- 20%** |
| Astaxanthin | 2.5% |
| Capsaicin | 5% |
| CBD (Or CBD Pro-Drug) | 40% |
| Chondroitin Sulfate | 5% |
| Glucosamine Hydrochloride Or Glucosamine Sulfate | 5% |

| | |
|---|---|
| Hyaluronic Acid | 5% |
| Lidocaine Hydrochloride | 2.5% |
| Methylsufonlymethane (MSM) | 5% |
| Menthol | 5% |
| S-Adenosyl Methionine (SAM) | 5% |
| **Total** | **100%** |

**[000366] Table 2 Pharmaceutical Formulation**

| **Botanical** | **WT % +/- 20%** |
|---|---|
| *Boswellia serrata* Extract | 20% |
| **Chemical** | **WT % +/- 20%** |
| Capsaicin | 5% |
| CBD (Or CBD Pro-Drug) | 42.5% |
| Chondroitin Sulfate | 5% |
| Glucosamine Hydrochloride Or Glucosamine Sulfate | 5% |
| Hyaluronic Acid | 5% |
| Lidocaine Hydrochloride | 2.5% |
| Methylsufonlymethane (MSM) | 5% |
| Menthol | 5% |
| S-Adenosyl Methionine (SAM) | 5% |

| | |
|---|---|
| **Total** | **100%** |

**[000367]** Cannabidiol (CBD)'s molecular structure is described below.




**[000368]** CBD or CBD pro-drug can be replaced by Perrottetinene (PET) and its molecular structure is described below.




**[000369]** Any bioactive compound of the Table 1 and Table 2 loaded with silk fibroin-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table 2 loaded with silk fibroin-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain (e.g., via a tablet/patch/injection).

**[000370]** Any bioactive compound of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP)-all encapsulated/caged

in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP)-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain (e.g., via a tablet/patch/injection).

**[000371]** Any bioactive compound of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from a stem cell (e.g., a pluripotent stem cell/three-dimensional (3-D) bio-inkjet printed stem cell)-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from a stem cell-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain or tissue regeneration (e.g., via a tablet/patch/injection).

**[000372]** Any bioactive compound of the Table 1 and Table 2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from an engineered/edited stem cell or a modulated stem cell-all encapsulated/caged in a macroshell (with an immune shielding surface) or alternatively, the entire pharmaceutical formulation of the Table 1 and Table

2 loaded with (a) silk fibroin and/or (b) platelet-rich plasma (PRP) and/or (c) tissue graft from an engineered/edited stem cell or a modulated stem cell-all encapsulated/caged in a macroshell (with an immune shielding surface) can provide an effective long and lasting relief of inflammation or pain or tissue regeneration (e.g., via a tablet/patch/injection).

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000373]** Cas9 is an RNA-directed deoxyribonucleic acid-binding protein, guided by a single guide RNA. By inactivating its nuclease activity, coupling the protein to other effector domains and choosing an appropriate guide sequence, it can direct activities in a specific part of a genome.

**[000374]** CRY2 and CIB1 are plant proteins. In response to light, CRY2 undergoes a conformational change that allows it to interact with CIB1. In a light activated CRISPR-Cas9 system, CRY2 is fused to the transactivation domain (either p65 or VP64) and C1B1 is fused to dCas9-the deactivated Cas9 nuclease from CRISPR. The light activated CRISPR-Cas9 system can enable precise spatial and/or temporal control by light (e.g., blue light) and can direct activities in a specific part of a genome.

**[000375]** Generally, a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system can remove a first defective gene and add/insert/replace a second gene, which may be beneficial against a particular type of diseased

cells.

**Modulating CRISPR-Cas9 System**

**[000376]** A modulating CRISPR-Cas9 system includes Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus (AAV).

**[000377]** The modulating CRISPR-Cas9 does not remove or add/insert/replace any gene. Rather it can activate an expression of one or more genes beneficial against a particular type of diseased cells.

**[000378]** Various gene editing methods has been disclosed in "OPTICAL BIOMODULE FOR DETECTION OF DISEASES", filed on October 29, 2012, wherein U.S. Non-Provisional Patent Application No. **13/663,376** resulted in an issuance of a U.S. Patent No. **9,557,271** on January 31, 2017.

**Engineered/Edited Stem Cell**

**[000379]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can deliver the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system into a stem cell by an external stimulus (e.g., heat/light/pH/receptor binding).

**[000380]** Alternatively, the above nanoshell can be decorated with one or more targeting ligands to recognize/match/bind with specific biological receptors on a stem cell to deliver the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system into a stem cell.

**[000381]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosòmes beneficial against a particular type of diseased cells

**[000382]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event that occurs within a particular type of diseased cells.

**Modulated Stem Cell**

**[000383]** The modulating CRISPR-Cas9 system (inserted) into a stem cell activates an expression of one or more genes beneficial against a particular diseased cells-thus enabling a modulated stem cell.

**[000384]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of diseased cells.

**[000385]** The modulated stem cell can include with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a

particular type of diseased cells

**Encapsulation Of Engineered/Edited Stem Cell Or Modulated Stem Cell**

**[000386]** The engineered/edited or the modulated stem cell can be encapsulated/caged in a macroshell.

**[000387]** The macroshell can include an immune shielding surface (details of an immune shielding surface were discussed in previous paragraphs).

**Application To Treatment Of Inflammation Without An Engineered/Edited Or Modulated Stem Cell**

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000388]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., a defective/mutated gene) responsible for inflammation and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) to reduce inflammation (e.g., tumor necrosis factor-alpha (TNF-alpha) inhibitor) or pain.

**[000389]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000390]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells.

**[000391]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation.

**Modulating CRISPR-Cas9 System**

**[000392]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against inflammation.

**[000393]** The modulating CRISPR-Cas9 system can be encapsulated/caged

in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000394]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells.

**[000395]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation.

**Application To Treatment Of Inflammation Without An Engineered/Edited Or Modulated Stem Cell**

**[000396]** Deoxyribonucleic acids can be coupled with a metal (e.g., gold) nanorod. Upon infrared light activation, deoxyribonucleic acids can be decoupled from the metal nanorod due to heating. Upon Deoxyribonucleic acids-receptors coupling, stem cells can migrate to a site of inflammation or pain for tissue regeneration.

**Application To Treatment Of Inflammation With An Engineered/Edited Or Modulated Stem Cell**

**Engineered/Edited Stem Cell**

**[000397]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a stem cell to remove a first gene responsible for inflammation or pain and then add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) that expresses/releases a molecule to reduce inflammation or pain (and/or enhance regeneration of tissues)-thus enabling an engineered/edited stem cell.

**[000398]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. An engineered or edited stem cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a stem cell.

**[000399]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g.,

chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells. Furthermore, the nanoshell includes an immune shielding surface.

