# APPEAL DOCKET NO.: 2024-1756

RECEIVED
JUL 26 2024
United States Court of Appeals
For the Federal Circuit

# US COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**In Re: MOHAMMAD A. MAZED,**
**APPELLANT**

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD OF THE UNITED STATES PATENT AND TRADEMARK OFFICE APPEAL DOCKET No. 2024-00723

**APPELLANT'S <u>CORRECTED</u> OPENING APPEAL BRIEF IN SUPPORT OF REVERSAL OF USPTO'S OBVIOUSNESS DETERMINATION**

Respectfully Submitted:
Mohmmad A. Mazed
21520 Yorba Linda Blvd. No. 393G
Yorba Linda, CA 92887

# TABLE OF CONTENTS


| | PAGE(S) |
|---|---|
| TABLE OF AUTHORITIES | 3 |
| I. STATEMENT OF RELATED CASES | 4 |
| II. STATEMENT OF JURISDICTION | 4 |
| III. STATEMENT OF ISSUE | 4 |
| IV. STATEMENT OF THE CASE | 5 |
| V. SUMMARY OF ARGUMENT | 6 |
| VI. ARGUMENT | 6 |
| A: STANDARD OF REVIEW | 6 |
| B: TECHNICAL ARGUMENTS | 6 |
| C: LEGAL ARGUMENTS | 31 |
| VIII. CONCLUSION AND PRAYER FOR RELIEF | 44 |
| ADDENDUM | Appx001-028 |
| CERTIFICATE OF COMPLIANCE | |

# TABLE OF AUTHORITIES

Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1376 (Fed. Cir. 2004) **40**

DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326–27 (Fed.Cir.2009) **36**

DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006) **37**

Eisai Co. v. Dr. Reddy's Labs, Ltd, 533 F.3d1353 (Fed. Cir. 2008) **31, 37**

Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966) **32, 39, 40, 45**

Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994) **38**

W. L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir. 1983 **33**

In re Bergel, 292 F.2d 955, 956-57 (C.C.P.A. 1961) **34**

In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988) **39, 43**

In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) **24, 40, 42, 45**

In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) **31**

## I. STATEMENT OF RELATED CASES

Appellant has no related cases, appeals, interferences or judicial proceedings/trials, at this filing of this Opening Brief with US Court of Appeal, Federal Circuit.

## II. STATEMENT OF JURISDICTION

This US Court of Appeal, Federal Circuit has jurisdiction over Appellant's appeal, because the ending (final) ruling on USPTO BPAI's appeal docket number 2024-00723 is from the United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI) for the independent claim 85 and its dependent claim 87 in the patent Application 16/602,403, entitled Molecular System For Cancer Biology, filed on September 28, 2019.

## III. STATEMENT OF ISSUE

Did the United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI) make errors in obviousness rejection {**Appx001-0028**} under 35 U.S.C. § 103 of the independent claim 85 and its dependent claim 87 in the patent Application 16/602,403, entitled Molecular System For Cancer Biology, filed on September 28, 2019?

## IV. STATEMENT OF THE CASE

- On September 28, 2019 Appellant filed this non-provisional patent application with 45 pages of specifications and 45 total claims.
- On July 27, 2022 Appellant timely filed response to Restriction Requirements. Appellant believed that Restriction Requirements were improper.
- On March 27, 2023 Appellant timely filed response to Non-Final First Office Action on **only two** examined claims: independent Claim 85 and its dependent claim 87, **which were not amended**.
- On May 3, 2023 Appellant received Final Office Action on obviousness rejection under 35 U.S.C. § 103.
- On June 27, 2023 Appellant received rejection of further consideration after Final Office Action Program.
- On July 14, 2023 Appellant timely filed Appeal at United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI) with an appeal docket number 2024-00723.
- On April 4, 2024 United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI) affirmed obviousness rejection under 35 U.S.C. § 103.

## V. SUMMARY OF ARGUMENT

The United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI) made errors in Obviousness Rejection **{Appx001-0028}** under 35 U.S.C. § 103, in view of:

(i) Factual discrepancy/dispute,

(ii) Intrinsic evidence, and

(iii) A reasoned legal explanation, showing why Appellant's claimed invention would have been obvious to a PHOSITA at that time of the claimed invention.

## VI. ARGUMENT

### A: STANDARD OF REVIEW

This Court reviews the ending (final) determination of all patents related cases from the United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI) as a matter of law de novo.

### B: TECHNICAL ARGUMENTS

#### Claim Terms & Occasionally Naturally Expressed Biomolecules

Claim terms such as (i) Engineered, (ii) Biocompatible and (iii) Bioactive were generally known to a PHOSITA at the time of the claimed invention. Thus, Appellant was not required in defining such

terms in the specification. However, it should be noted that USPTO selectively and conveniently construed only one term – "Engineered", but not Biocompatible and Bioactive.

Furthermore, as to intrinsic evidence of a scaffold, following specification text paragraphs 189-194 **{Appx065-066}** outlines its meaning.

> "**[000189]** An implanted biodegradable and biocompatible (artificial) lymph node can be fabricated/constructed (e.g., a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure or a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer or a scaffold of silk fibroin) or a metallic glass material and then antibiotics can be added by soaking the scaffold in an antibiotic solution. Furthermore, the metallic glass material can be fabricated/constructed to have nanoscaled porosity and/or nanoscaled surface pattern for cell adhesion and/or inflammation.
>
> **[000190]** The implanted biodegradable and biocompatible (artificial) lymph node can be integrated with a mechanically

actuating membrane (which changes its shape in microscale level) to reduce unwanted cell growth near the implanted biodegradable and biocompatible (artificial) lymph node.

**[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution.

**[000192]** The above scaffold can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000193]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000194]** The above scaffold can contain one or more molecules (e.g., recruiting molecules and/or co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells to recruit, attract and activate nearby immature dendritic cells at the site of the

implanted biodegradable and biocompatible (artificial) lymph node."

Occasionally Naturally Expressed Biomolecules would require either presence or absence of various biological factors (for example, as shown in **{Appx189}** Figure 1, that "CD40 is upregulated on activated DCs,") and such biological factors can vary from one person to another person and even in a course of time. But, to construct a consistent engineered dendritic cell in a lab, it is not possible to rely on occasionally naturally expressed biomolecules. Thus, to construct an engineered dendritic cell in a lab, synthetic molecules are to be **added consistently** in the claimed invention. According to {**Appx189**}, CD40 is upregulated on activated DCs.

**Thus, there is no consistent presence of CD40 without any occasional and natural upregulation, based on various biological factors.**

**Claimed invention is not about activating DCs (dendritic cells), rather inserting an engineered dendritic cell (created in a lab), which is consistently added with synthetic molecules to alter molecular biology of a cancer cell.**




**Figure 1**

**{Appx189}**

| |
|---|
| Fig. 1. Schematic showing CD40 and CD40L/CD154 expression on DCs and lymphocytes. (Left). Model of CD40-CD40L/CD154 interactions between T cells and DCs. **CD40 is upregulated on activated DCs,** and CD154 is expressed on activated T cells. Engagement of CD40 on DCs induces positive signaling that leads to expression of CDS0/86 and the production of lL-12 that skews towards Thl differentiation in CD4+ Tcells. ln addition to IL-12, CD154 signaling in Tcells induces IFN--y production. (Right) Model of CD40-CD40L/CD154 crosstalk interactions between T cells, B cells and DCs. CD40 and CD154 are both reciprocally expressed on activated DCs and lymphocytes, and may engage in multi-directional crosstalk between cell types. CD40 signaling on DCs induces secretion of IL-12 which promotes Th 1 differentiation, IL-10 which induces Icegs, or other cytokines that induce Th 17 differentiation. CD40 signaling in DCs also induces BAFF and APRIL production, which along with effector T cell-derived IL-2 and IL-4 ! 128],induce B cell class switching and secretion of lgG and lgA antibodies. |

**{Appx189}**

**Factual Discrepancy/Dispute of Prior Art With Respect to Claim Elements of Independent Claim 85**

**{Appx156-157} & {Appx360-361}**

**Independent Claim 85**

An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,[;]

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami,

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**Preamble**: An engineered dendritic cell comprising:

**Prior Art**: Prior art, in combination does not teach an engineered dendritic cell with all added synthetic biocomponents.

**Appellant's Technical Argument**: Engineered dendritic cell requires consistent addition of synthetic molecules, but cannot rely on occasionally naturally expressed biomolecules based on either presence or absence of various biological factors and such biological factors can vary from one person to another person and even in a course of time. Thus, prior art in combination does not teach an engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents, as in claimed invention).

**Preamble is limited to an engineered dendritic cell.**

**<u>Claim Element 1</u>:**

**(a)** a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

**Prior Art**: Prior art allegedly discloses CD40/CD40L is a programming molecule per Ma.

**Appellant's Technical Argument**: This is a disputed fact, based on the following two publications, as listed below CD40 and CD40L are not programming molecules.

**{Appx417}**

Publication 1: Bullock, T.N.J. CD40 stimulation as a molecular adjuvant for cancer vaccines and other immunotherapies. Cell Mol Immunol 19, 14–22 (2022). https://doi.org/10.1038/s41423-021-00734-4

Publication 2 Targeting CD40L: a Promising Therapeutic Approach

"CD40L is a member of the tumor necrosis factor (TNF) family of cell surface interaction molecules.

https://journals.asm.org/doi/10.1128/CDLI.11.4.635-641.2004

**Claim element 1 has disputed fact, because CD40 and CD40L are not programming molecules in an engineered dendritic cell, based on the above two publications {Appx417}**

**Claim Element 2:**

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**Prior Art**: Prior art discloses MHC molecule.

