24-1756

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

**IN RE: MOHAMMAD A. MAZED,**

***APPELLANT.***

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 16/602,403.

# BRIEF FOR APPELLEE—DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

FARHEENA Y. RASHEED
Solicitor

AMY J. NELSON
Senior Counsel for Patent Policy and Litigation

SHEHLA WYNNE
MAUREEN D. QUELER
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the U.S. Patent and Trademark Office*

September 25, 2024

## REPRESENTATIVE CLAIMS

85. An engineered dendritic cell comprising:

(a) a first bioactive molecule;

*wherein the first bioactive molecule is* selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and *a programming molecule*,

(b) a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

(c) an identifying protein on a cancer cell; and

(d) *a first scaffold of a biocompatible polymer* for interaction with the T-cell, and/or the natural killer cell against the cancer cell, *wherein the first scaffold comprises*

a deoxyribonucleic acid (DNA) based origami,

or

a ribonucleic acid (RNA) based origami,

or

a XNA based origami

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

87. The engineered dendritic cell in claim 85, further comprising a protein to detect a molecular event within the cancer cell.

# TABLE OF CONTENTS

I. STATEMENT OF THE ISSUE .......... 1

II. STATEMENT OF THE CASE .......... 3

A. Mr. Mazed's Application: Engineered Dendritic Cells Comprising Bioactive Molecules, a Nucleic Acid Scaffold, and a Cancer Cell-Identifying Protein. .......... 4

B. The Prior Art: Chang 2011, Chang 2020, and Ma. .......... 6

1. Chang 2011 discloses engineered APCs bound to a nucleic acid scaffold and expressing bioactive molecules that activate T cells and natural killer cells. .......... 6

2. Chang 2020 discloses engineered dendritic cells bound to a nucleic acid scaffold and a cancer cell-identifying protein. .......... 9

3. Ma discloses that dendritic cells express CD40, a programming bioactive molecule. .......... 10

C. The Board Found That Claim 85 Would Have Been Obvious Over the Combination of Chang 2011, Chang 2020, and Ma. .......... 11

1. The Board construed the terms "engineered dendritic cell," "coupled," and "biocompatible polymer." .......... 12

2. The Board found that Chang 2011, Chang 2020, and Ma teach all the limitations of claim 85. .......... 13

3. The Board found that a skilled artisan would have been motivated to combine Chang 2011, Chang 2020, and Ma with a reasonable

expectation of success. .......... 16

III. SUMMARY OF THE ARGUMENT .......... 19

IV. STANDARD OF REVIEW .......... 21

V. ARGUMENT .......... 23

A. The Board Properly Construed the Claims Terms "Engineered Dendritic Cell," "Coupled," and "Biocompatible Polymer." .......... 23

1. Mr. Mazed advances an improperly narrow construction of "engineered dendritic cell." .......... 25

2. Mr. Mazed's arguments regarding the term "coupled" are unsupported by the claim language and the specification. .......... 27

3. Mr. Mazed improperly seeks to limit the claim term "biocompatible polymer." .......... 28

B. Substantial Evidence Supports the Board's Findings that Claim 85 Would Have Been Obvious Over the Prior Art. .......... 32

1. Substantial evidence supports the Board's findings that Chang 2021, Chang 2020, and Ma disclose each of the claim limitations. .......... 33

2. Substantial evidence supports the Board's findings that a POSA would have been motivated to combine the prior art with a reasonable expectation of success. .......... 36

3. Mr. Mazed fails to show that the Board erred by relying on hindsight. .......... 43

VI. CONCLUSION .......... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
903 F.3d 1310 (Fed. Cir. 2018) .......... 22

*Bass, In re*,
314 F.3d 575 (Fed. Cir. 2002) .......... 24

*Baxter Int'l, Inc., In re*,
678 F.3d 1357 (Fed. Cir. 2012) .......... 32

*Bayer Aktiengesellschaft, In re*,
488 F.3d 960 (Fed. Cir. 2007) .......... 23, 36

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) .......... 22

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 23

*Gartside, In re*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 22

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) .......... 30

*Google Tech. Holdings LLC, In re*,
980 F.3d 858 (Fed. Cir. 2020) .......... 32

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) .......... 24

*ICON Health & Fitness, Inc., In re*,
496 F.3d 1374 (Fed. Cir. 2007) .......... 22

*Intell. Ventures I LLC v. Unified Pats., LLC*,
803 F. App'x 403 (Fed. Cir. 2020) .......... 22

*Jolley, In re*,
308 F.3d 1317 (Fed. Cir. 2002) .................................................. 23

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) .................................................. 22

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015) .................................................. 24

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
192 F.3d 1353 (Fed. Cir. 1999) .................................................. 39

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .................................................. 21, 22

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) .................................................. 23

*Watts, In re*,
354 F.3d 1362 (Fed. Cir. 2004) .................................................. 21

**Statutes**

28 U.S.C. § 1295(a)(4)(A) .................................................. 19

35 U.S.C. § 141(a) .................................................. 19

## STATEMENT OF RELATED CASES

The Director is not aware of any other appeal from the Patent Trial and Appeal Board (the Board) of the United States Patent and Trademark Office (USPTO) in connection with U.S. Patent Application No. 16/602,403 (the '403 application) that has previously been before this Court. The Director is also unaware of any cases pending in this or any other court that will directly affect, or be directly affected by, the Court's decision in the pending appeal.

## I. STATEMENT OF THE ISSUE

Mr. Mazed's claimed invention relates to cancer immunotherapy, specifically to engineered dendritic cells,[1] which can be utilized to cause T cells or natural killer cells to target cancer cells. Independent claim 85 is directed to an "engineered dendritic cell" comprising a first bioactive molecule, a second bioactive molecule, a scaffold of "biocompatible polymer" comprising DNA-, RNA-, or XNA-based origami, and a cancer-cell identifying protein, wherein all of the components are "coupled."

Given the lack of limiting language in the specification, the Board construed the term "engineered dendritic cell" to encompass cells that have been man-made to induce interaction with another cell and the term "biocompatible polymer" to encompass nucleic acid polymers. The Board interpreted the term "coupled" as not requiring any specific arrangement of the claimed components.

[1] Dendritic cells are a type of antigen-presenting cell (APC) that boost immune responses. *See* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/dendritic-cell (a dendritic cell is a "special type of immune cell that . . . boosts immune responses by showing antigens on its surface to other cells of the immune system. A dendritic cell is . . . a type of antigen-presenting cell (APC).").

Based on this claim interpretation, the Board found that claim 85 would have been obvious over the combined teachings of Chang 2011, Chang 2020, and Ma. In particular, the Board found that Chang 2011 teaches engineered antigen presenting cells (APCs) bound to a nucleic acid scaffold and expressing major histocompatibility complex (MHC) (a bioactive molecule for activating T cells). The Board further found that Chang 2020 teaches engineered *dendritic* cells, a specific type of APCs, also coupled to a nucleic acid scaffold, where the nucleic acid scaffold is bound to a tumor identifying protein. The Board also found that Ma teaches that dendritic cells naturally express CD40 (a bioactive, programming molecule).

