**APPEAL DOCKET NO.: 2024-1756**

RECEIVED
OCT 08 2024
United States Court of Appeals
For the Federal Circuit

**US COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**In Re: MOHAMMAD A. MAZED,**
**APPELLANT**

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD OF THE UNITED STATES PATENT AND TRADEMARK OFFICE APPEAL DOCKET No. 2024-00723

# APPELLANT'S REPLY APPEAL BRIEF IN SUPPORT OF REVERSAL OF USPTO'S OBVIOUSNESS DETERMINATION

Respectfully Submitted:

Mohammad A. Mazed
21520 Yorba Linda Blvd. No. 393G
Yorba Linda, CA 92887

# TABLE OF CONTENTS


| | PAGE |
|---|---|
| TABLE OF AUTHORITIES | 3 |
| I. ARGUMENT | 4 |
| A: ISSUES ON STANDARD OF REVIEW | 4 |
| B: REBUTTAL ARGUMENTS | 20 |
| II. CONCLUSION | 46 |
| CERTIFICATE OF COMPLIANCE | 47 |

# TABLE OF AUTHORITIES

Eisai Co. v. Dr. Reddy's Labs, Ltd, 533 F.3d1353 (Fed. Cir. 2008)........................................................................ **32**

Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 894 F.3d 1374 (Fed. Cir. 2018) ..........................................................................**44**

Daiichi Sankyo Co. v. Matrix Labs., Ltd., 619 F.3d 1346, 1354 (Fed. Cir. 2010)..........................................................................**32**

Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966)........... **4, 44**

KSR Int'l Co. v. TeleflexInc., 550 U.S. 398, 82 USPQ2d 1385 (2007)..**34, 44**

Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994)........**22, 38**

Nautilus, Inc. v. Biosig Instruments, Inc., 527 U.S., 898 (2014)................**6**

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)..........................................................**4, 5, 18, 26, 27, 28, 41**

Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001) ..........................................................................**4, 5, 17, 36**

Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002)................................................................ **.4, 5, 17, 36**

In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988)..............**13, 45**

In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994) ..........................**42, 43**

In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009)............................**13**

In re Soni, 54 F.3d 746, 750 (Fed. Cir. 1995) ..................................**43**

In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970)...**4, 5**

# I. ARGUMENT

## A: ISSUES ON STANDARD OF REVIEW

Generally, the claim construction is undertaken during the prosecution of a patent application (and the scrutiny of a patent before a court of law) where the primary objective of the deciding authority is to determine the meters and bounds of a claim. The USPTO's Board made reversible errors in an obviousness rejection under § 103 by improperly constructing the legal content and/or the legal effect of the independent claim 85, including at least, but not limited to (i) improper claim (term) interpretation; (ii) improper claim construction; (iii) impermissible hindsight bias; and (iv) improper factual findings, without considering the intrinsic evidence and context of the patent documents (e.g., the specification text and drawings, collectively a preferred specification) {Appx041-095} and in view of In re Wilson, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970); Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005); Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001); Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002) and Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966).

In re Wilson requires the "consideration" of every claim feature in an obviousness determination.

In Phillips v. AWH Corp., the words of the claims should be given their ordinary and accustomed meanings in the **context** of the patent documents (e.g., the specification text and drawings), as interpreted by a person having ordinary skill in the art ("PHOSITA") to which the patent pertains at the time of the claimed invention.

In Rexnord Corp. v. Laitram Corp. claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

Furthermore, there is a "heavy presumption" that the undefined claim terms used in the claim elements at the time of the claimed invention "mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002).

Furthermore Appellant does not need to describe every claim element exactly, because there is no such requirement (MPEP § 2163). However, Appellant points to paragraphs {Appx083-084} in the specification text,

> "**[000331]** While "absolute precision is unattainable" in patented claims, the definiteness requirement "mandates clarity." See Nautilus, Inc. v. Biosig Instruments, Inc., 527 U.S., 134 S. Ct. 2120, 2129, 110 USPQ2d 1688, 1693 (2014). Definiteness of claim language must be analyzed NOT in a vacuum, but in light of:
>
> (a) The content of the particular application disclosure,
>
> (b) The teachings of any prior art and
>
> (c) The claim interpretation that would be given by one possessing the ordinary level of skill in the pertinent art at the time the invention was made. (Id.). See Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1 USPQ2d 1081 (Fed. Cir. 1986)
>
> **[000332]** There are number of ways the written description requirement is satisfied. Applicant(s) does not need to describe every claim element exactly, because there is no such requirement (MPEP § 2163). Rather to satisfy the written description requirement, all that is required is "reasonable clarity" (MPEP § 2163.02). An adequate description may be made in any way through express, implicit or even inherent disclosures in the application, including word, structures,

figures, diagrams and/or equations (MPEP §§ 2163(I), 2163.02). The set of claims in this invention generally covers a set of sufficient number of embodiments to conform to written description and enablement doctrine. See Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1355 (Fed. Cir. 2010), Regents of the University of California v. Eli Lilly & Co., 119 F.3d 1559 (Fed. Cir. 1997) & Amgen Inc. v. Chugai Pharmaceutical Co. 927 F.2d 1200 (Fed. Cir. 1991)."