**[000400]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation. Furthermore, the nanoshell can include an immune shielding surface.

**Modulated Stem Cell**

**[000401]** The modulating CRISPR-Cas9 system inserted into a stem cell. The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against inflammation-thus enabling a modulated stem cell.

**[000402]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of inflammation within a particular type of inflamed cells

**[000403]** The modulated stem cell can include with one or more

molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against inflammation.

**Application To Treatment Of Alzheimer's Disease Without An Engineered/Edited Or Modulated Stem Cell**

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000404]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., defective/mutated ApoE4 gene) responsible for Alzheimer's disease and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) to reduce accumulation of amyloid beta protein and/or tau protein. (**FIG. 1**).

**[000405]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including

genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000406]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of neurons.

**[000407]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease.

**[000408]** The nanoshell can include or bind/couple (e.g., chemically couple) with an antibody or surface modification with a functional ligand (e.g., lactoferrin/transferrin) and/or a carrier molecule (e.g., glutathione/glucose) to cross the blood-brain barrier (BBB).

**Modulating CRISPR-Cas9 System**

**[000409]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against Alzheimer's disease.

**[000410]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding

surface.

**[000411]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of Alzheimer's disease within a particular type of neurons.

**[000412]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease.

**[000413]** This approach can be applicable to other neurodegenerative diseases (e.g., Parkinson's disease (**FIG. 2**)/dementia with Lewy bodies).

**Application To Treatment Of Alzheimer's Disease With Engineered/Edited Or Modulated Stem Cell**

**Engineered/Edited Stem Cell**

**[000414]** A stems cell such as mesenchymal stem cell can cross the blood-brain barrier. The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a mesenchymal stem cell to remove a first gene responsible for Alzheimer's disease and then

add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) that expresses/releases a molecule (e.g., an antibody/hormone/protein) for reduction in accumulation of amyloid beta protein and/or tau protein. **(FIG. 1)**-thus enabling an engineered/edited mesenchymal stem cell.

**[000415]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. An engineered or edited mesenchymal stem cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a stem cell.

**[000416]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of Alzheimer's disease within a particular type of neurons. Furthermore, the nanoshell includes an immune shielding surface.

**[000417]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g.,

chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease. Furthermore, the nanoshell can include an immune shielding surface.

**Modulated Stem Cell**

**[000418]** The modulating CRISPR-Cas9 system inserted into a mesenchymal stem can activate an expression of one or more genes beneficial against Alzheimer's disease-thus enabling a modulated mesenchymal stem cell.

**[000419]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event of Alzheimer's disease within a particular type of neurons.

**[000420]** The modulated stem cell can include one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against Alzheimer's disease. The modulated stem cell can transfer healthy mitochondria to damaged neurons for neuroregeneration.

**Application To Treatment Of Brain Cancer Without An Engineered/Edited Or Modulated Stem Cell**

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000421]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., a defective/mutated gene) responsible for brain cancer and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for apoptosis of a brain cancer cell and/or reduction of brain cancer growth (e.g., blocking an enzyme to inhibit self-regenerating capabilities glioma stem cell (GSC)).

**[000422]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000423]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g.,

chemically bind/couple) a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[000424]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of brain cancer cells.

**[000425]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000426]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000427]** The nanoshell can include or bind/couple (e.g., chemically couple) with an antibody or surface modification with a functional ligand (e.g., lactoferrin/transferrin) and/or a carrier molecule (e.g., glutathione/glucose) to cross the blood-brain barrier (BBB).

**[000428]** Combining the above approach with photodynamic therapy (PDT)

delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Modulating CRISPR-Cas9 System**

**[000429]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against brain cancer.

**[000430]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000431]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[000432]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against brain cancer.

**[000433]** Combining the above approach with photodynamic therapy (PDT) delivered to a particular type of brain cancer cells through a stereotactically

placed optical fiber(s) can enhance therapeutic outcome.

**Application To Treatment Of Brain Cancer With An Engineered/Edited Or Modulated Stem Cell**

**Engineered/Edited Stem Cell**

**[000434]** A stems cell such as mesenchymal stem cell can cross the blood-brain barrier. The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a mesenchymal stem cell to remove a first gene responsible for a first gene (e.g., a defective/mutated gene) responsible for brain cancer and then add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) that expresses/releases a molecule (e.g., an antibody/hormone/protein) for apoptosis of a brain cancer cell and/or reduction of brain cancer growth (e.g., blocking an enzyme to inhibit self-regenerating capabilities glioma stem cell (GSC)).

**[000435]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. An engineered or edited mesenchymal stem cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A

(adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a stem cell.

**[000436]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[000437]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of brain cancer cells.

**[000438]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000439]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000440]** Combining the above approach with photodynamic therapy (PDT)

delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Modulated Stem Cell**

**[000441]** The modulating CRISPR-Cas9 system inserted into a mesenchymal stem can activate an expression of one or more genes beneficial against brain cancer-thus enabling a modulated mesenchymal stem cell.

**[000442]** The modulated stem cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of brain cancer cells.

**[000443]** The modulated stem cell can include one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of brain cancer cells.

**[000444]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000445]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such

biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000446]** Combining the above approach with photodynamic therapy (PDT) delivered to a particular type of brain cancer cells through a stereotactically placed optical fiber(s) can enhance therapeutic outcome.

**Application To Treatment Of Cancer Without An Engineered/Edited Or Modulated Stem Cell CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000447]** Calcium is generally increased in a cancer cell. Calcium stimulates the secretion of exosomes due to calcium-binding protein called Munc13-4. Furthermore, Munc13-4 protein levels are often elevated in breast, pancreatic and lung cancers. Munc13-4 protein couples (e.g., chemically couples) with Rab11 protein to develop multivesicular bodies for fusing with the plasma membrane and releasing exosomes.

**[000448]** Exosomes released from cancer cells carry MT1-MMP enzyme, which can degrade in the extracellular matrix around cancer cells, by dispersing a secondary metastatic cancer cells.

**[000449]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene (e.g., a

defective/mutated gene responsible for Munc13-4 protein) responsible for cancer and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for reduce cancer growth (e.g., a gene for turning on gulonolactone oxidase production or activation of p53 gene responsible for apoptosis of a particular type of cancer cells.

**[000450]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000451]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000452]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi

molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosome beneficial against a particular type of cancer cells.

**[000453]** The nanoshell may include or bind/couple (e.g., chemically couple) with an immune- checkpoint inhibitor molecule.

**[000454]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000455]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000456]** The nanoshell can include or couple (e.g., chemically couple) with a separate nanosystem.

**[000457]** The separate nanosystem can be coated with lipid oleate and DOTAP to enhance its interaction and penetration into a particular type of cancer cells.