**Appellant's Technical Argument**: MHC molecule is occasionally naturally expressed. Engineered dendritic cell requires consistent addition of synthetic molecules, but cannot rely on occasionally naturally expressed biomolecules based on either presence or absence of various biological factors and such biological factors can vary from one person to another person and even time to time. Thus, prior art in combination does not teach an engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents, as in claimed invention).

**Claim element 2 has disputed fact, because there is distinction between occasionally naturally expressed biomolecules (based on either presence or absence of various biological factors) and synthetically added biomolecules in an engineered dendritic cell.**

**<u>Claim Element 3</u>:**

**(c)** an identifying protein on a cancer cell;

**Prior Art**: Prior art (Chang 2020) discloses RNA origami **nanostructure directly binding** onto tumor antigen peptide, as it favors the benefits due to nanostructure itself being is immunosimulatory {**Appx535**} and {**Appx541**}.

**Appellant's Technical Argument:** An identifying protein (which can be generally found on a cancer cell) is to be synthetically added with an engineered dendritic cell, but not directly bound on an RNA origami nanostructure, as taught by (Chang 2020).

{**Appx535**} and {**Appx541**} Chang (2020) favors the benefits due to **nanostructure robot itself being is immunosimulatory. USPTO does not explain when RNA nanostructure robot itself is immunosimulatory, then why a PHOSITA would be motivated to make an identifying protein (which can be generally found on a cancer cell) to be synthetically added with an engineered dendritic cell?**

Thus, Chang (2020) as a whole discourages a PHOSITA from making an identifying protein (which can be generally found on a cancer cell) to be synthetically added with an engineered dendritic cell.




FIGURE 13

**{Appx535}**

**[0034]** FIG. **13** illustrates representative **DNA-nanostructures of aptamer-DNA nanostructures to engage cell-cell interactions.** A) Spiral DNA scaffolds. B) DNA origami holding aptamers at different positions. C) and D) Representative configurations of multi-specific DNA origami to direct NK cells to tumor (Ramos) cells

**{Appx541}**

Prior art teaches away unlikely, reasonably, from being combined to produce claim element 3 in an engineered dendritic cell, as **prior art is providing the benefits for incorporating an RNA origami nanostructure directly binding onto a tumor antigen peptide for immuno-therapy.**

**Thus, this is a clear discouragement from binding an identifying protein (which can be generally found on a cancer cell and isolated in a lab) directly onto an engineered dendritic cell, as in the claimed invention as it relates to an unpredictable art.**

**<u>Claim Element 4</u>:**

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami,

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

**Prior Art**: Prior art discloses a RNA nanostructure origami, not a scaffold.

**Appellant's Technical Argument**: As to intrinsic evidence of scaffold, following **{Appx065-066}** specification text paragraphs 189-194 give the contour of such meaning.

**{Appx066}** Paragraph of 191 of the specification outlines how a scaffold is protected

> "**[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution."

Claim element 4 requires a scaffold of a biocompatible polymer. Furthermore, the meaning of biocompatible polymer would be known to a PHOSITA as generally as (i) polylactic-co-glycolic acid or (ii) polyLactic Acid, at the time of the claimed invention. A PHOSITA will not consider DNA/RNA as a biocompatible polymer for a scaffold as it has not been used in medical device and/or drug delivery industry, at the time of the invention. For example, a 2019 review paper on biocompatible polymer and its abstract is included in its entirety below:

**https://pubmed.ncbi.nlm.nih.gov/31604409/Biocompatible Polymers and their Potential Biomedical Applications: A Review: Arif et. al Current Pharmaceutical Design, Volume 25, Issue 34, 2019** DOI: 10.2174/1381612825999191011105148

> **"Abstract**
> **Background:** Biocompatible polymers are gaining great interest in the field of biomedical applications. The term biocompatibility refers to the suitability of a polymer to body and body fluids exposure. Biocompatible polymers are both synthetic (man-made) and natural and aid in the close vicinity of a living system or work in intimacy with living cells. These are used to gauge, treat, boost, or substitute any tissue, organ or function of the body. A biocompatible polymer improves body

functions without altering its normal functioning and triggering allergies or other side effects. It encompasses advances in tissue culture, tissue scaffolds, implantation, artificial grafts, wound fabrication, controlled drug delivery, bone filler material, etc.

**Objectives:** This review provides an insight into the remarkable contribution made by some well-known biopolymers such as polylactic-co-glycolic acid, poly(ε-caprolactone) (PCL), polyLactic Acid, poly(3-hydroxybutyrate-co-3-hydroxyvalerate) (PHBV), Chitosan and Cellulose in the therapeutic measure for many biomedical applications.

**Methods:** Various techniques and methods have made biopolymers more significant in the biomedical fields such as augmentation (replaced petroleum based polymers), film processing, injection modeling, blow molding techniques, controlled / implantable drug delivery devices, biological grafting, nano technology, tissue engineering etc.

**Results:** The fore mentioned techniques and other advanced techniques have resulted in improved biocompatibility, nontoxicity, renewability, mild processing conditions, health condition, reduced immunological reactions and minimized side effects that would occur if synthetic polymers are used in a host cell.

**Conclusion:** Biopolymers have brought effective and attainable targets in pharmaceutics and therapeutics. There are huge numbers of biopolymers reported in the literature that has been used effectively and extensively.

> **Keywords:** Biopolymers; biocompatibility; drug delivery; nano technology; scaffolds; tissue engineering."

Additionally, such a scaffold made of a biocompatible polymer is distinct from a DNA scaffold. The scaffold made of a biocompatible polymer at least includes an origami of DNA/RNA/XNA.

USPTO simply equated a scaffold of a biocompatible polymer is a DNA/RNA origami nanostructure. To contrast this with the intrinsic evidence of the specification text paragraph 191 **{Appx066}**, a PHOSITA would differ from USPTO.

**{Appx066}**

> **[000191]** Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution.

Following the intrinsic evidence of a scaffold in the specification text paragraphs 189-194 **{Appx065-066}** and knowledge of a PHOSITA at the time of the claimed invention, BPAI made errors in **simply equating** a scaffold made of a biocompatible polymer (that at least includes an origami of DNA/RNA/XNA) as just a nanostructure origami of DNA/RNA itself – thus improperly supplying two distinct claim limitations with a single prior art.

**Claim element 4 (in particular a scaffold of a biocompatible polymer) in an engineered dendritic cell is a missing element.**

**<u>Claim Element 5</u>:**

**(e)** wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**Prior Art**: Prior art **supposedly discloses** dendritic cell is #16 and is externally interacting with another cell #17 through a RNA origami scaffold #1.

**Appellant's Technical Argument**:

**{Appx299-300}** Items #16 and #17 were **never identified** in Chang (2020)'s Figure 20 in the entire specification, but USPTO fills it anyway by simply guessing.

"Chang (2020) Portion of Fig. 20"




**{Appx299}**

**[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

**{Appx300}**

Additionally, in view of Chang (2020)'s Figure 15 {**Appx411**},

FIG. 15




Chang (2020)'s Figure 15 {**Appx411**},

**Chang (2020) favors directly externally coupling an RNA origami nanostructure onto a tumor cell for immuno-therapy**.

Thus, prior art **discourages any internal coupling** of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents, as in the claimed invention),

**Prior art teaches away from being combined, unlikely, reasonably, to produce the claim element 5 in an engineered dendritic cell.**

<u>**Summary Of Technical Arguments**</u>

In summary, prior art, in combination does not teach Appellant's claimed invention in view of at least the following:

**(i)** USPTO is equating occasionally naturally expressed biomolecules with synthetically added consistent biomolecules in construction of an engineered dendritic cell. **USPTO's argument is essentially that an engineered robotic hand invention is obvious under 35 U.S.C. § 103, when a naturally expressed biological hand already exists.**

**(ii)** In view of added synthetic biocomponents with an engineered dendritic cell, Thaiss prior art (Thaiss et al., Chemokines: a new dendritic cell signal for T cell activation, Frontiers in Immunology) is **moot**.

**(iii)** Factual dispute as to claim element 1, ((a) a first bioactive molecule; wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule), whether **CD40/CD40L is a programming molecule-this is a disputed fact**;

**(iv) Because Chang (2020) favors for directly binding a RNA origami nanostructure onto a cancer cell for immuno-therapy,** Teaching away as to claim element 3 ((c) an identifying protein on a

cancer cell;), as Chang (2020) and as a whole, discourages an identifying protein (which can be generally found on a cancer cell) to be synthetically added with an engineered dendritic cell;

**(v)** Missing element in claim element 4 ((d) a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell). Following the intrinsic evidence of a scaffold, BPAI made errors in equating a scaffold of a biocompatible polymer (that at least includes a nanostructure origami) as simply only a nanostructure origami, when a PHOSTIA would not regard DNA/RNA as a biocompatible polymer as apposed to what is known at the time of invention such as polylactic-co-glycolic acid, or polyLactic Acid.