The Board determined that a person of ordinary skill in the art (POSA) would have been motivated to combine the teachings of the prior art to produce engineered dendritic cells as recited in claim 85 given that: (1) dendritic cells are a type of the APC disclosed in Chang 2011, and can be bound to a nucleic acid nanostructure to promote interaction with T cells; (2) Chang 2020 teaches that engineering dendritic cells to include a nucleic acid nanostructure is an effective means for activating cells in a tumor-antigen specific manner; and (3) Chang 2020 teaches that

utilizing a cancer-cell identifying protein is an effective way to direct immunotherapy to the cancer cell. And, the Board found that a POSA would have had a reasonable expectation of success given the teachings in Chang 2020 that engineered dendritic cells are capable of coupling with other cells via nucleic acid nanostructures.

The issues on appeal underlying the Board's determination that independent claims 85 would have been obvious are as follows:

1. Whether the Board properly construed the claim terms "engineered dendritic cell," "coupled," and "biocompatible polymer;" and

2. Whether substantial evidence supports the Board's underlying factual findings and its conclusion that independent claim 85 would have been obvious over Chang 2011, Chang 2020, and Ma.

Because the Board's claim construction and findings are correct as a matter of law and supported by substantial evidence, this Court should affirm the Board's decision.

## II. STATEMENT OF THE CASE

This appeal arises from the examination of Mr. Mazed's '403 application, titled "Molecular System for Cancer Biology." Appx043-095. The examiner rejected independent claim 85 and dependent claim 87 as

obvious over Chang 2011,[2] Chang 2020,[3] and Ma.[4] Appx176-186; Appx230-243; Appx363-388. The Board affirmed the examiner's rejection.[5] Appx001-028. Mr. Mazed timely appealed to this Court.

### A. Mr. Mazed's Application: Engineered Dendritic Cells Comprising Bioactive Molecules, a Nucleic Acid Scaffold, and a Cancer Cell-Identifying Protein.

Mr. Mazed's '403 application relates to a "molecular system for cancer biology." Appx043-095. In one embodiment, the application describes activated/engineered dendritic cells, that "can train other types of immune cells (especially T cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body[.]" Appx069, ¶224; *see* Appx073, ¶251. The application also describes inclusion of DNA,

---

[2] U.S. Patent Application Publication No. 2011/0275702, published Nov. 10, 2011 and entitled "Novel DNA Nanostructures That Promote Cell-Cell Interaction and Use Thereof." Appx521-562.
[3] U.S. Patent Application Publication No. 2020/0385734, published Dec. 10, 2020 and entitled, "RNA-Nanostructured Double Robots and Methods of Use Thereof." Appx563-663.
[4] Ma et al., *The Role of CD40 and CD154/CD40L in Dendritic Cells*, 21 Seminars in Immunology 265-272 (2009). Appx664-673.
[5] Pending claims 46-84, 86 and 88-93 were withdrawn from consideration following a restriction requirement, and thus were not addressed in the examiner's office action and were not at issue in the appeal to the Board. Appx003 n.3; Appx231.

RNA, and XNA origami nanostructures, for enhanced cell-cell interactions. Appx044, ¶¶9-10; Appx069, ¶225; Appx071, ¶¶238-239. The '403 application explains that the "engineered dendritic cell[s] can include or bind/couple (e.g., chemically bind/couple) with the deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based nanostructure for enhanced interaction with the T-cells and/or natural killer cells." Appx071, ¶238.

In addition to the DNA, RNA, or XNA origami, the application discloses that the engineered dendritic cells may also include (1) a first bioactive molecule, which can be a co-stimulating molecule, a mobility enhancing molecule, or a programming molecule; (2) a second bioactive molecule that activates T cells or natural killer cells; and (3) a cancer-cell identifying protein. Appx076, ¶¶278-79.

Independent claim 85 is directed to an engineered dendritic cell:

85. An engineered dendritic cell comprising:

(a) a first bioactive molecule;

wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,

(b) a second bioactive molecule to activate (i) a T-cell, and/or (ii) a

natural killer cell;

(c) an identifying protein on a cancer cell; and

(d) a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell, wherein the first scaffold comprises

a deoxyribonucleic acid (DNA) based origami,

or

a ribonucleic acid (RNA) based origami,

or

a XNA based origami

wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

Appx004-005; Appx360-361.

### B. The Prior Art: Chang 2011, Chang 2020, and Ma.

#### 1. Chang 2011 discloses engineered APCs bound to a nucleic acid scaffold and expressing bioactive molecules that activate T cells and natural killer cells.

Chang 2011 discloses nucleic acid nanostructures that promote cell-cell interactions, which can be used to treat mammalian tumors. Appx521 (Abstract). A nucleic acid nanostructure refers to the nanoscale folding of genetic molecules to generate defined shapes or scaffolds. *See* Appx544, ¶65. Chang 2011 explains that cell-cell

interactions underlie many aspects of immune responses, "including target recognition, immune cell activation and target elimination." Appx 539, ¶3. It further explains the role of the immune system in anti-tumor activity, such as the detection by immune cells of molecular differences between tumor cells and normal cells, followed by rejection of the tumor cells by the body's immune system. Appx539, ¶5. Chang 2011 describes T cells and natural killer cells as the "major players in tumor immunity," and explains that the "anti-tumor effects of T cells are triggered by the interaction and engagement of T cells with the target tumor cells." *Id.* ¶¶5-7. In particular, engagement of MHC "on an antigen presenting cell (APC) with the T cell receptor" activates the T cells. *Id.* at ¶6. Chang 2011's aim is therefore to "augment[] tumor immunity by promoting cell-cell interaction[.]" *Id.* at ¶7.

To that end, Chang 2011 discloses "compositions comprising a first ligand that is capable of binding to a receptor of a first cell type, a second ligand that is capable of binding to a receptor of a second cell type, wherein the first ligand and the second ligand are bound to a nucleic acid

nanostructure." *Id.*, ¶8; Appx561 (claim 1).[6] It defines "nucleic acid nanostructure," as "a nucleic acid structure that includes at least one nanoscale dimension, wherein the nucleic acid structure comprises one or more single stranded nucleic acids, which hybridize to form at least a partially double-stranded structure with defined features and geometry." Appx544, ¶65. Chang 2011 further teaches that the nucleic acid nanostructure can comprise a DNA origami. *See id*, ¶66. It also defines the term "nucleic acid" to include DNA, RNA, and "analogues of natural nucleotides"—*i.e.*, synthetic nucleotides or XNA. *See id.*, ¶67. Chang explains that its described "nano-engineering platform offers an unprecedented opportunity to create programmable multivalent biomolecular interactions for activation of immune responses to boost tumor immunity." Appx550, ¶136.