**(i) Improper Claim [Term] Interpretation:**

The specification text paragraphs 189-194 {Appx065-066} have the context and meaning of a scaffold.

"**[000189]** An implanted biodegradable and biocompatible (artificial) lymph node can be fabricated/constructed (e.g., a deoxyribonucleic acid origami based nanostructure/ribonucleic acid origami based nanostructure/XNA origami based **nanostructure or a scaffold (e.g., three-dimensional) printed with a biocompatible and biodegradable polymer or a scaffold of silk fibroin) or a metallic glass material and then antibiotics can be added by soaking the scaffold in an antibiotic solution.** Furthermore, the metallic glass material can be fabricated/constructed to have nanoscaled porosity and/or nanoscaled surface pattern for cell adhesion and/or inflammation.

**[000190]** The implanted biodegradable and biocompatible (artificial) lymph node can be integrated with a mechanically

actuating membrane (which changes its shape in microscale level) to reduce unwanted cell growth near the implanted biodegradable and biocompatible (artificial) lymph node.

**[000191] Alternatively, the above scaffold can be coated with a lattice of microgels and/or the whole assembly can be soaked/dipped at least two (2) times in an antibiotic solution.**

**[000192]** The above scaffold can contain the Ly49 protein and/or a patient-specific Major Histocompatibility Complex protein.

**[000193]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically coupled with a patient-specific peptide of a particular type of cancer cells.

**[000194]** The above scaffold can contain one or more molecules (e.g., recruiting molecules and/or co-stimulating molecules (e.g., cytokines) and/or mobility enhancing molecules and/or programming molecules) and/or proteins on the surface of a particular type of cancer cells to recruit, attract and activate nearby immature dendritic cells at the site of the implanted biodegradable and biocompatible (artificial) lymph node."

Furthermore, "after USPTO restriction" Appellant filed claims that differentiate between a scaffold and a nanostructure {Appx148-158}. Based on the above, the USPTO's Board made reversible errors in the claim interpretation of the claim term – Scaffold.

**(ii) <u>Improper Claim Construction</u>:**

There is a distinction between claim construction (determines the legal content and/or the legal effect) and claim interpretation (relates to linguistic meaning) of a patent claim.

{Appx156-157} & {Appx360-361}

For example, the claim element (d) of Independent Claim 85

> "**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,
>
> **wherein** the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, ...............................
>
> **wherein** the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are **coupled**."

"Comprises" and "coupling" in the claimed invention should be construed according to the sequential legal structure identified by the "wherein" clause. The USPTO's Board should identify a scaffold of a

biocompatible polymer in a first prior art, then identify that the scaffold includes an origami nanostructure of DNA/RNA/XNA in a second prior art, but not just **simply equate** a scaffold of a biocompatible polymer to an origami nanostructure of DNA/RNA/XNA in a single prior art.

> {Appx017} Examiner therefore, interpreted ...... "that DCs **naturally express** both CD40 molecules and MHC molecules that simultaneously **couple the DCs to T cells and NK cells.**"

But above {Appx017} is **not** what the claim element "**wherein** the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are **coupled**" means.

**(iii) <u>Impermissible Hindsight Bias</u>**

However, the USPTO's Board adopted {Appx 372} "Dendritic cell is #16 and is interacting with a tumor cell #17 through an RNA origami scaffold #1." {Appx367-368} "Chang (2020) Fig. 20 & 15"




“The Examiner has interpreted that the dendritic cell is #16 and is interacting with a tumor cell #17 through a RNA origami scaffold #1 coupled to a peptide antigen based on Figure 15 (see below) of Chang (2020) which explicitly labels each as such”.

FIG. 15


Dendritic cell
Maturation
MHCI, MHCII
CD80, CD86,
CD40
NK cell
Cytolytic activity
Proliferation
Migration
T cell
Antigen-dependent
T cell activation
IFN-γ
Mφ
TNF-α, IL-1, IL-6,
IL-12, NO,
C-C chemokines
Hsp70
Perforin
NK cell
Granzyme B
Tumor cell
Antigen
Hsp70
CD8+ T cell
MHC I
MHC II
CD4+ T cell
Dendritic cell

Contrary to USPTO's assertion, items #16 and #17 were **never** identified/labeled in Chang (2020)'s Figures 15 and 20 {Appx367-368} and the entire Chang (2020) specification, but USPTO simply made it up. The claim elements in Appellant's claimed invention clearly define "X" and prior art describes a distinct concept of "Y" and there is a high degree of separation between claim element "X" and prior art's distinct concept of "Y", but USPTO simply made it up about items #16 and #17. In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988))." In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use the hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention."). See Ashley A. Bolt, Combating Hindsight Reconstruction in Patent Prosecution, 64 Emory L. J. 1137 (2015). https://scholarlycommons.law.emory.edu/elj/vol64/iss4/4.