**[000458]** The separate nanosystem can include a tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal (e.g., gold) rod (which is about 35 nanometers long and about 10 nanometers in radius).

**[000459]** The tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal rod can be coupled/chemically coupled with a heat shock protein and/or TRAIL protein.

**[000460]** Furthermore, the tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal rod can include or couple (e.g., chemically couple) with a biocompatible metal (e.g., gold) nanoparticle, a nanoshell X and a nanoshell Y by strands of a biological material (e.g., apatmers/deoxyribonucleic acids/ribonucleic acids/XNAs).

**[000461]** The biocompatible metal nanoparticle, the nanoshell X and the nanoshell Y includes an immune shielding surface.

**[000462]** About fifteen (15) X/Y nanoshells can be coupled.

**[000463]** The strands of the biological material can include or couple (e.g., chemically couple) with one or more molecules beneficial against a particular type of cancer cells (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or a photosensitizer molecule(s).

**[000464]** For example, a cannabis flavonoid is any of these molecules:

Cannflavin A, Cannflavin B, Cannflavin C, Chrysoeriol, Cosmosiin and Flavocannabiside – but not limited to these examples.

**[000465]** The chemical structure of Cannflavin A is illustrated below:



**[000466]** The chemical structure of Cannflavin B is illustrated below:



**[000467]** It should be noted that Cannflavin B causes apoptosis and enhances the effectiveness of common chemo-and radiation therapies.

**[000468]** The nanoshell X can include or couple (e.g., chemically couple) with a near-infrared fluorescent polymer to visualize its accumulation at the target location of a particular type of cancer cells.

**[000469]** The nanoshell Y can be an upconverting nanoshell which converts

a (continuous wave/pulsed) laser light of near-infrared wavelength into a (continuous wave/pulsed) laser light of visible wavelength.

**[000470]** The separate nanosystem can include one or more liposomes. Each liposome can encapsulate bioactive molecules/drugs and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000471]** The separate nanosystem can further include or couple (e.g., chemically couple) with cerium fluoride nanoparticles and/or hafnium oxide.

**[000472]** Cerium fluoride nanoparticles can release reactive oxygen species upon activated/stimulated by X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000473]** Hafnium oxide can generate electrons when exposed to X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000474]** Chimeric antigen receptor (CAR) is produced by splicing together the gene for an antibody that recognizes a tumor antigen and the gene for a receptor that sits on the surface of the T-cells.

**[000475]** CAR natural killer (NK) cells may be safer without many side effects, faster to produce and cheaper. CAR natural killer cells can be less vulnerable to cancer cells' tricks for avoiding attacks, as natural killer cells generally rely on other receptors to recognize a particular type of cancer cells and they may detect a particular type of cancer cells, even when a particular type of cancer cells modifies the antigens.

**[000476]** There may be multiple doses of CAR natural killer cells, as opposed to a single dose of the T-cells.

**Engineered T-cell/ Natural Killer Cell/CAR T-cell/CAR Natural Killer Cell**

**[000477]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system or the modulating CRISPR-Cas9 system (encapsulated/caged in the nanoshell) can be utilized to CRISPR-Cas9 mediated modification of a T-cell/CAR T-cell/CAR natural killer cell.

**[000478]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000479]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein. The Ly49

protein can bind with a Major Histocompatibility Complex (MHC) molecule to distinguish between a healthy cell and a particular type of cancer cells.

**[000480]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000481]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000482]** The T-cell/CAR T-cell/CAR natural killer cell can include one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000483]** The T-cell/CAR T-cell/CAR natural killer cell can include one or more XNA sequences, wherein the one XNA sequence at least consists of one or more synthetic/artificial genetic bases (e.g., α and ß) to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000484]** The T-cell/CAR T-cell/CAR natural killer cell can include one or more (e.g., a first/second/third/fourth) nanoshells.

**[000485]** At least a first nanoshell can encapsulate one or more

deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000486]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000487]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000488]** The first/second/third nanoshell can be made of synthetic lipids comprising disulfide bonds in the fatty chain.

**[000489]** When the first/second/third nanoshell enters a cancer cell, the environment within the cancer cell breaks open the disulfide bond to disassemble the first/second/third nanoshell, subsequently the contents with specific purposes of the first/second/third nanoshell are quickly and efficiently released into the cell.

**[000490]** The first/second/third nanoshell can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty

acid integrated with a binding site for a molecule.

**[000491]** The first/second/third nanoshell can be a carbon nanodot.

**[000492]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000493]** The carbon nanodot can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with a binding site for a molecule.

**[000494]** The T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000495]** Alternatively, the T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells and a nanoshell encapsulating one or more deoxyribonucleic acid sequences and/or one or more XNA sequences and/or one or more with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000496]** The nanoshell can be decorated with one or more targeting ligands to recognize/match/bind with specific biological receptors on a particular type of cancer cells.

**[000497]** The nanoshell can also include RNAi based logic circuit for computation regarding receptor based binding on a particular type of cancer cells.

**[000498]** The T-cell with above configuration is illustrated in **FIG. 3.**

**Augmented & Engineered T-cell/ Natural Killer Cell/CAR T-cell/CAR Natural Killer Cell**

**[000499]** Furthermore the T-cell/CAR T-cell/CAR natural killer cell can include or bind/couple (e.g., chemically bind/couple) with deoxyribonucleic acid origami based nanostructure/ribonucleic acid (RNA) origami based

nanostructure/XNA origami based nanostructure for recognition of a particular type of cancer cells.

**[000500]** The nanoshell (as described in previous paragraphs) can be coupled with a separate nanosystem.

**[000501]** The above separate nanosystem can be coated with lipid oleate and DOTAP to enhance its interaction and penetration into a particular type of cancer cells.

**[000502]** The separate nanosystem can include a tube shaped nanoscaled deoxyribonucleic acid cargo/carbon nanodot/nanoscaled metal (e.g., gold) rod (which is about 35 nanometers long and about 10 nanometers in radius).

**[000503]** The carbon nanodot is a fluorescent nanoparticle made of sucrose and citric acid and it is less toxic.

**[000504]** The tube shaped nanoscaled deoxyribonucleic acid cargo/carbon nanodot/nanoscaled metal rod can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin (HSA)), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000505]** The tube shaped nanoscaled deoxyribonucleic acid cargo/carbon nanodot/nanoscaled metal rod can be coupled/chemically coupled with a heat shock protein and/or TRAIL protein.

**[000506]** Furthermore, the tube shaped nanoscaled deoxyribonucleic acid cargo/nanoscaled metal rod can include or couple (e.g., chemically couple) with a biocompatible metal (e.g., gold) nanoparticle, a nanoshell X and a nanoshell Y by strands of a biological material (e.g., apatmers/deoxyribonucleic acids/ribonucleic acids/XNAs).