**(vi)** Using one single prior art for two distinct claim limitations - a scaffold and an origami nanostructure; and

**(vii)** Teaching away as to claim element 5 ((e) wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.), even in view of Chang (2020)'s Figure 15 {**Appx411**}, prior art discourages internal coupling of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an

engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents in the claimed invention), as Chang (2020) favors for directly externally coupling a RNA origami nanostructure with a cell for immuno-therapy. But USPTO points to items #16 and #17. **It should be noted that items #16 and #17 were never identified in Chang (2020)'s Figure 20 in the entire specification, but USPTO fills it anyway by simply guessing.**

**{Appx299}**

"Chang (2020) Portion of Fig. 20"



## C: LEGAL ARGUMENTS

### All Words Must Be Considered – Including Even "Minor Differences"

When determining eligibility, BPAI must consider the claims as a whole without discounting or disregarding any claim element and without regard to its novelty or conventionality. The entire claim should be considered properly to ensure that even "Minor differences" in claim terms accurately reflect the desired breadth and scope over alleged prior art. "All words in a claim must be considered in judging the patentability of that claim against the prior art." In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) requires the "consideration" of every claim feature in an obviousness determination. Unlike engineering, biology is an unpredictable technological field. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable". To render claim unpatentable, BPAI must do more than merely "consider" each and every feature for Claim. See In re Royka, 490 F.2d 981, 180 USPQ 580 (CCPA 1974) (emphasis added) (to establish Prima Facie case of obviousness of Appellant's claimed

invention, all claim features must be taught or suggested by alleged prior art). A proper obviousness determination requires that Examiner make "a searching comparison of the claimed invention – including all its limitations with the teaching of the prior art." See In re Wada and Murphy, Appeal 2007-3733, citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including ... ascertaining the differences between Appellant's claimed invention and the alleged prior art. See Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added). For example, the fact that a certain result or characteristic may occur or be present in alleged prior art is NOT sufficient to establish the inherency of that result or characteristic. In re Rijckaert, 9 F.3d 1531, 1534, (Fed. Cir. 1993).

**Conclusory Without A Reasoned Explanation**

**BPAI decision on page 8-9 {Appx0009-0010}.** "FF 6. Examiner found that Chang 2011 does not disclose cell are APC or dendritic cells that "comprises (a) a first bioactive molecule such as a co-stimulatory molecule, (b) a second bioactive molecule that activate[s]

T cells, and (c) a synthetic protein found on a cancer cell" (Ans. 12; see also Final Act 4), yet BPAI Decision on page 13 **{Appx0014}**, Examiner, therefore, found that **"DC would have been an obvious choice among a limited genus of APC to engineer"** (Ans. 13, See FF 11-12, 14)". **BPAI never explained why DC (dendritic cell) would have been an obvious choice in the case of an engineered dendritic cell in an unpredictable art and this is conclusory**. The real trouble with **"if A / Y then B / Z" is when it comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A / Y then B / Z" this is simply conclusory**.

The state of the art at the time of the invention **may have pointed researchers in a different direction including just activating a T-cell or a nanostructure than the direction followed by Appellant. A contrary to the accepted wisdom (of just activating a T-cell or a nanostructure) in an unpredictable art represents strong evidence of unobviousness**. In re Hedges, 783 F.2d 1038, 1041 (Fed. Cir. 1986); W. L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir. 1983).

**A PHOSITA's Motivation To Combine Prior Art**

**BPAI Decision on page 10 {Appx0011}. "FF 9**. Chang 2020 disclosed "a RNA nanostructure robot, wherein RNA nanostructure is immuno-simulatory" (Chang 2020 ¶ 38).

But USPTO does not explain when RNA nanostructure robot **itself is immunosimulatory**, then why a PHOSITA would be motivated to make the combination of prior art (even including without limitation of the context of the prior art) to arrive at Appellant's claims' actual limitations of an engineered dendritic cells. In re Fulton, 391 F.3d 1195, 1201 (Fed. Cir. 2004). In re Gurley, 27 F.3d 551 (Fed. Cir. 1994). Additionally, even in view of Chang (2020)'s Figure 15, and as a whole, prior art discourages internal coupling of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold onto an engineered dendritic cell.

Furthermore, the combination of prior art is not obvious, when there is a missing element in the combination and the combination discourages and teaches away from Appellant's claimed invention. Furthermore, the combination of prior art is not obvious **"unless the art also contains something to suggest the desirability of the proposed combination" to construct an engineered dendritic cell**

(which is a lab-made dendritic cell with all claim elements in the claimed invention). In re Bergel, 292 F.2d 955, 956-57 (C.C.P.A. 1961).

**A PHOSITA's Reasonable Expectation of Success, In Absence of Motivation To Combine Prior Art, In View Of Missing Element & Teaching Away By Prior Art**

Reasonable expectation of success is a distinct and a separate requirement from the motivation to combine. As there is no motivation to combine in view of teaching away and missing elements, then there is no reasonable expectation of success.

Prior art (Chang 2020) discloses a RNA origami nanostructure **directly** bound onto Tumor Antigen Peptide.

**{Appx299}** Furthermore, "Chang (2020) Portion of Fig. 20"



For example, items #16 and #17 were **never identified** in Chang (2020)'s Figure 20 and in its entire specification, but USPTO fills it anyway by simply guessing.

Additionally, in view of Chang (2020)'s Figure 15{**Appx411**}, prior art **does not teach internal coupling** of the first bioactive molecule, the second bioactive molecule, the identifying protein, and the scaffold onto an engineered dendritic cell (which is a lab-made dendritic cell with all claim elements in the claimed invention). Developments flowing from prior art are unlikely, reasonably to produce Appellant's engineered dendritic cell (which is a lab-made dendritic cell with all added synthetic biocomponents in the claimed invention), further in view of factual discrepancy/dispute what are #16 and #17. Thus, prior art teaches away from being combined, unlikely, reasonably, to produce the claimed invention of an engineered dendritic cell. DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326–27 (Fed.Cir.2009). Furthermore, in Mintz *v.* Dietz & Watson, Inc., 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("The mere recitation of the words `**common sense'** without any support adds nothing to the obviousness equation."); Arendi S.A.R.L. *v.* Apple Inc., 832 F.3d 1355, 1362 (Fed. Cir. 2016) ("[R]eferences to `common

sense'—whether to supply a motivation to combine or a missing limitation—cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references specified."). Common sense is typically invoked to provide a known motivation to combine references. DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).

**Obvious To Try**

"Obvious to Try" test has three (3) prongs:

(1) A recognized problem, (2) A finite number of identified and predictable solutions and (3) A reasonable expectation of success.

Furthermore, contrary to USPTO's belief, unlike engineering, biology is an unpredictable art; results based on one cell does not produce the similar result on another cell. Thus, there was no finite number of identified and predictable solutions at the time of claimed invention in an unpredictable art. In Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008), Federal Circuit stated that for unpredictable arts, "potential solutions are less likely to be genuinely predictable".

**One Prior Art For Two Distinct Claim Limitations**

Use of one prior art of against two distinct claim limitations: a scaffold and an origami. Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994).

**Impermissible Hindsight Bias/Reconstruction**

Claim element in Appellant's claimed invention clearly defines "X" and prior art describes a distinct concept of "Y" and there is a high degree of separation between claim element "X" and prior art's distinct concept of "Y". But USPTO misreads claim element "X" into alleged prior art's distinct concept of "Y", using Hindsight Bias and engaged in impermissible Hindsight reconstruction just to design rejection under 35 U.S.C. § 103 in view of an unpredictable art.

**{Appx411} PAGE 5 OF EXAMINER'S ANSWER**

**"Chang (2020) Fig. 15"**




**"Chang (2020) Portion Of Fig. 20"**



> **[0083]** FIG. **20**. Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists.

**{Appx 372} From Examiner's Answer**

"the dendritic cell is #16 and is interacting with a tumor cell #17 through a RNA origami scaffold #1."

**But according to {Appx299} and {Appx411} items #16 and #17 were never identified in Chang (2020)'s Figure 20 and in its entire specification, but USPTO fills it anyway by simply guessing**:

Thus, in view of added synthetic biocomponents with an engineered dendritic cell, Thaiss prior art (Thaiss et al., Chemokines: a new dendritic cell signal for T cell activation, Frontiers in Immunology) is moot.

**Graham v. John Deere Co., 383 U.S. 1, 36 (1966) ("[Objective inquiries] may also serve to guard against slipping into use of hindsight,** and to resist the temptation to read into the prior art the teachings of the invention in issue.") (internal quotations and citations omitted); In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use hindsight reconstruction to pick and choose among isolated

disclosures in the prior art to deprecate the claimed invention."); Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1376 (Fed. Cir. 2004) ("[T]he suggestion to combine references must not be derived by hindsight from knowledge of the invention itself."). USPTO used impermissible Hindsight Bias to bridge the gap of the missing elements (as described before).

> "Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

See Graham v. John Deere Co., 383 U.S. 1, 36 (1966). See also Otsuka Pharmaceutical Co. Ltd v. Sandoz Inc., 678F. 3d 1280 (Fed. Cir. 2012), cert denied, 133 S. Ct. 940 (Jan. 14. 2013) In re Brimonide Patent Litigation, 643 F.3d (Fed. Cir. 2011), cert denied (March 26, 2012).