Chang 2011 also explains that its first ligand may be capable of binding to a T cell receptor and the second ligand is capable of binding to an MHC on an APC. Appx542, ¶¶46-47; Appx 561 (claims 2 and 13). It expressly teaches that MHCs are present on APCs. Appx561 (claim 13).

[6] In biology, a ligand refers to a molecule that attaches to another molecule. *See* https://dictionary.cambridge.org/us/dictionary/english/ligand.

Chang 2011 thus teaches engineered APCs bound to a nucleic acid (DNA, RNA, or XNA) nanostructure and expressing bioactive molecules (MHCs) that activate T cells and natural killer cells.

### 2. Chang 2020 discloses engineered dendritic cells bound to a nucleic acid scaffold and a cancer cell-identifying protein.

Chang 2020 discloses compositions and methods for treating patients with cancer using immunostimulatory RNA nanostructures, as well as methods of creating such nanostructures. Appx563 (Abstract); Appx589, ¶3. Specifically, Chang 2020 discloses "a[n] RNA nanostructure (also referred to herein as 'RNA origami' or 'OG-RNA' or 'RNA-OG') having the sequence of $(R_3)_n$-$NR_1$-L-$NR_2$-$(R_4)_m$" where $NR_1$ and $NR_2$ represent RNA nanostructures. Appx589, ¶10. Chang 2020 states that the RNA origami "stimulates the immune system by, for example, inducing activation or increasing activity of any components of the immune system, or by reducing inhibition of the immune system." Appx601, ¶¶171-172.

According to Chang 2020, "[i]n some aspects, one or more of the $R_3$ and/or $R_4$ moieties is an RNA targeting strand, wherein each targeting strand is operably linked to a targeting moiety and to $NR_1$ or $NR_2$." "The

targeting moiety can be a [peptide or protein] moiety which binds to a target." Appx591, ¶31. Chang 2020 further teaches that "[i]n some aspects one or more of the $R_3$ and/or $R_4$ moieties is a protein[,]" and that "[i]n some aspects, the protein is selected from: tumor targeting peptide (TTP), a human cancer peptide, or calreticulin protein." Appx592, ¶41.

In one embodiment, Chang 2020 discloses that the protein is "calreticulin protein to RNA-origami," which engages "interactions between tumor cells and macrophages *or dendritic cells* for enhanced antigen presentation and stimulation of antigen-specific T cells." Appx592, ¶41 (emphasis added). The protein may also be Human cancer peptide NY-ESO-1 or Mucl. *Id.* Chang 2020 thus teaches dendritic cells engineered to be bound to a nucleic acid nanostructure that has a cancer cell-identifying protein. Chang 2020 also teaches that dendritic cells express MHC molecules and are capable of binding with other cells via the nucleic acid nanostructure. Appx581 (Figure 20).

### 3. Ma discloses that dendritic cells express CD40, a programming bioactive molecule.

Ma discloses the role of CD40 in dendritic cells. Appx664. Specifically, Ma teaches that "CD40 is a 48 kDA transmembrane glycoprotein surface receptor that is a member of the tumor necrosis

factor receptor superfamily[.]" *Id.* Ma further teaches that CD40 and CD154 (the ligand for CD40) are expressed on dendritic cells. *Id.* According to Ma, "CD40-CD154 interactions between T cell[s] and [dendritic cells] provides reciprocal effects that regulate both T cells and [dendritic cells]." Appx668. Ma also teaches that the levels of CD40 expression on dendritic cells may influence "lymphocyte programming by" dendritic cells. *Id.*

### C. The Board Found That Claim 85 Would Have Been Obvious Over the Combination of Chang 2011, Chang 2020, and Ma.

The Board affirmed the examiner's rejections of claims 85 and 87 as obvious over the combined teachings of Chang 2011, Chang 2020, and Ma. Because Mr. Mazed does not separately argue the nonobviousness of dependent claim 87 before this Court, *see* Opening Brief (Br.) at 43, the Director summarizes only the Board's findings with respect to independent claim 85.

In affirming, the Board adopted the examiner's interpretation of certain claim terms and the examiner's factual findings regarding the teachings of the prior art. Appx8; *see generally* Appx8-12 (Findings of Fact citing to the examiner's Answer and Final Rejection for support); *see*

*also* Appx15 (finding no error in the examiner's conclusion of obviousness).

### 1. The Board construed the terms "engineered dendritic cell," "coupled," and "biocompatible polymer."

The Board first adopted the examiner's interpretation of the claim term "engineered dendritic cell," noting that Mr. Mazed's application did not define the term. Appx007-008 (citing Appx376). The Board agreed with the examiner that the term "engineered" encompasses cells that have been modified in a laboratory for a certain task. Appx007. In the context of Mr. Mazed's claims and specification, the Board agreed with the examiner that the broadest reasonable interpretation of the term "engineered dendritic cell" means a cell "that has been man made in order to induce an interaction with another cell." *Id.* (cleaned up).

In construing the term "coupled," the Board further agreed with the examiner that claim 85 requires that the components (first bioactive molecule, second bioactive molecule, identifying protein, and nucleic acid scaffold) of the dendritic cell are coupled, but does not require "any specific arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction." *Id.* (citations omitted) (quoting Appx379).

Because "biocompatible polymer" is not expressly defined in Mr. Mazed's specification, the Board agreed with the examiner that a POSA would have recognized that strands of DNA, RNA, or XNA are biopolymers that are encompassed by this phrase. Appx007-008 (quoting Appx382). In so concluding, the Board and examiner rejected Mr. Mazed's argument that the claimed biocompatible polymer must be distinct from the claimed DNA or RNA origami, noting that claim 85 is "drafted in such a manner that the biocompatible polymer (alleged element 1 [of the scaffold]) and the DNA or RNA origami (alleged element 2 [of the scaffold]) do not have to be distinct elements in the scaffold." Appx382; *see also* Appx20-21.

### 2. The Board found that Chang 2011, Chang 2020, and Ma teach all the limitations of claim 85.

The Board and examiner found that Chang 2011, Chang 2020, and Ma teach all the limitations of independent claim 85. In the answering brief before the Board, the examiner detailed in both tabular and graphical form where each limitation was found in the asserted art. Appx366-372; *see also* Appx234-236.




As the examiner's graphic represents on the left-hand side, Chang 2011 discloses an APC that expresses an MHC and is coupled through the MHC to a DNA origami. Appx366. Specifically, the examiner found and the Board agreed, that Chang 2011 teaches APCs engineered to be bound to a nucleic acid nanostructure. Appx008-009; Appx234; Appx366-367; Appx521 (Abstract). The Board and examiner further found that Chang 2011 teaches that APCs express bioactive molecules (MHCs) that activate T cells and natural killer cells and therefore discloses the claimed second bioactive molecule. Appx009; Appx234; Appx368-369; Appx539, ¶¶5-7.