**(iv) Improper Factual Findings:**

Quoting from page 26 of Appellee USPTO's brief's footnote 8,

> "8 Mr. Mazed does not expressly argue that the undefined "bioactive molecules" according to his invention must be "synthetic biocomponents." See Br. at 16. To the extent his brief can be read to suggest such an argument, such a

> construction is also not supported by the claim language **or the specification**. The claims describe the "first bioactive molecule" and "second bioactive molecule" functionally, and the specification does not further limit these terms."

Appellant disputes Appellee USPTO's brief's footnote 8, given specific paragraphs 251-254 {Appx073} in the specification text, abstract {Appx085} and the context of the patent documents (e.g., the specification text and drawings). A dendritic cell is engineered in the lab (synthetically) added with synthetic molecules, synthetic components (e.g., an RNAi based logic circuit/CRISPR-Cas9 system {Appx085}), a scaffold and an origami nanostructure delivered (injected) to the human body to alter molecular biology of a cancer cell by training other types of immune cells (especially T cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body or even orchestrate in delivering a payload (e.g., a nanoshell encapsulating a sequence of DNA/XNA that encodes a therapeutic protein) to a cancer cell.

> "**[000251]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can train another immune cell (especially the T-cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body, if any and/or protect

against future recurrence of any cancer cells, elsewhere in the human body.

**[000252]** When injected into human body, the engineered dendritic cell may then travel to nearby natural lymph nodes, where these can exchange with another immune cell (especially the T-cells and/or natural killer cells) the sensing protein to recognize and destroy existing cancer cells in the human body, if any and/or protect against future recurrence of any cancer cells, elsewhere in the human body.

**[000253] Moreover, when injected into human body, the engineered dendritic cell** may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via [r]eceptor-mediated endocytosis, **the nanoshell can release one or more deoxyribonucleic acid sequences to encode one or more therapeutic proteins against a particular type of cancer cells.**

[000254] **Moreover, when injected into human body, the engineered dendritic cell** may then travel to nearby natural lymph nodes, where these can transfer with another immune cell (especially the T-cells and/or natural killer cells) the nanoshell. Upon transfer with another immune cell via [r]eceptor-mediated endocytosis, **the nanoshell can release one or more XNA sequences to encode one or more therapeutic proteins against a particular type of cancer**

**cells.”**

| |
|---|
| **MOLECULAR SYSTEM FOR CANCER BIOLOGY**<br>**ABSTRACT**<br><br>An engineered dendritic cell including a nanostructure, RNAi based logic circuit, a CRISPR-Cas9 system/light activated CRISPR-Cas9 system (or a modulating CRISPR-Cas9 system) and a sensing protein and/or an activating protein for enhanced interaction with a T-cell and/or a natural killer cell against a particular type of cancer cells is disclosed. The engineered dendritic cell can be ex vivo or in vivo (implanted as a biodegradable/biocompatible lymph node). Furthermore, the CRISPR-Cas9 system can be replaced by Cas9-HFI or Cas12a or a transposon-encoded CRISPR-Cas system. |

> “Examiner found "that Appellant's [S]pecification provided no special definition for [the term] 'engineered' and [that] the broadest reasonable interpretation of the term encompasses cells that have been modified in a lab for a certain task" (Ans. 14)” {Appx007}

When customary, widely used and well-known terms like “Engineered”, “Bioactive”, Biodegradable and “Biocompatible” are known to a PHOSITA at the time of claimed invention, then Appellant is not required to define such terms in the patent documents (e.g., specification text and drawings). Rexnord Corp. v. Laitram

Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001); Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002).

Quoting from page 2 of Appellee USPTO's brief "The Board also found that Ma teaches that dendritic cells naturally express CD40 (a bioactive, programming molecule)."

According to the USPTO's Board, an **in situ activated** dendritic cell that naturally expresses CD40 **in situ** (an alleged bioactive programming molecule based on various biological factors) can include ("comprise") a lab-made scaffold, a lab-made origami nanostructure and lab-made synthetic components (e.g., an RNAi based logic circuit/CRISPR-Cas9 system {Appx085}) to transform/morph into an engineered dendritic cell, even retaining **once** naturally expressed molecules **in situ**, **after** the deactivation/removal. A PHOSITA would disagree with such a claim construction, as Appellant's claimed invention is/was concerned with synthetic molecules, synthetic components (e.g., an RNAi based logic circuit/CRISPR-Cas9 system{Appx085}), a scaffold and an origami nanostructure, in view paragraphs 251-254 {Appx073}, the intrinsic evidence and context of the patent documents (e.g., the specification and drawings).

Thus, the USPTO's Board misconstrued engineered dendritic cells and in view of Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005).