**[000507]** The biocompatible metal nanoparticle, the nanoshell X and the nanoshell Y includes an immune shielding surface.

**[000508]** About fifteen (15) X/Y nanoshells can be coupled.

**[000509]** The strands of the biological material can include or couple (e.g., chemically couple) with one or more molecules beneficial against a particular type of cancer cells (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or a photosensitizer molecule(s).

**[000510]** The nanoshell X can include or couple (e.g., chemically couple) with a near-infrared fluorescent polymer to visualize its accumulation at the target location of a particular type of cancer cells.

**[000511]** The nanoshell Y can be an upconverting nanoshell which converts a (continuous wave/pulsed) laser light of near-infrared wavelength into a (continuous wave/pulsed) laser light of visible wavelength.

**[000512]** The separate nanosystem can include one or more liposomes. Each

liposome can encapsulate bioactive molecules/drugs and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**[000513]** The separate nanosystem can further include or couple (e.g., chemically couple) with cerium fluoride nanoparticles and/or hafnium oxide.

**[000514]** Cerium fluoride nanoparticles can release reactive oxygen species upon activated/stimulated by X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000515]** Hafnium oxide can generate electrons when exposed to X-rays of a (suitable) dose to destroy a particular type of cancer cells.

**[000516]** The nanoshell can include or bind/couple (e.g., chemically bind/couple) with biocompatible magnetic nanoparticles (e.g., Zn-Co-Cr-Ferrite nanoparticles or mn-co-Ferrite nanoparticles). Such biocompatible magnetic nanoparticles can be heated by a low magnetic field.

**[000517]** Combining the above approach with photodynamic therapy (PDT) via an optical fiber(s) can enhance therapeutic outcome against a particular

type of cancer cells.

**Nanostructure Assisted Preferential Binding**

**[000518]** A biologic pro-drug can be a non-toxic immune-stimulating drug (e.g., a non-toxic interleukin-2, when it binds only on beta and gamma units of a lymphocyte's surface).

**[000519]** Such preferential binding only on beta and gamma units of a lymphocyte's surface can be enabled by a combination of (a) polyethylene glycol (PEG) molecules and/or (b) a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure.

**Modulating CRISPR-Cas9 System**

**[000520]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against a particular type of cancer cells.

**[000521]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000522]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

[000523] The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**In Vivo Implanted, Biodegradable & Biocompatible (Artificial) Lymph Node**

[000524] An implanted biodegradable and biocompatible (artificial) lymph node can be fabricated/constructed (e.g., a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure or a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer or a scaffold of silk fibroin) or a metallic glass material and then antibiotics can be added by soaking the scaffold in an antibiotic solution. Furthermore, the metallic glass material can be fabricated/constructed to have nanoscaled porosity and/or nanoscaled surface pattern for cell adhesion and/or inflammation.

[000525] The implanted biodegradable and biocompatible (artificial) lymph node can be integrated with a mechanically actuating membrane (which

changes its shape in microscale level) to reduce unwanted cell growth near the implanted biodegradable and biocompatible (artificial) lymph node.

**[000526]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution).

**[000527]** The above scaffold can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000528]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000529]** The above scaffold can contain one or more molecules (e.g., recruiting molecules and/or co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells to recruit, attract and activate nearby immature dendritic cells at the site of the implanted biodegradable and biocompatible (artificial) lymph node.

**[000530]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[000531]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be functionalized by modifying the oligonucleotide structures.

**[000532]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can include RNAi based logic circuit regarding receptor computation on a particular type of cancer cells.

**[000533]** The inside and out side of the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be functionalized by a precise spatial pattern of ligands to induce/activate dendritic cells in order to initiate response of the T-cells and/or natural killer cells.

**[000534]** To overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be attached with a red blood cell/white blood cell.

**[000535]** Alternatively, to overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be encapsulated

in a lipid bilayer.

**[000536]** The engineered dendritic cell exchanges or transfers the sensing protein to the T-cell, and/or the natural killer cell.

**[000537]** The engineered dendritic cell can include one or more (e.g., a first/second/third/fourth) nanoshells.

**[000538]** A first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000539]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000540]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000541]** For example, a cannabis flavonoid is any of these molecules: Cannflavin A, Cannflavin B, Cannflavin C, Chrysoeriol, Cosmosiin and Flavocannabiside – but not limited to these examples.

**[000542]** The first nanoshell or the second nanoshell or the third nanoshell

can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000543]** The first nanoshell or the second nanoshell or the third nanoshell can be a carbon nanodot.

**[000544]** The engineered dendritic cell can exchange or transfer the first/second/third nanoshell to the T-cell and/or the natural killer cell.

**[000545]** At least a first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000546]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000547]** A third nanoshell can encapsulate a messenger RNA (mRNA) for coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000548]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time t = 0. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time t = t.

**CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000549]** These immature dendritic cells can include the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system.

**[000550]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for inactivation of immature dendritic cells and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for enhanced interaction of dendritic cells with the T-cells and/or natural killer cells.

**[000551]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000552]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000553]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNA(s) and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**Modulating CRISPR-Cas9 System**

**[000554]** These immature dendritic cells can include the modulating CRISPR-Cas9 system.

**[000555]** The modulating CRISPR-Cas9 system can activate an expression

of one or more genes beneficial against a particular type of cancer cells.

**[000556]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000557]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000558]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000559]** These activated dendritic cells can then travel to nearby natural lymph nodes, where these can train other types of immune cells (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000560]** In general, but not limited to, an engineered dendritic cell (in vivo), wherein the engineered dendritic cell is residing in a biocompatible/biodegradable lymph node, wherein the lymph node is coated with a lattice of microgels or dipped in an antibiotic solution, wherein the engineered dendritic cell includes:

**(a)** a first molecule,

wherein the first molecule is selected from the group consisting of the following: a co-stimulating molecule, a mobility enhancing molecule and a programming molecule,

**(b)** an identifying protein on the surface of a particular type of cancer cells,

or

a sensing protein to detect a particular type of cancer cells,

**(c)** a nanostructure or a scaffold of biocompatible polymers or a scaffold of silk-fibroin,

wherein the nanostructure includes a deoxyribonucleic acid origami based nanostructure or a ribonucleic acid origami based nanostructure or a XNA origami based nanostructure for interaction with the T-cells and/or the natural killer cells against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T),

guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases, wherein the nanostructure is functionalized by a pattern of ligands to induce or activate dendritic cell to initiate response of the T-cells and/or the natural killer cells, wherein the nanostructure is encapsulated in a lipid bilayer or the nanostructure is attached with a red blood cell or a white blood cell.

**[000561]** The engineered dendritic cell in above, can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000562]** The engineered dendritic cell in above, can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000563]** The engineered dendritic cell in above, further exchanges or transfers the sensing protein to the T-cells and/or the natural killer cells.