**Summary Of Legal Arguments**

In summary, prior art, in combination does not teach Appellant's claimed invention in view of at least the following:

**(i)** USPTO is equating (with hindsight bias) occasionally naturally expressed biomolecules with synthetically added consistent biomolecules in construction of an engineered dendritic cell. **USPTO's argument is essentially that an engineered robotic hand invention is obvious under 35 U.S.C. § 103, when a naturally expressed biological hand already exists**;

**(ii)** There is no motivation to combine prior art, due to disputed fact, missing element and teaching away;

**(iii)** Reasonable expectation of success is a distinct and a separate requirement. There is no reasonable expectation of success, as there is no motivation to combine;

**(iv)** Items #16 and #17 were never identified in Chang (2020)'s Figure 20 in its entire specification, but USPTO fills it anyway by simply guessing. **{Appx299}**



**Furthermore, USPTO selectively and conveniently construed only one term – "Engineered", but not "Biocompatible" and "Bioactive".** Furthermore, USPTO disregarded the intrinsic evidence of a scaffold. Specification text paragraphs 189-194 {**Appx065-066**} outlines such meaning of a scaffold.

USPTO is engaged in **wholesale** hindsight biased reconstruction to engineer obviousness rejection under 35 U.S.C. § 103 with disregard of facts, intrinsic evidence and law.

> "Courts should reject "hindsight claims of obviousness." In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

**(v)** Conclusory Obviousness Determination

**{Appx0014}**, "Examiner, therefore, found that "DC would have been an obvious choice among a limited genus of APC to engineer" (Ans. 13, See FF 11-12, 14)". (Ans. 13; see FF11-12, 14)" **BPAI never explained why DC (dendritic cell) would have been an obvious choice in the case of an engineered dendritic cell in an unpredictable art and this is conclusory**. The real trouble with **"if A / Y then B / Z" is when it comes without a "because" and a "why."**

**Without a "because" and/or "why" attached to the "if A / Y then B / Z" this is conclusory.**

**Prima Facie Case of Obviousness**

A Prima Facie case of obviousness is established, when three strict basic criteria have been met.

- First, there must be some Suggestion or Motivation, either in alleged prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify alleged prior art being relied upon to reject Appellant's claimed invention.
- Second, there must be an "Anticipated Success" or "Expectation of Success".
- Third, alleged prior art must Teach or Suggest All Requirements of Appellant's claimed invention.

USPTO failed to prove that Appellant's claimed invention is Prima Facie obvious.

**Dependent Claim 87**

Furthermore, when independent claim 85 is not Prima Facie obvious under 35 U.S.C § 103, then its dependent claim 87 is also not Prima Facie obvious under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988).

## VII. CONCLUSION & STATEMENT OF RELIEF SOUGHT

United States Patent & Trademark Office (USPTO)'s Board of Patent Appeal and Interference (BPAI)'s errors in obviousness rejection under 35 U.S.C. § 103 should be respectfully reversed in view of at least the following facts, intrinsic evidence and law:

**(i)** USPTO is simply equating (with hindsight bias) occasionally naturally expressed biomolecules with synthetically added consistent biomolecules in construction of an engineered dendritic cell. **USPTO's argument is essentially that an engineered robotic hand invention is obvious under 35 U.S.C. § 103, when naturally expressed biological hand already exists**;

**(ii)** There is no motivation to combine prior art at least due to the disputed fact, missing element and/or teaching away;

**(iii)** Reasonable expectation of success is a distinct and a separate requirement;

(**iv**) There is no reasonable expectation of success, as there is no motivation to combine;

**(v)** Conclusory determination of obviousness **{Appx0014}**, "Examiner, therefore, found that "DC would have been an

obvious choice among a limited genus of APC to engineer" (Ans. 13, See FF 11-12, 14)"", without a reasoned analysis per Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966); **One out of six people worldwide dies from cancers (https://www.who.int/news-room/fact-sheets/detail/cancer) and there are still no suitable remedy exists, but why "DC would have been an obvious choice among a limited genus of APC to engineer" in an unpredictable art**; and

**(v)** Hindsight reconstructions of obviousness are impermissible. USPTO used **wholesale** hindsight biased reconstruction just to design an obviousness rejection under 35 U.S.C. § 103 with conveniently constructed facts and disregard of the intrinsic evidence and law and deny the Appellant the claimed invention. In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))."

Respectfully Submitted,
Dated: July 25, 2024

**Mohammad A. Mazed**

# ADDENDUM

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313 1450
www uspto gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/602,403 | 09/28/2019 | Mohammad A. Mazed | | 2068 |

7590 04/02/2024

Mohammad A. Mazed
21520 Yorba Linda Blvd.
No. 393G
Yorba Linda, CA 92887

| EXAMINER | |
|---|---|
| LEONARD, ARTHUR S | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1631 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/02/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

*Ex parte* MOHAMMAD A. MAZED

Appeal 2024-000723
Application 16/602,403
Technology Center 1600

Before DONALD E. ADAMS, ERIC B. GRIMES, and TAWEN CHANG, *Administrative Patent Judges.*

ADAMS, *Administrative Patent Judge.*

DECISION ON APPEAL

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. § 134(a), Appellant[1] appeals from Examiner's decision to reject claims 85 and 87 (*see* Final Act.[2] 1; Appeal Br. 5).[3] We have jurisdiction under 35 U.S.C. § 6(b).[4]

We AFFIRM.

---

[1] "Appellant" refers to "applicant" as defined in 37 C.F.R. § 1.42. Appellant identifies the real party in interest as "Mohammad A. Mazed" (Appellant's July 14, 2023, Appeal Brief ("Appeal Br.") 5). Appellant represents himself *pro se*. As a courtesy to Appellant, the USPTO has resources available for inventors prosecuting their patent applications themselves. The Pro Se Assistance Program is available at: www.uspto.gov/patents/basics/using-legal-services/pro-se-assistance-program.

[2] Examiner's May 3, 2023, Final Office Action.

[3] Appellant's claims 46–84, 86, and 88–93 stand withdrawn from consideration (*see* Examiner's October 4, 2023, Answer ("Ans.") 3).

[4] We acknowledge Appellant's statements that "Examiner ignored Appellant's arguments after Final Office Action," "[c]laims were NOT entered after First Office Action," and "[o]nly independent claims **85** and its dependent claim **87** were examined; other remaining claims were NOT examined" (Appeal Br. 5).

> The line of demarcation between appealable matters for the Board and petitionable matters for the Director of the U.S. Patent and Trademark Office (Director) should be carefully observed. The Board will not ordinarily hear a question that should be decided by the Director on petition, and the Director will not ordinarily entertain a petition where the question presented is a matter appealable to the Board. . . . Some matters which have been determined to be petitionable and not appealable include: a requirement for restriction or election of species, finality, non-entry of amendments, and holdings of abandonment.

(Manual of Patent Examining Procedure, Rev. 07.2022, February 2023 § 1201.) Because Appellant's statements relate to petitionable matters, we decline to address their merits.

CLAIMED SUBJECT MATTER

Appellant discloses "[a]n engineered dendritic cell including a nanostructure . . . and a sensing protein and/or an activating protein for enhanced interaction with a T-cell and/or a natural killer cell against a particular type of cancer cell[]" (Abstr.[5]). Appellant's claim 85 and 87 are reproduced below:

> 85. An engineered dendritic cell comprising:
>
> (a) a first bioactive molecule;
>
> wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,
>
> (b) a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;
>
> (c) an identifying protein on a cancer cell; and
>
> (d) a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,
>
> wherein the first scaffold comprises
>
> a deoxyribonucleic acid (DNA) based origami,
>
> or
>
> a ribonucleic acid (RNA) based origami,
>
> or
>
> a XNA based origami
>
> wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

[5] Appellant's Abstract, filed September 28, 2019.

> wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

(Appeal Br. 82–84.)

> 87. The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell.

(*Id.* at 84.)

REJECTION

Claims 85 and 87 stand rejected under 35 U.S.C. § 103 as being unpatentable over the combination of Chang 2011,[6] Chang 2020,[7] and Ma.[8]

ISSUE

Does the preponderance of evidence relied upon by Examiner support a conclusion of obviousness?

CLAIM INTERPRETATION

Appellant's claimed invention was subject to a requirement for an election of species (*see* Examiner's July 13, 2022, Office Action).[9] In response to Appellant's July 27, 2022, election of species, "an engineered dendritic cell comprising: (A) a programming molecule as the bioactive factor[,] (B) an identifying protein, (C) a first scaffold comprising a XNA based origami nanostructure[,] (D) [w]herein the nanostructure is attached to

---

[6] Chang et al., US 2011/0275702 A1, published Nov. 10, 2011.
[7] Chang et al., US 2020/0385734 A1, published Dec. 10, 2020.
[8] Ma et al., *The role of CD40 and CD154/CD40L in dendritic cells*, 21 Seminars in Immunology 265–72 (2009).
[9] Examiner made the requirement final on March 14, 2023 (*see* Examiner's March 14, 2023, Non-Final Office Action 2; *see also* Final Act. 2–3 (Examiner addressed Appellant's arguments regarding the "species election requirement.")).

a white blood cell" (Examiner's March 14, 2023, Non-Final Office Action 2–3.)

Examiner, therefore, limited review of Appellant's claimed invention to the following elected subject matter:

> 85. An engineered dendritic cell comprising:
>
> (a) a first bioactive molecule;
>
> wherein the first bioactive molecule is . . . a programming molecule,
>
> (b) a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;
>
> (c) an identifying protein on a cancer cell; and
>
> (d) a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,
>
> wherein the first scaffold comprises . . .
>
> a XNA based origami
>
> wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,
>
> wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.
>
> 87. The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell.