The Board and examiner recognized that Chang 2011 does not teach: (1) APCs that are dendritic cells, (2) a first bioactive molecule and a second bioactive molecule that are present on the dendritic cell, and (3)

an identifying protein. Appx009-010; Appx374. The Board and examiner found, however, that Chang 2020 teaches engineering dendritic cells to be bound to a nucleic acid nanostructure. Appx011; Appx235; Appx367-368. The Board and examiner also found that Chang 2020 also teaches a nucleic acid [RNA] origami bound to a cancer cell-identifying protein. Appx010-011; Appx235; Appx369-370; Appx592, ¶41.

The Board agreed with the examiner that Ma evidences the state of the prior art at the time, that CD40/CD40L were known to be programming molecules on dendritic cells that couple them to activated T cells. Appx014-016; *see also* Appx235 (citing Appx665 (Figure 1) and Appx668). Accordingly, the Board and the examiner found that Ma teaches that dendritic cells express CD40, a programming bioactive molecule, thus disclosing the claimed first bioactive molecule that is a programming molecule. Appx008-012; Appx235; Appx368.

The Board and examiner further noted that Thaiss[7] "establishes that 'it was known that [dendritic cells] naturally express both CD40 molecules and MHC molecules that simultaneously couple the [dendritic

[7] Thaiss et al., *Chemokines: a new dendritic cell signal for T cell activiation*, 2 Frontiers in Immunology 1-9 (2011). Appx245-253.

cells] to T cells and NK cells . . . . Thus, the claimed bioactive molecules are naturally occurring elements on a [dendritic cell] that function as claimed during their normal use and operation.'" Appx013 (quoting Appx385-386); Appx241.

#### 3. The Board found that a skilled artisan would have been motivated to combine Chang 2011, Chang 2020, and Ma with a reasonable expectation of success.

The Board affirmed the examiner's determination that there was a motivation to combine the prior art. Appx013-026; Appx235-236. The Board agreed with the examiner that both Chang 2011 and Chang 2020 are directed to immunotherapy for cancer, and that dendritic cells (taught in Chang 2020) are a subtype of Chang 2011's APCs, and thus dendritic cells "would have been an obvious choice among a limited genus of APCs to engineer." Appx014 (quoting Appx375); *see also* Appx023-024 n.16 ("[A] person of ordinary skill . . . would have found Chang 2011 and Chang 2020 to represent analogous and reasonably pertinent art on this record."). The Board also agreed with the examiner that Chang 2020 discloses that engineering a dendritic cell to include an origami nanostructure that targets a tumor cell with an identifying protein is an effective means for activating cells in a tumor-antigen specific manner

and thus a POSA would have been motivated to use an identifying protein to direct immunotherapy to a cancer cell target. Appx014 (citing Appx375). In sum, the Board found that the prior art renders obvious "the engineering of [dendritic cells], which naturally express CD40 and MHC molecules on their cell surface, to include non-naturally occurring components, specifically the coupling of an origami nanostructure . . . to the [dendritic cell]." Appx017; *see also* Appx235-236.

The Board also found that because Chang 2020 discloses engineered dendritic cells that are capable of coupling with other cells via origami nanostructures, a POSA would have had a reasonable expectation of success that such coupling would have occurred in the engineered dendritic cells made obvious by the combination of Chang 2011, Chang 2020, and Ma. Appx014.

The Board found unpersuasive Mr. Mazed's counterarguments. First, the Board rejected Mr. Mazed's argument that CD40 is not a "programming molecule," as required by claim 85. Appx015-016. The Board found that Mr. Mazed's argument does not address Ma's teachings and that the record supports a finding that CD40 and its ligand are involved in T cell programming. Appx015 (citing Appx378; Appx012).

Next, the Board rejected Mr. Mazed's argument that the claimed first and second bioactive molecules do not encompass molecules that are naturally expressed on dendritic cells, such as the CD40 and MHC that the examiner and Board relied on in the prior art. Appx016-018. The Board noted that Mr. Mazed did not explain why his claims should be interpreted to require only synthetic components for the first and second bioactive molecules. *Id.*

The Board also rejected Mr. Mazed's argument that Chang 2020 teaches away from the claimed invention because the identifying protein disclosed in Chang 2020 is present directly on an RNA origami. Appx018-019. The Board concluded that because the claims did not require any specific arrangement of the various components, Mr. Mazed's arguments regarding the teachings of Chang 2020 were misplaced. *Id.* Next, the Board rejected Mr. Mazed's argument that the claimed biocompatible polymer is distinct from the claimed nucleic acid origami structure, noting that the claim language did not support such a reading. Appx019-021.

Finally, the Board rejected Mr. Mazed's argument that the examiner misread Chang 2020's Figures 15 and 20, and that the figures

cannot be read to disclose a *dendritic cell* interacting with *a tumor cell*. Appx025-026. The Board disagreed that the examiner misread the figures, and observed that the examiner merely used the figures to illustrate how the teachings of the prior art could be combined. *Id.*

Mr. Mazed timely appealed the Board's decision to this Court. The Court has jurisdiction under 35 U.S.C. § 141(a) and 28 U.S.C. § 1295(a)(4)(A).

## III. SUMMARY OF THE ARGUMENT

The Board correctly construed the claim terms "engineered dendritic cell," "coupled" and "biocompatible polymer" in independent claim 85. Given the lack of an express definition in the specification, the Board interpreted "engineered dendritic cell" to encompass cells that have been modified in a laboratory for a certain task, and in the context of Mr. Mazed's invention, to mean a cell "that has been man made in order to induce an interaction with another cell." Appx007 (cleaned up). Likewise, the Board properly construed the undefined term "coupled," to not require "any specific arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction." *Id.* And, as to the term "biocompatible polymer," the Board correctly agreed with the examiner

that a POSA would have recognized that strands of DNA, RNA, or XNA are biopolymers that are encompassed by this phrase. Appx007 (quoting Appx382). Mr. Mazed's attempts to distinguish the prior art as not teaching certain claim limitations relies on improperly narrow constructions of these claim terms that are unsupported by the claim language and the specification.