Moreover, naturally expressed CD40 and CD40L are not **programming molecules**, based on the two publications {Appx417} – a disputed fact.

Quoting from page 2 of Appellee USPTO's brief "The Board further found that Chang 2020 teaches engineered dendritic cells, a specific type of APCs, also coupled to a nucleic acid scaffold, where the nucleic acid scaffold is bound to a tumor identifying protein."

Chang (2020)'s construction is an origami nanostructure (made of DNA/RNA) that can couple with a cell/protein. As discussed later, Appellant disputes the USPTO's Board's assertion that "Chang 2020 teaches engineered dendritic cells (a specific type of APCs), also coupled with a nucleic acid scaffold, where the nucleic acid scaffold is bound to a tumor identifying protein", as in the claimed invention.

As discussed later, Appellant disputes that an engineered dendritic cell in the claimed invention is Prima Facie obvious, in view of the combined prior art of Chang (2011), Chang (2020) and Ma.

Thus, Appellant met the Standard of Review due to the USPTO's Board's reversible errors and this court should review this case, as a matter of law de novo.

**B: <u>REBUTTAL ARGUMENTS</u>**

**<u>INDEPENDENT CLAIM</u>**

{Appx156-157} & {Appx360-361}

**85.** An engineered dendritic cell comprising:

**(a)** a first bioactive molecule;

> wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,[;]

**(b)** a second bioactive molecule to activate (i) a T-cell, and/or (ii) a natural killer cell;

**(c)** an identifying protein on a cancer cell; and

**(d)** a first scaffold of a biocompatible polymer for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

> wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,

wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled."

**TABULAR REPRESENTATION OF INDEPENDENT CLAIM 85 V. PRIOR ART [OF CHANG 2011, CHANG 2020 AND MA]**

| CLAIM 85 | DESCRIPTION | CITIED PRIOR ART | ARGUMENT AGAINST |
|---|---|---|---|
| Preamble | An **engineered dendritic cell** comprising | Chang (2020) | Improper Interpretation |
| Claim Element 1 | (a) a **first bioactive molecule;** wherein the first bioactive molecule is selected from a group consisting of a **co-stimulating molecule, a mobility enhancing molecule, and a programming molecule,** | Naturally & Occasionally Expressed CD40/CD40L is a Programming Molecule Per Ma | Opposite to Added Synthetic Molecule & Synthetic Components<br><br>Disputed Facts Publications 1 & 2 {Appx417} |

| | | | |
|---|---|---|---|
| Claim Element 2 | (b) a **second bioactive molecule to activate** (i) a T-cell, and/or (ii) a natural killer cell; | Naturally & Occasionally Expressed MHC Molecule (Chang 2011) | Opposite to Added Synthetic Molecule & Synthetic Components |
| Claim Element 3 | (c) **an identifying protein on a cancer cell**; and | Significant Benefits Of Origami Nanostructure Directly Binding to Tumor Antigen Peptide (Chang 2020) | Origami Nanostructure Directly Binding to Tumor<br><br>Teaching Away From a Engineered Dendritic Cell |
| Claim Element 4 | (d) a first **scaffold of a biocompatible polymer** for interaction with the T-cell, and/or the natural killer cell against the cancer cell,<br><br>wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or | Scaffold of DNA/RNA Origami (Chang 2011) | Improper Claim Term Interpretation<br><br>Missing Claim Element<br><br>Prior Art Used For "2" Distinct Claim Elements<br><br><u>Lantech, Inc. v. Keip Machine Co</u> |

| | | | |
|---|---|---|---|
| | a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases, | | |
| Claim Element 5 | (e) wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are **coupled**. | Chang (2020)'s Figure 20<br><br>External Coupling | Hindsight Bias<br><br>Teaching Away From Multi-Component Internal Coupling |

## CLAIM ELEMENT BY CLAIM ELEMENT ANALYSIS

**Preamble:** An engineered dendritic cell

**Appellant's Argument**: Occasionally naturally expressed molecules in situ would require either the presence or absence of various biological factors. As shown in {Appx189} Figure 1 (below), "CD40 is **only upregulated (expressed) on activated DCs,"**) and such biological factors can vary from one person to another and even over time.