**[000564]** The engineered dendritic cell in above, further includes a nanoshell, wherein the nanoshell encapsulates deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells, wherein XNA includes genetic bases adenine

(A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000565]** The engineered dendritic cell in above, further exchanges or transfers the nanoshell with to the T-cells and/or the natural killer cells, wherein the nanoshell releases deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells within the T-cells and/or the natural killer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000566]** The engineered dendritic cell in above, wherein the nanostructure includes RNAi based logic circuit.

**[000567]** The engineered dendritic cell in above, further includes a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system removes a first defective gene for inactivation of a dendritic cell and adds/inserts/replaces a second gene, wherein the added/inserted/replaced second gene expresses, or releases a third molecule to increase interaction with the T-cells and/or the natural killer cells. The added/inserted/replaced second gene includes one or more synthetic or artificial genetic bases.

**[000568]** The Cas9 can be replaced by Cas9-HFI or Cas12a. CRISPR-Cas9 system can be replaced by a transposon-encoded CRISPR-Cas system.

**[000569]** The engineered dendritic cell in above, includes a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system consists of Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus (AAV), wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes beneficial gene against a particular type of cancer cells.

**Ex Vivo Engineered/Edited Dendritic Cells**

**[000570]** Instead of an implanted biodegradable and biocompatible (artificial) lymph node, the activation of the dendritic cells by one or more molecules (e.g., co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells and/or sensing proteins to detect a particular type of cancer cells can be realized in ex vivo

**[000571]** The engineered dendritic cell (about 7 microns in diameter) can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000572]** The engineered dendritic cell can include or bind/couple (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major

Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000573]** The engineered dendritic cell can include or bind/couple (e.g., chemically bind/couple) with the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure for enhanced interaction with the T-cells and/or natural killer cells.

**[000574]** The deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be three-dimensional in shape.

**[000575]** To overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be attached with a red blood cell/white blood cell.

**[000576]** Alternatively, to overcome the immunosurveillance, the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can be encapsulated in a lipid bilayer.

**[000577]** Furthermore, the deoxyribonucleic acid origami based

nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure can include or couple (e.g., chemically couple) with RNAi based logic circuit for precise/enhanced interaction of the engineered dendritic cells with the T-cells and/or natural killer cells.

**[000578]** RNAi based logic circuit can be capable of deciphering (computation by RNAi-based logic circuit) the cellular transcriptome, which calculates levels of targeted biomarkers and determines whether cells are either healthy or cancerous by evaluating internal cell state through mRNA expression patterns specifically via an overexpression of Gata3, NPYIR and TFFI (as these are generally present in cancer cells).

**[000579]** The engineered dendritic cell can include one or more (e.g., a first/second/third/fourth) nanoshells.

**[000580]** At least a first nanoshell can encapsulate one or more deoxyribonucleic acid sequences and/or one or more XNA sequences.

**[000581]** A second nanoshell can encapsulate one or more molecules (e.g., a synthetic p53 protein(s)/synthetic version of a cannabis flavonoid(s)) and/or an RNAi molecule(s) and/or modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**[000582]** A third nanoshell can encapsulate a messenger RNA (mRNA) for

coding Cas9 and a single-guide RNA (sgRNA). The single-guide RNA can scan the genome to help the nuclease find that specific sequence to be edited to fix mutation against a particular type of cancer cells.

**[000583]** The first nanoshell or the second nanoshell or the third nanoshell can be coupled/chemically coupled with a molecular complex (which is encapsulated within human serum albumin), wherein the molecular complex includes a long-chain fatty acid integrated with one or more binding sites for one or more molecules.

**[000584]** The first nanoshell or the second nanoshell or the third nanoshell can be a carbon nanodot.

**[000585]** A fourth nanoshell can be a liposome. The liposome can encapsulate bioactive molecules/drugs (beneficial against a particular type of cancer cells) and magnetic nanoparticles. Upon heating by a high frequency and low intensity magnetic field, the liposome can undergo a phase change from solid to liquid – thus releasing the bioactive molecules/drugs at a time $t = 0$. But, when the high frequency and low intensity magnetic field is turned off, the lipids re-solidify due to reverse phase change, preventing any release of the bioactive molecules/drugs at a time $t = t$.

**[000586]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another

immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000587]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000588]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000589]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via

eceptor-mediated endocytosis, the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**Ex Vivo Engineered/Edited Dendritic Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000590]** These dendritic cells can include the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system. Thus, these are engineered/edited dendritic cells.

**[000591]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for inactivation of immature dendritic cells and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein) for enhanced interaction of the dendritic cell with the T-cell and/or natural killer cell.

**[000592]** Autophagy is a process of maintaining cell homeostasis by removing cellular waste and damaged cellular organelles. Autophagy of the dendritic cell can activate the T-cell's anticancer activity. Furthermore,

autophagy related Atg5-deficient dendritic cell has significantly elevated receptor CD36 on its surface, which increased the phagocytosis of apoptotic cancer cell, but restricted the activation of the T-cell. Thus, controlling receptor CD36 on the surface of the dendritic cell by the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can activate the T-cell's anticancer activity.

**[000593]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000594]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000595]** The nanoshell can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000596]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g.,

chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells.

**Ex Vivo Engineered/Edited Dendritic Cells, Utilizing Modulating CRISPR-Cas9 System**

**[000597]** These dendritic cells can include the modulated CRISPR-Cas9 system. Thus, these are engineered/edited dendritic cells.

**[000598]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial against a particular type of cancer cells.

**[000599]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000600]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of cancer cells.

**[000601]** The nanoshell can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000602]** Autophagy is a process of maintaining cell homeostasis by

removing cellular waste and damaged cellular organelles. Autophagy of the dendritic cell can activate the T-cell's anticancer activity. Furthermore, autophagy related Atg5-deficient dendritic cell has significantly elevated receptor CD36 on its surface, which increased the phagocytosis of apoptotic cancer cell, but restricted the activation of the T-cell. Thus, controlling receptor CD36 on the surface of the dendritic cell by the modulating CRISPR-Cas9 system can activate the T-cell's anticancer activity.

**[000603]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of cancer cells

**[000604]** When injected into human body, these engineered/edited dendritic cells may then travel to nearby natural lymph nodes, where these can train other types of immune cells (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000605]** The engineered dendritic cell can contain the nanoshell, wherein one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells are encapsulated within the nanoshell.

**[000606]** Furthermore, the engineered dendritic cell can contain the nanoshell, wherein one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells are encapsulated within the nanoshell.

**[000607]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000608]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000609]** Moreover, when injected into human body, the engineered

dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000610]** Moreover, when injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via eceptor-mediated endocytosis, the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer cells.