We limit the scope of our review to Appellant's elected invention. *See Ex parte Ohsaka*, 2 USPQ2d 1460, 1461 (BPAI 1987) (When the Examiner has required the applicant to elect a chemical species for examination, the issue on appeal is the patentability of the elected species. It

is, therefore, appropriate for the Board to limit discussion to that single issue and take no position respecting the patentability of the non-elected species).

In addition, "claims are given their broadest reasonable construction consistent with the [S]pecification." *In re Herz*, 537 F.2d 549, 551 (CCPA 1976). Examiner interpreted a number of claim limitations consistent with Appellant's Specification as set forth below.

Examiner found "that Appellant's [S]pecification provided no special definition for [the term] 'engineered' and [that] the broadest reasonable interpretation of the term encompasses cells that have been modified in a lab for a certain task" (Ans. 14). Examiner, therefore, interpreted "the term 'engineered' . . . in the context of . . . [Appellant's] [S]pecification to mean that said cell has been man made in order to induce[] an interact[ion] with another cell" (*id.* (emphasis omitted)).

Examiner recognized that Appellant's claim 85 "requires that the first bioactive molecule, second bioactive molecule, identifying protein, and origami scaffold are coupled" (*id.* at 17). Examiner found, however, that Appellant's claim 85 "does not require any specific arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction" (*id.*). Examiner, therefore, interpreted Appellant's claim 85 "to mean that the dendritic cell itself is the structure that couples" the first bioactive molecule, second bioactive molecule, identifying protein, and origami scaffold (*id.*).

Examiner found that "Appellant's [S]pecification does not provide a special definition for [the phrase] 'biocompatible polymer'" and that "one of ordinary skill would have recognized that strands of . . . [XNA] are biopolymers that are encompassed by the phrase" (*id.* at 20).

Examiner found that "Applicant's [S]pecification provides no definition or examples for the [phrase] 'molecular events' to be detected within a cancer cell," as set forth in Appellant's claim 87 (*id.* at 24). Examiner, therefore, interpreted "the phrase 'molecular events' as those related to the damage or death of cancer cells" (*id.*).

We adopt the foregoing interpretation and scope of Appellant's claimed invention.

FACTUAL FINDINGS (FF)

FF 1. Chang 2011 disclosed "a ligand-nucleic acid nanostructure that promotes cell-cell interaction" (Chang 2011, Abstr.; *see also* Ans. 5; Final Act. 4).

> [T]he term "nucleic acid nanostructure" or "nanostructure"[, as used in Chang 2011,] refers to a nucleic acid structure that includes at least one nanoscale dimension, wherein the nucleic acid structure comprises one or more single stranded nucleic acids, which hybridize to form at least a partially double-stranded structure with defined features and geometry. The nucleic acid nanostructure presents ligands bound thereto to the target cell surface molecules on different cells, and the resulting binding promotes cell-cell[, i.e. multivalent,] interaction.

(Chang 2011 ¶ 65; *see also id.* ¶ 42 (Chang 2011 disclosed "compositions comprising a first ligand that is capable of binding to a receptor of a first cell type, a second ligand that is capable of binding to a receptor of a second cell type, wherein the first ligand and the second ligand are bound to a nucleic acid nanostructure."); *see generally* Ans. 4–5.)

FF 2. Chang 2011 disclosed that "[m]ultivalent interaction plays a large role in biology as many bio-machineries display high affinity multivalent bindings to their targets when sub-domains are arranged accurately with certain spatial and geometric configurations," wherein the "nano-

engineering platform offers an unprecedented opportunity to create programmable multivalent biomolecular interactions for activation of immune responses to boost tumor immunity" (Chang 2011 ¶ 135; *see generally* Final Act. 6 (Examiner found that Chang 2011 is "directed to immunotherapy for cancers.")).

FF 3. Chang 2011 disclosed that "[t]he engagement of MHC class I on an antigen presenting cell (APC) with the T cell receptor (TCR) activates CD8 T cells," wherein "[t]he activated CD8 cytotoxic T cell can directly kill the tumor cell through well characterized mechanisms" (Chang 2011 ¶ 6; *see* Ans. 6–7; *see also* Ans. 23 (citing Chang 2011 ¶ 6) (Examiner found that Chang 2011 "explicitly teaches MHC molecules are on antigen presenting cells."); Ans. 17–18 (citing Chang 2011 ¶ 46, 23: Claim 13) (Examiner found that Chang 2011 disclosed an "origami nanostructure [that] binds the MHC receptor on the antigen presenting cell (APC), and the TCR on the T cells.")).).

FF 4. Chang 2011 disclosed that "[a] variety of suitable nucleic acid nanostructures are known in the art" and, "[i]n certain embodiments [of Chang 2011's disclosure], the nucleic acid nanostructure comprises . . . a DNA origami" (Chang 2011 ¶ 66; *see also* Ans. 11; Final Act. 4).

FF 5. Chang 2011 defines the term "nucleic acid" as including DNA, RNA, and analogous thereof, wherein "[n]ucleic acid analogues include known analogues of natural nucleotides which have similar or improved binding properties," i.e., XNA, as defined in Appellant's claim 85 (Chang 2011 ¶ 67; *see also* Ans. 7, 11–12; Final Act. 4).

FF 6. Examiner found that Chang 2011 does not disclose that dendritic cells are APCs or dendritic cells that "comprise (a) a first bioactive molecule

such as a co-stimulatory molecule, (b) a second bioactive molecule that activate[s] T cells, and (c) a synthetic protein found on a cancer cell" (Ans. 12; *see also* Final Act. 4).

FF 7. Chang 2020 disclosed "compositions and methods for treating patients with cancer using immuno-stimulatory RNA nanostructures" and "methods of creating immuno-stimulatory RNA nanostructures, and compositions comprising said nanostructures" (Chang 2020 ¶ 3; *see generally* Final Act. 6 (Examiner found that Chang 2020 is "directed to immunotherapy for cancers.")).

FF 8. Chang 2020 disclosed:

> RNA nanostructure (also referred to herein as "RNA origami" or "OG-RNA" or "RNA-OG") having the sequence of $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$—wherein:
>
> $NR_1$ represents a first nano-robot comprising a single stranded RNA (ssRNA) of about 1500 to 10,000 bases in length that self-assembles into a first scaffold;
>
> $NR_2$ represents a second nano-robot comprising a ssRNA, or a DNA cage, of about 1500 to 10,000 bases in length that self-assembles into a second scaffold;
>
> L is a linker which operably links $NR_1$ to $NR_2$;
>
> wherein $R_3$ and $R_4$ are independently selected from a pair of fastener strands, an aptamer, a cargo molecule, a capture strand, a targeting strand, or H;
>
> n is an integer from 0 to 20; and
>
> m is an integer from 0 to 20.

(Chang 2020 ¶¶ 10–16; *see also id.* ¶ 49 (Chang disclosed that "an RNA nanostructure robot" may also be referred to "as 'RNA origami' or 'OG-RNA' or 'RNA-OG.'"); *see generally* Ans. 8; Final Act. 5 (citing Chang 75: Claim 40).)

FF 9. Chang 2020 disclosed "a RNA nanostructure robot, wherein the RNA nanostructure is immuno-stimulatory" (Chang 2020 ¶ 38).

FF 10. Chang 2020 disclosed that the cargo molecule can be a protein (Chang 2020 ¶ 27; *see also id.* ¶ 31 (Chang 2020 disclosed that "one or more of the $R_3$ and/or $R_4$ moieties is an RNA targeting strand, wherein each targeting strand is operably linked to a targeting moiety and to $NR_1$ or $NR_2$. The targeting moiety can be[, *inter alia*, a peptide or protein] moiety which binds to a target."); Chang 2020 ¶ 35 (Chang 2020 disclosed that "one or more of the $R_3$ and/or $R_4$ moieties is an agent," such as a "therapeutic agent [that] is a protein."); *see* Ans. 8; *see generally* Final Act. 6).

FF 11. Chang 2020 disclosed:

> [O]ne or more of the $R_3$ and/or $R_4$ moieties is a protein. In some aspects, the protein is selected from: tumor targeting peptide (TTP), a human cancer peptide, or calreticulin protein. In some aspects, the protein is calreticulin protein to RNA-origami to engage interactions between tumor cells and macrophages or dendritic cells for enhanced antigen presentation and stimulation of antigen specific T cells. In some aspects, the protein is [h]uman cancer peptide NY-ESO-1 or Muc1.

(Chang 2020 ¶ 41; *see also* Ans. 5, 7–8, 12; Final Act. 5, 6.)

FF 12. Chang 2020 disclosed:

> [A]n immune-stimulatory RNA nanostructure stimulates the immune system by, for example, inducing activation or increasing activity of any components of the immune system, or by reducing inhibition of the immune system. In certain embodiments, the RNA nanostructure is an agonist of a pattern recognition receptor. As used herein, the terms "pattern recognition receptor" or *"PRR" refer to proteins expressed by cells of the innate immune system, such as dendritic cells* . . . to identify two classes of molecules: pathogen-associated molecular patterns (PAMPs), which are associated with

> microbial pathogens, and *damage associated molecular patterns (DAMPs), which are associated with components of host's cells that are released during cell damage or death.*

(Chang 2020 ¶ 171 (emphasis added); Ans. 10, 14; *see also* Final Act. 6; *cf.* Appellant's claim 87, reproduced above (Appellant's claim 87 depends from and further limits Appellant's claim 85 to further comprise "a protein to detect a molecular event within the cancer cell," i.e., a DAMPs protein as defined by Chang 2020.).)