Substantial evidence supports the Board's findings that claim 85 would have been obvious over the combined teachings of Chang 2011, Chang 2020, and Ma. Chang 2011 teaches engineered APCs bound to a nucleic acid scaffold and expressing MHC, a bioactive molecule for activating T cells. Chang 2020 teaches engineered *dendritic* cells, a specific type of APCs, also coupled to a nucleic acid scaffold, where the nucleic acid scaffold is bound to a tumor identifying protein. And finally, Ma teaches that dendritic cells naturally express CD40 molecules (a bioactive, programming molecule). A POSA would have been motivated to combine the prior art to produce engineered dendritic cells for targeted immunotherapy with a reasonable expectation of success given that: (1) Chang 2011 taught APCs engineered to be bound to a nucleic acid nanostructure to promote interaction with T cells; (2) dendritic cells

(taught by Chang 2020) are one of only a handful of types of APCs; (3) Chang 2020 also teaches that engineering dendritic cells to include a nucleic acid nanostructure for binding a cancer-identifying protein is an effective means for activating cells in a tumor-antigen specific manner; and (4) Chang 2020 teaches that utilizing an identifying protein on a cancer cell is an effective way to direct immunotherapy to the cancer cell. Mr. Mazed's contrary arguments are based on a misreading of the prior art and the rejection.

## IV. STANDARD OF REVIEW

Mr. Mazed bears the burden of showing that the Board committed reversible error. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004). Claim construction is a question of law with underlying questions of fact. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015). During patent examination, pending claims are given their broadest reasonable interpretation consistent with the specification. *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007). This Court reviews the Board's claim construction *de novo* and any underlying factual findings based on extrinsic evidence for substantial evidence, including where the claim construction is governed by the broadest-

reasonable-interpretation standard. *See Teva,* 574 U.S. at 325; *Intell. Ventures I LLC v. Unified Pats., LLC,* 803 F. App'x 403, 405 (Fed. Cir. 2020).

Obviousness is a legal conclusion based on underlying findings of fact. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007); *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 978 (Fed. Cir. 2014). The Court has held that motivation to combine and reasonable expectation of success are questions of fact. *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1328 (Fed. Cir. 2018).

This Court reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over the other is the type of decision that must be sustained by this court as supported by substantial

evidence." *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007) (citing *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)).

## V. ARGUMENT

The Board correctly construed the disputed claim terms and affirmed the examiner's rejection of independent claim 85 and dependent claim 87 as obvious over the prior art. On appeal, Mr. Mazed does not separately challenge the examiner's rejection of claim 87. *See* Br. at 43. With respect to claim 85, Mr. Mazed challenges the Board's decision on the grounds that: (1) the Board's construction of the claim terms "engineered dendritic cell," "coupled," and "biocompatible polymer" is incorrect; (2) the Board's findings underlying its determination of obviousness—such as those concerning the teachings of the prior art and motivation to combine—are unsupported, including because the prior art teaches away and the Board improperly relies on hindsight. Each of these challenges lacks merit for the reasons discussed below.

### A. The Board Properly Construed the Claims Terms "Engineered Dendritic Cell," "Coupled," and "Biocompatible Polymer."

During patent examination, the Board "must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification." *In re Bass*, 314 F.3d 575, 577

(Fed. Cir. 2002). Under the broadest reasonable interpretation, words of the claim must be given their plain meaning as understood by one of skill in the art, unless such meaning is inconsistent with the specification. *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1362 (Fed. Cir. 2015). This Court "depart[s] from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

The Board correctly adopted the examiner's construction of the terms "engineered dendritic cell," "coupled," and "biocompatible polymer," as recited in independent claim 85, giving them the broadest reasonable interpretation in light of the specification. Although Mr. Mazed appears to concede that the claim terms "engineered" and "biocompatible polymer" should be given their plain and ordinary meaning and are undefined in his specification, *see* Br. at 6-7, he nonetheless proposes narrow definitions for these terms that have no basis in the claim language or the specification. As to the term "coupled," Mr. Mazed attempts to distinguish Chang 2020 by proposing a specific

order for the coupling of the claimed components (Br. at 19, 28-29)—a reading unsupported by the claim language and the specification.

#### 1. Mr. Mazed advances an improperly narrow construction of "engineered dendritic cell."

The plain language of claim 85 requires only that the dendritic cell has been engineered to include a nucleic acid nanostructure and various components, which are coupled together. *See* claim 85 (Appx004). And the '403 application does not define or limit the term "engineered dendritic cell." Accordingly, the Board correctly concluded that the broadest reasonable interpretation of the term "engineered" "encompasses cells that have been modified in a laboratory for a certain task." Appx007 (citing Appx376). And, in the context of Mr. Mazed's claims and specification, which focus on enhanced cell-cell interactions using nucleic acid nanostructures, the Board correctly agreed with the examiner that the broadest reasonable interpretation of the term "engineered dendritic cell" means a cell "that . . . has been man made in order to induce an interaction with another cell." *Id.* (cleaned up). Likewise, the Board correctly agreed with the examiner that Mr. Mazed's claim limitations "directed towards a first and second bioactive molecule

are very broad and . . . encompass cell surface receptors naturally found on the [dendritic cells].” Appx017 (citing Appx383).

In an effort to distinguish his pending claims from the prior art, Mr. Mazed contends that an “engineered dendritic cell” according to his invention is limited to a “lab-made dendritic cell with *all added synthetic biocomponents*[.]” Br. at 13 (emphasis added); *see also id.* at 9, 16, 41. Thus, Mr. Mazed seeks to exclude from his invention engineered dendritic cells that naturally express bioactive molecules. But, as the Board observed, the ’403 application does not define the term “engineered,” and nothing in the claim language or specification supports the limited construction Mr. Mazed seeks.[8] Appx007; *see also* Appx237-238.

Besides pointing to the claim language, Mr. Mazed provides no support for his proposed limited construction. *See* Br. at 13. And the claim language does not limit “an engineered dendritic cell” to require all

[8] Mr. Mazed does not expressly argue that the undefined “bioactive molecules” according to his invention must be “synthetic biocomponents.” *See* Br. at 16. To the extent his brief can be read to suggest such an argument, such a construction is also not supported by the claim language or the specification. The claims describe the “first bioactive molecule” and “second bioactive molecule” functionally, and the specification does not further limit these terms.

added synthetic components. The only limitation on the first bioactive molecule, for example, is that it is "selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule[.]" *Id.* at 12. Likewise, the only limitation on the second bioactive molecule is that it can activate a T cell or natural killer cell. Nowhere does the claim suggest the use of synthetic components only. Nor does Mr. Mazed's specification define or limit the term "engineered dendritic cell," to limit it to synthetic molecules. There is no reason to depart from the Board's interpretation, which is consistent with the claim language and the specification.

#### 2. Mr. Mazed's arguments regarding the term "coupled" are unsupported by the claim language and the specification.

The '403 application does not define the claim term "coupled." The Board correctly agreed with the examiner that claim 85 requires that the components (first bioactive molecule, second bioactive molecule, identifying protein, and nucleic acid scaffold) of the dendritic cell are "coupled," but does not require "any specific arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction." Appx007 (citations omitted) (quoting Appx379); *see also* Appx238-239 (the

examiner noting that the term "coupled" is "very broad and does not limit the elements to being in direct contact with one another."). Nor does the specification mandate a particular order for coupling the components of the claim. *Id.*

Although Mr. Mazed does not expressly argue that the Board misconstrued the term "coupled," he attempts to distinguish Chang 2020 by arguing that, unlike his invention, Chang 2020 favors binding an RNA origami nanostructure onto a tumor antigen peptide, and thus cannot teach a tumor antigen peptide coupled *directly onto a* dendritic cell. Br. at 19, 28-29. But as the Board correctly found, claim 85 does not require that the identifying protein must be bound directly to the dendritic cell, or any specific order for the coupling of the claimed components. Appx007. Mr. Mazed fails to point to anything in the claim language or the specification to suggest otherwise.