Figure 1{Appx189}

| |
|---|
| Fig. 1. Schematic showing CD40 and CD40L/CD154 expression on DCs and lymphocytes. (Left). Model of CD40-CD40L/CD154 interactions between T cells and DCs. **CD40 is upregulated on activated DCs**, and CD154 is expressed on activated T cells. Engagement of CD40 on DCs induces positive signaling that leads to expression of CDS0/86 and the production of lL-12 that skews towards Thl differentiation in CD4+ Tcells. ln addition to IL-12, CD154 signaling in Tcells induces IFN--y production. (Right) Model of CD40-CD40L/CD154 crosstalk interactions between T cells, B cells and DCs. CD40 and CD154 are both reciprocally expressed on activated DCs and lymphocytes, and may engage in multi-directional crosstalk between cell types. CD40 signaling on DCs induces secretion of IL-12 which promotes Th 1 differentiation, IL-10 which induces Icegs, or other cytokines that induce Th 17 differentiation. CD40 signaling in DCs also induces BAFF and APRIL production, which along with effector T cell-derived IL-2 and IL-4 ! 128], induce B cell class switching and secretion of lgG and lgA antibodies. |

{Appx189}

Based on paragraphs 251-254 {Appx073}, abstract {Appx085}, the intrinsic evidence and context of the patent documents (e.g., the specification text and drawings), a PHOSITA would interpret that the claimed invention is **not** about activating a naturally occurring in situ

dendritic cell with occasionally naturally expressed molecules in situ (based on various biological factors), rather an engineered (lab-made) dendritic cell (synthetically) added with synthetic molecules, synthetic components (e.g., an RNAi based logic circuit/CRISPR-Cas9 system{Appx085}), a scaffold and an origami nanostructure delivered (injected) to the human body to alter molecular biology of a cancer cell by training other types of immune cells (especially T cells and/or natural killer cells) to recognize and destroy existing cancer cells in the human body or even orchestrate in delivering a payload (e.g., a nanoshell encapsulating a sequence of DNA/XNA that encodes a therapeutic protein) to a cancer cell.

The USPTO's Board construed that the engineered dendritic cell is modified in a lab {Appx016} and then erroneously mixed up with occasionally expressed natural molecules in situ **against the intrinsic evidence and context of patent documents** (the specification text and drawings) and in view of Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005).

**Claim Element 1**

An engineered dendritic cell comprising:

"(a) a first bioactive molecule; wherein the first bioactive molecule is selected from a group consisting of a co-stimulating molecule, a mobility enhancing molecule, and a **programming molecule**,"

**Appellant's Argument**: Considering the intrinsic evidence and context of the patent documents (e.g., the specification text and drawings) and in view of the claimed invention at least including synthetic molecules, the **occasionally naturally expressed molecules in situ** such as CD40 and CD40L are moot. Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)

Furthermore, CD40 and CD40L are not programming molecules based on the two publications. {Appx417}. This is a disputed fact.

Similarly, an engineered dendritic at least including synthetic molecules, the publication of Thaiss et al. {Appx245-253} (Chemokines: A new dendritic cell signal for T cell activation. Frontiers in Immunology) is moot.

**Claim Element 2:**

An engineered dendritic cell comprising:

"(b) **a second bioactive molecule to activate** (i) a T-cell, and/or (ii) a natural killer cell;"

**Appellant's Argument**: Considering the intrinsic evidence and context of the patent documents (e.g., the specification text and drawings) and in view of the claimed invention at least including synthetic molecules, **occasionally naturally expressed molecules in situ** such as MHC molecules is moot. Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)

**Claim Element 3:**

An engineered dendritic cell comprising:

"(c) an identifying protein on a cancer cell; and"

**Prior Art**: Prior art (Chang 2020) discloses that RNA origami nanostructure directly binds onto tumor antigen peptide {Appx535} and {Appx541}.

Patent Application Publication Nov. 10, 2011 Sheet 14 of 17 US 2011/0275702 A1




FIGURE 13

> [0034] FIG. 13 illustrates representative DNA-nanostructures of aptamer-DNA nanostructures to engage cell-cell interactions. A) Spiral DNA scaffolds. B) DNA origami holding aptamers at different positions. C) and D) Representative configurations of multi-specific DNA origami to direct NK cells to tumor (Ramos) cells"

{Appx541}

**Appellant's Argument**: An identifying protein (which can be found on a cancer cell) is to be (synthetically) added with an engineered dendritic cell. Such a synthetic protein is included with the engineered dendritic cell in the claimed invention, but it is **not** directly bound to an RNA origami nanostructure, as taught by (Chang 2020).

> **[0171]** Certain embodiments of the invention provide an RNA nanostructure having immuno-stimulatory properties. As used herein, an immune-stimulatory RNA nanostructure stimulates the immune system by, for example, inducing activation or increasing activity of any components of the immune system, or by reducing inhibition of the immune system. In certain embodiments, the RNA nanostructure is an agonist of a pattern recognition receptor. As used herein, the terms "pattern recognition receptor" or "PRR" refer to proteins expressed by cells of the innate immune system, such as dendritic cells, macrophages, monocytes, neutrophils and epithelial cells, to identify two classes of molecules: pathogen-associated molecular patterns (PAMPs), which are associated with microbial pathogens, and damage-associated molecular patterns (DAMPs), which are associated with components of host's cells that are released during cell damage or death. PRRs also mediate the initiation of antigen-specific adaptive immune response and release of inflammatory cytokines. In certain embodiments, the PRR is a toll-like receptor (TLR) (e.g., TLR3 or TLR7).