**[000611]** Additionally, an engineered T-cells/natural killer cells can include or bind/couple (e.g., chemically bind/couple) with deoxyribonucleic acid origami nanostructure/ribonucleic acid origami nanostructure/XNA origami nanostructure for enhanced interaction with the engineered/edited dendritic cells.

**[000612]** Additionally, the engineered T-cells/natural killer cells can include one or more deoxyribonucleic acid/XNA sequences to encode one or more therapeutic proteins.

**[000613]** In general, but not limited to, an engineered dendritic cell (ex vivo) includes:

**(a)** a first molecule,

wherein the first molecule is selected from the group consisting of the following: a co-stimulating molecule, a mobility enhancing molecule and a programming molecule,

**(b)** an identifying protein on the surface of a particular type of cancer cells,

or

a sensing protein to detect a particular type of cancer cells and

**(c)** a nanostructure,

wherein the nanostructure includes a deoxyribonucleic acid origami based nanostructure or a ribonucleic acid origami based nanostructure or a XNA origami based nanostructure for interaction with the T-cells and/or the natural killer cells against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or

artificial genetic bases, wherein the nanostructure is encapsulated in a lipid bilayer, or the nanostructure is attached with a red blood cell, or a white blood cell.

**[000614]** The engineered dendritic cell in above, further includes a second molecule to initiate response of the T-cells and/or the natural killer cells.

**[000615]** The engineered dendritic cell in above, further includes an activating protein to detect a molecular event within a particular type of cancer cells.

**[000616]** The engineered dendritic cell in above, further exchanges or transfers the sensing protein to the T-cells and/or the natural killer cells.

**[000617]** The engineered dendritic cell in above, further includes or binds/couples (e.g., chemically bind/couple) with the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000618]** The engineered dendritic cell in above, further includes or binds/couples (e.g., chemically bind/couple) with the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000619]** The engineered dendritic cell in above, further includes a nanoshell, wherein the nanoshell encapsulates deoxyribonucleic acid

sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000620]** The engineered dendritic cell in above, further exchanges or transfers the nanoshell to the T-cells and/or the natural killer cells, wherein the nanoshell releases deoxyribonucleic acid sequence and/or XNA sequence to encode a therapeutic protein against a particular type of cancer cells within the T-cells and/or the natural killer cells, wherein XNA includes genetic bases adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and one or more synthetic or artificial genetic bases.

**[000621]** The engineered dendritic cell in above, wherein the nanostructure further includes RNAi based logic circuit.

**[000622]** The engineered dendritic cell in above, wherein the nanostructure is functionalized by a pattern of ligands to induce or activate dendritic cell to initiate response of the T-cells and/or the natural killer cells.

**[000623]** The engineered dendritic cell in above, further includes a CRISPR-Cas9 system or a light activated CRISPR-Cas9 system, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system removes a first defective gene for inactivation of a dendritic cell, and

adds/inserts/replaces a second gene, wherein the added/inserted/replaced second gene expresses, or releases a third molecule to increase interaction with the T-cells and/or the natural killer cells. The added/inserted/replaced second gene includes one or more synthetic or artificial genetic bases.

**[000624]** The Cas9 can be replaced by Cas9-HFI or Cas12a. CRISPR-Cas9 system can be replaced by a transposon-encoded CRISPR-Cas system.

**[000625]** The engineered dendritic cell in above, further couples with or includes one or more modified exosomes.

**[000626]** The engineered dendritic cell in above, is an engineered and modulated dendritic cell, wherein the engineered dendritic cell further includes a modulating CRISPR-Cas9 system, wherein the modulating CRISPR-Cas9 system includes Cas9, a short single guide RNA, a transcriptional activator and an adeno-associated virus, wherein the modulating CRISPR-Cas9 system activates an expression of one or more genes beneficial gene against a particular type of cancer cells.

**Application To Editing B Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System Or Modulating CRISPR-Cas9 System To Create Specific Antibody**

**[000627]** The CRISPR-Cas9 system/light activated CRISPR-Cas9 system or modulating CRISPR-Cas9 system can be utilized to modify B cells (a class

of white blood cells) with genes that create specific antibodies that produce antibodies to protect from diseases and/or inflammation.

**[000628]** Furthermore, genes can include natural genetic bases such as adenine (A), thymine (T), guanine (G), cytosine (C) and uracil (U) and/or one or more synthetic/artificial genetic bases (e.g., α and ß).

**[000629]** Furthermore, the CRISPR-Cas9 system/light activated CRISPR-Cas9 system or modulating CRISPR-Cas9 system can be encapsulated in the nanoshell.

**[000630]** Additionally, the nanoshell can include synthetically created a small chain(s) of amino acids or a polypeptide for triggering B cells to create specific antibodies.

**[000631]** As an example, but not limited to, a synthetic polypeptide for a specific beta amyloid protein (Alzheimer's disease) can be a formula Vab-Rn-X-P-Y-Rn-Vab, wherein the synthetic polypeptide is engineered and chemically conjugated, wherein each variable antigen-binding (Vab) domain includes a binding site for an antigen and all or a portion of the Vab domains are from camelid single-domain heavy chain antibodies lacking light-chains, wherein each Rn independently includes a camelid hinge region from a single domain heavy chain antibody lacking light chains, wherein X is a human immunoglobulin CH2 domain, wherein P is $-(CH_2\text{-}CH_2\text{-}O)_n-$,

wherein n = 4, wherein Y is a succinimidyl moiety, wherein Y further includes -S-$(CH_2)_3$-C($NH_2Cl$)NH-, wherein the synthetic polypeptide binds or couples to a segment of a beta amyloid protein, wherein the beta amyloid protein has an amino acid sequence (Sequence ID No: 52): MDAEFRHDSG YEVHHQKLVF FAEDVGSNKG AIIGLMVGGV VIATVIVITL VMLKKKQYTS IHHGVVEVGK LDCMFPSGN, wherein the synthetic polypeptide has a molecular weight between 25 kDa and 90 kDa.

**[000632]** Similarly, a synthetic polypeptide for a specific tau protein (Alzheimer's disease) can be realized.

**Application To Treatment Of HIV With An Engineered/Edited Or Modulated Stem Cell**

**[000633]** In order for HIV, the virus causing AIDS, to enter cells it usually must fuse with a receptor called CCR5 that sits on the surface of T-helper immune cells.

**[000634]** The delta-32 mutation in the gene encoding the CCR5 protein results in a defective/mutated receptor site that can block the entry of the virus causing AIDS.

**[000635]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a stem cell to remove a first gene (or first genes) that promote the development of mutation of the

receptor called CCR5 and/or additionally, the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system via the nanoshell can be inserted into a stem cell to add/insert/replace a second gene (or genes) that promote the development of mutation of the receptor called CCR5.