FF 13. Ma disclosed that "CD40 is a 48 kDa transmembrane glycoprotein surface receptor that is a member of the tumor necrosis factor receptor superfamily (TNFRSF)" and "[t]he ligand for CD40, CD154 (also known as TRAP, I-BAM, CD40 Ligand or CD40L) is a 34-39 kDa type II integral membrane protein" (Ma § 2).

FF 14. Ma disclosed that CD40 and CD154 are expressed on a variety of cells, including T-cells and antigen presenting cells, such as dendritic cells (DCs) (Ma §§ 2, 5).

FF 15. Ma disclosed "that CD40-CD154 interactions between T cell and DCs provides reciprocal effects that regulate both T cells and DCs" (Ma § 5; *see generally* Ans. 12; Final Act. 5).

FF 16. Ma disclosed that "CD40 expression on DCs is clearly important for the effector functions regulating lymphocytes" and that "the levels of CD40 expression on DCs may influence CD40-CD154 interactions between DCs and T cells and thus lymphocyte programming by DCs" (Ma §§ 4–5; *see generally* Ans. 4, 12; Final Act. 5).

FF 17. Examiner directs attention to Thaiss,[10] as evidence of the state of the art before the effective filing date of Appellant's claimed invention, wherein Thaiss establishes that "it was known that DCs naturally express both CD40 molecules and MHC molecules that simultaneously couple the DCs to T cells and NK cells. . . . Thus, the claimed bioactive molecules are naturally occurring elements on a DC that function as claimed during their normal use and operation" (Ans. 23–24 (citing Thaiss Figs 1–3)).

## ANALYSIS

Appellant provides separate arguments for claims 85 and 87, reproduced and interpreted above. We, therefore, separately address Appellant's claims 85 and 87 in turn below.

Claim 85:

Based on the combination of Chang 2011, Chang 2020, and Ma, Examiner concluded that, before the effective filing date of Appellant's claimed invention, it would have been prima facie obvious

> to prepare the engineered APC comprising the origami nanostructure for interacting with a T cell as taught by Chang (2011), and choose a dendritic cell as the APC comprising an origami nanostructure for binding a synthetic peptide tumor antigen as taught by Chang (2020) with a reasonable expectation of success.

(Ans. 12; *see* FF 1–16.) In support of the foregoing conclusion, Examiner reasoned that a person of ordinary skill in this art would have been motivated to combine the disclosures of Chang 2011, Chang 2020, and Ma to produce engineered DCs because these antigen presenting cells express a

[10] Thaiss et al., *Chemokines: a new dendritic cell signal for T cell activation*, 2 Frontiers in Immunology 1–9 (2011).

first bioactive molecule, CD40/CD40L, that is a programming molecule and a second bioactive molecule, MHC, that activates T-cells (Ans. 13; *see* FF 1–16). Examiner, therefore, found that "DCs would have been an obvious choice among a limited genus of APCs to engineer" (Ans. 13; *see* FF 11–12, 14).

Examiner further reasoned that because Chang 2011 and Chang 2020 are both directed to immunotherapy for cancers and Chang 2020 disclosed that engineering a DC to comprise an origami nanostructure that targets a tumor cell was an effective means for activating cells in a tumor antigen specific manner, a person of ordinary skill in this art would have found it prima facie obvious to use an identifying protein, such as NY-ESO-1, to direct immunotherapy to a cancer cell target (*see* Ans. 13; FF 1–12). Examiner, therefore, reasoned that because Chang 2020 disclosed engineered dendritic cells [that] are capable of coupling with other cells via the origami nanostructures," a person of ordinary skill in this art would have had "a reasonable expectation of success that such coupling would have occurred in the engineered dendritic cells" made obvious by the combination of Chang 2011, Chang 2020, and Ma (Ans. 13; *see* FF 1–16).

In sum, the combination of Chang 2011, Chang 2020, and Ma makes obvious an engineered DC that expresses a first bioactive molecule, CD40/CD40L, that is a programming molecule, a second bioactive molecule, MHC, that activates a T cell, and further comprises an XNA origami biocompatible polymer scaffold that comprises an identifying protein on a cancer cell, e.g., NY-ESO-1, wherein the first bioactive molecule, the second bioactive molecule, XNA origami, and identifying protein are all coupled via the engineered DC (*see* FF 1–16). For the

foregoing reasons, we find no error in Examiner's conclusion of obviousness.

Appellant relies on Bullock[11] and Daoussis[12] to dispute that "CD40/CD40L is a Programming Molecule" (Appeal Br. 30; *see also* Reply Br.[13] 28–29). In particular, Appellant relies on Bullock to characterize CD40 as "**a molecular adjuvant and CD40L as a member of the "tumor necrosis factor (TNF) family**" (Reply Br. 28–29). We are not persuaded.

As Examiner explains, both Bullock and Daoussis disclosed that CD40 is expressed on DCs (*see* Ans. 16 (citing Bullock, Abstr., Daoussis 635)). Ma also disclosed that CD40 as well as CD40L are expressed on DCs (*see* FF 13–14). Ma further disclosed that the CD40-CD40L "interactions between T cell and DCs provides reciprocal effects that regulate both T cells and DCs" and "CD40 expression on DCs is clearly important for the effector functions regulating lymphocytes" and that "the levels of CD40 expression on DCs may influence CD40-CD154 interactions between DCs and T cells and thus lymphocyte programming by DCs" (FF 15–16). Thus, we find that the preponderance of evidence on this record supports a finding that CD40/CD40L are expressed on the surface of DCs, are involved in DC and

---

[11] Bullock, et al., *CD40 stimulation as a molecular adjuvant for cancer vaccines and other immunotherapies*, 19 Cell Mol. Immunol. 14–22 (2022).
[12] Daoussis et al, *Targeting CD40L: a Promising Therapeutic Approach*, 11 Clin. Diagn. Lab. Immunol. 635–41 (2004).

[13] Appellant's November 25, 2023, Reply Brief.

T cell interactions, and, absent evidence to the contrary, are involved in lymphocyte, i.e., T cell, programming by DCs (FF 15–16).[14]

Further, Appellant failed to explain the relevance of characterizing CD40L as a member of the TNF family to the claimed invention or the disclosure of Ma, as relied upon by Examiner. In addition, although Bullock disclosed CD40 as a molecular adjuvant rather than a programming molecule, we find that identical language between the prior art and claim is not required to sustain a prior-art rejection. *In re Skoner*, 517 F.2d 947, 950 (CCPA 1975) ("Any other result would permit the allowance of claims drawn to unpatentable subject matter merely through the employment of descriptive language not chosen by the prior art."). In sum, Appellant failed to identify an evidentiary basis on this record to establish that CD40 and/or CD40L are not programming molecules within the scope of Appellant's claimed invention.

As discussed above, having found no special definition for the term "engineered" in Appellant's Specification, Examiner interpreted the term as encompassing DCs "that have been modified in a lab for a certain task" (Ans. 14). In addition, Examiner found that Appellant's claim 85 "does not require any specific arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction" (*id.* at 17). Examiner, therefore, interpreted Appellant's claim 85 "to mean that the dendritic cell itself is the

[14] We review appealed rejections for reversible error based on the arguments and evidence Appellant provides for each issue Appellant identifies. 37 C.F.R. § 41.37(c)(1)(iv); *Ex parte Frye*, 94 USPQ2d 1072, 1075 (BPAI 2010) (precedential) (cited with approval in *In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011) ("[I]it has long been the Board's practice to require an applicant to identify the alleged error in the [E]xaminer's rejections.")).

structure that couples" the first bioactive molecule, second bioactive molecule, identifying protein, and origami scaffold (*id.*). As discussed above, and evidenced by Examiner's citation to Thaiss,

> it was known[, prior to the effective filing date of Appellant's claimed invention,] that DCs naturally express both CD40 molecules and MHC molecules that simultaneously couple the DCs to T cells and NK cells. . . . Thus, the claimed bioactive molecules are naturally occurring elements on a DC that function as [Appellant] claimed during their normal use and operation.

(FF 13.) As Examiner explained, Appellant's claim "limitations directed towards a first and second bioactive molecule are very broad and . . . encompass cell surface receptors naturally found on the DCs" and, "[t]hus, these elements are naturally 'coupled' to the membrane of the DC" (Ans. 21). As discussed further below, the combination of Chang 2011, Chang 2020, and Ma makes obvious the coupling of an origami nanostructure to DCs (*see*, *e.g.*, *id.* at 21–22). Stated differently, the combination of Chang 2011, Chang 2020, and Ma makes obvious the engineering of DCs, which naturally express CD40 and MHC molecules on their cell surface, to include non-naturally occurring components, specifically the coupling of an origami nanostructure, having the sequence: $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$, to the DC (*see* FF 1–16).

For the foregoing reasons, we are not persuaded by Appellant's contentions regarding "naturally occurring molecules expressed in[, or more specifically on the cell surface of,] a dendritic cell" (Reply Br. 4; *see also id.* at 30). We acknowledge Appellant's reproduction of various paragraphs of its Specification as "**instructive in the Context of an Engineered Construction of a Dendritic Cell for Entered Independent claim 85**"

(Reply Br. 5; *see also id.* at 4–20 (citing Spec.[15] ¶¶ 235–291 and Exhibit A (Appellant's Specification)); *id.* at 30 (citing Spec. ¶ 251); *id.* at 49–53).