### 3. Mr. Mazed improperly seeks to limit the claim term "biocompatible polymer."

The term "biocompatible polymer" is likewise not expressly defined in Mr. Mazed's specification. Accordingly, the Board correctly agreed with the examiner that a POSA would have recognized that strands of DNA, RNA, or XNA are biopolymers that are encompassed by this

phrase. Appx007 (quoting Appx382); *see also* Appx021; Appx239. The examiner pointed to Chang 2011 as teaching a nanostructure comprising a *polymer* of nucleic acid-based origami nanostructure for interaction with a T cell. Appx239. Thus, the Board properly concluded that the broadest reasonable interpretation of the term "scaffold of a biocompatible polymer" encompasses nucleic acid origami scaffolds.

Mr. Mazed seeks to distinguish his claimed invention from the prior art by contending that the claimed scaffold made from a biocompatible polymer is distinct from the claimed DNA or RNA origami, and the Board erred in equating these allegedly distinct limitations. Br. at 23. According to Mr. Mazed, a POSA would understand the claim term "biocompatible polymer" "generally as (i) polylactic-co-glycolic acid or (ii) polyLactic Acid[.]" Br. at 21. Mr. Mazed again fails to provide support for his proposed construction.

The claim language does not support Mr. Mazed's argument that the claimed scaffold of biocompatible polymer is distinct from the claimed DNA or RNA origami. The limitation reads, in relevant part, "(d) a first scaffold of a biocompatible polymer . . . wherein the first scaffold *comprises* a deoxyribonucleic acid (DNA) based origami or a ribonucleic

acid (RNA) based origami . . . ." Claim 85 (Appx004) (emphasis added). The word "comprises" is a term of art in patent law, signaling that "the named elements are essential, but other elements may be added[.]" *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Here, the most natural reading of the claim language is that the scaffold of biocompatible polymer is or contains the DNA or RNA origami, not that it is distinct from the DNA or RNA origami. Accordingly, the Board correctly adopted the examiner's reasoning that "the rejected claim has been drafted in such a manner that the biocompatible polymer (alleged element 1) and the DNA or RNA origami (alleged element 2) do not have to be distinct elements in the scaffold." Appx382; *see also* Appx020 (quoting Appx382).[9] For this reason, Mr. Mazed's argument that the Board used the same prior art for supplying two distinct claim limitations, *see* Br. at 23, 38, should also be rejected.

---

[9] Indeed, seemingly recognizing that claim 85 lacks such distinction, Mr. Mazed proposed an after-final amendment to the claim to recite, *inter alia*, that the scaffold comprises a "biocompatible polymer, *and* a nanostructure," distinguishing the two elements. Appx256-260 (emphasis added). The examiner stated that Mr. Mazed's proposed amendments to the claim would overcome the rejection of record, but would not be entered because they raised new issues. Appx261-262. Mr. Mazed elected to pursue appeal to the Board rather than a request for continued examination for entrance of the amended claim.

The specification of the ’403 application does not support a different interpretation. As Mr. Mazed concedes, the term “scaffold of a biocompatible polymer” is not defined in his specification. Br. at 6-7. Mr. Mazed nonetheless points to portions of the specification to attempt to support reading the term to exclude nucleic acid scaffolds. *See* Br. at 7-8 (citing Appx065-066, ¶¶189-194); *see also* Br. at 23. The cited portions of the specification appear in a section titled “*In Vivo Implanted, Biodegradable & Biocompatible (Artificial) Lymph Node.”* Appx065. Mr. Mazed does not explain how this section limits the claim term “biocompatible polymer,” other than simply stating that it does. But neither Mr. Mazed’s cited section nor the rest of the specification limit the claimed scaffold of a biocompatible polymer to any non-nucleic acid structure, let alone polylactic-co-glycolic acid or polylactic acid, as Mr. Mazed proposes, or even to an artificial lymph node, as described in the cited paragraphs of the specification.

Mr. Mazed’s related argument that the biocompatible polymer must be (i) polylactic-co-glycolic acid or (ii) polylactic acid, is also unavailing. Br. at 21. Neither the claims nor the specification limit biocompatible polymer in this manner. Mr. Mazed’s citation to extrinsic evidence, *see*

Br. at 21-23 (quoting Arif et. al) does not advance his argument either. First, this argument was not presented to the Board, and thus is forfeited. *See In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) ("Absent exceptional circumstances, ... we generally do not consider arguments that [appellant] failed to present to the Board."); *In re Google Tech. Holdings LLC*, 980 F.3d 858, 863-64 (Fed. Cir. 2020) (same). Second, regardless of forfeiture, as Mr. Mazed's quoted excerpt shows, polylactic-co-glycolic acid and polylactic acid may be types of biopolymers, but are not the *only* type of biocompatible polymers. *See* Br. at 22 (characterizing the listed molecules as "some well-known biopolymers"); *id.* (noting that the prior art reports "huge numbers of biopolymers"). Indeed, the article acknowledges the existence of other natural and synthetic biocompatible polymers that are used to boost a function of the body—the exact role of the nucleic acid origami taught by Chang 2011 and Chang 2020. *See* Br. at 21-22.

### B. Substantial Evidence Supports the Board's Findings that Claim 85 Would Have Been Obvious Over the Prior Art.

Under the proper construction of claim 85, the Board affirmed the examiner's rejection of claim 85 as obvious over the combination of Chang

2011, Chang 2020, and Ma. Appx013-017; Appx234-236. As discussed below, substantial evidence supports the Board's and examiner's findings that Chang 2011, Chang 2020, and Ma disclose each of the claim limitations, and that a POSA would have been motivated to combine these teachings with a reasonable expectation of success. Morever, Mr. Mazed's argument that the Board relied on improper hindsight in analyzing the prior art is meritless.

#### 1. Substantial evidence supports the Board's findings that Chang 2021, Chang 2020, and Ma disclose each of the claim limitations.