**[0172] "Accordingly, certain embodiments provide an RNA nanostructure that is immuno-stimulatory. As used herein, an immuno-stimulatory RNA nanostructure stimulates the immune system thereby inducing activation or increasing activity of any components of the immune** system. In some embodiments, the immune-stimulatory RNA structures described herein stimulate immune cell activation, boost anti-tumor immunity, increase anti-tumor (pro-inflammatory) cytokines and/or reduce immunosuppressive cytokines. For example, in some embodiments immuno-stimulatory RNA structures described herein: activate immune cells, e.g., T helper cells, T cells (including CD69+ activated T cells), dendritic cells, natural killer cells, macrophages, reprogram the cytokine microenvironment by, for example, decreasing levels of immunosuppressive cytokines e.g., TGF beta (TGF~l, TGF~2, IL10, and IL4 and/or increasing production of anti-tumor (pro-inflammatory) cytokines, for example, interferon gamma and TNF-alpha; inhibit or suppress tumor growth, cause tumor regression and/or induce tumor immunity; stimulate splenic B and T cells; or activate the TLR3-signaling pathway."

{Appx601} Paragraphs 0171 and 0172

Quoting from page 8 of Appellee USPTO's brief "Appx544, ¶65. Chang 2011 further teaches that the nucleic acid nanostructure can comprise a DNA origami. See id, ¶66. It also defines the term "nucleic acid" to include DNA, RNA, and "analogues of natural nucleotides"—i.e., synthetic nucleotides or XNA. See id., ¶67. Chang explains that its described "**nano-engineering platform offers an unprecedented opportunity to create programmable multivalent biomolecular interactions for activation of immune responses to boost tumor immunity.** Appx550, ¶136."

USPTO does not explain as **the nano-engineering platform itself offers such an unprecedented opportunity** for immunostimulatory, then **why** a PHOSITA (through the lens, who does not **yet** know about the claimed invention at the time of the claimed invention) would be motivated to make an identifying synthetic protein to be included with an engineered dendritic cell or even pursue the path of an engineered dendritic cell in an unpredictable technological field. Daiichi Sankyo Co. v. Matrix Labs., Ltd., 619 F.3d 1346, 1354 (Fed. Cir. 2010); Eisai Co. v. Dr. Reddy's Labs., Ltd, 533 F.3d1353 (Fed. Cir. 2008). Unlike engineering, chemistry and biology are unpredictable technological fields.

Due to this unprecedented opportunity of immunostimulatory, there is a clear discouragement on binding an identifying protein directly with an engineered dendritic cell, as in the claimed invention. Thus, prior art teaches away unlikely, reasonably, from being combined to produce claim element 3 in an engineered dendritic cell, as the nano-engineering platform itself offers an unprecedented opportunity of immunostimulatory. The state of the art at the time of the claimed invention may have pointed researchers in a different direction including activating a T-cell with or without a nanostructure than the direction followed by Appellant in an unpredictable technological field. Contrary to the accepted wisdom, the claimed invention of an engineered (lab made) dendritic cell represents compelling evidence of unobviousness. In re Hedges, 783 F.2d 1038, 1041 (Fed. Cir. 1986); W. L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1552 (Fed. Cir. 1983).

"Examiner, therefore, found that "DC would have been an obvious choice among a limited genus of APC to engineer" (Ans. 13, See FF 11-12, 14)"." {Appx0014}. But the USPTO's Board does not explain **why** a dendritic cell (DC) would have been an obvious choice among the genus of APC? The real trouble with "if A/Y then B/Z" is when it

comes without a "because" and a "why." Without a "because" and/or "why" attached to the "if A/Y then B/Z" this is a mere conclusion. KSR Int'l Co. v. TeleflexInc., 550 U.S. 398, 82 USPQ2d 1385 (2007).

**Claim Element 4:**

An engineered dendritic cell comprising:

"(d) a first **scaffold of a biocompatible polymer** for interaction with the T-cell, and/or the natural killer cell against the cancer cell,

> wherein the first scaffold comprises a deoxyribonucleic acid (DNA) based origami, or a ribonucleic acid (RNA) based origami, or a XNA based origami, wherein XNA comprises genetic bases of adenine (A), thymine (T), guanine (G), cytosine (C), and uracil (U), wherein XNA further comprises one or more synthetic or artificial genetic bases,"

**Prior Art**: Prior art discloses an RNA nanostructure origami.

Quoting from page 30 of Appellee USPTO's brief "Here, the most natural reading of the claim language is that the scaffold of **biocompatible polymer is or contains the DNA or RNA origami, not that it is distinct from the DNA or RNA origami."**

**Appellant's Argument**: When customary, widely used and well-known terms like "Biocompatible" are known to a PHOSITA at the time of claimed invention, then Appellant is not required to define such terms in the patent documents (e.g., specification text and drawings).

Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001); Tex. Digital Sys., Inc. v. Telegenix, Inc. , 308 F.3d 1193, 1202 (Fed. Cir. 2002).

The USPTO's Board simply equated a scaffold of a biocompatible polymer **is not** distinct from DNA/RNA origami nanostructure. But the following paragraphs dispute the USPTO's Board's assertion on a scaffold in the claimed invention.

{Appx045}
Paragraph "**[00011]** "Silk fibroin is biodegradable and biocompatible"

{Appx069}
Paragraph **"[000225]** wherein the engineered dendritic cell includes:

........................................................................................

........................................................................................

"(c) a nanostructure **or** a scaffold of biocompatible polymers **or** a scaffold of silk-fibroin,"

For example, a 2019 review paper on biocompatible polymer and its abstract and objectives are included below:

**https://pubmed.ncbi.nlm.nih.gov/31604409/Biocompatible** Polymers and their Potential Biomedical Applications: A Review: Arif et. al

Current Pharmaceutical Design, Volume 25, Issue 34, 2019 DOI: 10.2174/1381612825999191011105148

"**Abstract** Background: Biocompatible polymers are gaining great interest in the field of biomedical applications. The term biocompatibility refers to the suitability of a polymer to body and body fluids exposure. Biocompatible polymers are both synthetic (man-made) and natural and aid in the close vicinity of a living system or work in intimacy with living cells. These are used to gauge, treat, boost, or substitute any tissue, organ or function of the body. A biocompatible polymer improves body functions without altering its normal functioning and triggering allergies or other side effects. It encompasses advances in tissue culture, tissue scaffolds, implantation, artificial grafts, wound fabrication, controlled drug delivery, bone filler material, etc.

**Objectives**: This review provides an insight into the remarkable contribution made by some well-known biopolymers such as **polylactic-co-glycolic acid, poly(ε-caprolactone) (PCL), polyLactic Acid, poly(3- hydroxybutyrate-co-3-hydroxyvalerate) (PHBV), Chitosan and Cellulose** in the therapeutic measure for many biomedical applications.

USPTO supplied two distinct claim limitations with a single prior art. Lantech, Inc. v. Keip Machine Co., 32 F.3d 542 (Fed. Cir. 1994)

Furthermore, quoting from page 30 of Appellee USPTO's brief's foot note "Indeed, seemingly recognizing that claim 85 lacks such distinction, Mr. Mazed proposed an after-final amendment to the claim to recite, inter alia, that the scaffold comprises "a biocompatible polymer, and a nanostructure," distinguishing the two elements Appx256-260 (emphasis added). The examiner stated that Mr. Mazed's proposed amendments to the claim would overcome the rejection of record, but would not be entered because they raised new issues. Appx261-262. Mr. Mazed elected to pursue appeal to the Board rather than a request for continued examination for entrance of the amended claim." {Appx258}.

Appellant's "after-final amendment" {Appx258} of the Scaffold retained the original meaning of **both** a biocompatible polymer and a nanostructure and it was negotiated in **compromise for clarification.** But the "after-final amendment" was not entered.

**Claim Element 5:**

An engineered dendritic cell comprising:

(e) wherein the first bioactive molecule, the second bioactive molecule, the identifying protein, and the first scaffold are coupled.

**Prior Art:** {Appx016} "In addition, Examiner found that Appellant's claim 85 "**does not require any specific** arrangement of the elements nor that the 'coupling' is a direct protein-protein interaction" (id. at 17)." Furthermore, prior art **supposedly discloses** that a #16 is interacting externally with #17 through a RNA origami scaffold #1.




Chang (2020) Figure 15 {Appx576},




Chang (2020) Figure 20 {Appx581}

> "**[0083]** FIG. **20.** Exemplary RNA nanostructure double-robot. In some embodiments, RNA-origami comprises antigen-specific peptides, which are linked via a pH-sensitive double helix to an RNA-nanocage that is responsive to interferon-gamma to release checkpoint inhibitor antagonists."

{Appx594}

**Appellant's Argument**: Figures 15 and 20 do not even identify/label items#16 and #17 and the USPTO's Board is interpreting claim element 5 beyond its meaning (e.g., a direct protein-protein interaction {Appx016}). Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)

Paragraph 193 {Appx066} teaches the context of a coupling

> **[000193]** The above scaffold can contain the Ly49 protein and/or a synthetic Major Histocompatibility Complex molecule, wherein the synthetic Major Histocompatibility Complex molecule is further chemically **coupled** with a patient-specific peptide of a particular type of cancer cells.

Chang (2020) Figures 15 and 20 favor the external coupling of an RNA origami nanostructure onto a tumor cell for immunotherapy. Thus, the prior art discourages any **multi-component internal coupling** to enhance the effectiveness (via synergy) of an engineered dendritic cell and this, teaches away from being combined, unlikely, reasonably, to produce the claim element 5 in an engineered dendritic cell.