**[000636]** Thus, a mutation strategy of the receptor called CCR5 can block the entry of the virus causing AIDS.

**Application To Genetic Medicine, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System**

**[000637]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include a drug printed by a three-dimensional printer/bio-ink printer.

**[000638]** The CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface, wherein the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system can remove a first gene responsible for a disease and add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) to express/release a molecule (e.g., an antibody/hormone/protein), beneficial against a particular type of diseased cells.

**[000639]** Inserting genes in the point cleaved by CRISPR-Cas9 system may require other proteins. A cell may contain or can be configured to contain such proteins. Thus, a complementary sequence on the ends of the insertion sequence may be needed to add/insert/replace a second gene (including genetic bases A (adenine), C (cytosine), T (thymine), G (guanine) and/or one or more synthetic/artificial genetic bases (e.g., α and ß)) inside a cell.

**[000640]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of diseased cells.

**[000641]** The nanoshell (encapsulating/caging the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of diseased cells

**Application To Genetic Medicine, Utilizing Modulating CRISPR-Cas9 System**

**[000642]** The modulating CRISPR-Cas9 system can activate an expression of one or more genes beneficial genes against a particular type of diseased

cells.

**[000643]** The modulating CRISPR-Cas9 system can be encapsulated/caged in the nanoshell, wherein the nanoshell includes an immune shielding surface.

**[000644]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) with a sensing protein and/or an activating protein to detect a molecular event within a particular type of diseased cells.

**[000645]** The nanoshell (encapsulating/caging the modulating CRISPR-Cas9 system) can include or bind/couple (e.g., chemically bind/couple) can include or bind/couple (e.g., chemically bind/couple) with one or more molecules/RNAi molecules/modified (e.g., an overexpression of certain microRNAs and/or modified ligand(s)) exosomes beneficial against a particular type of diseased cells

**Application To Transplantable Organ With Stem Cell, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System Or Modulating CRISPR-Cas9 System**

**[000646]** A human induced pluripotent stem cells can be injected into the animal's embryo and placed into womb of the female animal (e.g., a pig/sheep) to grow a human organ – resulting in birth of an adult animal

(e.g., a pig/sheep) with the human organ after nine (9) months.

**[000647]** Furthermore, the human induced pluripotent stem cells can be engineered/edited utilizing the CRISPR-Cas9 system or the light activated CRISPR-Cas9 system or the modulating CRISPR-Cas9 system.

**[000648]** Then, the human organ can be transplanted to a patient, upon slaughtering the adult animal with the human organ.

**Application To Stem Cell Derived Beta Cells, Utilizing CRISPR-Cas9 System/Light Activated CRISPR-Cas9 System Or Modulating CRISPR-Cas9 System**

**[000649]** Immature pancreatic cells (beta cells) can be derived from human embryonic stem cells. Such immature pancreatic cells (beta cells) can be edited utilizing CRISPR-Cas9 system or light activated CRISPR-Cas9 system, encapsulated in the nanoshell.

**[000650]** Alternatively, such immature pancreatic cells (beta cells) can be modulated utilizing modulating CRISPR-Cas9 system, encapsulated in the nanoshell.

**[000651]** The edited/modulated immature pancreatic cells (beta cells) can be encapsulated to protect from the human body's immune system. The encapsulated edited/modulated immature pancreatic cells (beta cells) can be implanted under the skin of the human body to manage insulin production

for either Type -1 diabetes or Type- 2 diabetes

**Replacement By Cas9-HFI Or Cas12a**

**[000652]** In all previous paragraphs, high-fidelity Cas9-HFI or a suitable molecule (e.g., Cas12a) can be utilized instead of Cas9 for reduced off-targets.

**Replacement By Transposon-Encoded CRISPR-Cas System (With Jumping Genes)**

**[000653]** A first concern with is that editing with CRISPR-Cas9 system can alter deoxyribonucleic acid in places it is not supposed to be there and these off-target may trigger cancers. A second concern is that a cell can insert a random deoxyribonucleic acid when it is making repairs with CRISPR-Cas9 system and these could silence needed genes. A third concern is that it is harder to insert the right new genes with CRISPR-Cas9 system. A transposon-encoded CRISPR-Cas system (with jumping genes) can be utilized instead of CRISPR-Cas9 system to reduce the above mentioned first, second and third concerns.

**PREFERRED EMBODIMENTS & SCOPE OF THE INVENTION**

**[000654]** As used in the above disclosed specifications, the above disclosed specifications "/" has been used to indicate an "or".

**[000655]** As used in the above disclosed specifications and in the claims, the singular forms “a”, “an”, and “the” include also the plural forms, unless the context clearly dictates otherwise.

**[000656]** As used in the above disclosed specifications, the term “includes” means “comprises”. Also the term “including” means “comprising”.

**[000657]** As used in the above disclosed specifications, the term “couples” or “coupled” does not exclude the presence of an intermediate element(s) between the coupled items.

**[000658]** As used in the above disclosed specifications, any weight % in the above disclosed specifications is by way of an approximation only and not by way of any limitation.

**[000659]** Any dimension in the above disclosed specifications is by way of an approximation only and not by way of any limitation.

**[000660]** As used in the above disclosed specifications, unless otherwise specified in the relevant paragraph(s), a nanoscaled dimension shall generally mean a dimension from about 1 nm to about 1000 nm.

**[000661]** Any example in the above disclosed specifications is by way of an example only and not by way of any limitation. Having described and illustrated the principles of the disclosed technology with reference to the illustrated embodiments, it will be recognized that the illustrated

embodiments can be modified in any arrangement and detail with departing from such principles. The technologies from any example can be combined in any arrangement with the technologies described in any one or more of the other examples. Alternatives specifically addressed in this application are merely exemplary and do not constitute all possible examples. Claimed invention is disclosed as one of several possibilities or as useful separately or in various combinations. See Novozymes A/S v. DuPont Nutrition Biosciences APS, 723 F3d 1336,1347.

**[000662]** The best mode requirement "requires an inventor(s) to disclose the best mode contemplated by him/her, as of the time he/she executes the application, of carrying out the invention." "...[T]he existence of a best mode is a purely subjective matter depending upon what the inventor(s) actually believed at the time the application was filed." See Bayer AG v. Schein Pharmaceuticals, Inc. The best mode requirement still exists under the America Invents Act (AIA). At the time of the invention, the inventor(s) described preferred best mode embodiments of the present invention. The sole purpose of the best mode requirement is to restrain the inventor(s) from applying for a patent, while at the same time concealing from the public preferred embodiments of their inventions, which they have in fact conceived. The best mode inquiry focuses on the inventor(s)' state of mind

at the time he/she filed the patent application, raising a subjective factual question. The specificity of disclosure required to comply with the best mode requirement must be determined by the knowledge of facts within the possession of the inventor(s) at the time of filing the patent application. See Glaxo, Inc. v. Novopharm Ltd., 52 F.3d 1043, 1050 (Fed. Cir. 1995). The above disclosed specifications are the preferred best mode embodiments of the present invention. However, they are not intended to be limited only to the preferred best mode embodiments of the present invention.

**[000663]** Embodiment by definition is a manner in which an invention can be made or used or practiced or expressed. "A tangible form or representation of the invention" is an embodiment.

**[000664]** Numerous variations and/or modifications are possible within the scope of the present invention. Accordingly, the disclosed preferred best mode embodiments are to be construed as illustrative only. Those who are skilled in the art can make various variations and/or modifications without departing from the scope and spirit of this invention. It should be apparent that features of one embodiment can be combined with one or more features of another embodiment to form a plurality of embodiments. The inventor(s) of the present invention is not required to describe each and every conceivable and possible future embodiment in the preferred best mode

embodiments of the present invention. See SRI Int'l v. Matsushita Elec. Corp. of America, 775F.2d 1107, 1121, 227 U.S.P.Q. (BNA) 577, 585 (Fed. Cir. 1985) (enbanc).

**[000665]** The scope and spirit of this invention shall be defined by the claims and the equivalents of the claims only. The exclusive use of all variations and/or modifications within the scope of the claims is reserved. The general presumption is that claim terms should be interpreted using their plain and ordinary meaning without improperly importing a limitation from the specification into the claims. See Continental Circuits LLC v. Intel Corp. (Appeal Number 2018-1076, Fed. Cir. February 8, 2019) and Oxford Immunotec Ltd. v. Qiagen, Inc. et al., Action No. 15-cv-13124-NMG. Unless a claim term is specifically defined in the preferred best mode embodiments, then a claim term has an ordinary meaning, as understood by a person with an ordinary skill in the art, at the time of the present invention. Plain claim language will not be narrowed, unless the inventor(s) of the present invention clearly and explicitly disclaims broader claim scope. See Sumitomo Dainippon Pharma Co. v. Emcure Pharm. Ltd., Case Nos. 17-1798; -1799; -1800 (Fed. Cir. Apr. 16, 2018) (Stoll, J). As noted long ago: "Specifications teach. Claims claim". See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001). The rights of claims (and rights of the

equivalents of the claims) under the Doctrine of Equivalents-meeting the "Triple Identity Test" (a) performing substantially the same function, (b) in substantially the same way and (c) yielding substantially the same result. See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009)) of the present invention are not narrowed or limited by the selective imports of the specifications (of the preferred embodiments of the present invention) into the claims.

**[000666]** While "absolute precision is unattainable" in patented claims, the definiteness requirement "mandates clarity." See Nautilus, Inc. v. Biosig Instruments, Inc., 527 U.S. ____, 134 S. Ct. 2120, 2129, 110 USPQ2d 1688, 1693 (2014). Definiteness of claim language must be analyzed NOT in a vacuum, but in light of:

(a) The content of the particular application disclosure,

(b) The teachings of any prior art and

(c) The claim interpretation that would be given by one possessing the ordinary level of skill in the pertinent art at the time the invention was made. (Id.).

See Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1 USPQ2d 1081 (Fed. Cir. 1986)

**[000667]** There are number of ways the written description requirement is satisfied. Applicant(s) does not need to describe every claim element exactly, because there is no such requirement (MPEP §2163). Rather to satisfy the written description requirement, all that is required is "reasonable clarity" (MPEP §2163.02). An adequate description may be made in any way through express, implicit or even inherent disclosures in the application, including word, structures, figures, diagrams and/or equations (MPEP §§ 2163(I), 2163.02). The set of claims in this invention generally covers a set of sufficient number of embodiments to conform to written description and enablement doctrine. See Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1355 (Fed. Cir. 2010), Regents of the University of California v. Eli Lilly & Co., 119 F.3d 1559 (Fed. Cir. 1997) & Amgen Inc. v. Chugai Pharmaceutical Co. 927 F.2d 1200 (Fed. Cir. 1991).

**[000668]** Furthermore, Amgen Inc. v. Chugai Pharmaceutical Co. exemplifies Federal Circuit's strict enablement requirements. Additionally, the set of claims in this invention is intended to inform the scope of this invention with "reasonable certainty". See Interval Licensing, LLC v. AOL Inc. (Fed. Cir. Sept. 10, 2014). A key aspect of the enablement requirement is that it only requires that others will not have to perform "undue experimentation" to reproduce it. Enablement is not precluded by the

necessity of some experimentation, "[t]he key word is 'undue', not experimentation." Enablement is generally considered to be the most important factor for determining the scope of claim protection allowed. The scope of enablement must be commensurate with the scope of the claims. However, enablement does not require that an inventor disclose every possible embodiment of his invention. The scope of enablement must be commensurate with the scope of the claims. The scope of the claims must be less than or equal to the scope of enablement. See Promega v. Life Technologies Fed. Cir., Dec. 2014, Magsil v. Hitachi Global Storage Fed. Cir. Aug. 2012.

**[000669]** The term "means" was not used nor intended nor implied in the disclosed preferred best mode embodiments of the present invention. Thus, the inventor(s) has not limited the scope of the claims as mean plus function.

**[000670]** An apparatus claim with functional language is not an impermissible "hybrid" claim; instead, it is simply an apparatus claim including functional limitations. Additionally, "apparatus claims are not necessarily indefinite for using functional language . . . [f]unctional language may also be employed to limit the claims without using the means-plus-function format." See National Presto Industries, Inc. v. The West Bend Co., 76 F. 3d 1185 (Fed. Cir. 1996), R.A.C.C. Indus. v. Stun-Tech, Inc., 178 F.3d

1309 (Fed. Cir. 1998) (unpublished), Microprocessor Enhancement Corp. v. Texas Instruments Inc. & Williamson v. Citrix Online, LLC, 792 F.3d 1339 (2015).

UNITED STATES POSTAL SERVICE® | PRIORITY® MAIL

Retail

U.S. POSTAGE PAID
PM
YORBA LINDA, CA 92885
JUL 11, 2024

UNITED STATES POSTAL SERVICE®

20439

$18.40

RDC 03 3 Lb 13.10 Oz S2324H500436-11

EXPECTED DELIVERY DAY: 07/13/24

USPS TRACKING® #

9505 5147 1504 4193 4318 45

l destinations.

ic Mail Manual at *http://pe.usps.com.*

nual at *http://pe.usps.com* for availability and

AT RATE BOX

/EIGHT

ickup,

FROM:

Mo Mazed
21520 Yorba Linda Blvd.
No. 393G
Yorba Linda
CA 92887

Appeal Docket NO. 2024-1756

TO:

Clerk of Court
(US Court of Appeals FoR Federal Circui
717 Madison Place NW
Washington
DC 20439