Initially, we recognize that Appellant's claimed invention does not require CRISPR technology and, therefore, Appellant's reference to a disclosure of CRISPR technology is not persuasive on this record (*see* Reply Br. 10–14, 19–20 (citing Spec. ¶¶ 255–268, 288–291). In addition, Appellant failed to explain why the cited portions of its Specification require an interpretation of its claimed invention that differs from Examiner's (*see* Appeal Br. 4–20 (citing Spec. ¶¶ 235–291)). *See* 37 C.F.R. § 41.37(c)(1)(iv); *Ex parte Frye*, 94 USPQ2d at 1075.

The engineered DC of Appellant's claim 85 comprises, *inter alia*, an identifying protein on a cancer cell. Appellant recognizes that Chang 2020 has an identifying protein directly on an RNA origami (Appeal Br. 31; *see also* Reply Br. 32; Ans. 17 (Examiner found "as correctly noted by Appellant, Chang (US2020) teaches an identifying protein on a cancer cell (such as a tumor antigen peptide) bound to the RNA origami scaffold."); FF 8–11). Chang 2020's RNA origami has the sequence: $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$ (FF 8). Chang 2020 disclosed that "one or more of the $R_3$ and/or $R_4$ moieties is an RNA targeting strand, wherein each targeting strand is operably linked to a targeting moiety and to $NR_1$ or $NR_2$. The targeting moiety can be[, *inter alia*, a peptide or protein] moiety which binds to a target" (FF 10). Chang 2011 disclosed an "origami nanostructure [that] binds the MHC receptor on the antigen presenting cell (APC), and the TCR on the T cells" (FF 3). DCs are antigen presenting cells (FF 14). Thus, the combination of Chang 2011, Chang 2020, and Ma makes obvious an XNA

[15] Appellant's September 20, 2019, Specification.

origami scaffold, discussed further below, containing an identifying protein on a cancer cell and a targeting moiety for a DC MHC, wherein the "identifying protein and the . . . [XNA] origami scaffold are coupled to each other, wherein the complex is coupled to the dendritic cell[] by the MHC (i.e., second bioactive molecule), which is coupled to the first bioactive molecule (i.e., CD40) through the cell membrane of the dendritic cell" (Ans. 17; *see also id.* at 17–19; FF 1–16). As Examiner explains, "using a characterized tumor antigen peptide would have immediately enabled the engineered APCs (e.g., dendritic cell) to target tumors with already establish[ed] tumor antigens such as NY-ESO-1 (Ans. 18; *see also* FF 11).

For the foregoing reasons, we are not persuaded by Appellant's contention that Chang 2020 teaches away from Appellant's claimed invention because the identifying protein of Chang 2020 is on an RNA origami (Appeal Br. 31; *see also id.* at 68 (Appellant contends that "claim 85 is not **Prima Facie obvious** under 35 U.S.C[.] § 103 in view of [a] teaching away."); *id.* at 72; *see also* Reply Br. 32).

The engineered DC of Appellant's claim 85 comprises, *inter alia*, a first scaffold of a biocompatible polymer for interaction with the T-cell and/or natural killer cells against a cancer cell, wherein the first scaffold comprises an XNA based origami. Appellant's claim 85 defines XNA as genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases. As discussed above, the combination of Chang 2011, Chang 2020, and Ma makes obvious a DC coupled to a biocompatible polymer first scaffold, i.e., an XNA origami, that facilitates the interaction with a T-cell against cancer cells (*see* FF 1–16). Chang 2011 defines the

term "nucleic acid" as including DNA, RNA, and analogues thereof, wherein "[n]ucleic acid analogues include known analogues of natural nucleotides which have similar or improved binding properties," i.e. XNA, as defined in Appellant's claim 85 (FF 5). Thus, we are not persuaded by Appellant's contention that Examiner misconstrued and failed to provide an evidentiary basis to support a finding that the combination of Chang 2011, Chang 2020, and Ma makes obvious "a first scaffold of a biocompatible polymer, **wherein** the first scaffold at least includes an origami nanostructure of . . . a XNA" or that Examiner improperly relied "on the same structure in alleged prior art as being responsive to two different claim elements" (Appeal Br. 32; *see also id.* at 71; Reply Br. 35).

We are not persuaded by Appellant's invitation to consider the scope of Appellant's claim 85 in the context of Appellant's claim 93, which is not before this Panel for review (*see* Reply Br. 35 (Appellant contends that "**[d]ependent claim 93 is instructive to extract the claim meaning of scaffold**. Examiner has to find a **scaffold** of a biocompatible polymer first, when that **scaffold** of a biocompatible polymer **at least includes** a . . . XNA based origami.")). We are also not persuaded by Appellant's exemplification of a scaffold in its Specification as "a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer or a scaffold of silk fibroin) or a metallic glass material" (Reply Br. 36–37 (citing Spec. ¶¶ 189–194) (emphasis omitted)).

As Examiner explains, Appellant's claim 85 was "drafted in such a manner that the biocompatible polymer (alleged element 1) and the . . . [XNA] origami (alleged element 2) do not have to be distinct elements in the scaffold" (Ans. 20). Stated differently, as claimed, Appellant's first scaffold

of a biocompatible polymer is defined as comprising an XNA based origami. An XNA origami is a biocompatible polymer (*see* Ans. 20 (Examiner found that "Appellant's [S]pecification does not provide a special definition for [the phrase] 'biocompatible polymer'" and that "one of ordinary skill would have recognized that strands of . . . [XNA] are biopolymers that are encompassed by the phrase.")). The term "'[c]omprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)). Because the combination of Chang 2011, Chang 2020, and Ma makes obvious a scaffold comprising an XNA origami, we find that the preponderance of evidence on this record falls in favor of Examiner (*see* FF 5, 8).

For the foregoing reasons, we are not persuaded by Appellant's contention that Examiner failed to establish an evidentiary basis on this record to support a finding that the combination of Chang 2011, Chang 2020, and Ma makes obvious an engineered DC, "wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled" (Appeal Br. 33; *see also id.* at 67–68 (Appellant contends "Examiner did not provide any analysis in [the] Final Office Action that Appellant's claim[ed] invention is an 'anticipated success,'" because Examiner's rejection "is Conclusory, Unsupported and without Rigorous Analysis of all Claim Elements and Limitation[s]," "failed to undertake a full Graham Analysis," "Fail[ed] to Consider the Claimed Invention as a Whole," "ignored All Claim Limitations and Claim Elements," "Failed to Show a Finite Number of Predictable Solutions with

Anticipated Success," "Failed to Show a Reasonable Motivation to Combine/Modify the Reference(s)," and "Inappropriately Imagined 'Obvious to Try'."); *id.* at 69 (Appellant contends that "claim 85 is not **Prima Facie obvious** under 35 U.S.C[.] § 103 in view of . . . missing claim elements."); *id.* at 71–72; Reply Br. 41, 54).

For the foregoing reasons, we are not persuaded by Appellant's contention that Examiner relied upon improper hindsight reasoning or that Examiner's findings are based solely on a misrepresentation and misconstruction of Appellant's claim elements (*see* Appeal Br. 41–52, 54, 65, 71–72).

Before an obviousness analysis can be made, Examiner must first determine what is "prior art" or "analogous art." *See In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992) (explaining that a prerequisite to making the factual findings outlined in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966), is "determining what is 'prior art'"); *In re Sovish*, 769 F.2d 738, 742 (Fed. Cir. 1985) (explaining that the label "analogous art" merely connotes that a reference is relevant to a consideration of obviousness under 35 U.S.C. § 103 as "'prior art'"). In short, Examiner identifies relevant prior art based on findings regarding the scope and content of prior art, differences between prior art and claims at issue (among other relevant factors as required by *Graham vs. John Deere* Co., 383 U.S. 1, 17–18 (1966)). Therefore, we are not persuaded by Appellant's inquiry as to why "one of ordinary skill[] in the art [would] have selected [the] asserted alleged prior art as the best candidate(s) or most promising starting point(s) for further development efforts" (Appeal Br. 52).

For the foregoing reasons, we are not persuaded by Appellant's contention that the combination of Chang 2011, Chang 2020, and Ma fails to provide a person of ordinary skill in the art with a reasonable expectation of success or that Examiner failed to "articulate[] a reasonable basis with rational underpinnings as to **How** and **Why** [the] alleged prior art could be combined to render Appellant's claimed invention Prima Facie . . . obvious" (Appeal Br. 53; *see also id.* at 56, 58, 67, 71).

We do not find a reference to "routine optimization" in Examiner's Final Office Action or Answer and, therefore, are not persuaded by Appellant's contentions regarding "routine optimization" (*see* Appeal Br. 64).

For the foregoing reasons, we find that the combination of Chang 2011, Chang 2020, and Ma makes obvious an engineered DC comprising every element of Appellant's claim 85. Therefore, we are not persuaded by Appellant's contention regarding "claim elements [that] are NOT 'found' in alleged prior art" (Appeal Br. 66 (emphasis omitted)). For the foregoing reasons, we are not persuaded by Appellant's contentions that Examiner relied on "'common sense' for an ordinary artisan to supply the limitation missing from alleged prior art [that] was not supported by substantial evidence" and "Failed to Consider the Totality of the Evidence, Presented by All Claims, but Falsely Used '**Common Sense**' Clause" (*id.* at 67; *see also id.* at 71 (Appellant contends that Examiner "[r]elied on common sense without substantial evidence.")).[16]

[16] We recognize Examiner's statement: "[T]he artisan following the guidance of Chang (2011) for engineering APCs would have naturally turned to analogous art by the same inventor [(i.e. Chang 2020)] out of

We recognize Appellant's contention that "**Biology is an Unpredictable Technological Field**" (*id.* at 70 (citing articles from "www.newsweek.com" and "www.cell.com."); *see also id.* at 72; Reply Br. 48, 53). According to Appellant "[m]ost studies on senescence are related to chronic inflammation, cancer and age-related diseases in humans. But Hydractinia symbiolongicarpus needs senescence-related genes in order to regenerate new stem cells/organs. This is an exact opposite effect in humans" (Appeal Br. at 70). Appellant failed, however, to establish a nexus between Appellant's claimed invention, the references relied upon by Examiner, and Appellant's contention and cited documents. *See generally Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) ("[C]ase law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."); *see also Ex parte Frye*, 94 USPQ2d at 1075 (precedential) (cited with approval in *In re Jung*, 637 F.3d at 1365 ("[I]t has long been the Board's practice to require an applicant to identify the alleged error in the [E]xaminer's rejections."); 37 C.F.R. § 41.37(c)(1)(iv).

---

common sense" (Final Act. 5). We find Examiner's reference to "common sense" harmless on this record and instead find that Examiner was simply pointing out that a person of ordinary skill in this art would have found Chang 2011 and Chang 2020 to represent analogous and reasonably pertinent prior art on this record. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (A reference is "reasonably pertinent" to the inventor's particular problem when the reference "is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem."); *see also In re Clay*, 966 F.2d at 658–9; *In re Sovish*, 769 F.2d at 742. On this record, we find that those of ordinary skill in this art would have found both Chang 2011 and Chang 2020 reasonably pertinent to Appellant's claimed invention (*see* FF 1–12).

On this record, we find that—although biological systems may, in general, be unpredictable—the combination of Chang 2011, Chang 2020, and Ma overcomes any such unpredictability by providing a person of ordinary skill in this art with a reasonable expectation of success, as it relates to Appellant's claimed invention, by following the guidance provided by the references when viewed in combination as discussed above. In this regard, we note that "[o]bviousness does not require absolute predictability of success . . . all that is required is a reasonable expectation of success." *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). In sum, Appellant failed to establish an evidentiary basis on this record to support a finding that there was not a reasonable expectation of success in following the combined disclosures of Chang 2011, Chang 2020, and Ma as a guide to the subject matter now claimed by Appellant.

We acknowledge Appellant's contentions with respect to Examiner's interpretation of Chang 2020's Figures 15 and 20 (Reply Br. 23–27 (citing Chang 2020 Figs. 15, 20, ¶¶ 83, 347–353); *see also id.* at 38–41). Initially, we appreciate Appellant's contention that Chang 2020's "**FIG. 15 illustrates a natural Dendritic Cell, NOT an Engineered Dendritic Cell and NOT interacting with a Tumor Cell; rather a natural Dendritic Cell is interacting with a NK cell or a T-Cell. A NK cell or a T-cell is NOT a Tumor cell**" (Reply Br. 27; *see also id.* at 41). As we understand this record, however, Examiner appreciated that Chang 2020's disclosure did not identify elements 16 and 17 as illustrated in its Figure 20 and, therefore, directed attention to Chang 2020's Figure 15 to establish that the shape of the features identified as elements 16 and 17, in Chang 2020's Figure 20, correspond to a dendritic cell and tumor cell, respectively (*see* Ans. 5

("Examiner has interpreted that the dendritic cell is #16 and is interacting with a tumor cell #17 through a RNA origami scaffold #1 coupled to a peptide antigen based on Figure 15 . . . of Chang (2020) which explicitly labels each as such.")). Thus, as we understand it, Examiner attempted to provide an illustration, for the benefit of Appellant, of how the various elements of Appellant's claimed invention are made obvious by the combined disclosures of Chang 2011, Chang 2020, and Ma, when considered as a whole.

We further appreciate Appellant's contention that Chang 2020's "**FIG. 20** is about a nano double-robot" (Reply Br. 27, 41) and note that Chang 2020 defines a nano-robot, such as one having the sequence: $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$, as "RNA origami" (*see* FF 8; *see also* FF 9 (Chang 2020 disclosed "a RNA nanostructure robot, wherein the RNA nanostructure is immuno-stimulatory.")). Thus, when Examiner's[17] interpretation is taken in context; we are not persuaded by Appellant's contention that "**Examiner**

[17] Appellant questions "**<u>who is he (Examiner) to erroneously define/interpret</u>**" Chang's figures (Reply Br. 27, 41). *In re Berg*, 320 F.3d 1310 (Fed. Cir. 2003) provides the answer:

> *As persons of scientific competence in the fields in which they work, examiners* and administrative patent judges on the Board *are responsible for making findings, informed by their scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons.* Absent legal error or contrary factual evidence, those findings can establish a prima facie case of obviousness.

*Id.* at 1315 (emphasis added); *cf.* 37 C.F.R. § 41.37(c)(1)(iv); *Ex parte Frye*, 94 USPQ2d at 1075.

(willful [sic]) fraudulently interpreted a material fact with intent to deceive a Pro Se Applicant" (Reply Br. 27).[18]

Claim 87:

Appellant's claim 87, reproduced above, depends from and further limits Appellant's claim 85 to further comprise a protein to detect a molecular event within the cancer cell. For the reasons discussed above, with respect to claim 85, we find no error in Examiner's conclusion that the combination of Chang 2011, Chang 2020, and Ma makes obvious the subject matter of Appellant's claim 85.

As Examiner explains, Chang 2020 disclosed that "dendritic cells comprise pattern recognition receptors 'PRRs'" that detect molecular events within cancer cells, i.e., DAMPs (Ans. 14; *see* FF 12).

Therefore, we find no error in Examiner's conclusion that, before the effective filing date of Appellant's claimed invention, it would have been prima facie obvious, in view of the combination of Chang 2011, Chang 2020, and Ma, to have engineered a dendritic cell, as recited in Appellant's claim 85, further comprising a protein to detect a molecular event within the cancer cell as required by Appellant's claim 87.

For the foregoing reasons, we are not persuaded by Appellant's contention that the combination of Chang 2011, Chang 2020, and Ma fails to make obvious the subject matter of Appellant's claim 87 (*see* Appeal Br. 35; Reply Br. 43; *cf.* Ans. 24–25).

---

[18] As to the remainder of Appellant's contentions on pages 27 and 41 of Appellant's Reply Brief, we remind Appellant of the requirement to conduct business before this Office with decorum and courtesy. *See* 37 C.F.R. § 1.3.

## CONCLUSION

The preponderance of evidence relied upon by Examiner supports a conclusion of obviousness. The rejection of claims 85 and 87 under 35 U.S.C. § 103 as being unpatentable over the combination of Chang 2011, Chang 2020, and Ma is affirmed.

## DECISION SUMMARY

The following table summarizes our decision:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 85, 87 | 103 | Chang 2011, Chang 2020, Ma | 85, 87 | |

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a). *See* 37 C.F.R. § 1.136(a)(1)(iv).

AFFIRMED

# CERTIFICATE OF COMPLIANCE

Appellant's Opening Brief was produced using the 14-font size in the Times New Roman style.

It has **5600** words, **excluding**

(i) embedded images and

(ii) **166** word counts of the text on the embedded images on page 11.

For the Word Count, Appellant relied on the Word Count Function of the Tool Menu of the Microsoft Word ("MS Word") program.

Respectfully Submitted,

Dated: July 25, 2024

**Mohammad A. Mazed**

U.S. POSTAGE PAID
PME
YORBA LINDA, CA 92885
JUL 25, 2024

UNITED STATES POSTAL SERVICE

20439

RDC 07

$30.45

S2324H500440-09

FOR DOMESTIC AND INTERNATIONAL USE

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EI 341 961 448 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE ( )

21520 Yorba Linda Blvd.
No. 393G
Yorba Linda. CA 92887

DELIVERY OPTIONS (Customer Use Only)

☐ SIGNATURE REQUIRED *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

US Court of Appeals. For
The "Federal Circuit"
717 Madison Place NW
Washington DC

ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 4 3 9 -

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT (if applicable)

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|
| | |

ORIGIN (POSTAL SERVICE USE ONLY)

☐ 1-Day ☐ 2-Day ☐ Military ☐ DPO

| | | | |
|---|---|---|---|
| PO ZIP Code: 92885 | Scheduled Delivery Date (MM/DD/YY): 7/26 | Postage: $ 30.45 | |
| Date Accepted (MM/DD/YY): 7/25 | Scheduled Delivery Time: ☒ 6:00 PM | Insurance Fee: $ | COD Fee: $ |
| Time Accepted: 9:05 ☒ AM ☐ PM | | Return Receipt Fee: $ | Live Animal Transportation Fee: $ |
| Special Handling/Fragile: $ | Sunday/Holiday Premium Fee: $ | Total Postage & Fees: $ 30.45 | |
| Weight ☒ Flat Rate lbs. ozs. | Acceptance Employee Initials: LB | | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| | ☐ AM ☐ PM | |

LABEL 11-B, MAY 2021 PSN 7690-02-000-9996