The examiner set forth with specificity where each limitation of the claims was found in the prior art, detailing how the combination of Chang 2011, Chang 2020, and Ma disclose engineering dendritic cells, which naturally express CD40 and MHC, to include an origami nanostructure that is linked to an identifying protein. Appx008-017; Appx234-236; Appx366-376. In particular, Chang 2011 teaches engineered APCs bound to a nucleic acid scaffold and expressing MHC (a bioactive molecule for activating T cells). *See, e.g.*, Appx539, ¶¶5-8; Appx542, ¶¶46-47; Appx544, ¶¶65-67; Appx561 (claims 1, 2, and 13). Chang 2020 teaches engineered *dendritic* cells, a specific type of APCs, also coupled to a

nucleic acid scaffold, where the nucleic acid scaffold is bound to a tumor identifying protein. *See, e.g.*, Appx563 (Abstract); Appx589, ¶3 and ¶10; Appx592, ¶41; Appx581 (Figure 20). And finally, Ma teaches that dendritic cells naturally express CD40 molecules (a bioactive, programming molecule). Appx664; Appx668.

Besides the claim construction-based arguments addressed above (*see* § V.A.), Mr. Mazed disputes the presence of only one limitation in the prior art. Specifically, Mr. Mazed contends that there is no teaching of a first bioactive molecule that is a programming molecule. Br. at 14-15. Mr. Mazed argues that, contrary to the Board's findings, CD40 is not a programming molecule, and therefore this limitation is not taught by the prior art. *Id.* But the Board's reading of the prior art Ma reference, and its teaching that CD40 is a programming molecule, is supported by substantial evidence. Specifically, Ma discusses the role of CD40 in dendritic cells. Appx664. Ma teaches that CD40 and CD154 (the ligand for CD40, also called CD40L) are expressed on dendritic cells. *Id.* Ma further teaches that "CD40-CD154 interactions between T cell[s] and [dendritic cells] provides reciprocal effects that regulate both T cells and [dendritic cells]." Appx668. Ma also teaches that the levels of CD40

expression on dendritic cells may influence "lymphocyte programming by" dendritic cells. Appx668. Based on these teachings, the Board found that CD40/CD40L are "involved in lymphocyte, i.e., T cell, programming by [dendritic cells]. Appx015-016.

Mr. Mazed's contrary arguments are unavailing. Mr. Mazed appears to argue that CD40 is characterized as a "molecular adjuvant" or "a member of the tumor necrosis factor (TNF) family of cell surface interaction molecules[,]" in the titles of two other publications, so it cannot be a programming molecule. Br. at 14-15. But these additional characterizations of CD40 do not detract from or rebut the teachings of Ma, which firmly characterize CD40 as a programming molecule. Mr. Mazed also points to Ma's teaching that CD40 is upregulated on activated dendritic cells, claiming that this shows there is "no consistent presence of CD40 without any occasional and natural upregulation[.]" Br. at 9. But this argument again does not refute that CD40 is a programming molecule that is naturally present on dendritic cells. Mr. Mazed seeks to have this Court reweigh the evidence, and reinterpret the teachings of the prior art. But "[w]here two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one

conclusion over the other is the type of decision that must be sustained by this court as supported by substantial evidence." *Bayer Aktiengesellschaft*, 488 F.3d at 970.

Accordingly, substantial evidence supports the Board's findings that the prior art teaches each of the limitations of claim 85.

**2. Substantial evidence supports the Board's findings that a POSA would have been motivated to combine the prior art with a reasonable expectation of success.**

Substantial evidence supports the Board's findings that a POSA would have been motivated to combine Chang 2011, Chang 2020, and Ma with a reasonable expectation of success. The Board first correctly determined that there was a motivation to combine Chang 2011 and Chang 2020, noting that both references are authored by the same inventor and directed to cancer immunotherapy, and that dendritic cells (as taught in Chang 2020) are a subtype of APCs (as taught in Chang 2011), and thus "'an obvious choice among a limited genus of APCs to engineer.'" Appx014 (quoting Appx375).

The Board also properly found that Chang 2020 discloses that engineering a dendritic cell to include an origami nanostructure that targets a tumor cell is an effective means for activating cells in a tumor-

antigen specific manner. Appx014 (citing Appx375); *see also* Appx011 (citing Appx592, ¶41); Appx235-236. Given that teaching, the Board determined that a POSA would have been motivated to use an identifying protein to direct immunotherapy to a cancer cell target, as taught in Chang 2020. Appx014. As the examiner found, it would have been obvious to modify engineered dendritic cells, which naturally express CD40 and MHC molecules on their cell surface, to include non-naturally occurring components—specifically, an origami nanostructure for binding a synthetic peptide tumor antigen—to direct immunotherapy to a cancer cell,. *See* Appx235-236.

The Board also correctly relied on the examiner's finding that Ma evidences the state of the prior art at the time, that a POSA would have known that CD40/CD40L are programming molecules on dendritic cells that couple them to activated T cells. Appx235 (citing Appx665 (Figure 1) and Appx668); *see also* Appx012-013.

Finally, the Board properly found that because Chang 2020 discloses engineered dendritic cells that are capable of coupling with other cells via origami nanostructures, a POSA would have had a reasonable expectation of success that such coupling would occur in the

engineered dendritic cells made obvious by the combination of Chang 2011, Chang 2020, and Ma. Appx014 (citing Appx375); Appx581, Figure 20. As the examiner explained, Chang 2011 contains a detailed methodology for promoting interactions between a first cell type and a second cell type, comprising a nucleic acid nanostructure. Appx240 (citing Appx561, claim 1); *see also* Appx235-236. Additionally, the examiner explained that Chang 2020 demonstrates that an origami nanostructure can promote the interaction of dendritic cells with other cells. Appx240; *see also* Appx592, ¶41. A POSA would therefore have expected that the modification of the cells of Chang 2011 to promote interactions between dendritic cells and T cells would have been successful. *Id.* Given these teachings in the prior art that the claimed dendritic cell could have been made and function as intended (*i.e.*, bind another cell), the Board's finding of a reasonable expectation of success are supported by substantial evidence.

Mr. Mazed raises three main challenges to the Board's findings of a motivation to combine, first that the prior art teaches away from the claimed invention (Br. at 17-19, 25-27, 34-35), second that the Board did not explain why a POSA would have been motivated to use dendritic

cells, and third that the examiner erred in relying on "common sense" in combining the teachings of Chang 2011 and Chang 2020 (Br. at 36-37).[10] None shows error in the Board's findings.

1. As to teaching away, "[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant … [or] if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) (citations omitted). Mr. Mazed appears to argue that Chang 2020 favors directly binding the RNA origami nanostructure onto a cancer cell, rather than through a cancer cell-identifying protein. *See* Br. at 28-29.[11] According to Mr. Mazed, a POSA reading Chang 2020 would therefore be discouraged from synthetically adding a cancer-

---

[10] Mr. Mazed does not provide any substantive arguments regarding a lack of a reasonable expectation of success, other than to state that "[a]s there is no motivation to combine in view of teaching away and missing elements, then there is no reasonable expectation of success." Br. at 35.

[11] Mr. Mazed makes similar arguments on Br. at 17-19, seemingly about Chang 2020, but appears to erroneously reproduce Figure 13 of Chang 2011, not Chang 2020, to make his point.

identifying protein to an engineered dendritic cell. *Id.* Mr. Mazed fails to meet the standard for teaching away for a number of reasons.

First, Mr. Mazed ignores the teachings of Chang 2020, which discloses an RNA-origami nanostructure, teaches that the RNA-origami structure can be bound to a protein, and teaches that "[i]n some aspects, the protein is selected from: tumor targeting peptide (TTP), a human cancer peptide, or calreticulin protein." Appx592, ¶41. Thus, substantial evidence supports the Board's finding that, far from discouraging the path chosen by Mr. Mazed, Chang 2020 expressly contemplates adding a cancer cell-identifying protein to the RNA origami nanostructure.

Second, and perhaps more critically, Mr. Mazed's argument suggests a requirement that the claimed identifying protein cannot be directly coupled to the RNA origami scaffold. *See* Br. at 11. But there is no requirement in the claims that the components of the claim must be arranged or coupled in any specific order. As the Board recognized, claim 85 requires that the various components (first bioactive molecule, second bioactive molecule, identifying protein, and origami scaffold) are coupled, but the claim does not require "any specific arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction." Appx016-

017 (citations omitted) (quoting Appx379). Mr. Mazed provides no reason to depart from the claim language.[12]

2. Mr. Mazed's contention that the Board did not explain why "[dendritic cells] would have been an obvious choice among a limited genus of APC to engineer[,]" Br. at 33, is likewise unavailing. As explained above, the Board explained that dendritic cells (as taught in Chang 2020) are a subtype of APCs (as taught in Chang 2011), and thus a POSA would have found it obvious to combine the teachings of Chang 2020 and Chang 2011—references by the same inventor and touching on the same subject matter (cancer immunotherapy). *See* Appx014. Mr. Mazed does not dispute that dendritic cells were known or that they are a part of the genus of APCs, or provide any evidence that the genus of APCs is not limited.

3. As to Mr. Mazed's argument regarding the examiner's use of "common sense" to supply a motivation to combine Chang 2011 and

[12] Mr. Mazed also contends that the Board did not explain why a POSA would be motivated to modify the teachings of Chang 2020 to engineer the claimed dendritic cells when the RNA nanostructure of Chang 2020 itself is immuno-simulatory. *See* Br. at 34. Mr. Mazed makes this argument for the first time on appeal, and the Board had no opportunity to consider it.

Chang 2020, *see* Br. at 36-37, this argument was squarely addressed by the Board. *See* Appx023-024 n.16. As the Board explained, although the examiner stated that a POSA following the teachings of Chang 2011 would have turned to Chang 2020, "analogous art by the same inventor," "out of common sense," any reference to "common sense" was harmless error. *Id.* The Board found that the rejection can be interpreted as explaining that a POSA would have found Chang 2011 and Chang 2020 to represent analogous and reasonably pertinent art. *Id.* The Board further found that Chang 2011 and Chang 2020 were reasonably pertinent to the claimed invention. *Id.*

In any event, as explained above, both the examiner and the Board provided additional findings to support a motivation to combine Chang 2011 and Chang 2020, including that both references are directed to cancer immunotherapy and disclose ligand-nucleic acid nanostructures that promote cell-cell interactions. Appx014; Appx235-236. Accordingly, this is not a situation, as in Mr. Mazed's cited cases, of the Board using "common sense" "as a wholesale substitute for reasoned analysis and evidentiary support[.]" *See* Br. at 36-37.

In sum, Mr. Mazed's contentions that the Board's findings of motivation to combine with a reasonable expectation of success are unsupported are meritless.

### 3. Mr. Mazed fails to show that the Board erred by relying on hindsight.

Finally, Mr. Mazed challenges the Board's reading of Chang 2020, arguing that the Board relied on hindsight in analyzing that reference. Br. at 38-39; *see also* Br. at 25-27. Mr. Mazed's argument here appears to be that, contrary to the examiner and the Board's interpretation, Figure 20 of Chang 2020 (Appx581, reproduced below) does not teach a dendritic cell interacting with a tumor cell through an RNA origami scaffold. Mr. Mazed thus contends that the figure cannot teach the limitation "wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold *are coupled*," and that the Board could only have reached such a conclusion through hindsight-based analysis.




Figure 20 (Chang 2020). Appx581.

As a threshold matter, as discussed above, there is no requirement that the components of claim 85 must be arranged or coupled in any specific order. *See* § V.A.2. Beyond that, Mr. Mazed's arguments misread Chang 2020 and the examiner's rejection. The examiner pointed to structure 16 and 17 as disclosing a dendritic cell (16) interacting with a tumor cell (17). Appx236. Because structure 16 and 17 are not identified by Chang 2020, Mr. Mazed objects to the examiner's reading of these elements, arguing instead that structure 17 is a natural killer cell.

As the Board explained, however, the examiner appreciated that Chang 2020's disclosure did not identify elements 16 and 17 as illustrated in Figure 20, and therefore, the examiner pointed to Chang 2020's Figure 15 as providing support that the features labelled 16 and 17 correspond

to a dendritic cell and tumor cell, respectively. Appx025-026. As the Board further explained, in citing to Figure 20 of Chang 2020, the examiner attempted to provide an illustration of how the various components of the claimed invention may be coupled according to the asserted prior art combination, when considered as a whole. *Id.* For example, Mr. Mazed's arguments do not detract from the teachings of Chang 2020 concerning interactions between tumor cells and dendritic cells for enhanced antigen presentation and stimulation of antigen specific T cells. *See, e.g.*, Appx592, ¶41. And Mr. Mazed does not dispute that Figure 20 of Chang 2020 shows that dendritic cells are capable of binding with other cells via the origami nanostructure.

In sum, there is no error in the Board's analysis of the teachings of Chang 2020.

## VI. CONCLUSION

The Board's conclusion that claim 85 of the '403 application would have been obvious over the combination of Chang 2011, Chang 2020, and Ma is correct as a matter of law and the Board's underlying factual findings are supported by substantial evidence. Accordingly, this Court should affirm the Board's decision.

September 25, 2024

Respectfully submitted,

/s/ *Shehla Wynne*

FARHEENA Y. RASHEED
Solicitor

AMY J. NELSON
Senior Counsel for Patent Policy and Litigation

SHEHLA WYNNE
MAUREEN D. QUELER
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the U.S. Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation in Fed. Cir. R. 32(b). The total number of words in the foregoing brief is 8713, as calculated by Microsoft Word.

/s/ *Shehla Wynne*
SHEHLA WYNNE
Associate Solicitor
United States Patent & Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2024, I electronically filed the foregoing BRIEF FOR APPELLEE—DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE with the Court's CM/ECF filing system, and caused it to be served on Appellant via first class mail.

/s/ *Shehla Wynne*
SHEHLA WYNNE
Associate Solicitor
United States Patent & Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450