The USPTO's Board does not explain **why** a PHOSITA would be motivated to combine the prior art of Chang (2011), Chang (2020) and Ma and then select a dendritic cell (among the genus of APC) in securing Appellant's claimed invention of an engineered dendritic cell. Since there is no motivation to combine prior art Chang (2011), Chang (2020) and Ma, due to at least (i) teaching away (ii) missing elements, and (iii) disputed facts, then there is no reasonable expectation of success. In re Fulton, 391 F.3d 1195, 1201 (Fed. Cir. 2004). In re Gurley, 27 F.3d 551 (Fed. Cir. 1994). Furthermore, the reasonable expectation of success is a separate and distinct requirement from the motivation to combine.

Considering the difference between the claimed invention and the prior art, the claimed invention of an engineered dendritic cell delivered (injected) into the human body (with synthetic molecules, synthetic components (e.g., an RNAi based logic circuit/CRISPR-Cas9 system {Appx085}), a scaffold and an origami nanostructure and the interaction/coupling of the given elements with synergy, where the whole is greater than the sum of the parts) yields unpredictable results to alter molecular biology of a cancer cell by training other types of immune cells (especially T cells and/or natural

killer cells) to recognize and destroy existing cancer cells in the human body or even orchestrate in delivering a payload (e.g., a nanoshell encapsulating a sequence of DNA/XNA that encodes a therapeutic protein) to a cancer cell.

In contrast to predictable technological fields like physics and engineering, chemistry and biology-based technologies are generally considered unpredictable, where minor changes in a product or process may yield substantially different results. In re Soni, 54 F.3d 746, 750 (Fed. Cir. 1995).

In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994) "When a piece of prior art 'suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant' the piece of prior art is said to 'teach away' from the claimed invention.", as in this case of an engineering dendritic cell in the claimed invention that includes synthetic molecules/synthetic components, a scaffold and an origami nanostructure, as opposed to occasionally naturally expressed molecules in situ in the prior art.

Furthermore, use of inherency in the context of obviousness must be carefully limited because "that which may be inherent is not necessarily known and that which is unknown cannot be obvious."

Endo Pharmaceuticals Solutions, Inc. v. Custopharm Inc., 894 F.3d 1374 (Fed. Cir. 2018).

A Prima Facie case of obviousness is established when three strict basic criteria have been met.

- First, there must be some Suggestion or Motivation, either in the prior art cited by Examiner or in the knowledge generally available to one of ordinary skill in the art, to modify prior art being relied upon to reject Appellant's claimed invention.
- Second, there must be an "Anticipated Success" or "Expectation of Success".
- Third, the alleged prior art must "Teach or Suggest all Requirements" of Appellant's claimed invention.

In summary, based on the above, the USPTO's Board failed to prove that Appellant's claimed invention is Prima Facie obvious or yields predictable results, based on the intrinsic evidence, context of the patent documents (e.g., the specification text and drawings) and in view of teaching away, missing claim element, disputed facts and hindsight bias. Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966); KSR Int'l Co. v. TeleflexInc., 550 U.S. 398, 82 USPQ2d 1385 (2007).

**Dependent Claim 87**

When independent claim 85 is not Prima Facie obvious under 35 U.S.C § 103 and then its dependent claim 87 is not Prima Facie obvious under 35 U.S.C § 103. In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988) under 35 U.S.C § 103.

## II. CONCLUSION

The USPTO's Board failed to prove Appellant's claimed invention is Predictable or Prima Facie obvious under 35 U.S.C. § 103, in view of (i) improper consideration of the intrinsic evidence, the context of the patent documents, (ii) teaching away, (iii) missing claim element and (iv) hindsight bias.

Respectfully, this Court should reject the obviousness rejection of the independent claim 85, under 35 U.S.C. § 103.

Respectfully Submitted,
Dated: October 4, 2024

**Mohammad A. Mazed**

## CERTIFICATE OF COMPLIANCE

Appellant's Opening Brief was produced using the 14-font size in the Times New Roman style.

It has 5,770 words, **excluding** embedded images.

For the Word Count, Appellant relied on the Word Count Function of the Tool Menu of the Microsoft Word ("MS Word") program.

Respectfully Submitted,

Dated: October 4, 2024

**Mohammad A. Mazed**

EXPECTED DELIVERY DAY: 10/08/24

USPS TRACKING® #

9505 5147 1505 4279 4610 17

POSTAL SERVICE®

PRESS FIRMLY TO SEAL

PRIORITY® MAIL

Retail

U.S. POSTAGE PAID
PM
YORBA LINDA, CA 92885
OCT 05, 2024

20439

$9.85

RDC 03 0 Lb 9.20 Oz S2324H500440-09

FROM:

21520 Yorba Linda Blvd
NO. 393G
Yorba Linda
CA 92887

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

Urgent

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

TO:

Clerk of Court
US Court of Appeal
For Federal Circuit
717 Madison Place
NW
Washington
DC 20439

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED